1  DARREN E. NADEL, Bar No. 154417
2  dnadel@littler.com
   LITTLER MENDELSON, P.C.
3  1900 Sixteenth Street, Suite 800
   Denver, CO 80202-5835
4  Telephone: 303.362.2861
   Facsimile:  303.362.8230
5  [*additional counsel listed on signature page*]

6  *Attorneys for Defendants*
7  *Prime Healthcare Services, Inc. and the*
   *Administrative Committee of the Prime*
8  *Healthcare Services, Inc. 401(k) Plan*

9              **UNITED STATES DISTRICT COURT**

10        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

11

12 | *In re Prime Healthcare ERISA Litig.* | Case No. 8:20-cv-1529-JLS (JDEx) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO PRECLUDE THE TESTIMONY OF, AND REPORTS GENERATED BY, MARCIA S. WAGNER**

Date:       December 15, 2023
Time:       10:30 am
Judge:      Josephine L. Staton

Trial Date:  None

Complaint Filed:  August 18, 2020

Filed Concurrently With:
1. Notice of Motion
2. Declaration of Rachel P. Kaercher
3. Proposed Order

LITTLER
MENDELSON P.C.
2049 Century Park
East
5th Floor
Los Angeles, CA
90067.3107
310.553.0308

# TABLE OF CONTENTS

**PAGE**

I.      INTRODUCTION ........................................................................................1

II.     PLAINTIFFS' CLAIMS AND BURDEN OF PROOF .........................1

III.    RELEVANT FACTUAL BACKGROUND .............................................2

    A.   The Committee .................................................................................2

    B.   Monitoring the Investment Options in the Plan ...........................3

    C.   The Plan's Recordkeeper and Committee Evaluation of Recordkeeping Fees ...................................................................................................4

    D.   Wagner's Report..............................................................................6

       1.   Prime failed to provide the Committee with guidance on its fiduciary duties by not adopting a charter until 2019, and giving "isolated and random" fiduciary training (Doc. 107-1, pp.26-30);..............................6

       2.   Defendants failed to adequately review and monitor the Plan's investment lineup, including by failing to consider strategy changes in the Active Suite or to look beyond the numerical score Captrust provided for each fund, and because they did not independently verify Captrust's expert recommendations (Id., pp.30-32, 48-61);.................................7

       3.   The Committee adopted a flawed, infrequently updated IPS that was overly reliant on Captrust, failed to separately evaluate the Plan's QDIA, was too heavily weighted toward qualitative factors of fund performance, and provided no clear guidance for when a fund should be removed (Id., pp.32-42);...........................................................................................................7

       4.   The Committee failed to adequately calculate, review and monitor the annual fees of Transamerica, the recordkeeper (Id., pp.43-48); and .............7

       5.   Prime's Board failing to monitor the Committee in the performance of its fiduciary duties (Id., pp.64-65).........................................................7

IV.    STANDARD OF REVIEW.....................................................................7

V.     ARGUMENT AND CITATION TO AUTHORITY .............................8

    A.   Wagner's opinion is unreliable because it is based solely on irrelevant "experience" that is not methodically tied to the conclusions drawn. ..........10

    B.   Wagner's opinion is unreliable because she failed to consider critical record evidence highly relevant to her opinion and it is therefore not based on sufficient facts or data. ................................................................................13

    C.   Wagner's expert "opinion" is an improper attempt to have an "expert" advance Plaintiffs' version of a factual narrative and subvert the factfinder by testifying as to a legal conclusion. .......................................................20

VI.    CONCLUSION .....................................................................................21

LITTLER
MENDELSON P.C.
2049 Century Park
East
5th Floor
Los Angeles, CA
90067.3107
310.553.0308

i

# TABLE OF AUTHORITIES

**Page**

## Cases

*Arjangrad v. JPMorgan Chase Bank*,
No. 3:10-cv-01157-PK, 2012 WL 1890372 (D. Or. May, 23, 2012) ........... 11, 12

*Chavez v. Charter Communications, LLC*,
No. 19-01341, 2022 WL 2079323 (C.D. Cal. Jan. 19, 2022) (Staton, J.) ......................................................................................................... 21

*In re Computer Sciences Corp. ERISA Litig.*,
635 F. Supp.2d 1128 (C.D. Cal. 2009) ................................................... 2

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ........................................................................ 8, 18

*Howard v. Shay*,
100 F.3d 1484 (9th Cir. 1996) ............................................................ 13

*In re Incretin-Based Therapies Prod. Liab. Litig.*,
524 F.Supp.3d 1007 (S.D. Cal. 2021) ................................................. 18

*Johns v. Bayer Corp.*,
No.09-1935, 2013 WL 1498965 (S.D. Cal. Apr. 10, 2013) .................... 20

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ............................................................................ 8

*Lust by & Through Lust v. Merrell Dow Pharms.*,
89 F.3d 594 (9th Cir. 1996) ................................................................. 8

*In re Mirena Jus Levonorgestrel-Related Prod. Nab. Litig. (No. II)*,
341 F.Supp.3d 213 (S.D.N.Y. 2018), aff'd 982 F.3d 113 (2d Cir. 2020) ..................................................................................... 14, 18

*Morrison v. Washington*,
No. 3:20-CV-06015-JHC, 2023 WL 5287647 (W.D. Wash. Aug. 17, 2023) ................................................................................................ 13

*Nationwide Transp. v. Cass Info. Sys., Inc.*,
523 F.3d 1051 (9th Cir. 2008) ............................................................ 21

LITTLER
MENDELSON P.C.
2049 Century Park
East
5th Floor
Los Angeles, CA
90067.3107
310.553.0308

ii

1

**TABLE OF AUTHORITIES**
(continued)

2

3

**Page**

4

*Orgain, Inc. v. Northern Innovations Holding Corp.*,
5   No. 18-01253, 2022 WL 2189648 (C.D. Cal. Jan. 28, 2022) (Staton,
   J.)...........................................................................................................21
6

7   *Pizarro v. Home Depot, Inc.*,
   634 F.Supp.3d 1260 (N.D. Ga. 2022).................................................2

8

*Powell v. Anheuser-Busch Inc.*,
9   No. 09-729, 2012 WL 12953439 (C.D. Cal. Sept. 24, 2012)...........12

10

*In re Rezulin Prods. Liab. Litig.*,
11   309 F.Supp.2d 531 (S.D.N.Y. 2004) ................................................20

12

*Sacerdote., v. N.Y. Univ.*,
13   S.D.N.Y. Case No. 1:16-cv-06284-KBF ..........................................21

14   *Sardis v. Overhead Door Corp.*,
   10 F.4th 268 (4th Cir. 2021) ..............................................................8

15

16   *Scentsational Techs., LLC v. Pepsi, Inc.*,
   No. 13-8645, 2018 WL 910587 (S.D.N.Y. Feb. 14, 2018)..............20

17

18   *Therasense, Inc. v. Becton, Dickinson & Co.*,
   No. 04-02123, 2008 WL 2323856 (N.D. Cal. May 22, 2008) .........19

19

*Tibble v. Edison Int'l*,
20   575 U.S. 523 (2015).............................................................................2

21

*United States v. Bilzerian*,
22   926 F.2d 1285 (2d Cir. 1991) ...........................................................20

23

*United States v. Pac. Gas & Elec. Co.*,
24   No. 14--00175, 2016 WL 1640462 (N.D. Cal. Apr. 26, 2016).........20

25   **Statutes**

26   Employee Income Retirement Security Act of 1974.......................*passim*

27

28

LITTLER MENDELSON
P.C.
2049 Century Park East
5th Floor

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

4    **Other Authorities**

5    Federal Rule of Evidence  702..........................................................7, 8, 13

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Prime Healthcare, Inc. ("Prime") and the Administrative Committee of the Prime 401(k) Plan (the "Committee" and, collectively with Prime, "Defendants"), pursuant to Federal Rule of Evidence 702, move the Court to preclude Marcia S. Wagner ("Wagner") from testifying as an expert in this matter.

## I.   INTRODUCTION

Plaintiffs have retained Wagner as an expert to support their claim that Defendants breached their fiduciary duties under the Employee Income Retirement Security Act of 1974 ("ERISA") by failing to follow a prudent process in selecting and retaining a recordkeeper for the Prime Healthcare 401(k) Plan (the "Plan") and for selecting, monitoring, and retaining the available investment options in the Plan. However, Plaintiffs should be precluded from offering Wagner's testimony because her experience-based opinion is not supported by any objective or reliable methodology, and her opinion is built upon her admitted refusal to review and/or consider evidence she admits is relevant to her prudence determination. Opinions based exclusively on experience that are not meaningfully connected to the opinion offered, and which fail to account for highly relevant record evidence are routinely excluded from evidence. Wagner's opinions and testimony should likewise be excluded here.

## II.   PLAINTIFFS' CLAIMS AND BURDEN OF PROOF

Plaintiffs allege that Defendants breached their fiduciary duty of prudence to the Plan under ERISA in three ways: (1) by retaining five "Challenged Funds" (defined below) as investment options in the Plan; (2) by offering an overall investment menu that was too expensive; and (3) by having a recordkeeping fee that was allegedly too high. (*See* Doc. 16). Plaintiffs also allege a derivative failure to monitor claim against the Company based on its alleged failure to appropriately monitor the work of the Committee. (*Id.*).

To prevail on a claim for breach of ERISA's fiduciary duty of prudence, a plaintiff must demonstrate that the defendant was (1) was acting in a fiduciary capacity; (2) acted imprudently in that capacity; and (3) this breach caused losses to the plan. *See*

LITTLER
MENDELSON P.C.
2049 Century Park
East
5th Floor
Los Angeles, CA
90067.3107
310.553.0308

1

29 U.S.C. § 1109(a). ERISA's duty of prudence is a process-based duty requiring fiduciaries to follow a prudent process selecting and monitoring retirement plan investments. *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015); *see also In re Computer Sciences Corp. ERISA Litig.*, 635 F. Supp.2d 1128, 1136-1137 (C.D. Cal. 2009); *Pizarro v. Home Depot, Inc.*, 634 F.Supp.3d 1260, 1298 (N.D. Ga. 2022).

## III.   RELEVANT FACTUAL BACKGROUND

### A.   The Committee.

Prime established the Plan as of January 1, 2006, and delegated responsibility for its administration to the Committee. (*See* Doc. 117-14, ¶¶1-2). The Committee selected Transamerica Retirement Solutions LLC ("Transamerica") to serve as the Plan's recordkeeper, and Captrust to serve as its fiduciary investment advisor. (*Id.*, ¶¶17-21, 83-85).

Although the Committee did not adopt an official "charter" until 2019, it is undisputed that there was an Investment Policy Statement ("IPS") in place to guide the Committee in its work throughout the relevant period, and this IPS was reviewed and updated two different times during the relevant period. (*Id.*, ¶¶106-107). The IPS outlined different metrics and scoring methodologies for evaluating the performance of different types of funds in the Plan. (*Id.*, ¶¶106, 108-13). The IPS had a specific, separate Appendix dedicated to evaluating the performance of the Target Date Fund ("TDF") that served as the Plan's Qualified Default Investment Alternative ("QDIA"). (*See id.*, ¶106, Ex. 83, App. D).

Committee members received periodic fiduciary training during the relevant period, including in July 2013, Q4 2016, August 2018, and December 2021. (*Id.*, ¶¶37-38). Captrust provided updates on fiduciary duties and standards at virtually every Committee meeting. (*Id.*, ¶36). In addition to copies of these fiduciary trainings and updates that were produced in discovery, Committee members who were deposed testified under oath about the trainings and what they entailed. (*See* Doc. 117-1, Ex. 1,

73:6-74:16).

**B.     Monitoring the Investment Options in the Plan.**

Plaintiffs claim that the Committee's process for monitoring investment options in the Plan was imprudent, causing them to retain five "Challenged Funds" that no reasonable person would have included in a plan's investment lineup: the actively managed Fidelity Freedom TDFs (the "Active Suite"), the Invesco Real Estate Fund ("Invesco Fund"), the Prudential Jennison Small Company Fund ("Prudential Fund"), the T. Rowe Price Mid Cap Value Fund ("T. Rowe Price Fund"), and the Oakmark Equity and Income Fund ("Oakmark Fund"). (*See* Doc. 16).

During the relevant period,[1] the Committee met at least quarterly along with representatives from Captrust, Transamerica, and outside counsel to review the administration and operation of the Plan. (Doc. 117-14, ¶¶23-28). Captrust and Transamerica provided the Committee members copies of detailed presentations for review in connection with the meetings. (*Id.*, ¶¶25-27). Committee members testified that they actually did review these presentations, often in advance of the meetings, and always with Captrust and Transamerica during the meetings. (*Id.*).

These quarterly presentations provided a detailed analysis of all Plan investments, and assigning a score to each investment as outlined in the IPS. (*Id.*, ¶¶26-29). However, at each quarterly meeting Captrust did far more than simply recite the numerical score of each fund in the Plan, and Captrust would lead a discussion about the performance of all Plan investments (including each of the Challenged Funds) under the framework of the IPS, providing even deeper fund analysis where a fund underperformed IPS metrics, and often providing additional information about fund performance and strategy as a result of their expertise ***and*** on-site meetings Captrust held with different fund managers. (*Id.*, ¶¶107, 114, 116, 119, 120-21, 124-44).

In particular, Captrust specifically alerted the Committee to a 2014 change in the

---

[1] The "relevant period" is from August 18, 2014 to present. (*See* Doc. 16, ¶66).

LITTLER MENDELSON
P.C.
2049 Century Park East
5th Floor

management strategy for the Active Suite, monitoring the fund for changes in its performance after the new managers took over and specifically meeting with those new managers to discuss ongoing changes and expected future performance. (*Id.*, ¶134-148).

The Committee maintained minutes of these quarterly meetings that documented its review of fund performance under the terms of the IPS, summarized certain discussion topics regarding the funds and other items of Plan administration, and noted action items. (*Id.*, ¶117). The minutes were meant to be a summary, but explicitly incorporate by reference the extensive, detailed Captrust reports and reports provided by Transamerica to the Committee that were discussed at the meetings. (*Id.*, ¶¶117, 122).

In addition to 32 regular quarterly meetings (and counting) during the relevant period, the Committee had other ad-hoc meetings to discuss important issues such as the COVID-19 pandemic. (*Id.*, ¶29). Committee members also held monthly meetings with Transamerica to discuss its ongoing Plan projects, a byproduct of the high volume of work Transamerica was performing to facilitate corporate mergers affecting the Plan. (*Id.*, ¶¶30-31). Individual Committee members would continue their discussion and investigation into Plan-level decisions outside of meetings via email and phone. (*Id.*, ¶¶32-34). Email evidence of these discussions were produced as part of the record in this case. (*See, e.g.*, Doc. 101-30, pp.2-3; Doc. 101-31, pp.2-3; Doc. 101-32, pp.2-3; Doc. 101-33, pp.2-4; Doc. 101-54, pp.2-5; 101-57; Doc. 101-68).

### C.   The Plan's Recordkeeper and Committee Evaluation of Recordkeeping Fees.

Prior to the relevant period, the Committee contracted with Transamerica to provide an extensive array of services including, *inter alia*, transaction processing, data management, plan design and documentation, investment education for Plan participants, development of Plan participant communication services, and assistance with acquisitions, dispositions, spinoffs, and plan mergers. (Doc. 117-14, ¶¶17-9, 83-85).

In 2012, the Plan paid an asset-based fee to Transamerica for its services, which was 23 basis points ("bps") of the total assets in the Plan. (*Id.*, ¶¶40-41). In 2012, the Committee, with Captrust's assistance, assessed this fee by reviewing a vendor fee benchmark analysis and, eventually, conducting a request for proposal ("RFP") to solicit bids from other recordkeepers. (*Id.*, ¶¶43-49). These bids were all higher than Transamerica's fee, ranging from 26 bps (Wells Fargo) to 53 bps (JP Morgan). Still, the Committee negotiated a two-point reduction in Transamerica's fee by the beginning of 2013, to 21 bps. (*Id.*, ¶¶50-51).

At the start of the relevant period, the Plan had 18,158 participants and $405,818,455 in total assets, but grew at a remarkable rate due to Prime's merger and acquisition activity. (*Id.*, ¶¶10-12, 15).[2] In early 2015, the Committee asked Captrust to conduct another recordkeeping RFP, and three vendors, Prudential, Milliman, and Fidelity, "present[ed to the Committee] their services and cost structures for consideration." (*Id.*, ¶¶53-54). The Committee decided to stay with Transamerica because Transamerica agreed to "provid[e] a day-to-day service team, []a dedicated email to work through administrative processes with Transamerica" and "also provided [] some additional onsite meeting to accommodate the growth of the hospitals that we acquired up to that point." (*Id.*, ¶55).

Approximately two years later, Transamerica announced it was eliminating certain services from its offerings, so the Committee requested another vendor fee benchmark analysis from Captrust to ensure Transamerica's fee remained reasonable. (*Id.*, ¶¶59-65). This November 2017 analysis showed that Transamerica's current fee was lower than the lowest fee charged to plans with relatively similar overall assets and average participant account balances. (*Id.*, ¶66).

About nine months later, at an August 31, 2018, meeting, the Committee decided to change the structure of Transamerica's fee from an asset-based fee to a per participant

---

[2] Specifically, from 2014 to 2019, the Plan participants more than doubled to 43,051, and total assets almost tripled to $1,127,756,300. (*Id.*, ¶12). In 2021, the Plan had 47,619 participants and $1,613,615,959 in total assets. (*Id.*, ¶15).

fee of $50. This change was prompted by an analysis from Captrust showing a per participant fee structure would become less costly than an asset-based fee for most Plan participants considering the number of plan participants their average account balances. (*Id.*, ¶¶68-75). The Committee also secured a commitment from Prime to pay Transamerica's fee for all active Plan participants going forward. (*Id.*, ¶¶76-77).

In 2021, Captrust conducted another RFP for the Committee to assess Transamerica's fee, soliciting bids from Fidelity, Empower, and Milliman. (*Id.*, ¶78). The Committee used bids that came in lower than Transamerica's to negotiate, and Transamerica ultimately agreed to lower its per participant fee to $34, which was lower than all bids received. (*Id.*, ¶¶79-80).

### D.   Wagner's Report.

Wagner opines that Prime and the Committee violated ERISA's duty of prudence in their administration of the Plan both with regard to the Committee's selection and retention of the Challenged Funds and with regard to the recordkeeping fees paid to Transamerica. She bases this opinion almost entirely on her own personal "experience" as a lawyer, and as a result her expert report is devoid of any citation to outside support apart from handful of general citations to ERISA, its regulations, and interpreting case law (none of which support the specific opinions Wagner offers here). Ultimately, Wagner's opinion boils down to an assertion that, upon review of the selected record curated for her by Plaintiffs' counsel, there is "no evidence" that the Committee took steps or followed practices that, as a lawyer, she contends are "industry standard." Applying her standardless and unsupported methodology, Wagner opines that Defendants' process was imprudent because:

1.   Prime failed to provide the Committee with guidance on its fiduciary duties by not adopting a charter until 2019, and giving "isolated and random" fiduciary training (Doc. 107-1, pp.26-30);

2.     Defendants failed to adequately review and monitor the Plan's investment lineup, including by failing to consider strategy changes in the Active Suite or to look beyond the numerical score Captrust provided for each fund, and because they did not independently verify Captrust's expert recommendations (*Id.*, pp.30-32, 48-61);

3.     The Committee adopted a flawed, infrequently updated IPS that was overly reliant on Captrust, failed to separately evaluate the Plan's QDIA, was too heavily weighted toward qualitative factors of fund performance, and provided no clear guidance for when a fund should be removed (*Id.*, pp.32-42);

4.     The Committee failed to adequately calculate, review and monitor the annual fees of Transamerica, the recordkeeper (*Id.*, pp.43-48); and

5.     Prime's Board failing to monitor the Committee in the performance of its fiduciary duties (*Id.*, pp.64-65).

Notably, Wagner's Report does not explain which, if any, of these alleged "industry standard" practices, if implemented, would have caused the Committee to make different choices. Indeed, Wagner explicitly refused to answer this question, claiming it was outside the scope of her opinion. (*See* Excerpts from Deposition of Marcia Wagner, attached as Exhibit 1, at 214:5-216:16).

## IV.   STANDARD OF REVIEW

Pursuant to Federal Rule of Evidence 702, an expert identified by a party may testify if:

> (a) expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts.

The Supreme Court has provided factors to aid the Court with this determination,

including whether the expert's theory: (1) can be tested; (2) has been subjected to peer review and publication; (3) has a high known or potential rate of error, and whether there are standards controlling its operation; and (4) enjoys general acceptance within a relevant scientific community. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993). These *Daubert* factors focus on reliability, and apply to all expert testimony, not just scientific. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). The proponent of the expert must demonstrate the expert's testimony satisfies *Daubert* by a preponderance of the evidence. *Lust by & Through Lust v. Merrell Dow Pharms.*, 89 F.3d 594, 598 (9th Cir. 1996).

Indeed, "the indispensable nature of district court's Rule 702 gatekeeping function" is a recent focus of proposed amendments to Rule 702, because "many courts have [incorrectly] held that the critical questions of the sufficiency of an expert's basis for his testimony, and the application of the expert's methodology, are generally questions of weight and not admissibility." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 284 (4th Cir. 2021). In *Sardis*, the court rejected the argument that "relevance and reliability impact[] only the weight of the [expert's] testimony, not [its] admissibility," and reiterated the importance of gatekeeping purported expert testimony. *Id.* at 281. The Fourth Circuit noted there is a "pervasive problem" of district courts not performing proper gatekeeping set forth under *Daubert*. *Id.* at 284.

Wagner's expert opinion clearly does not meet the standard set forth in *Daubert* and she should not be permitted to testify as an expert in this matter.

## V.     ARGUMENT AND CITATION TO AUTHORITY

As a preliminary matter, Wagner's testimony should be excluded because she fails to provide any authority or support for her opinions. Instead, she relies solely on her own experience as a benefits lawyer in making proclamations about "industry standards," an approach that has been rejected by courts time and again as an unreliable foundation for expert testimony where such experience is not explicitly connected to the opinions drawn.

Moreover, Wagner admits she only reviewed a subset of the record evidence (curated by Plaintiffs' counsel), and purposefully ignored record evidence of the Committee's process when rendering her opinions. Specifically, she did not exercise her expertise to request the relevant information needed to evaluate the prudence of the Committee's process, but instead simply accepted a portion of the record for review that had been curated for her by Plaintiffs' counsel. (Exhibit 1 at 22:5-13, 40:2-41:17, 220:4-22 (testifying she reviewed only documents provided by Plaintiffs' counsel, did not ask for any additional documents, and only reviewed deposition transcripts from two of the five Committee members deposed)). Given that Wagner's opinions are, in essence, an assertion that the "record does not contain evidence" of discussions that she claims would evidence a prudent process, her failure to specifically ask for evidence of such processes, or to review the entire body of record evidence showing the Committee's processes, is highly suspect, particularly because ***there is record evidence that directly refutes her opinion*** that Defendants failed to do certain things and which show that Defendants followed the very practices she touts as prudent.

These flaws, taken together, make clear that Wagner's opinions are nothing more than an improper attempt by Plaintiffs' counsel to repackage a portion of the record in an argumentative fashion that benefits Plaintiffs' case before having this "expert," who is simply another ERISA benefits lawyer, apply her own view of the relevant legal standard to these "facts." It is entirely improper to use "expert opinion" to set forth an incomplete, argumentative narrative, and then attempt to usurp the job of the Court by arguing about how the law applies to those selective facts.

The prejudice of such a masquerade would be particularly egregious here, where the factual narrative offered by Wagner (of which she has no personal knowledge) is admittedly incomplete given her failure to review Committee member emails and more than half of the Committee member depositions taken, and also inaccurately characterizes events by willfully ignoring the depth and detail of Captrust investment presentations, all of which contain the exact discussions Wagner claims she would have

wanted to see in a prudent process, and which every Committee member testified were discussed in depth during the Committee meetings. Indeed, these reports were incorporated by reference into the quarterly Committee meeting minutes, but Wagner inexplicably refuses to consider their contents in rendering her opinion.

Because Wagner's opinions—to the extent they rise above argumentative factual recitations and legal conclusions—are not based on any discernible authority or reliably connected to her professed experience, and because they are based upon an incomplete view of the record curated for her by Plaintiff's counsel, they should be excluded.

### A.   Wagner's opinion is unreliable because it is based solely on irrelevant "experience" that is not methodically tied to the conclusions drawn.

Wagner does not offer any support for her "expert" analysis, providing no discernible methodology for developing the opinions she offers as to what fiduciary prudence under ERISA requires. Instead, after a conclusory recitation of her experience as an employee benefits attorney and her purported recognition *in other contexts* as an "expert" (Doc. 107-1 §III), Wagner jumps into a laundry list of "applicable fiduciary procedures and standards." (*See id.*, §IV). Then, despite having no qualifications as an economic expert,[3] Wagner provides an "investment overview" discussing TDFs, QDIAs, and steps that plan fiduciaries "must" or are "expected to" take with respect to such investments. (*Id.*, §V). In total, these sections of her report—which purport to set out the standard of care for fiduciaries managing defined contribution plans—contain *only five* citations to external authority regarding what is required of fiduciaries. (*Id.*, ¶¶18-27 at fns. 1-4, 6). All of these are citations to ERISA itself, ERISA regulations, or case law setting out the basic existence of ERISA fiduciary duties. (*See id.*). And, importantly, none of these citations provide support for the specific statements Wagner made about what each of these duties "requires" or what fiduciaries "must do" to fulfill them.

---

[3] Indeed, Wagner specifically disclaimed any economic expertise (Exhibit 1 at 61:7-23).

While Wagner apparently believes the Court will take her unsupported word for whether the listed practices are required to meet the minimum fiduciary standards under ERISA because her opinion was developed from her undisclosed "experience" (*see, e.g., id.*, ¶¶17, 22, 25, 27, 28, 79, 92, 123, 125, 128, 136, 167, 178, 180, 184), "[e]xperts . . . who rely 'solely or primarily on experience,' must explain 'how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" *Arjangrad v. JPMorgan Chase Bank*, No. 3:10-cv-01157-PK, 2012 WL 1890372 (D. Or. May, 23, 2012). Thus, for Wagner's opinion to be admissible, she cannot only offer her bar license and practice history before summarily listing fiduciary practices she believes are "industry standard."[4] She must instead connect her qualifications and experience to the opinions she offers, demonstrating how that experience is being reliably brought to bear on the facts at hand. *See id.*, at *16-17. Wagner's report is completely devoid of any such connection.

In this regard, *Arjangrad* parallels this case and illustrates the flaws in, and inadmissibility of, Wagner's opinions. In *Arjangrad*, the plaintiff identified an expert in human resources practices to provide testimony on accepted standards and the defendant's adherence to them. *Id.* at *3. The court, however, found the expert's opinion was not admissible because he relied "solely or primarily" on experience to opine what practices were "broadly recognized" and did not demonstrate this opinion was the product of reliable principles and methods. *See id.* at *5. Instead, the expert merely "read the documents provided to him by [plaintiff's] counsel, had his junior associate perform some legal research, and arrived at his conclusions." *See id.* And, while the *Arjangrad* expert attempted to bolster his opinion by citing regulatory guidance, the court found such citations insufficient where the expert "does not explain whether HR

---

[4] It is also notable that Wagner refuses to provide any specifics on her "experience" based on purported claims of attorney-client privilege, such that the Court cannot discern whether she is applying the same rigor for her "expert" opinion as she does in her own work as an attorney. (Exhibit 1 at 63:13-17).

departments in major U.S. companies in fact follow this EEOC guidance, and if they do, what practices they use to implement it." *See id.* In sum, the court stated that if the expert:

> wishes to testify about generally accepted HR practices in major companies, he must do more than cite standards based vaguely on his "experience" and "common sense." He must demonstrate that he applied a reliable methodology to gain insight into how companies' HR personnel actually operate, otherwise he is effectively asking the court to "take his word for it."

2012 WL 1890372, at *5 (citation omitted). Because the expert failed to offer any objective support for his opinion or link his experience to the opinion developed with concrete examples assuring the reliability of his approach, the opinion was excluded; *see also Powell v. Anheuser-Busch Inc.*, No. 09-729, 2012 WL 12953439, at *6 (C.D. Cal. Sept. 24, 2012).

The same reasoning applies here. Wagner was retained as an expert to provide testimony on accepted ERISA fiduciary process standards and the Defendants' adherence to them. *Supra* at 11-12. She relies almost exclusively on her "experience" to justify the conclusions that she draws. But she did little more than read a curated set of documents provided to her by Plaintiffs' counsel, do some minimal research on the applicable legal standards (as evidenced by her citations to the ERISA statute, regulations, and basic case law) to arrive at her conclusions. She purports to bolster this analysis by citing to articles setting out DOL guidance regarding fiduciary training and the standards for assessing TDF performance (*id.*, ¶¶30-37), but does not explain whether ERISA fiduciaries for retirement plans similar to the Plan at issue in this litigation in fact follow this DOL guidance and, if they do, what practices they use to implement it. *Compare Arjangrad*, 2012 WL 1890372, at *5. In fact, she expressly admits that she did not even search for or review industry surveys or studies that would

demonstrate, for example, if any "major U.S. companies in fact follow" the practices she insists on in her report. (*See* Exhibit 1 at 43:13-44:23; *see also id.* at 75:22-78:19 (admitting she had no knowledge of what percentage of retirement plans have or do not have a charter); 119:8-120:13 (admitting she did not look for evidence of data directly relevant to the Committee analysis she purports to criticize, *and* acknowledging that such data is available)). Because Wagner critically fails to explain how her experience actually led her to the opinions she purports to offer,[5] she has not shown that she applied a reliable methodology to gain insight into how retirement plan fiduciary committees actually operate, such that her opinion effectively asks the Court to "take her word for it"[6] and must be excluded as unreliable.

### B.    Wagner's opinion is unreliable because she failed to consider critical record evidence highly relevant to her opinion and it is therefore not based on sufficient facts or data.

Wagner's testimony is also unreliable because it was developed in willful ignorance of crucial facts and record evidence and, a result, is not based on sufficient facts or data. *Compare* Fed. R. Evid. 702(b). Where an expert's opinion is not supported by a sufficient factual foundation, it is unreliable and subject to exclusion. *See Morrison v. Washington*, No. 3:20-CV-06015-JHC, 2023 WL 5287647, at *4 (W.D. Wash. Aug.

---

[5]  Again, Wagner explicitly refused to answer any questions about her purported "experience" and its operation outside of the context of this litigation due to "attorney-client privilege." (*See* Exhibit 1 at 63:6-16).

[6] The unsupported nature of her assertion is particularly obvious with regard to the claim that ERISA requires a committee to independently verify the fund data provided to them by a fiduciary investment advisor. (Doc. 107-1, ¶19). No outside support is cited for this incredible assertion, nor does Wagner attempt to connect this "standard" to any of her experiences or describe how her experience has led her to conclude that reasonable fiduciaries would go behind an advisor to independently verify their expert analysis. She has noted cited a single real-world example of any fiduciary doing this, much less the commonality of practice that would be required to establish this as a minimum fiduciary standard. And, her assertion flies in the face of authority expressly recognizing that prudent ERISA fiduciaries should employ experts to perform analysis pertinent to their fiduciary duties when they do not have such expertise themselves. *See*, *e.g.*, *Howard v. Shay*, 100 F.3d 1484, 1489 (9th Cir. 1996) (acknowledging a fiduciary can rely on an expert investment advisor where they (1) investigate the expert's qualifications, (2) provide the expert with complete and accurate information, and (3) ensure that reliance on the expert's advice is reasonably justified under the circumstances).

17, 2023) (citations omitted); *see also In re Mirena Jus Levonorgestrel-Related Prod. Nab. Litig. (No. II)*, 341 F.Supp.3d 213, 242 (S.D.N.Y. 2018), aff'd 982 F.3d 113 (2d Cir. 2020) ("Where an expert ignores evidence that is highly relevant to his conclusion, contrary to his own stated methodology, exclusion of the expert's testimony is warranted.").

Here, Wagner's opinions, at base, recite her view that there is a "lack of evidence" of certain procedures necessary for a prudent process under ERISA. However, Appendix D to her report, which lists documents reviewed to develop this opinion, reveals that she did not actually review the entire body of record evidence of Committee fiduciary work before offering this opinion (*See* Doc. 107-1 at App. D; *see also* Exhibit 1 at 40:9-16). Instead, the portion of the evidentiary record Wagner reviewed to develop her opinion was selected by Plaintiffs' counsel at their discretion, and Wagner did not request any specific documents to conduct her evaluation of Defendants' fiduciary process. (*See* Exhibit 1 at 22:5-13). Significantly, Appendix D does not include, and Wagner did not review, the deposition transcripts of three out of the five Committee members. (*Compare id.* at 13:2-4, 40:9-41:17 (stating that she reviewed two deposition transcripts, those of Committee Members Brian Brady and Michael Heather) *with* Declaration of Rachel Kaercher, ¶¶5-9 (depositions of Committee members Arti Dhuper, Jamie Gomez, Michael Heather, Brian Brady, and Michael Bogert were taken in this case).[7] Nor does it include email communications between the Committee members and the service providers exchanged outside of the Committee meetings. (*Cf.* Exhibit 1 at 220:4-22 (Wagner admitting she did not ask about the existence of or attempt to obtain any emails between Committee members and Captrust discussing share class selections, despite admitting such evidence would be relevant to her opinion and she would "love to see it")). Many such emails exist and have been produced as part of the record in this case. (*See, e.g.,* Doc. 101-53; Doc. 101-57; Doc. 101-68; Doc.

---

[7] Excerpts from the transcripts of the depositions of Committee members Arti Dhuper, Jamie Gomez, Michael Heather, Brian Brady, and Michael Bogert are attached as Exhibits 2 through 6, respectively.

101-69; Doc. 101-70). In fact, of the thousands of emails that have been produced in this case, Wagner admits to reviewing just *six* in preparing her Report. (*See* Doc. 107-1 at App. D).

In short, Wagner opines that the Defendants failed to comply with "industry standards" because she "did not see evidence" of adequate fiduciary training or engagement with the investment performance data, investment cost data, and recordkeeping fee information, all while admitting that she did not review the exact record evidence that establishes that such training and engagement happened. For example:

- Wagner opines that the Plan fiduciaries had inadequate guidance in their role because the "fiduciary training" points referenced in Captrust's quarterly Committee meeting presentations are "isolated and random." (Doc. 107-1, ¶85). However, deposition testimony from Dhuper, Gomez, and Bogert—which was not provided to Wagner by Plaintiffs' counsel—makes clear that the Committee members testified that they received "constant" fiduciary updates from Captrust at Committee meetings, in addition to more formalized training from outside counsel. (*Cf.* Excerpts from Deposition of Arti Dhuper, attached as Exhibit 2, at 17:12-33:2; Excerpts from Deposition of Jamie Gomez attached as Exhibit 3 at 73:9-21, 160:7-162:22; *see also* Excerpts from Deposition of Michael Heather, attached as Exhibit 4, at 207:16-208:13; Excerpts from Deposition of Brian Brady, attached as Exhibit 5, at 74:4-16).

- Wagner opines the Committee was imprudent because there is "no record" it critically evaluated fund performance or Captrust's recommendations because there is no such discussion in the meeting minutes. (Doc. 107-1, ¶93). However, deposition testimony from Dhuper, Gomez, and Bogert—which was not provided to Wagner by Plaintiffs' counsel—makes clear that the Committee critically considered fund performance and Captrust's related recommendations (Exhibit 2 at 212:5-213:18; Exhibit 3 at 62:21-63:18; Excerpts from Deposition of Michael Bogert, attached as Exhibit 6, at 131:15-132:14), and the record contains emails between and among

Committee members—which were not provided to Wagner by Plaintiffs' counsel—discussing both fund performance generally and their view of Captrust's related recommendations. (*See, e.g.*, Doc. 101-30, pp.2-3; Doc. 101-31, pp.2-3; Doc. 101-32, pp.2-3; Doc. 101-33, pp.2-4; Doc. 101-54, pp.2-5; 101-57; Doc. 101-68).

- Wagner opines that the Committee was imprudent because there is "no evidence" that it considered the change in investment strategy for the Active Suite in 2014 because there is no such discussion in the meeting minutes. (Doc. 107-1, ¶¶149-52). However, deposition testimony from Dhuper and Gomez—which was not provided to Wagner by Plaintiffs' counsel—makes clear that the change in investment strategy for the Active Suite was considered at length by the Committee and played an active role in its decision regarding the funds (Exhibit 2 at 124:18-126:3 (testifying Committee's discussion of Active Suite was "clearly documented, we reviewed it. It's in that presentation you just showed me yourself."); Exhibit 3 at 149:11-25); *see also* Doc. 117-14, ¶137 (citing Defendants' 30(b)(6) testimony confirming Committee's consideration of changes with Active Suite)).

- Wagner opines that the Committee's process was imprudent because there is "no evidence" that the Committee ever looked beyond Captrust's fund performance score in evaluating funds because there is no such discussion in the meeting minutes. (Doc. 107-1, ¶179). However, deposition testimony from Dhuper, Gomez, and Bogart—which was not provided to Wagner by Plaintiffs' counsel—provides just such evidence. (Exhibit 2 at 137:9-138:5 (testifying the Committee "would look at multiple different areas" in evaluating funds); Exhibit 3 at 186:15-25 (testifying the Committee would review "Commentary" from Captrust in evaluating funds); Exhibit 6 at 111:13-114:10 (testifying "many things[,]" such as a fund's score, manager, strategic changes, and market trends were used to evaluate funds).

- Wagner opines the fiduciary process was imprudent because there is "no evidence" that Committee members endeavored to calculate or understand the actual costs of recordkeeping fees being paid to Transamerica given that there is no such

discussion in the meeting minutes. (Doc. 107-1, ¶¶123-25). However, deposition testimony from Dhuper, Gomez, and Bogart—which was not provided to Wagner by Plaintiffs' counsel—provides just such evidence and points to numerous benchmarking presentations outlining total recordkeeping fees and a detailed presentation provided by Captrust to the Committee analyzing the differences in costs to Plan participants if an asset-based fee versus a per-participant fee was agreed to (Exhibit 2 at 76:4-78:12 (discussing Committee's consideration of per-participant versus asset-based recordkeeping fee); Exhibit 3 at 152:19-153:2; Exhibit 6 at 40:14-42:1), and the assertion is also directly contradicted by emails between and among Committee members—which were not provided to Wagner by Plaintiff's counsel—that clearly show critical analysis and evaluation of the recordkeeping fee. (*Cf.* Doc. 101-53 (email from Brian Brady to Captrust asking if the Plan would "qualify for the I share class of MassMutual Mid Cap Growth Fund, noting that the class "offers a little lower expense ratio"); Doc. 101-57 (email from Brady to Committee members summarizing conversation outside of quarterly meetings with Captrust and Transamerica representatives about expense ratios on funds available in the Plan, asking about the share classes, explaining the impact of revenue sharing).

Wagner's deposition testimony further confirms her minimal engagement with the record materials based on her myopic obsession with the "meeting minutes." This refusal to meaningfully engage extends to willful ignorance of the in-depth discussions of fund performance and recordkeeping fees contained in the quarterly Captrust presentations, which ***every single committee member who was deposed testified were discussed in depth at each meeting and which were incorporated by reference into the meeting minutes themselves***. (Exhibit 2 at 212:5-14; Exhibit 3 at 63:6-18; Exhibit 4 at 55:13-25; Exhibit 5 at 91:18-92:15; Exhibit 6 at 127:19-128:20). Not only does Wagner's report devote three pages to her contention that there is "no evidence" the Committee considered the Active Suite's change in investment strategy despite the deposition testimony outlined above, but this discussion entirely ignores multiple

LITTLER MENDELSON
P.C.
2049 Century Park East
5th Floor

Captrust presentations about the Active Suite change in investment strategy. (*Compare* Doc. 117-4, ¶¶134-148). There is absolutely no dispute that this information was presented to, and considered by, the Committee. But, Wagner, despite claiming to have reviewed and considered the Captrust reports in developing her opinion, and Defendants' 30(b)(6) testimony, once again disingenuously claims there is "no evidence" the Committee was aware of the Active Suite's strategy change by focusing exclusive on the summary meeting minutes. By failing to engage with the voluminous evidence beyond the meeting minutes, Wagner's opinion falls below the standard of reliability required by *Daubert*. *Cf. In re Incretin-Based Therapies Prod. Liab. Litig.*, 524 F.Supp.3d 1007, 1037 (S.D. Cal. 2021) (excluding expert testimony for, *inter alia*, "offeri[ing] no meaningful explanation" for refusing to consider relevant evidence)*; In re Mirena Jus Levonorgestrel-Related Prod. Nab. Litig. (No. II)*, 341 F.Supp.3d at 242 (S.D.N.Y. 2018) ("Where an expert ignores evidence that is highly relevant to his conclusion, contrary to his own stated methodology, exclusion of the expert's testimony is warranted.").

Similarly, Wagner's opinion also mischaracterizes the IPS scoring system[8]—a fault that is not altogether surprising given that Wagner specifically testified she was not an economic expert. (*See* Exhibit 1 at 26:1-3 (saying "Oh, God" is it a "hardy no" when asked if she is an economic expert). Accordingly, her opinion as to the propriety of the relative weight that should be given to various fund characteristics in evaluating investment performance or when an investment committee should remove a fund based on its economic indicators falls far outside her purported expertise and should not be credited by this Court. (*See, e.g.*, Doc. 107-1, ¶¶108-12).

In a similar vein, Wagner's deposition testimony was rife with admissions

---

[8] For example, Wagner inexplicably claims that the IPS does not have any standards for evaluating the Plan's QDIA (Doc. 107-1, ¶¶103-07), despite that it contains an entire separate appendix devoted to scoring target date funds, which served as the QDIA for the entirety of the relevant period. (*See* 2013 Investment Policy Statement (Doc. 107-5), pp.17-20; 2016 Investment Policy Statement (Doc. 107-6), pp.17-20; 2017 Investment Policy Monitoring (Scoring) System Methodology (Doc. 107-7), pp.12-14).

showing that her review of the subset of record evidence was cursory, underscoring the unreliable nature of her opinion. For instance, Wagner admitted that she had no idea whether Captrust ever met with investment managers of the Challenged Funds and presented their findings to the Committee. (*See* Exhibit 1 at 170:23-171:9, 174:11-175:19). However, the Captrust presentations reflect, among other things, that Captrust's research team met with portfolio managers and senior leadership for one of the Challenged Funds – the Active Suite – in September 2016. (*See* Doc. 101-35, p.33). She likewise testified that Captrust's presentations did "not really" provide "any analysis," which is a laughable contention to anyone who has actually reviewed the reports – which average more than 60 pages in length and contain detailed scoring reports, precise recommendations on whether to hold or remove funds, and detailed breakdowns of fund performance. (*Compare* Exhibit 1 at 170:23-171:9, *with* Doc. 101-35, pp.33-36, 38-39, 51-53) (providing analysis of the Fidelity Freedom Funds, as an example) *and* Doc. 101-34; Docs. 101-35, 101-36 (containing more than 70 pages of analysis and commentary on funds, including the Challenged Funds)).

In short, Wagner should not be permitted to offer an expert opinion that the Committee failed to comply with "industry standard" ERISA fiduciary practices because there is "no evidence" of certain actions being taken when it is obvious that she received a curated subset of relevant testimony and documentary evidence, which was curated at the discretion of Plaintiffs' counsel, and when Wagner brazenly admits she purposefully ignored or did not ask for any additional information or evidence relevant to her analysis (including information which she testified she would "love to see"). Indeed, courts have recognized that "[o]ne of the worst abuses in civil litigation is the attempted spoon-feeding of client-prepared and lawyer-orchestrated 'facts' to a hired expert who then 'relies' on the information to express an opinion." *Therasense, Inc. v. Becton, Dickinson & Co.*, No. 04-02123, 2008 WL 2323856, at *1 (N.D. Cal. May 22, 2008) (excluding expert testimony where the "probative value" of testimony based on "rigged and biased source of information" is far outweighed by risk of "misleading the

1  jury").

2  **C.  Wagner's expert "opinion" is an improper attempt to have an "expert" advance Plaintiffs' version of a factual narrative and subvert the factfinder by testifying as to a legal conclusion.**

3

4  Considering the flaws outlined above, it is apparent that Plaintiffs are

5  impermissibly seeking to use Wagner "to act as a vehicle to present a factual narrative

6  of interesting or useful documents for a case, in effect simply accumulative and putting

7  together" its "story." *Scentsational Techs., LLC v. Pepsi, Inc.*, No. 13-8645, 2018 WL

8  910587, at *4 (S.D.N.Y. Feb. 14, 2018) (citations omitted). "Expert testimony that

9  'simply rehash[es] otherwise admissible evidence about which [the expert] has no

10 personal knowledge . . . is inadmissible. *United States v. Pac. Gas & Elec. Co.*, No. 14-

11 -00175, 2016 WL 1640462, at *2 (N.D. Cal. Apr. 26, 2016) (quoting *Highland Capital

12 Mgmt., L.P. v. Schneider*, 379 F.Supp.2d 461, 468-69 (S.D.N.Y. 2005)); *see also Johns

13 v. Bayer Corp.*, No.09-1935, 2013 WL 1498965, at *27-29 (S.D. Cal. Apr. 10, 2013)

14 (excluding expert testimony that set forth a narrative of information that could be

15 presented to the trier of fact through the testimony of fact witnesses and the documents

16 in the record evidence of the case); *In re Rezulin Prods. Liab. Litig.*, 309 F.Supp.2d 531,

17 551 (S.D.N.Y. 2004) (rejecting portions of plaintiffs' expert's testimony that was "a

18 narrative reciting selected regulatory events" because "[s]uch material, to the extent it

19 is admissible, is properly presented through percipient witnesses and documentary

20 evidence").

21 Wagner's report--which devotes numerous pages repackaging the facts of the

22 case--not only improperly sets forth a factual narrative in the form of an opinion, but it

23 also improperly advances ultimate legal conclusions that supplant the Court's role.

24 Courts have consistently recognized that "expert" opinions advancing legal conclusions

25 are inadmissible, even if they are presented "in terms of industry practice." *See United

26 States v. Bilzerian*, 926 F.2d 1285, 1295 (2d Cir. 1991). In other words, statements as

27 to the ultimate issue in the case – in contrast to testimony demonstrating "industry

28

practice" – are inadmissible. *See Sacerdote., v. N.Y. Univ.*, S.D.N.Y. Case No. 1:16-cv-06284-KBF, at [Doc. 270] (finding that Wagner is qualified as an expert but stating that she may not opine as to the ultimate legal conclusion regarding prudence, "(e.g., she cannot make statements such as 'NYU acted prudently' or the like)"). "[A]n expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law." *Nationwide Transp. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008); *Orgain, Inc. v. Northern Innovations Holding Corp.*, No. 18-01253, 2022 WL 2189648 at *4 (C.D. Cal. Jan. 28, 2022) (Staton, J.) (granting motion to excluded expert opinion that contained "legal conclusions that are not the proper subject of expert testimony"); *Chavez v. Charter Communications, LLC*, No. 19-01341, 2022 WL 2079323, at *3-4 (C.D. Cal. Jan. 19, 2022) (Staton, J.) (excluding expert report that "read[s] like a legal brief.").

Whether the Defendants acted prudently with respect to the Plan is the ultimate issue to be decided by the trier of fact in this case. Repeatedly throughout her report and deposition, Wagner—an ERISA lawyer by trade—offers her legal opinion that Defendants acted imprudently, unreasonably, or not in compliance with ERISA. (*See, e.g.* Doc. 107-1 §VII.D.ii ("The Committee's imprudent process for determining competitive pricing"); §VII.E.i ("The Committee's imprudent retention of [Captrust]"); §VII.E.ii.e ("The Committee's imprudent retention of the FIAM Blend Target Date Funds.")). Such opinions as to the ultimate issue in the case are the exclusive purview of the factfinder and are not properly presented through expert testimony. For this additional reason, Wagner's testimony should be excluded.

## VI.   CONCLUSION

For the reasons stated herein, this Court should exclude Wagner's testimony from all proceedings in this matter.

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 11-6.1**

The undersigned counsel of record for Defendants certifies that this brief contains 6,989 words, which complies with the word limit of L.R. 11-6.1

Dated:    October 17, 2023

By: */s/ Darren E. Nadel*
DARREN E. NADEL
Bar No. 154417
BRADLEY J. CROWELL
(*admitted pro hac vice*)
LITTLER MENDELSON, P.C.
dnadel@littler.com
bcrowell@littler.com
1900 16th Street, Suite 800
Denver, CO 80202
Telephone: 303.629.6200
Facsimile: 303.629.0200

WESLEY E. STOCKARD
(*admitted pro hac vice*)
RACHEL P. KAERCHER
(*admitted pro hac vice*)
LITTLER MENDELSON, P.C.
wstockard@littler.com
rkaercher@littler.com
3424 Peachtree Road, NE, Suite 1200
Atlanta, GA 30326
Telephone: 404.443.3502
Facsimile: 404.393.5353

PAMELA S.C. REYNOLDS
(*admitted pro hac vice*)
LITTLER MENDELSON, P.C.
preynolds@littler.com
375 Woodcliff Drive, Suite 2D
Fairport, NY 14450
Telephone: 585.203.3415
Facsimile: 585.486.1706

SARA ZIMMERMAN
Bar No. 300549
LITTLER MENDELSON, P.C.
szimmerman@littler.com
18565 Jamboree Road, Suite 800
Irvine, CA 92612
Telephone: 949.705.3076
Facsimile: 949.724.1201

*Attorneys for Defendants*
*Prime Healthcare Services, Inc. and the*
*Administrative Committee of the Prime*
*Healthcare Services, Inc. 401(k) Plan*