1  James C. Shah (SBN 260435)
2  MILLER SHAH LLP
   19712 MacArthur Boulevard, Suite 222
3  Irvine, CA 92612
4  Telephone: (866) 540–5505
   Facsimile: (866) 300–7367
5  Email: jcshah@millershah.com

6
   *Counsel for Plaintiffs, the Plan,*
7  *and the Class*

8
   [Additional Counsel Listed Below]
9

10        **IN THE UNITED STATES DISTRICT COURT**
          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
11

12  *In re Prime Healthcare ERISA Litig.*    Case No.  8:20–cv–1529–JLS (JDEx)

13
                                             **PLAINTIFFS' PROPOSED FINDINGS**
14                                           **OF FACT AND CONCLUSIONS OF**
                                             **LAW**
15

16                                           Action Filed: August 14, 2020

17                                           Trial Concluded: April 16, 2024

18

19

20

21

22

23

24

25

26

27

28

# PROPOSED FINDINGS OF FACT

## I.    THE PLAN AND THE PARTIES

### A. The Prime Healthcare Services, Inc. 401(k) Plan

1.      Prime Healthcare Services, Inc. ("Prime" or the "Company") is a private Delaware corporation headquartered in Ontario, California that owns and operates hospitals in 14 states.  *See* ECF No. 196, Final Pretrial Conference Order ("Stipulated Facts") ¶ 6.

2.      Prime sponsors the Prime Healthcare Services, Inc. 401(k) Plan (the "Plan"), a defined contribution 401(k) retirement plan.  Stipulated Facts ¶ 6.

3.      The Plan is a defined contribution retirement plan, and the Employee Retirement Income Security Act ("ERISA") applies to the Plan.  Stipulated Facts ¶ 6.

4.      The Plan is a multiple employer defined contribution plan that was established on January 1, 2006.  *See* Tr., at 1012:14–21; Ex. 165,[1] at 8; Ex. 166, at 3; Ex. 167, at 7.[2]  A multiple employer plan is a single defined contribution plan that permits participating employers to join the plan.  *See* Tr., at 962:4–6.

5.      Participants in the Plan make tax-deferred contributions to their individual accounts and then can choose to invest in mutual funds or other investment vehicles offered by the Plan.  Stipulated Facts ¶ 6.

6.      Transamerica Retirement Solutions, Inc. ("Transamerica") was the Plan's recordkeeper during the entire period running from August 18, 2014, through the present.  Stipulated Facts ¶¶ 6, 35.

7.      Captrust Financial Partners ("Captrust") was the Plan's investment advisor during the entire period running from August 18, 2014, through the present. Stipulated Facts ¶¶ 6, 37–38.

---

[1]References to "Ex. __" are to the admitted trial exhibits.

[2]*See generally, Plan Amendments,* Ex. 11; Ex. 168; Ex. 169; Ex. 170; Ex. 171; Ex. 172; Ex. 173; Ex. 174; Ex. 175; Ex. 176; Ex. 177; Ex. 178; Ex. 179.

1

**B. Plaintiffs and the Certified Class**

2     8.     All Plaintiffs are, or were during the limitations period, participants in

3     the Plan under 29 U.S.C. § 1002(7).  Stipulated Facts ¶ 6.

4     9.     Plaintiffs did not obtain actual knowledge of Defendants' breaches of

5     fiduciary duty until shortly before filing this action.  *See* ECF No. 202-1,[3] at 16:22–

6     17:25 (Plaintiff Horton testifying that, when he enrolled in the Plan, his assets were

7     directed into the default allocations), 21:8–12, 21:23–22:3, 22:18–24, 39:25–40:12

8     (Plaintiff Horton testifying that he has not received any education or instruction on

9     401(k) investments and did not previously know about the recordkeeping fees charged

10    to the Plan), 24:18–25 (Plaintiff Horton testifying that he did not conduct any

11    independent research about the Plan's investments), 25:1–4, 25:9–13 (Plaintiff Horton

12    testifying that he did not learn about the fees at issue in this action until its filing),

13    27:21–25, 36:8–13 (Plaintiff Horton testifying that he did not know how to evaluate

14    the performance of Plan investments); ECF No. 202-2, at 37:21–23 (Plaintiff Ornelas

15    testifying that she did not personally make investment elections), 81:16–22 (Plaintiff

16    Ornelas testifying that she does not have training or education in retirement investing

17    subjects and did not previously know any steps Defendants took to monitor the Plan);

18    ECF No. 202-3, at 26:22–23, 28:1–10 (Plaintiff Cervantes testifying that her Plan

19    account was her first 401(k) account and she thought investment elections were

20    automatically set up by Prime), 34:18–21 (Plaintiff Cervantes testifying that she did

21    not have a substantial understanding of the Plan account statements she received),

22    38:4–7 (Plaintiff Cervantes testifying that she did previously not review Plan account

23    statements or market information to determine how her Plan account was performing),

24    45:2–13 (Plaintiff Cervantes testifying that she did not previously know about the

25    recordkeeping fees associated with her Plan account).

26

27    [3]Citations to ECF Nos. 202-1, 202-2, and 202-3 refer to designations of Plaintiffs' deposition testimony submitted by the parties in lieu of examination at trial pursuant to Local Rule 16-2.7 and the parties' agreement.

28

10. The relevant statute of repose period that applies to Plaintiffs' claims in this litigation commences on August 18, 2014, which is six years prior to the filing of Plaintiffs' initial complaint (the "Relevant Period"). Stipulated Facts ¶ 6.

11. On December 28, 2023, the Court certified the following Class:

> **Challenged–Funds and Expense–Monitoring Class:** All participants and beneficiaries in the Prime Healthcare Services, Inc. 401(k) Plan on or after August 18, 2014 to the present, including any beneficiary of a deceased person who was a participant in the Plan at any time during that period.

> **Recordkeeping–Fees Class:** All participants and beneficiaries in the Prime Healthcare Services, Inc. 401(k) Plan at any time on or after August 18, 2014 to July 31, 2019, including any beneficiary of a deceased person who was a participant in the Plan at any time during that period.

ECF No. 190, Order Granting Plaintiff[s'] Motion for Class Certification, at 15–16.

### C. Prime's Delegated Fiduciaries

12. The Prime Healthcare Services, Inc. Benefits Committee ("Committee") is the named fiduciary responsible for operating and administering the Plan. Stipulated Facts ¶ 6.

13. Jamie Gomez, the Human Resources Benefits Manager for Prime Healthcare Management, Inc., has served on the Committee from 2005 through the present. Stipulated Facts Appendix ¶ 5–6. Ms. Gomez does not have any training or certifications in investments or financial planning. *See* Tr., at 560:1–7.

14. Arti Dhuper, the Vice President of Human Resources of Prime Healthcare Management, Inc., has served on the Committee from 2012 through the present. Stipulated Facts Appendix ¶ 7–8.

15. Mike Heather was the Corporate Chief Financial Officer of Prime Healthcare Management, Inc. until 2020. Stipulated Facts Appendix ¶ 10. Mr. Heather served on the Committee from 2013 until 2020. Stipulated Facts Appendix ¶ 9. Mr. Heather does not have any training in investments or financial planning. *See*

Tr., at 393:11–15.  Prior to joining the Committee, he had never served as a fiduciary of a retirement plan.  *See* Tr., at 440:17–20, 446:14–16.  Although Mr. Heather was previously a partner at Deloitte, his work with ERISA–governed retirement plans was limited to auditing the financial statements rather than plan administration or fiduciary responsibilities.  *See* Tr., at 440:8–10, 442:5–7.

16.    Steve Aleman became Corporate Chief Financial Officer of Prime Healthcare Management, Inc. following Mr. Heather's departure.  Stipulated Facts Appendix ¶ 11.  Mr. Aleman has served on the Committee from 2020 through the present.  Stipulated Facts Appendix ¶ 12.  Mr. Aleman did not testify at trial and there was no testimony offered regarding the role, if any, that he played on the Committee or the knowledge or experience, if any, that he provided as a Committee member.  Indeed, based upon the testimony of Sarah Langkamp, one would have thought that only Mr. Brady, Ms. Dhuper, Ms. Gomez and Mr. Heather ever served on the Committee.  *See* Tr., at 937:14–20.

17.    Michael Bogert, the Hospital System Chief Financial Officer and President of Corporate Finance of Prime Healthcare Management, Inc., served on the Committee from 2008 until 2020.  Stipulated Facts Appendix ¶ 13–14.  Mr. Bogert joined the Committee after he was brought to a meeting by Prime's then–Chief Financial Officer.  *See* Tr., at 505:12–14.  Mr. Bogert did not have any formal investment training when he joined the Committee.  *See* Tr., at 505:15–18.  Nor had Mr. Bogert previously served as a fiduciary to a fiduciary to a retirement plan.  *See* Tr., at 505:23–506:1.

18.    Mike Sarian, the President of Hospital Operations of Prime Healthcare Management, Inc., served on the Committee from 2012 until 2020.  Stipulated Facts Appendix ¶ 15–16.  Mr. Sarian did not testify at trial and there was no testimony offered regarding the role, if any, that he played on the Committee or the knowledge or experience, if any, that he provided as a Committee member.  Indeed, based upon the testimony of Sarah Langkamp, one would have thought that only Mr. Brady, Ms.

Dhuper, Ms. Gomez and Mr. Heather ever served on the Committee. *See* Tr., at 937:14–20.

19.     Owen Shen, the Corporate Controller and Director of Finance of Prime Healthcare Management, Inc., served on the Committee from 2015 until 2020. Stipulated Facts Appendix ¶¶ 17–18. Mr. Shen did not testify at trial and there was no testimony offered regarding the role, if any, that he played on the Committee or the knowledge or experience, if any, that he provided as a Committee member. Indeed, based upon the testimony of Sarah Langkamp, one would have thought that only Mr. Brady, Ms. Dhuper, Ms. Gomez and Mr. Heather ever served on the Committee. *See* Tr., at 937:14–20.

20.     Brian Brady, Director of Investments of Prime Healthcare Management, Inc., served on the Committee from 2016 until 2023. Stipulated Facts Appendix ¶ 19–20. Mr. Brady's professional responsibilities at Prime included managing pension investments, a captive insurance trust, foundations, limited liability companies, and unrelated investments. *See* Tr., at 118:1–5. Although Mr. Brady previously worked for Northern Trust, Mr. Brady never directly had responsibility for any retirement plans governed by ERISA. *See* Tr., at 121:21–122:1.

21.     Ms. Dhuper and Ms. Gomez were more involved in the "administrative" aspects of the Plan (*e.g.*, recordkeeping) and Mr. Brady and Mr. Heather were more involved on the "investment side[.]" *See* Tr., at 937:12–18.

## II.     THE COMMITTEE'S SKELETAL FIDUCIARY PROCESS

### A. The Parties Responsible for Managing and Administering the Plan

22.     Since at least July 2011, Prime has contracted with Captrust as the Plan's investment advisor.[4] Ex. 725, at 1; Ex. 213; Ex. 214; Ex. 215; Ex. 216; Ex.

---

[4]Captrust was contracted to provide the following services: (1) investment advisory consulting, including plan level advice, investment menu development, and ongoing investment due diligence; (2) vendor analysis, including benchmark and scoring, plan administration and investment cost comparison, overall recommendation and ongoing

217; Ex. 218; Ex. 219; Ex. 220. In such capacity, Captrust has served as a "fiduciary as defined by ERISA §3(21)(A)(ii) with regard to the selection of investment manager(s) or mutual fund(s) available to the Plan." *Id.*; Tr., at 202:1–6. Captrust did not, at any time during the Class Period, serve as an ERISA § 3(38) investment manager with discretionary responsibility for the management of Plan investments. *See* Tr., at 884:7–10.

23.    In its agreement with Captrust (the "Captrust Agreement"), Prime represented that it was "the responsible plan fiduciary for the selection and monitoring of service providers and investment managers for the Plan in accordance with the requirements of ERISA and the governing Plan documents." *See* Tr., at 398:11–399:3; Ex. 14, at 9; Stipulated Facts Appendix ¶ 40 (Prime acknowledging in the Captrust Agreement "that it has retained and will exercise, final decision-making authority and responsibility for the implementation of any recommendation made" by Captrust").

24.    In the Captrust Agreement, Prime specifically confirmed its ultimate responsibility for the Plan's investments and service providers. *See* Tr., at 399:12–16. Captrust indicated that the investment performance data it provided to the Committee was not independently verified. *See* Tr., at 399:4–8.

25.    Transamerica has served as the recordkeeper to the Plan since October 1, 2011.[5] Ex. 195, at 1; Ex. 196; Ex. 197; Ex. 198; Ex. 199; Ex. 200; Ex. 201; Ex. 202; Ex. 203; Ex. 204; Ex. 205; Ex. 206; Ex. 207; Ex. 208; Ex. 209; Ex. 210; Ex. 211; Ex. 212. Prior to January 9, 2015, Transamerica was known as Diversified Retirement

---

due diligence of vendors; and (3) documentation/process management, including real-time access to industry research and access to an electronic repository of key plan documents. Stipulated Facts Appendix ¶ 39.

[5]Transamerica was contracted to provide the following services: (1) basic recordkeeping and general administrative services; (2) basic plan compliance testing; (3) plan document services; (4) loan administration; and (5) nonstandard plan compliance testing. Stipulated Facts Appendix ¶ 41.

Corporation ("Diversified").   Ex. 202, at 1.   Transamerica does not exercise any discretion or management over Plan assets.  *See* Tr., at 945:3–9.

### B. The Committee's Meetings and Minutes

26.     As Plaintiffs' fiduciary governance and process expert, Ms. Wagner, explained, the Committee operated without sufficient direction regarding its governance process.  *See* Tr., at 34:2–3.  Until 2019, the Committee operated without a written charter.  Stipulated Facts Appendix ¶ 22.  The Committee adopted a written charter for the first time in 2019.  Stipulated Facts Appendix ¶ 21; Ex. 2, at 1; Ex. 373, at 1.

27.     During the Class Period, the Committee averaged between four and six members.  *See* Tr., at 200:19–21.  The Committee met quarterly for "an hour to an hour and a half."  Tr., at 374:3–4; *see also* Stipulated Facts Appendix ¶¶ 44–107 (providing Committee meeting dates and attendees).  During Committee meetings, the Committee considered both the Plan and another pension plan offered by Prime. *See* Tr., at 162:12–14.

28.     In addition to Committee members, representatives from Captrust and Transamerica would also attend Committee meetings.  *See* Tr., at 201:21–25.  Diane Thompson, the Committee's attorney, also typically attended Committee meetings beginning in March 2018.  *Id.*; Stipulated Facts Appendix ¶ 110.  The meetings began with a general market overview before addressing substantive topics about the Plan. *See* Tr., at 374:14–15.

29.     In advance of meetings, Captrust provided quarterly investment review presentations to the Committee by email and Transamerica provided a presentation. *See* Tr., at 284:17–285:11, 789:9–11; *see also* Stipulated Facts Appendix ¶¶ 111–12. The email attaching the Captrust quarterly investment review contained some information reflected in the quarterly investment review.  *See* Tr., at 798:22–12.

30.     Captrust's presentation began with a retirement industry and market commentary review that would take 10 to 25 minutes.  *See* Tr., at 161:20–23; *see also,*

*e.g.,* Ex. 226, at 1; Ex. 228, at 1; Ex. 232, at 1; Ex. 237, at 1. Captrust would present on the Plan's investments in a segment of the meeting that, according to Mr. Heather, would last 20 to 30 minutes. *See* Tr., at 423:24–424:17.

31.     Transamerica's presentation included a high-level overview of "activity that was happening at Transamerica" as well as updates on plan demographics, education, and related information. *See* Tr., at 973:12–18.

32.     The Committee inadequately documented any of its deliberations regarding the selection, monitoring, and retention of the Plan's investment options and service providers. *See* Tr., at 35:13–16.

33.     Mr. Brady testified that meeting minutes would often include "all of the action items and important decisions" of the Committee. *See* Tr., at 123:18–20. Mr. Brady further testified that "the purpose of keeping minutes of Committee meetings was to document ***what was discussed, the decisions that were made by the Committee, and follow up items that needed to be addressed by the Committee at its next meeting***[.]" *See* Tr., at 124:17–22 (emphasis added); *see also* 533:2–8 (Ms. Dhuper testifying similarly). Ms. Dhuper testified that anything of significance discussed at meetings was generally included in the meeting minutes. *See* Tr., at 533:12–14, 534:3–5. When Defendants' fiduciary process expert, Mr. Gissiner, was examined by Defendants' counsel about the basis for his opinion that the Committee's considerations and discussions were documented, his initial answer was that any such deliberations would be reflected in the minutes. *See* Tr., at 1018:25–1019:4; *see also* Tr., at 1107:11–25 (Mr. Gissiner testifying that a source on which he relied states that meeting minutes should "document the reasons for any decisions the committee makes" and separately testifying meeting minutes should generally document "major items for discussion").

34.     Despite Mr. Brady's testimony that he always reviewed meeting minutes before they were approved at the subsequent meeting, the only time Mr. Brady could recall a correction to the meeting minutes was when someone realized

that Mr. Bogert's name had been misspelled in meeting minutes for several years. *See* Tr., at 126:3–16; Ex. 221, at 1; Ex. 223, at 1; *see also* 534:9–11 (Ms. Dhuper testifying that she could not recall the meeting minutes ever being inaccurate). Indeed, despite Mr. Bogert's own testimony that he reviewed the minutes of prior meetings and would have made corrections to the minutes if they contained anything inaccurate, *see* Tr., at 506:16–18, he apparently did not review the minutes closely enough to notice his misspelled name repeatedly appearing at the top of the first page. *See id.*

35.     The Committee did not maintain a formal watch list for purposes of monitoring Plan investments. *See* Tr., at 366:3–5, 421:8–9. Thus, there was no means by which the Committee tracked when an investment fell below IPS criteria in a previous quarter. *See id.*; *see also* Tr., at 367:18–22, 422:9–14. The Captrust quarterly investment reviews only reported on the scoring for the current quarter. *See* Tr., at 421:22–24.

36.     Based on the Plan's governance documents, the Committee's deliberative materials, and the testimony of Committee members, Ms. Wagner concluded that neither Prime nor its Board (the "Board") provided guidance to the Committee as to how to effectuate their roles and responsibilities with respect to Plan management. *See* Tr., at 33:18–21.

### C. The Façade of Fiduciary Training

37.     No onboarding training was provided to Committee members when they joined the Committee. *See* Tr., at 45:3–4, 202:13, 393:23–394:1, 560:18–561:1. Such onboarding training is ordinarily provided to inexperienced fiduciary committee members who have not previously served as fiduciaries and ensures new fiduciaries understand their responsibilities and the procedures necessary to adequately carry out their responsibilities. *See* Tr., at 45:3–11.

38.     None of the Committee members had fiduciary experience or training prior to joining the Committee.[6]  *See* Tr., at 121:21–122:24.  There was no onboarding process for new Committee members; rather, most Committee members were simply pulled into their first meeting and appointed to the Committee on the spot with little forewarning.  *See* Tr., at 122:14–24, 429:21–24 (Mr. Bogert testifying), 526:17–19 (Ms. Dhuper testifying); 559:22–25 (Ms. Gomez testifying).  Mr. Heather testified about his selection to the Committee, "it was a hallway thing, come to this meeting" and suddenly he was on the Committee.  *See* Tr., at 441:9–12.

39.     Ms. Wagner explained that, although fiduciary committees should be comprised of individuals with different perspectives and capacities, those qualities are not substitutes for adequate fiduciary training.  *See* Tr., at 102:5–22.

40.     Mr. Davis, the lead Captrust representative on the Plan engagement, testified that, absent a significant change in fiduciary practice or regulation, Captrust would provide the Committee with a fiduciary update every two or three years.  *See* Tr., at 797:15–18; Ex. 575, at 1.  Although Captrust provided periodic "updates" on fiduciary topics, these updates were not formal fiduciary training.  *See* Tr., at 34:19–20.  These "updates" typically indicated what new litigation had been filed and were not designed to address the particular needs of the Committee.  *See* Tr., at 45:12–17.  The information provided by Captrust never addressed how a fiduciary committee should monitor a non–discretionary investment advisor.  *See* Tr., at 45:18–46:1.  During her deposition, Ms. Dhuper did not even know that Captrust is fiduciary to the Plan, much less its role.  *See* Tr., at 536:5–8.

---

[6]Although Mr. Brady testified about receiving certain fiduciary training in connection with his prior work at Northern Trust, this experience was limited to the safekeeping of trust assets and did not include any training about fiduciary duties with respect to plans governed by ERISA.  *See* Tr., at 122:7–12.

41.    The Committee never received dedicated fiduciary training until 2018 after Diane Thompson was hired as outside counsel.[7]  *See* Tr., at 34:16–18.  Mr. Heather testified that the only dedicated fiduciary training he received was Ms. Thompson's training in 2018, which was held specifically due to Plan changes that necessitated the development of a new Plan document.  *See* Tr., at 394:16–20, 560:25–561:1.

42.    Mr. Davis' testimony that he would "do a fiduciary update every two or three years" in the absence of a significant change in fiduciary practice or Committee population and that "[i]f there is change in the Committee, [they] would do it more frequently," is not accurate or credible considering the record discussed above.  *See* Tr., at 797:10–15.  Ms. Wagner testified that the litigation updates and other forms of what Captrust deemed training in the quarterly investment review presentations was "training light" and noted that Captrust did not provide any training on how to monitor an investment advisor.  *See* Tr., at 45:16–46:6.

43.    Based on the Plan's governance documents, the Committee's deliberative materials, and the testimony of Committee members, Ms. Wagner concluded that the Committee was not adequately trained given applicable minimum standards concerning fiduciary training.  *See* Tr., at 34:13–14.

### D. Captrust's Outsized Role

44.    Captrust was engaged as a non–discretionary fiduciary to provide investment advice to the Plan.  *See* Tr., at 46:8–10, 406:3–12.  At all times, the Committee remained a discretionary fiduciary of the Plan.  *See* Tr., at 46:11–13, 54:3–7, 400:1–4, 406:3–12.  While Captrust had a fiduciary duty to deliver investment advice and recommendations to the Committee, the Committee retained ultimate

---

[7]Committee members testified that Ms. Thompson was the Committee's lawyer.  *See* Tr., at 201:21.  Ms. Thompson was not a fiduciary of the Plan and, to the extent she provided advice to the Committee, the Committee apparently did not assure itself that the advice was on behalf (or in the best interest of) the Plan.  *See id.*

responsibility to ensure that Plan investments were appropriate for participants.[8]  *See* Tr., at 506:2–7.

45.     Ms. Wagner explained that the Committee passively relied on Captrust for its decision–making to a degree that was atypical of retirement plan fiduciaries. *See* Tr., at 46:18–20, 47:4–7.

46.     Captrust provided a scoring system pursuant to which the Plan's investment options were evaluated.  *See* Tr., at 49:14–18.   The scoring system effectively supplanted any independent investment monitoring by the Committee.  *See* Tr., at 49:14–18.

47.     No Committee member ever expressed concern about Captrust's performance.  *See* Tr., at 121:14–17.  The Committee, however, never engaged in any analysis to determine how the service offerings of other investment advisors compared to Captrust, even though Captrust itself hosted webinars about conducting investment advisor RFPs.  *See* Tr., at 128:3–7; Ex. 24, at 1.  Nor did the Committee ever document any evaluation of Captrust's performance on behalf of the Plan.  *See* Tr., at 402:16–18.

48.     When representatives of Wells Fargo approached the Committee about considering its investment advisory services, Captrust interceded[9] and suggested that the Committee should not consider Wells Fargo's investment advisory services.  *See* Tr., at 128:23–129:3; Ex. 15, 2–5; Ex. 612, at 1–2.   There is no documented, independent basis for the Committee to have determined Wells Fargo was unqualified

---

[8]Captrust offered discretionary advisory services under ERISA § 3(38) several times to the Committee during the relevant period and the Committee never engaged Captrust in this capacity.  *See* Tr., at 436:15–437:2, 883:19–884:3.  The distinction between investment fiduciaries under ERISA § 3(21) and § 3(38) is an important one, and discussed in greater detail in Plaintiffs' Conclusions of Law.

[9]Other investment advisors who reached out to Committee members to inquire about the possibility of servicing the Plan were brought to Captrust's attention.  Ex. 16, at 1.

to serve as the Plan's investment advisor.  *See* Tr., at 403:25–404:15; *see also* Tr., at 910:18–25 (Mr. Davis testifying that he had conversations with Committee members about their satisfaction with Wells Fargo in connection with another business relationship but unable to remember the participants in or details of the conversation).

49.    Based on the Plan's governance documents, the Committee's deliberative materials, and the testimony of Committee members, Ms. Wagner concluded that the Committee relied on Captrust to a degree that was inconsistent with applicable minimum standards.  *See* Tr., at 46:18–20, 47:4–7.

### E. The Plan's Investment Policy Statement

50.    During the Class Period, the Plan has had three operative Investment Policy Statements.  Stipulated Facts Appendix ¶ 165, 168–9.  Captrust prepared each iteration of the IPS.  *See* Tr., at 210:21–211:4.

51.    An IPS is effectively a roadmap that defines the procedures that plan fiduciaries should follow when monitoring a plan's investment options.  *See* Tr., at 37:8–11.  The purpose of the Plan's IPS is to provide "how the Committee would monitor [the Plan's] investments, the review process for them in selecting new ones or making changes[.]"  *See* Tr., at 132:2–5, 803:7–9 (Mr. Davis testifying that the purpose of the IPS is "to establish standards for investment selection, monitoring, and review of the [P]lan's designated investment alternatives.").

52.    The IPS establishes a "prudent process for selecting appropriate investment options" and a "prudent process by which selected investment options generally will be monitored for compliance with this IPS."  Ex. 3, at 3; Ex. 4, at 3; Ex. 5, at 3–4.  The IPS provided that the Committee should "review the Plan's investment options following the regimen outlined later in the IPS."  Ex. 3, at 4; Ex. 4, at 4; Ex. 5, at 4.

53.    The IPS assigns to the Plan's investment consultant the responsibility to assist the Committee in reviewing the Plan's investment options relative to their stated

objectives and their relative performance as compared to their peers and designated benchmarks.  Ex. 3, at 4–5; Ex. 4, at 4–5; Ex. 5, at 4–5.

54.    The IPS provides that, with few exceptions, all actively managed investment options offered in the Plan should "rank in the top 50% of their given peer group for the 3 or 5 year annualized period at the time of their selection."  Ex. 3, at 6; Ex. 4, at 6; Ex. 5, at 6.; 509:2–9.  This guidance demonstrates the importance of determining that performance is reasonable with respect to the needs Plan's participants.  *See* Tr., at 40:14–25.  The Committee considered this guideline to be appropriate when selecting actively managed investments.  *See* Tr., at 509:10–19.

55.    The IPS instructs the Committee to "monitor investment options made available within the Plan to ensure they remain compliant with the criteria used to initially select them."  Ex. 3, at 6; Ex. 4, at 6; Ex. 5, at 7; 369:16–370:13.  Mr. Brady was unfamiliar with this guidance, as he testified that the top 50% rank requirement was only applicable to fund additions, and not investment monitoring.  *See* Tr., at 363:25–364:8.

56.    Three- and five-year performance criteria are a typical standard applied in retirement plan investment monitoring.  *See* Tr., at 41:1–2, 805:4–5 (Mr. Davis testifying as to Captrust's belief that "one year of performance is interesting, but again, too short a period of time.").  The Committee considered these time frames "to be very relevant and important since the longer time periods give more credence and weight . . . to historical track records."  *See* Tr., at 133:7–11.  Mr. Brady testified that failure of these criteria would be meaningful.  *See* Tr., at 373:5–9.  Mr. Bogert testified that the Committee considered these criteria to be appropriate when selecting actively managed investments and "also was important in evaluating the performance of ***existing investments*** in the plan[.]"  *See* Tr., at 508:18–509:19.  And, the IPS does not specifically provide that investments should be reviewed over any other time period—besides the three- and five-year time periods.  *See* Tr., at 428:25–429:5.

57.     These criteria applied not only to the initial selection of investments for inclusion in the Plan, but the IPS also provides that they should continue to be satisfied by investments for retention in the Plan. *See* Tr., at 41:10–13, 369:2–4. Specifically, the IPS states that the Plan's investment advisor "will monitor the investment options made available within the plan to ensure that they remain compliant with the criteria used to initially select them for inclusion in the plan under this IPS or such other or additional criteria as appropriate." *See* Tr., at 369:18–370:3. Indeed, Mr. Bogert testified at his deposition that "noncompliance with the IPS" could be established by an investment "fall[ing] below the 50th percentile of their peers" and specifically identified the criteria that investments "should rank in the top 50 percent of their given peer group for the three- or five-year annualized period[.]" *See* Tr., at 515:2–18. In such case an investment should be "marked for termination but not an automatic removal." *See* Tr., at 513:22–514:2. Mr. Davis testified that the IPS' reference to "such other or additional criteria as appropriate" is not a reference to the Captrust scoring system, ***and, importantly, only pertained to events not initially foreseen based on collected data (such as the resignation of a longstanding investment manager) —factors not relevant to this case***. *See* Tr., at 890:11-22, 891:3–6.

58.     After inclusion in the Plan, "each investment option is expected to maintain a high level of acceptability as described in the Investment Evaluation section of the IPS." Ex. 3, at 6; Ex. 4, at 6; Ex. 5, at 7. The Investment Evaluation process includes the Committee's review "of each investment option's relevant performance and relative rankings against appropriate indexes, and within appropriate peer groups." Ex. 3, at 7; Ex. 4, at 7; Ex. 5, at 7. These investment evaluation criteria do not give Plan investments a pass if they fail to perform well relative to appropriate indexes but perform acceptably relative to appropriate peer groups. *Id.*

59.     Captrust's scoring system does not differ with respect to investment selection and retention in the Plan. *See* Tr., at 370:25–371:4.

60.    The IPS provides that investments that do not comply with its terms should be considered for removal.  *See* Tr., at 41:18–24, 513:16–21; Ex. 3, at 7–8; Ex. 4, at 7–8; Ex. 5, at 8.  Investment options "can be removed or changed after a thorough comparative review using the regimen outlined earlier in the IPS."  Ex. 3, at 8; Ex. 4, at 8; Ex. 5, at 8.

61.    The IPS does not provide for the implementation of a "watch list" or any similar mechanism to track the compliance of Plan investments, nor did it provide guidance on how long a Plan investment could acceptably remain out of compliance with IPS monitoring criteria before removal of the investment should be considered (or would be required).  *See* Tr., at 60:4–6; 421:9–10.

62.    There are no material differences for purposes of investment monitoring between the three iterations of the IPS that were in place during the relevant period.  *See* Tr., at 42:2–9, 131:21–22, 508:8–10.

63.    Each iteration of the IPS includes an appendix that details the components of Captrust's proprietary scoring system, which is designed to "serve as a guide and an aid to the Committee when evaluating investment options, providing a baseline for measurement and discussion."  Ex. 3, at 11; Ex. 4, at 11; Ex. 194, at 5.  The scoring system and its tenets are not comprehensive and the IPS specifically cautions that it "should be considered in the context that the Scoring System is ***one tool*** for the Committee's use."  *Id.* (emphasis added).  The scoring system expressly evaluates actively managed investment options "relative to their peers" and does not include any component assessing actively managed investments relative to their benchmark indexes.  *Id.*    Accordingly, the scoring system cannot satisfy the Committee's obligation to review Plan investment performance relative to appropriate benchmarks.

64.    Indeed, separate from the scoring system appendix, the IPS identifies both a benchmark index and peer Morningstar category for each asset class in the Plan.  *See* Ex. 3, at 10; Ex. 4, at 10; 510:10–13; 510:19–22.

65.     The scoring system awards investments points based on Captrust's evaluation of ten criteria, with each fund receiving a final score that marks it in "good standing" for an 80 or above, "marked for review" for between a 70 and 79, and "considered for termination" for scores below a 70.  Ex. 3, at 12; Ex. 4, at 12; Ex. 194, at 7; 214:18–21; *see also* Tr., at 880:24–881:3 (Mr. Davis testifying that a score of 80 and above indicated that an investment "was meeting the standards required" by the IPS).

66.     A fund in "good standing" is "meeting [its] objectives" in most, if not all, categories and a fund "marked for review" is underperforming in "some areas," "usually relative to their peers."  *See* Tr., at 214:22–215:3; 880:14–22.  According to Mr. Davis, an investment scoring an 80 or above was "meeting the standards required" by the IPS.  *See* Tr., at 880:23–881:2.

67.     The scoring system was supposed to be "one tool for the Committee's use, not a system that supplants the fiduciary's role in prudently evaluating [the Plan's] investment options."  Ex. 3, at 11; Ex. 4, at 11; Ex. 194, at 5; 217:13–23.  It was not intended to act as an automatic trigger or result in a "mandated fiduciary outcome."  *See* Tr., at 891:12–14.  Despite this language, Mr. Brady felt that the scoring system functioned as a "watch list."  *See* Tr., at 215:24–216:2.

68.     For actively managed investments, the scoring system assigns points based on four quantitative scoring areas (each over three- and five-year periods) and two qualitative scoring areas, for a total of ten categories, based on where an investment ranks on a percentile basis relative to the rest of the peer universe.  Ex. 3, at 11–12; Ex. 4, at 11–12; Ex. 194, at 5–6.  Investments can receive points between a minimum and maximum score provided for each category.  Ex. 3, at 11; Ex. 4, at 11; Ex. 194, at 6.  For example, a fund's three-year risk-adjusted performance can receive a minimum score of 4 and a maximum score of 10.  *Id.*  In total, an investment can receive a minimum score of 20 and a maximum score of 100, as shown below.  *Id.*

| Category | Min Score | Max Score |
|---|---|---|
| Risk Adjusted Perf (3 Yr) | 4 | 10 |
| Risk Adjusted Perf (5 Yr) | 1 | 10 |
| Perf vs Peer Group (3 Yr) | 4 | 10 |
| Perf vs Peer Group (5 Yr) | 1 | 10 |
| Style Attribution (3 Yr) | 3 | 7 |
| Style Attribution (5 Yr) | 1 | 8 |
| Confidence (3 Yr) | 3 | 7 |
| Confidence (5 Yr) | 1 | 8 |
| Management Team | 1 | 25 |
| Investment Family Items | 1 | 5 |
| **Total** | **20** | **100** |

69. An underperforming investment that scored the bare minimum in each of the risk-adjusted performance and performance versus peers categories, while scoring the maximum available points in each other category, would not be "considered for termination" under the scoring system, but would instead by "marked for review" with a total score of 70. *Id.*

70. While three- and five-year periods are the two time frames that the IPS expressly calls for the Committee to review investment performance over, and are indeed the two time horizons incorporated into the scoring system, the scoring system emphasizes the five-year metric more than the three-year metric for each quantitative category. *Id.* By giving the worst performing funds lower minimum scores in each five-year category than the corresponding three-year category, the scoring system weights underperformance over a five-year time frame more heavily than underperformance over a three-year period. *Id.* For example, the worst-performing fund versus the relevant peer group receives a minimum score of 4 out of 10 on a three-year basis, but just 1 out of 10 on a five-year basis. *Id.* This emphasis on the five-year period exists for risk-adjusted performance, performance versus peer group, style attribution, and confidence. *Id.* For style attribution and confidence, the disparity between point values assigned to the three- and five-year metrics extends to

the maximum available score: while an investment can receive a maximum of 7 points for being the best performer over three years in each category, it can receive a maximum of 8 points for being the best performer over five years. *Id.*

71.    The scoring system has different categories specifically for target date investments, but the point thresholds for a target date fund to be considered in "good standing," "marked for review," or "considered for termination" are the same as for actively managed investments.   Ex. 3, at 16; Ex. 4, at 16; Ex. 194, at 11.   Score categories, as well as their minimum and maximum point values, are below.  *Id.*

| Category | Min Score | Max Score |
|---|---|---|
| Performance | 13 | 20 |
| Glidepath risk: equity weight | 6 | 10 |
| Glidepath risk: regression to global equity index | 6 | 10 |
| Portfolio construction | 1 | 15 |
| Underlying investment vehicles | 1 | 15 |
| Target Date Investment Mgmt | 1 | 25 |
| Firm | 1 | 5 |
| **Total** | **29** | **100** |

72.    The performance category in the target date scoring system breaks down into the same four categories as the scoring system actively managed investments: three- and five-year risk-adjusted performance and three- and five-year peer relative performance.  *Id.*  The individual performance scores of each target date vintage are aggregated to arrive at a combined score for the entire target date suite, which is the adjusted to arrive at a final score between 13 and 20.  *Id.*

73.    In principle, an underperforming target date fund that scored the bare minimum in the three quantitative categories (performance and the two glidepath risk categories), while scoring the maximum available points in each other category, would not be "considered for termination" or even "marked for review" under the scoring system, but would instead be considered in "good standing" with a total score

of 85.  *Id.*  Accordingly, even the worst-performing target date fund could not fail Captrust's scoring system through underperformance alone.  *Id.*

74.    Based on the Plan's governance documents, the Committee's deliberative materials, and the testimony of Committee members, Ms. Wagner concluded the Plan's IPS failed to provide sufficient guidelines for the Committee in monitoring the Plan's investments, *see* Tr., at 34:19–20, and placed an insufficient emphasis on performance.  *See* Tr., at 59:10–22.

\*        \*        \*

75.    Ms. Wagner concluded that Defendants did not satisfy minimum applicable standards with respect to their process applied to the selection, maintenance, and monitoring of the Challenged Funds and the Plan's service providers.  *See* Tr., at 33:3–5.

## III.    DEFENDANTS CAUSED THE PLAN TO PAY EXCESSIVE FEES

### A. The Plan's Recordkeeping Fees

#### 1.  The Market for Recordkeeping Services

76.    Recordkeeping and administrative services are the "set of services that all large, qualified recordkeepers provide to a plan to ensure that the plan can be administered properly, according to ERISA and IRS rules and regulations."  *See* Tr., at 609:23–610:6.  Recordkeeping fees are the amounts paid to recordkeepers for those services.  *See* Tr., at 610:7.

77.    The bundle of recordkeeping and administration services provided to plans are largely a commodity and any differences in these services are generally immaterial for purposes of comparing services received by different plans.  *See* Tr., at 664:3–13; *see also* 1023:21–24 (Defendants' expert, Mr. Gissiner, recognizing the bundled structure of the core services provided by recordkeepers), 1025:2–4 (same). "There are no material differences in the services that are provided by a recordkeeper to a plan because the healthcare workers have some different service needs that are not required by other plans in other industries[.]"    Tr., at 667:17–668:2.  Service

differentials such as merger and acquisition services are not considered material to recordkeepers from a pricing perspective. *See* Tr., at 675:7–17; *see also* Tr., at 1028:12–15 (Mr. Gissiner recognizing that most (if not all) enhanced services that Transamerica provided to the Plan are provided by all recordkeepers to the plans they administer). Merger and acquisition activity is effectively a sales activity from which the recordkeeper stands to benefit. *See* Tr., at 675:10–676:25.

78.    In the recordkeeping industry, service providers use pricing models to generate a trend line for fees across a range of plan participant counts. *See* Tr., at 661:8–24. "All else being equal, the more participants a plan has, the lower the effective per participant fee can be, because the service delivery model has a lot of fixed costs and then variable costs, and the variable costs are based on the number of participants." *Id.* Above a certain threshold, "be it 2- or 3- or 4,000 participants," a recordkeeper's variable costs represent more than half of its total costs, so recordkeepers will use participant count to create a trend line. *See* Tr., at 661:8–662:5 *see also* 952:3–8 (Ms. Langkamp testifying that under a *per capita* fee structure, the additional work performed per participant results in proportionally more revenue to the recordkeeper). Recordkeepers will account for a plan's growth potential in formulating a price quote. *See* Tr., at 671:21–672:9.

79.    All else being equal, a plan's average account balance has no impact on the cost of its recordkeeping services. *See* Tr., at 678:13–16. A recordkeeper's "costs are driven by the fixed cost to provide all of the basic services, administration services and the variable costs on a per participant level. *See* Tr., at 678:13–19. The cost of recordkeeping a participant with an account balance of $50,000 is effectively the same as a participant with an account balance of $5 million.[10] *See* Tr., at 678:13–22.

---

[10]This expert testimony casts significant doubt on Mr. Davis' testimony that "[a]verage account balance is the key determine[ant] in the recordkeeping business for how fees are derived and administered." *See* Tr., at 846:2–4.

80.    A plan's average account balance is only relevant to recordkeepers who offer plans proprietary investment products and services in order to earn ancillary revenues from the recordkeeping relationship insofar as they present additional revenue opportunities to recordkeepers. *See* Tr., at 677:21–678:12. Accordingly, a higher average account balance can reduce the effective recordkeeping fee rate for a plan. *See id.* However, plans with low average account balances do not necessarily require more work by a recordkeeper than plans with higher average account balances. *See* Tr., at 88:20–89:25.

81.    The market for recordkeeping fees is not transparent or efficient. *See* Tr., at 663:4–22. Accordingly, the minimum standard of care for plan fiduciaries is to solicit bids from competing recordkeepers to determine the reasonable fee for a plan. *See id.* Well-established industry standards dictate that competitive bidding should be conducted at least every three years. *See* Tr., at 865:6–17 (Mr. Davis testifying to his understanding that it is an industry standard to conduct a recordkeeping diligence exercise every three years). Incumbent recordkeepers faced with the prospect of losing a plan's business have a strong incentive to lower costs. *See* Tr., at 837:23–838:11.

82.    A Request for Proposal ("RFP") is a process by which a fiduciary solicits "more formal binding bids" than a Request for Information ("RFI"). *See* Tr., at 554:10–15. An RFP includes a detailed request for information from a vendor that requests an explicit proposal to provide services in response to a detailed description of the services the plan is seeking. *See* Tr., at 876:2–8. Compared to RFIs, RFPs "involve more data, more material, [and] the intent to hold presentations for finalists." *See* Tr., at 836:21–837:10 (Mr. Davis testifying). Since "negotiations tend to derive or yield better results the more serious they get[,]" RFP responses typically include lower fees than RFI responses. *See* Tr., at 876:15–18.

83.    The purpose of performing a fee benchmarking exercise is to determine whether or not a plan is paying a reasonable fee in comparison to what would have

otherwise been available in the marketplace. *See* Tr., at 531:10–20. But according to a New England Pension Consultants ("NEPC") benchmarking survey on which Defendants' own expert, Mr. Gissiner, relied for his opinions, "a recordkeeping search is the best way to measure and benchmark plan fees and assess different pricing models." *See* Tr., at 1102:20–1104:12.

84. If plan assets increase substantially in a short period, applicable minimum standards provide that competitive benchmarking should be conducted to determine whether fees remain reasonable. *See* Tr., at 70:5–71:3. The Plan's assets increased substantially in a short time during the relevant period. *See* Tr., at 81:7–11.

85. Recordkeepers that also offer asset management and related services earn additional incremental revenue from plans that obtain those services. *See* Tr., at 614:20–24.

86. It is well understood in the retirement plan industry that recordkeepers provide reduced recordkeeping bids under proprietary asset assumptions given the additional revenues the recordkeeper will earn from asset management and related services. *See* Tr., at 615:5–9. As discussed later, this dynamic is demonstrated by Transamerica offering a reduced recordkeeping bid in connection with the provision of proprietary managed advice service to the plan. *See* Tr., at 616:23–617:15. Applicable minimum standards provide that proprietary bids should be solicited in connection with competitive exercises. *See* Tr., at 615:11–15. Even Mr. Davis recognized that "it was not uncommon at all" for plans in his experience to seek out bids with proprietary fund requirements. *See* Tr., at 835:9–12; *see also* Tr., at 1088:22–24 (Mr. Gissiner acknowledging that soliciting proprietary bids can lead to lower recordkeeping fees).

87. Applicable minimum standards provide that incumbent recordkeepers should be required to participate in competitive exercises on the same basis as prospective new recordkeepers, including making presentations and providing bids at all stages, and fully negotiating. *See* Tr., at 615:20–616:4; *see also* Tr., at 838:6–12

(Mr. Davis recognizing that, with competitive bidding, incumbent providers have "a strong incentive" to keep business and plans have "strong leverage to negotiate lower costs"), 853:10–13 (Mr. Davis testifying about competition in the marketplace driving recordkeeping costs down).

88.    Plan fiduciaries can choose to implement fee structures whereby participants pay for recordkeeping services via either a direct charge to their account balances or indirectly via revenue sharing. *See* Tr., at 407:5–15.

89.    "If a plan chooses to utilize an asset–based fee structure with the record keeper, then the fiduciaries are required to evaluate the impact of that asset–based fee structure on a much more regular basis, and to ensure that it's not providing an increase to the revenue for the record keeper that is not commensurate with the services. Because the services being provided are identical." *See* Tr., at 622:14–25. Such review is consistent with the minimum standard of care for plan fiduciaries.

90.    At times, it appeared the Committee recognized that asset–based fee arrangements have the potential to result in increasing fees as Plan assets grew due to market appreciation. *See* Tr., at 414:5–8.

91.    Applicable minimum standards provide that, when a plan pays an asset-based fees, fiduciaries should determine the actual amount of fees being paid on a plan–wide and effective per–participant basis and continuously monitor fees to ensure the plan's fees do not increase inordinately if plan assets increase. *See* Tr., at 69:20–70:4 (Ms. Wagner testifying), 622:17–23 (Mr. Geist testifying "[I]f a plan chooses to utilize an asset–based fee structure with the record keeper, then the fiduciaries are required to evaluate the impact of that asset–based fee structure on a much more regular basis, and to ensure that it's not providing an increase to the revenue for the record keeper that is not commensurate with the services."). This is because there is a well–known dynamic in the retirement plan industry (illustrated in the Plan's own materials, including the 2017 Vendor Fee Benchmark discussed in greater detail below) that recordkeeping fees are driven by participant count. *See* Tr., at 620:8–17.

As Mr. Geist explained, average account balance has a less substantial impact on pricing since costs are driven by the fixed cost to provide all the basic bundled services and variable costs on a per-participant level, which are not impacted by account balance. Put differently, the cost of recordkeeping applied to a participant who has a balance of $50,000 is effectively the same as a participant who has $5 million. *See* Tr., at 678:13–22.

## 2. The Plan's Recordkeeping Arrangement

92.    From prior to the Class Period through July 31, 2019, the Plan compensated Transamerica for its provision of recordkeeping services through an asset-based fee structure, making payments by means of revenue sharing from Plan assets. *See* Tr., at 69:18–20, 184:23–185:3. In an asset-based fee arrangement, the total dollars paid to the recordkeeper fluctuate as a function of the variability of Plan assets. *See* Tr., at 611:3–13.

93.    The Plan's fee structure with Transamerica did not change between 2014 and August 1, 2019. *See* Tr., at 611:14–16.

94.    During the relevant period, the Plan grew in participant account primarily because of Prime's acquisition of hospitals. *See* Tr., at 446:10–12. As the Plan grew, Transamerica received greater recordkeeping fees from the Plan and, although Committee members testified that Transamerica provided a larger service team, *see* Tr., at 590:1–5, 591:6–12, the Committee did nothing to assess whether the additional fees paid to Transamerica were commensurate with any additional services received. *See* Tr., at 591:13–593:11 (Ms. Gomez testifying that analysis of proportionality of additional fees would have been part of the 2017 Vendor Fee Benchmark and admitting that the 2017 Vendor Fee Benchmark did not consider services).

95.    Effective January 21, 2013, the Plan began paying Transamerica a recordkeeping fee of 21 basis points, assessed on Plan assets. *See* Tr., at 837:11–22; Ex. 199, at 1.

96.    In addition to the fees paid to Transamerica, participants were also charged an additional 5 basis points to pay for Plan expenses, which was placed into an Expense Budget Account ("EBA").  *See* Tr., at 185:7–14; Ex. 199, at 1.  The following are the amounts paid by the Plan to Transamerica during the relevant period and year-end balance retained in the EBA:

| | | | Plan Recordkeeping Fees | | | Additional Admin Fee | Expense Budget Account | |
|---|---|---|---|---|---|---|---|---|
| Year | YE Plan Assets | Participants | Contractual Rate | Total | Per Participant | Charge | YE Balance | Unallocated $ Per Participant |
| 2014 | $ 382,035,856 | 20,399 | 0.21% | $ 852,219 | $42 | 0.05% | $ 172,951 | $8.48 |
| 2015 | $ 471,881,822 | 31,346 | 0.21% | $ 1,057,496 | $34 | 0.05% | $ 295,055 | $9.41 |
| 2016 | $ 613,600,075 | 38,687 | 0.21% | $ 1,366,191 | $35 | 0.05% | $ 330,348 | $8.54 |
| 2017 | $ 817,974,983 | 42,313 | 0.21% | $ 1,810,572 | $43 | 0.05% | $ 534,831 | $12.64 |
| 2018 | $ 856,868,293 | 43,050 | 0.21% | $ 1,844,789 | $43 | 0.05% | $ 663,015 | $15.40 |
| 2019 | $1,106,711,741 | 44,421 | 0.21%/$50pp | $ 2,306,939 | $52 | 0.05%/none | $ 288,299 | $6.49 |
| 2020 | $1,393,699,118 | 46,578 | $50pp | $ 2,328,900 | $50 | | - | - |
| 2021 | $1,613,165,959 | 39,578 | $50pp/$34pp | $ 1,609,505 | $41 | | - | - |

Ex. 763 (admitted summary exhibit with data drawn from Ex. 61, at 17 (2014 year-end plan assets); Ex. 253, at 21 (2015 year-end plan assets); Ex. 257, at 18 (2016 year-end plan assets); Ex. 262, at 24 (2017 year-end plan assets); Ex. 265, at 22 (2018 year-end plan assets); Ex. 269, at 23 (2019 year-end plan assets); Ex. 273, at 23 (2020 year-end plan assets); Ex. 400 (2021 year-end plan assets); Ex. 709, at 2 (2015 participant count); Ex. 710, at 2 (2017 participant count); Compilation of 2014–2021 Forms 5500 (2014–2021 participant counts and recordkeeping fees); Ex. 406 (expense budget account amounts); Ex. 406 (EBA amounts); Ex. 199 (recordkeeping fees); Ex. 209, at 3 (2019–2021 recordkeeping fees); Ex. 176 (2021 recordkeeping fees)).

97.    The 21-basis point recordkeeping fee covered all of the basic recordkeeping and general administrative services Transamerica provided to the Plan, which were set forth in sections I and II of its agreement (the "Pension Services Agreement").  *See* Tr., at 922:1–12; Ex. 195, at 2–3.  The Pension Services Agreement enumerates certain "Other Services" for which Transamerica does not assess an

additional charge, meaning these "Other Services" are effectively included under the 21-basis point fee. *See* Tr., at 922:7–12.

98.    Merger and acquisition services, including conversion services and consulting services (such as "review existing Plan, identify protected benefits, explain available options, Plan design alternatives and recommendations, and identify nondiscrimination/compliance testing issues"), were listed in the Pension Services Agreement among the "Other Services" for which there was no additional charge. *See* Tr., at 922:18–22; Ex. 195, at 13–14. Mr. Gissiner acknowledged that merger and acquisition fees were baked into the core contractual fee every time Transamerica provided a pricing proposal, in part due to uncertainty about the magnitude of merger and acquisition activity from one year to the next. *See* Tr., at 1099:15–24. Loan fees were assessed separately to the participant taking the loan. *See* Tr., at 913:20–22.

99.    In late 2018, Transamerica proposed lowering the Plan's recordkeeping fee from 21 basis points to either 20 basis points or to a flat $50 per participant. *See* Ex. 20, at 1. The proposal was not made in response to any competitive exercise. *See* Tr., at 414:9–19, 1094:16–18 (Mr. Gissiner conceding the Committee undertook no benchmarking or competitive exercise). Captrust prepared an analysis of the proposal, concluding that the asset-based fee benefited more participants at present, but that "this gap will shift over time" with Plan "assets growing rapidly, that 20 basis point fee on an absolute basis would have grown pretty significantly." *See* Tr., at 854:17–855:17; Ex. 722, at 3.

100.    Over the first four years of the Class Period, the Plan's assets "grew rapidly," from 23% to 33% per year. Ex. 247, at 16; Ex. 763. This is illustrated in the chart below:

| Year | Plan Assets | Growth ($) | Growth (%) |
|------|-------------|------------|------------|
| 2013 | $306,870,462 | | |
| 2014 | $382,035,856 | $75,165,394 | 24.49% |
| 2015 | $471,881,822 | $89,845,966 | 23.52% |

| 2016 | $613,600,075 | $141,718,253 | 30.03% |
| 2017 | $817,974,983 | $204,374,908 | 33.31% |

101.    The Committee maintained the asset-based fee arrangement with Transamerica throughout this period, during which "a lot of the merger and acquisition activity took place[.]" Tr., at 931:10–13; Ex. 763.

102.    Captrust "strongly recommended" that the Committee choose the *per capita* pricing model. Ex. 634, at 1. Mr. Davis explained that Captrust made this recommendation because "it makes business planning easier for Prime Healthcare. They could [assess], okay, we're purchasing a new healthcare system that has 10,000 participants and they will be able to document exactly what the cost of that is going to be. It's a business management tool." *See* Tr., at 856:7–18. This benefit to a flat fee arrangement was available to the Plan earlier in the Class Period while Prime pursued much of its merger and acquisition activity. *See* Tr., at 931:10–13. The Committee did not have input on Prime's merger and acquisition activity, and these transactions by Prime were done in its corporate capacity.[11] *See* Tr., at 599:3–14.

103.    There was nothing that ever prevented Prime from entering into an arrangement where the Plan paid for recordkeeping fees on a per participant basis but then charged its participants on an asset basis. *See* Tr., at 908:13–17.

104.    Concurrent with the move to a flat fee expense structure, the Committee secured Prime's agreement to pay recordkeeping expenses for all active Plan participants. Ex. 56, at 1–2. Captrust recommended that terminated participants still pay their own recordkeeping fees. Ex. 634, at 1. The change to a $50 per participant

---

[11]Although the Plan bore any costs for merger and acquisition services, Mr. Gissiner acknowledged that Prime could have "at any point in time" paid any excess merger and acquisition costs when the company decided to undertake a merger. *See* Tr., at 1098:22–1099:1. As discussed in Plaintiffs' Conclusions of Law, these expenses, which benefitted Prime and advanced its corporate objectives in a "settlor" rather than fiduciary capacity, should not have been paid from Plan assets.

recordkeeping fee, with Prime paying the fee for active participants, was made effective August 1, 2019. *See* Tr., at 357:2–15; Ex. 209, at 3.

105. Effective June 1, 2021, Transamerica's recordkeeping fee rate was reduced from $50 per participant to $34 per participant. *See* Tr., at 197:22–198:7; Ex. 211, at 1–2; Ex. 239, at 2. The new fee was conditioned on the Plan's addition of the voluntary managed advice service offered by Transamerica, through which the recordkeeper had the opportunity to earn investment income by offering asset allocation advice and portfolio services to plan participants who elected to use the managed advice program. *See* Tr., at 191:20–191:4; Ex. 693, at 1.

106. Pursuant to the then-prevailing contractual fee rate, and the effective annual fee rate for years during which the contractual rate changed, Transamerica received the following total dollar amounts in recordkeeping fees during the Class Period: $852,219 in 2014; $1,057,496 in 2015; $1,366,191 in 2016; $1,810,572 in 2017; $1,844,789 in 2018; $2,306,939 in 2019; $2,328,900 in 2020; $1,609,505 in 2021. *See* Tr., at 610:9–611:2; Ex. 763.

107. Transamerica was paid the following effective per-participant rates based on the total dollar amounts on an average, per participant basis: $42 in 2014; $34 in 2015; $35 in 2016; $43 in 2017; $43 in 2018; $52 in 2019; $50 in 2020; $41 in 2021.[12] *See id.*

108. Transamerica representatives had monthly calls with Ms. Gomez to discuss ongoing Plan–related projects. In participating in such calls, as well as in interacting with Transamerica regarding payroll streaming, onboarding to newly acquired participants, and returned mail services, Ms. Gomez was performing her day-to-day role as professional benefits manager, and not acting in a fiduciary capacity in

---

[12]It bears noting that certain Committee members, including Mr. Heather, incorrectly believed the Plan's recordkeeping fees decreased over the relevant period. *See* Tr., at 410:4–7.

any way.[13]  *See* Tr., at 582:1–13; 582:25–584:25.  Mr. Brady testified that Ms. Langkamp of Transamerica and Ms. Gomez would frequently communicate outside of Committee meetings but he has no personal knowledge of such conversations or their contents.  *See* Tr., at 221:24–222:2.  No other Committee members participated in these monthly calls with Transamerica, and Ms. Gomez did not report to the Committee regarding the substance of these discussions.  *See* Tr., at 585:1–6.

109.   The project plan spreadsheets that Transamerica provided to Ms. Gomez contained information on the progress of data projects relating to the administration of the Plan and the management of Plan ministerial functions.  *See* Tr., at 599:3–14. The spreadsheets tracked updates, deadlines, timelines and action items in regular categories:  compliance, meetings, plan documents/amendments, participant education, participant communication, fund and pricing activity, and ongoing administration items.[14]  While the project plans did contain information on changes to the Plan investment lineup, share classes, and fees, this took the form of a summary of past and forthcoming developments.  *See id.*  The project plan spreadsheets contained no data or information that amounted to any form of fee monitoring, comparison, or evaluation.  *See id.*  Emails circulating the project plans confirm that

---

[13]Although Ms. Gomez worked with Transamerica on a day-to-day basis, including regular monthly calls, *see* Tr., at 571:23–572:2, 573:21–24, this work was almost exclusively in a non-fiduciary capacity.  *See* Tr., at 582:5–8, 583:6–10, 583:20–584:10, 584:20–25.  Ms. Gomez did not report to the Committee on these activities. *See* Tr., at 582:20–22, 585:4–6.  Ms. Gomez did not exercise discretion or control over Plan assets in connection with these activities.  *See* Tr., at 584:20–25.  379. Similarly, although Ms. Gomez testified that she was satisfied with Transamerica's services, see Tr., at 576:13–19, this testimony was based on her personal positive working relationship with Transamerica rather than an evaluation of Transamerica's services.  *See* Tr., at 576:18–19.

[14]Ex. 337; Ex. 338; Ex. 339; Ex. 339; Ex. 340; Ex. 341; Ex. 342; Ex. 343; Ex. 345; Ex. 346; Ex. 347; Ex. 348; Ex. 349; Ex. 350; Ex. 351; Ex. 352; Ex. 353; Ex. 354; Ex. 355; Ex. 356; Ex. 357; Ex. 358; Ex. 359; Ex. 360; Ex. 361; Ex. 362; Ex. 363; Ex. 364; Ex. 365; Ex. 366; Ex. 367; Ex. 368; Ex. 369; Ex. 370; Ex. 371; Ex. 372.

they contain updates that serve as agendas for the monthly meetings between Transamerica and Ms. Gomez to discuss ongoing projects.[15]  While Ms. Langkamp testified that the project plans and monthly meetings allow Transamerica to provide "better quality services" to the Plan, she did not explain how they allowed Transamerica to provide "better quality services" beyond keeping track of ongoing items that were within the scope of services Transamerica provided to the Plan, nor did she testify that other recordkeepers do not implement these common measures in connection with their provision of services to retirement plans. *See* Tr., at 940:15–17, 941:11–13.

110.  The "Quarterly Progress Reports," "Participant Scorecards, Executive Plan Summaries," and "Dashboard Reports," which were the various titles over time of the same quarterly presentation provided by Transamerica, contained various Plan demographic information and other Plan-level data concerning participation, utilization, savings and other participant activities.[16]  While they contained certain Plan financial data, these reports never disclosed the effective recordkeeping fee rate or total dollars that Transamerica was being compensated for its provision of services to the Plan, and thus were of no utility to the Committee in monitoring the reasonableness of the Plan's fees. *Id.*  Transamerica "Plan Review Documents" documents contain information on provisions of the Plan Document, and thus are completely unrelated to the Plan's recordkeeping fees and served no meaningful monitoring purpose. Ex. 321; Ex. 322; Ex. 324.

---

[15]Ex. 596; Ex. 601; Ex. 604; Ex. 614; Ex. 641; Ex. 643; Ex. 650; Ex. 651; Ex. 654; Ex. 655; Ex. 659; Ex. 660; Ex. 661; Ex. 663; Ex. 674; Ex. 702; Ex. 704.

[16]Ex. 188; Ex. 189; Ex. 190; Ex. 191; Ex. 192; Ex. 193; Ex. 286; Ex. 287; Ex. 288; Ex. 289; Ex. 290; Ex. 291; Ex. 292; Ex. 293; Ex. 294; Ex. 295; Ex. 296; Ex. 297; Ex. 298; Ex. 299; Ex. 300; Ex. 301; Ex. 302; Ex. 303; Ex. 304; Ex. 305; Ex. 306; Ex. 307; Ex. 309; Ex. 310; Ex. 311; Ex. 312; Ex. 313; Ex. 314; Ex. 315; Ex. 316; Ex. 318; Ex. 319; Ex. 320; Ex. 323; Ex. 325; Ex. 328; Ex. 329; Ex. 330; Ex. 331; Ex. 623.

111.    The Eddy Award conferred on Transamerica in 2022 recognized the recordkeeper's adoption of electronic statements and did not evaluate the recordkeeping services provided to the Plan.  *See* Tr., at 950:7–19.

112.    The Net Promoter Score reflects participant satisfaction with Transamerica's call center, and does not relate to Transamerica's recordkeeping services or evaluate the fees charged to the Plan for such services in any way.  *See* Tr., at 1095:12–1096:5.  The survey from which this score was derived does not provide any information about respondents or the sample of plans represented in the survey.  *See* Tr., at 1095:2–6.

113.    Sarah Langkamp, a Transamerica client executive, has been the Plan's client executive and primary contact at Transamerica since April 2017.  *See* Tr., at 547:4–9; 916:2–9.    In comparing certain features of Transamerica's service arrangement with the Plan to other Transamerica clients including the number of payroll feeds, points of contact, and educational support, Ms. Langkamp's testimony was limited to her own experience, and not the experience of all Transamerica clients. *See* Tr., at 947:8–948:4.  In addition, it bears noting that all of the features that Ms. Langkamp described as giving rise to complexity, *see, e.g.*, 926:6–19, were accounted for in the pricing proposals that Transamerica (and when they were permitted to provide a bid, other providers) submitted to the Committee.  *See* Tr., at 670:3–671:20, 934:22–25.

### 3.  The Committee's Faulty Fee Evaluations

114.    The Committee retained the fiduciary responsibility to evaluate the reasonableness of the Plan's recordkeeping fees at all times.  *See* Tr., at 517:7–10. Based on the Plan's governance documents, the Committee's deliberative materials, and the testimony of Committee members, Ms. Wagner concluded the Committee did not adequately monitor its service providers.  *See* Tr., at 39:4–7.

115.    The Committee never conducted a request for proposal ("RFP") for the Plan's recordkeeping services.[17]  *See* Tr., at 126:16–21, 556:11–12.  Prime regularly issues RFPs in connection with its regular business to evaluate the fees and services of its vendors.  *See* Tr., at 526:20–527:16.  From 2012 to 2020, the Committee issued three RFIs.  *See* Tr., at 528:16–18, 555:18–20.  At all relevant times, the Committee could have requested that Captrust conduct an RFP on its behalf.  *See* Tr., at 1087:11–22.

116.    Although Ms. Wagner has testified—in another case with different circumstances over a different time period—that RFPs are more expensive or cumbersome than other benchmarking exercises, such costs would not be borne by Prime, the Committee, or the Plan in this case.  *See* Tr., at 80:23–81:4.  Captrust's agreement with the Plan provided that it would conduct bidding without an additional cost to the Plan.[18]  *See* Tr., at 80:24–81:4.

117.    The Captrust Agreement provided that Captrust would assist the Committee in assessing the fees charged by the Plan's service providers.  *See* Tr., at 402:1–5.  Competitive bidding processes were named in the scope of services provided by Captrust at no extra cost under the Captrust Agreement.  *See* Tr., at 402:6–9; Ex. 213, at 1; Ex. 219, at 12–13.

118.    The Committee operated under the belief that benchmarking and RFPs generally reflected the same information.[19]  *See* Tr., at 130:17–19.  Nonetheless, Mr.

---

[17]Defendants' expert, Mr. Gissiner, referenced "three different RFPs that were conducted between 2012 and 2020."  *See* Tr., at 1047:20–21.  As discussed herein, the record makes clear that no RFPs were conducted during the relevant period.  *See* Tr., at 1093:9–12 (Mr. Gissiner admitting that his earlier testimony was incorrect).

[18]Similarly, Defendants' expert, Mr. Gissiner, initially testified that "there is cost and time associated with conducting an RFP," *see* Tr., at 1047, but on cross-examination conceded that the cost would be borne by Captrust (and included within the scope of services Captrust provided to the Committee).  *See* Tr., at 1088:9–21.

[19]Mr. Brady testified that benchmarking captures more data from more providers

Brady recognized that, when a fiduciary issues an RFP, it is signaling to recordkeepers in the market that a plans business might be available and creates a more competitive environment. *See* Tr., at 131:7–11.

119. The Committee relied virtually exclusively on Captrust to perform its monitoring function with respect to the Plan's recordkeeping fees. *See* Tr., at 612:23–25. Nonetheless, Committee members such as Mr. Brady misapprehended basic dynamics of the recordkeeping market, such as the well-known dynamic that prices are driven less by plan size and more by average account balance. *See* Tr., at 329:16–17. None of the Plan's fee evaluations ever reviewed the impact (if any) of the Plan's supposed complexity, including anticipated merger and acquisition volume, on the Plan's recordkeeping fees. *See* Tr., at 613:5–8.

120. The Committee conducted two Vendor Fee Benchmark exercises during the Class Period while Plan participants were responsible for paying recordkeeping fees, in 2015 and 2017, and one Vendor Fee Benchmark prior to the Class Period in 2012. *See* Stipulated Facts Appendix ¶ 119, 131, 139. In 2018, the Committee received a presentation from Captrust detailing a Transamerica proposal to reduce its recordkeeping fee, which did not involve the provision or consideration of any "competitive market information." *See* Tr., at 1093:13–1094:18. In 2020, when Prime was responsible for paying Transamerica's fees on behalf of active participants, the Committee conducted another Vendor Fee Benchmark. Ex. 13.

121. None of the vendor fee benchmarks conducted by the Plan Committee required respondents to provide bids under any proprietary asset assumptions. *See* Tr., at 1089:4–9, 1093:2–5.

122. The Committee failed to document any discussions that formed the basis of decisions made because of the Vendor Fee Benchmarks. *See* Tr., at 665:20–25.

---

relative to RFPs. *See* Tr., at 130:24–125:3.

**i.    The Pre–Class Period Exercise**

123.    The Committee received a Vendor Fee Benchmark prepared by Captrust in December 2012 ("Pre–Class Period Exercise"). *See* Tr., at 550:8–13; Ex. 79. The Pre–Class Period Exercise was "akin to an RFI." *See* Tr., at 836:21–837:10. At the time of the Pre–Class Period Exercise, the Plan had 11,275 participants with account balances, $193.4 million in assets, and a contractual recordkeeping fee of 23 basis points. *See* Tr., at 550:23–551:10; 833:22–24; Ex. 79, at 5.

124.    Captrust used three "Client Specific Screening Criteria" to evaluate recordkeeper candidates based on the advisor's assessment of "the needs of your plan and participants": no or low proprietary fund requirements, full administrative outsourcing, and effective and user–friendly Sponsor and Participant websites. Ex. 79, at 4. The ability to service multiple employer plans and handle significant merger and acquisition activity were not listed by Captrust as factors specific to the Plan that Captrust deemed important to screen recordkeepers for their ability to service. *See* Tr., at 675:10–23. These factors do not "make a significant difference with respect to the price." *See* Tr., at 675:24–676:1. They were also not considered by prospective candidates when preparing their proposals. Ex. 79, at 5.

125.    Diversified (*i.e.*, Transamerica) was a recordkeeper that primarily served the small plan market. At the time of the Pre–Class Period Exercise, zero percent of Diversified's retirement plan clients had greater than 10,000 participants, while 53% of its clients had less than 100 participants. *See* Tr., at 556:13–557:2; Ex. 79, at 6. Zero percent of Diversified's retirement plan clients had greater than $500 million in assets, and 1% of its clients had assets of $200 million to $500 million. *See* Tr., at 557:3–9; Ex. 79, at 6.

126.    The Pre–Class Period Exercise involved proposals from Wells Fargo, Great West, TIAA–CREF, Vanguard and JPMorgan.[20] *See* Tr., at 551:11–14; 554:6–

---

[20]Wells Fargo representatives later reached out to the Committee about making a

9.  Fidelity declined to submit a bid.  *See* Tr., at 836:15–20.  Captrust presented the bundled fee rate proposals from each respondent and did not include information on what each recordkeeper charged for *a la carte* services, such as participant loans, because such expenses are paid by the individual participants who receive these services and are not material to the overall cost of providing recordkeeping services to the Plan as whole.[21]  *See* Tr., at 675:10–676:12; *see also* Tr., at 913:21–23 (Mr. Davis testifying that loan fees were paid by participants separate from the contractual rate charged by Transamerica).

127.    Following the Pre–Class Period Exercise, the Committee negotiated with Diversified for a reduction in the contractual fee rate to 21 basis points.  *See* Tr., at 552:11–17.

## ii.    The Vanishing Vendor Fee Benchmark of 2015

128.    Captrust conducted another RFI in 2015 ("2015 Vendor Fee Benchmark").  *See* Tr., at 528:8–15.  The Committee lost all documentation associated with the 2015 RFI; Prime was unable to locate and produce the RFI itself, or any quotes from respondents or presentations to the Committee relating to the 2015 Vendor Fee Benchmark.  *See* Tr., at 528:24–529:3; 1036:19–22.  That the RFI took place is only memorialized in the minutes of a single Committee meeting.  Ex. 33.

129.    Ms. Dhuper, who has been on the Committee since 2007 testified that she does not know who keeps the Committees' records.  *See* Tr., at 529:5–24, 530:12–

---

proposal for recordkeeping services and, despite being highly rated and offering Captrust's preferred open architecture structure, Mr. Davis interceded to prevent the proposal from proceeding further because he viewed it as a threat to Captrust's role as investment advisor.  *See* Tr., at 895:1–24, 897:8–10, 897:22–24, 900:23–24.

[21]Defendants' expert, Mr. Gissiner, initially testified that most recordkeepers would not include the same number of on-site meetings as Transamerica would as part of their base fee proposals.  *See* Tr., at 1028:19–21, 1034:16–19.  This testimony was inaccurate.  *See* Tr., at 1090:14–22 (Mr. Gissiner admitting his earlier testimony was incorrect).

15, 530:24–531:6.   This is despite Ms. Dhuper's testimony that she considered it important to keep documents reflecting monitoring of the Plan's expenses.   *See* Tr., at 539:18–21.

130.   Mr. Brady testified that he became aware of a previous recordkeeping exercise being conducted only during his deposition prep. *See* Tr., at 186:1–5.

131.   The 2017 Vendor Fee Benchmark presentation by Captrust ("2017 Vendor Fee Benchmark") noted, in a section entitled "Meeting Your Fiduciary Responsibilities," "[i]t is critical that fiduciaries **maintain documentation** of the process used for identifying and monitoring their plan expenses."   *See* Tr., at 539:4–21; Ex. 6, at 4 (emphasis added).   Ms. Dhuper testified that Committee members considered it important "to keep documents reflecting the monitoring of plan expenses." *See* Tr., at 539:4–21.

132.   In fact, when Mr. Davis was examined about the 2015 Vendor Fee Benchmark, he testified (perhaps assuming documentation had been maintained), "[t]he specifics, I'm sure, can be documented."  Tr., at 840:20.  No such documents were maintained.  *See* Tr., at 528:24–529:3; 1036:19–22.

133.   Based on the 2020 Vendor Fee Benchmark discussed in greater detail below, the Committee did not require Transamerica to compete in the process on the same basis as prospective new recordkeepers.   *See* Tr., at 623:8–10.   Instead, the Committee did not require Transamerica to compete in the initial stage of the process and informed Transamerica of other providers' bids before requiring it to submit a proposal.  *See* Tr., at 623:14–16.

134.   Three recordkeepers, Prudential, Milliman, and Fidelity, were invited to make presentations to the Committee regarding their services and their cost structure. Ex. 33, at 1.  Transamerica was not asked to present, and merely allowed to respond to the initial proposals of the candidates. *See id.*  Therefore, despite the solicitation of proposals from competitors, the 2015 Vendor Fee Benchmark was not a true competitive environment, as Transamerica was not required to compete to retain the

Plan's business. *See* Tr., at 623:1–16. Following the presentations, Transamerica proposed improving its service team dedicated to the Plan. Transamerica did not, as Mr. Gissiner suggested, agree to provide additional services to the Plan as a result of the 2015 Vendor Fee Benchmark. *See* Tr., at 1036:17–18. Transamerica's proposal did not include any reduction in the Plan's recordkeeping fee rate, which did not change as a result of or following the 2015 Vendor Fee Benchmark. *See* Tr., at 538:21–539:3.[22] Without negotiating with Transamerica, the Committee accepted the incumbent's proposal. *See* Tr., at 623:1–16; Ex. 33, at 1; Ex. 573, at 1.

135.   The minutes describing the 2015 Vendor Fee Benchmark do not articulate the fee bids submitted by Prudential, Milliman, or Fidelity, and do not contain any reference to how any bid compared to Transamerica's then–current fee rate. Ex. 33, at 1. They also contain no indication that the Committee attempted to negotiate with any of the candidates for additional services or price concessions to compare favorably with Transamerica's updated proposal. *See id.*

136.   Based on an evaluation of Plan documents and materials related to the 2015 Vendor Fee Benchmark, Mr. Geist concluded that the 2015 Vendor Fee Benchmark did not comport with minimum applicable standards for assessing the reasonableness of the Plan's recordkeeping fees. *See* Tr., at 23:19–21.

**iii.   The 2017 Vendor Fee Benchmark was Hopelessly Flawed**

137.   In 2017, Captrust provided the Committee with a Vendor Fee Benchmark ("2017 Vendor Fee Benchmark") that included a survey of Captrust clients and how much they were paying for recordkeeping services. *See* Tr., at 86:11–19. The survey consisted of a single presentation and the only comparative

---

[22]Ms. Dhuper testified that, as part of the 2012 Vendor Fee Benchmark, the Committee attempted to negotiate down from the lowest bid, which was offered by the incumbent recordkeeper. *See* Tr., at 552:13–20. This recognizes that the lowest initial bid provided in response to an RFI does not necessarily reflect a reasonable fee rate. *See* Tr., at 615:24–616:16.

information concerning the Plan's recordkeeping fees appeared on *a single page* of the presentation. *See* Tr., at 409:8–17; Ex. 6, at 10.  Still, Mr. Heather testified that this presentation included more information than the 2015 Vendor Fee Benchmark. *See* Tr., at 409:10–25.

138.    According to Ms. Gomez and Ms. Dhuper, the exercise represented the means by which the Committee investigated if the Plan's fees were in line with comparator plans.  *See* Tr., at 564:1–7; Ex. 609, at 1.  The 2017 Vendor Fee Benchmark did not involve the solicitation of any competitive bids, and "was just a comparison of what Captrust referred to as pricing projects."  *See* Tr., at 417:7–15; 617:16–618:3.  Benchmarking studies like the 2017 Vendor Fee Benchmark are not sufficient to determine the reasonable fee of any particular plan, because doing so requires a competitive environment.  *See* Tr., at 664:23–665:10.

139.    At the time of the 2017 Vendor Fee Benchmark, the Plan had 39,164 participants with account balances, $701.0 million in assets, and a contractual recordkeeping fee of 21 basis points. Ex. 6, at 5, 8.

140.    The presentation listed six specific factors driving plan complexity: payroll, participant advice, self–directed, plan design, company stock, and frozen assets.  *Id.* at 9.  The Committee understood these factors to drive plan complexity in connection with its evaluation of the Plan's recordkeeping fees.  *See* Tr., at 564:23–565:18.  Ms. Gomez could not recall the Committee discussing any other factors driving plan complexity.  *See* Tr., at 565:19–21.

141.    There were no plans in the 2017 Vendor Fee Benchmark survey sample that were of the same or similar size to the Plan at that time.  *See* Tr., at 71:22–25, 618:4–12.  The fee data presented in the survey was maintained by Captrust "in a central proprietary database for evaluating administrative fees, derived from over 1,300 institutional client relationships which spread across an extensive range of retirement plan service providers."  Ex. 6, at 9.  Captrust represented that the data "includes expense information on current clients in addition to provider bids for

administrator searches and fee benchmarks" and "represents a diverse collection of plan sizes, locations, and industries." *Id.* The 2017 Vendor Fee Benchmark was not limited to healthcare plans. *See* Tr., at 187:19–188:7.

142.    Committee members were unaware of the plans included in the fee benchmarking sample or the industries from which those plans were drawn. *See* Tr., at 188:10–11, 564:9–11, 564:20–21. Mr. Davis was similarly uninformed of the composition or parameters of this sample, deferring instead to other unspecified professionals at Captrust. *See* Tr., at 792:9–12.

143.    Captrust provided breakdowns of the full universe of the pricing data by year and by market segment on page nine of the 2017 Vendor Fee Benchmark. Ex. 6, at 9. Mr. Davis of Captrust "did not serve on the team that derived or created these charts" and could not testify as to the composition of the survey sample on the basis of these charts. *See* Tr., at 874:18–875:9. The price points comprising the benchmark dataset are broken out by year in a table entitled "Data Summary," ranging from 2012 to 2016. *Id.* The table below provides the "number of projects" from which these price points are derived, which total 454 projects:

| Year | Number of Projects |
|------|--------------------|
| 2012 | 62 |
| 2013 | 70 |
| 2014 | 80 |
| 2015 | 122 |
| 2016 | 120 |

*Id.*

144.    In a separate table, the 2017 Vendor Fee Benchmark breaks down the number of projects in a different manner, by market segment in terms of plan assets, ranging from plans with under $5 million in assets to plans with between $250 million and $500 million in assets. *Id.* It is unequivocal that the largest possible plan from which a price point in the 2017 Vendor Fee Benchmark is taken could have $500 million in assets, as none of the price points fit into any market segment above that

amount.[23]  *Id.*; *see also* Tr., at 874:25–875:14 (Mr. Davis conceding his understanding that the segment did not contain any plans larger than $500 million in assets, including because the Plan is clearly not in the survey sample).  The market segment table breaks down the exact same data set as is contained in the "Data Summary" table, as shown below; the total number of projects in the market segment table is 454, equivalent to the total number of projects in the Data Summary table summarizing all the data contained in the study:

| Market Segment (in $ millions) | Number of Projects |
|---|---|
| < 5 | 38 |
| 5 – 15 | 96 |
| 15 – 25 | 69 |
| 25 – 50 | 74 |
| 50 – 100 | 79 |
| 100 – 250 | 60 |
| 250 – 500 | 38 |

*Id.*

145.    Beneath the market segment table are the words "Source: Captrust Institutional Client Data – 2017."  These same exact words appear below the fee comparison table on page 10 of the 2017 Vendor Fee Benchmark that provides the price points for each market segment.  *Id.*, at 10.  Ms. Gomez confirmed her understanding that the datapoints on page 9 of the 2017 Vendor Fee Benchmark defined the universe of plans represented in the sample.  *See* Tr., at 564:1–7.  She also testified that pages nine and 10 of the 2017 Vendor Fee Benchmark were the only two pages in the presentation containing substantive comparative information about the

---

[23]When attempting to burnish Captrust's *bona fides* as a service provider to large plans, Mr. Davis was forced to admit that the sample used in this benchmarking must be an "incomplete list" of Captrust clients.  *See* Tr., at 846:23–847:1.  Crediting Mr. Davis' testimony, it is even clearer that the benchmarking group would not be an appropriate basis to conclude the Plan's fees were reasonable.  *See id.*

Plan's recordkeeping and administrative expenses (and page nine only provides background information on the sample of plans). *See* Tr., at 567:4–10.

146.    The price points on page 10 were presented for comparison as asset-based fees. Ex. 6, at 10. This was a critical error, as it is well understood in the industry that the appropriate manner for comparing recordkeeping fees is on a dollars-per-participant basis because "the cost structure for recordkeepers is based on the number of participants, not based on the number of assets." *See* Tr., at 617:16–618:21; 621:24–622:9. Presenting comparative price points as asset-based fees has a potentially distorting effect and "can result in scenarios where a plan could have twice as many participants and four or five times as many assets and be paying the same fee rate on an asset-based basis but paying twice as much on a per participant basis, like $100, and it would still show up as reasonable[.]" *See* Tr., at 618:22–619:6.

147.    Although Ms. Gomez initially testified that she understood the plans indicated in the sample on page nine of the 2017 Vendor Fee Benchmark represented the Plans included in the benchmarking on page 10, *see* Tr., at 563:7–11, 564:4–10, she later testified that she did not understand whether the sample on page nine represented the plans included in the benchmarking on page 10. *See* Tr., at 597:23–598:17. Ms. Gomez testified that she did not know whether the same was true of the 2020 Vendor Fee Benchmark the Committee eventually received. *See* Tr., at 598:21–24. In fact, Ms. Gomez appeared completely unfamiliar with the information contained in the Vendor Fee Benchmarks. *See id.*

148.    The price points were organized in a matrix by plan asset size and average account balance. Ex. 6, at 10. The data presented illustrates the prevailing dynamic in the recordkeeping industry that, all else being equal, a plan with more participants will be able to obtain a lower price per participant for recordkeeping services. *See* Tr., at 619:13–620:17.[24] However, in a further indication that the study

---

[24]Plan participant count is the quotient of the two axes in the fee comparison matrix,

was flawed, the one segment of price data that is identified in the 2017 Vendor Fee Benchmark as relevant to the Plan is anomalous: the low and average asset-based fee in the Plan's segment ($10,000–$25,000 average account balance and over $250 million in assets) are higher than the segment for the next-largest plans ($10,000–$25,000 average account balance and between $100 million and $250 million in assets). *See* Tr., at 619:13–621:1. In addition to the misfit of this data segment to the Plan (because the $250 million and over segment only includes plans with between $250 million and $500 million in assets), that the information highlighted as relevant to the Plan contradicted the trend shown in the rest of the data sample should have been questioned by the Committee. *Id.* The Committee failed to investigate the flaws in this data. *See* Tr., at 620:18–621:1; 621:16–20.

149.    The 2017 Vendor Fee Benchmark included no information about the services received by any of the plans in the data sample, including meeting days, phone calls, enrollment fliers, payroll streaming, onboarding newly acquired participants, returned mail services, or merger and acquisition services. *See* Tr., at 591:18–593:16; 1089:16–23. The Committee did not inquire about the services obtained by any of the plans whose fees were used as data points in the survey sample, or specifically in the comparator group. *See* Tr., at 568:17–20; 1101:2–24. Ironically, when asked on direct examination by Defendants' counsel, whether a consultant should "take into account comparable service levels when attempting to assess the reasonableness of a plan's [record]keeping fees," Defendants' own expert, Mr. Gissiner, testified, "I think when you are assessing fees, you do take into account service levels." Tr., at 1079:13–17. Captrust indisputably did not do so. *See* Tr., at 1089:19–21 (Mr. Gissiner testifying that there was no consideration of services among comparator plans as part of the 2017 Vendor Fee Benchmark).

_____

plan asset size divided by average account balance.

150.    With $701.0 million in assets, the Plan was at least **40% larger** than the largest plan possibly included in the 2017 Vendor Fee Benchmark database. Ex. 6, at 5, 9.  The Committee would, thus, have had no basis to form any conclusions about the reasonableness of the Plan's recordkeeping fees based on data for dissimilar plans.  Still, the Committee erroneously understood the 2017 Vendor Fee Benchmark to show that the Plan's fees "came lower than the lowest of what competitor or other companies were paying."  *See* Tr., at 538:10–20; 410:15–17.

151.    Transamerica was not provided the 2017 Vendor Fee Benchmark.[25]  *See* Tr., at 417:7–15.  The Committee did not undertake any negotiation for lower fees in connection with the 2017 Vendor Fee Benchmark.[26]  *See* Tr., at 568:13–16.  The Committee decided it was not necessary to conduct an RFP after assessing Transamerica's fees and services during the Vendor Fee Benchmark in 2017.  Stipulated Facts Appendix ¶ 140.  The Committee did not achieve any price reduction as a result of the 2017 Vendor Fee Benchmark.[27]  *See* Tr., at 186:20–23, 328:6–8, 329:25–30, 568:6–16.

152.    Mr. Brady testified that Transamerica "added a dedicated team that solely focused on [Prime's] acquisitions."[28]  *See* Tr., at 328:23–24; *see also* Tr., at

---

[25]This renders Mr. Davis' testimony that the "real purpose of this exercise was to give context to Transamerica in regard to this data" lacking in credibility.  *See* Tr., at 845:6–14.  So, too, with Mr. Davis' testimony that another purpose of the exercise was to use this benchmarking data to negotiate with Transamerica.  *See* Tr., at 845:6–14.

[26]Ms. Gomez testified that the Committee did not negotiate for a reduction because it appeared the Plan's fees were lower than the fees indicated on the inapt chart.  *see* Tr., at 578:23–579:1.

[27]This is despite Mr. Davis' testimony that the Committee was focused on the potential impact of a reduction in plan document support services by Transamerica around this time.  *See* Tr., at 843:6–14.

[28]Mr. Heather also defended the fact that no fee reduction was achieved for the Plan by emphasizing that Transamerica added people to its service team.  *See* Tr., at 416:17–23, 449:16–17.

336:14–16 (Mr. Brady testifying that Transamerica "created a dedicated team" to service the Plan). This was repeated by Defendants' expert, Mr. Gissiner. *See* Tr., at 1032:32–25. As Ms. Langkamp of Transamerica later testified, however, this was not true. *See* Tr., at 947:5–8. Although Mr. Langkamp testified that as many as 20 individuals at Transamerica worked in connection with its provision of services to the Plan, *see* Tr., at 925:17–23, these individuals also worked with other Transamerica clients. *See* Tr., at 947:5–8. In any event, Ms. Gomez testified that Prime's decisions to make acquisitions were made in its corporate capacity rather than fiduciary capacity. *See* Tr., at 599:10–14.

153.    Mr. Geist testified that all major recordkeepers include merger and acquisition services in bundled services arrangements because such services result in more revenue to the recordkeeper given more participants and assets on the recordkeeper's platform as well as cross-selling opportunities. *See* Tr., at 677:17–20.

154.    Mr. Heather testified that he believed the 2017 Vendor Fee Benchmark created competitive pressure, but he acknowledged that no bids were solicited by the Committee and Transamerica did not even receive the presentation. *See* Tr., at 414:11–13, 416:11–16, 417:13–14.

155.    The Committee did not solicit or receive any competitive bids in connection with the 2017 Vendor Fee Benchmark. *See* Tr., at 71:12–21. This lapse, which resulted in the Committee going five years without receiving any sort of competitive bids, was inconsistent with applicable minimum standards. *See* Tr., at 617:24–618:2. Mr. Gissiner speculated as to why Transamerica might not have offered to reduce its fees, but his speculation is not based on evidence and particularly dubious given the Committee's failure to negotiate with Transamerica in connection with the 2017 Vendor Fee Benchmark. *See* Tr., at 1038:13–16.

156.    These flaws with the 2017 Vendor Fee Benchmark rendered it inadequate to inform the Committee of the reasonable market rate for the Plan's fees. *See* Tr., at 617:16–621:9. Based on an evaluation of Plan documents and materials

related to the 2020 Vendor Fee Benchmark, Mr. Geist concluded that the 2017 Vendor Fee Benchmark did not comport with minimum applicable standards for assessing the reasonableness of the Plan's recordkeeping fees.  *See id.*

### 4. Defendants' Fee Monitoring After Prime Agreed to Pay Recordkeeping Fees for Active Employees

157.    As of the Committee's meeting on June 5, 2019, Prime nominally agreed to being paying recordkeeping fees on behalf of active participants in the Plan. *See* Tr., at 333:6–16.  When Prime nominally agreed to being paying recordkeeping fees on behalf of active participants in the Plan, it sent a communication to employees that it would pay these fees.  *See* Tr., at 949:22–950:1.

158.    When Transamerica proposed a fee of $50 per participant, Mr. Davis relayed to the Committee that he believed the proposed fee was still too high and might be forced down by taking the Plan out to bid.  *See* Tr., at 417:16–19; Ex. 631, at 1.  When Mr. Davis made this statement, he was aware of the Plan's level of complexity and servicing requirements.  *See* Tr., at 418:6–419:1.  Nonetheless, the Committee accepted the proposal of $50 per participant without attempting to negotiate a further reduction.  *See* Tr., at 418:13–16.  The Plan did not go out to bid. *See* Tr., at 418:23–419:2.

159.    After the Committee received Captrust's proposal to reduce recordkeeping fees to $50 per participant, the Committee took nearly a year to implement the fee reduction.  *See* Tr., at 357:2–13.

160.    Captrust provided a Vendor Fee Benchmark in 2020.  *See* Tr., at 334:19–24.   At the time of the 2020 Vendor Fee Benchmark, the Plan had approximately $1.1 billion in assets and 44,341 participants. Ex. 724, at 10.  Captrust informed Transamerica of the results of the 2020 Vendor Fee Benchmark, which placed Transamerica's $50 per participant fee "out of the benchmark range." Ex. 677, at 1.  In response, Transamerica proposed to lower its fee from $50 to $40 per participant.  *See* Tr., at 335:3–5; Ex. 677, at 1.  This was higher than other providers

proposed as part of the 2020 Vendor Fee Benchmark. *See* Tr., at 335:5–7. The bids of the other providers were all "open architecture," meaning they assumed no opportunity for the candidates to earn additional revenues from the Plan through investment products or services. Ex. 724, at 14. Each of the bids included the same exact number of onsite participant education days. *Id.* at 16.

161.    Rather than confirm the proposed reduction was reasonable based on the Plan's services or negotiation, Mr. Davis recommended the Committee accept this reduction simply because he thought the proposed reduction was "of value." *See* Tr., at 867:24–25. The Committee was prepared to accept Transamerica's proposal of $40 per participant. *See* Tr., at 546:4–6, 549:6–9. It was only when Mr. Aleman realized that the Plan's fees compared unfavorably to fee data that he insisted the Committee negotiate further. *See* Tr., at 553:21–23; *see also* 905:11–19 (Mr. Davis testifying that he did not provide information to Mr. Aleman that caused him to reach the conclusion that the Plan's recordkeeping fees were too high). In response to Mr. Aleman's question about Transamerica's proposed fee, Mr. Davis identified the Plan's the number of onsite participant education days as "why this Plan may cost more than others." Ex. 689, at 1. Mr. Davis' explanation incorrectly ignored that every provider responding to the 2020 Vendor Fee Benchmark assumed the exact same number of onsite participant education days as Transamerica in submitting their proposals. Ex. 724, at 14. Mr. Aleman did not testify at trial and there was no testimony offered regarding the fact that he apparently investigated the reasonableness of recordkeeping fees independent of Captrust and Transamerica. It is notable, however, that the one time that a Committee member appears to have acted independent of Captrust's advice, such action resulted in a reduction in the Plan's fees.[29]

_____

[29]It is perhaps unsurprising that Prime's CFO stepped in to negotiate after recordkeeping fees for active participants became a line item on Prime's corporate budget. *See* Tr., at 333:6–16.

162.    Mr. Brady admitted that the Committee did not consider the services of the providers that participated in the 2020 Vendor Fee Benchmark.  *See* Tr., at 336:9–19.  Specifically, Mr. Brady testified that, with the other vendors, "[y]ou don't know what type of service you are going to get."  *See* Tr., at 336:12–13.  Mr. Brady went on, "[w]ould one of these other providers provide the same level of service that we were getting from Transamerica?  That is an open-ended question."  *See* Tr., at 336:17–19.

163.    In response to the results of the 2020 Vendor Fee Benchmark, Transamerica proposed a fee reduction to $39 per participant or $34 per head if the Plan offered Transamerica's managed advice service.  *See* Tr., at 868:10–17; Ex. 238, at 1–2.    The Committee eventually obtained a recordkeeping rate of $34 per participant as part of an agreement to allow Transamerica to offer its managed advice service to Plan participants, effective June 1, 2021.  *See* Tr., at 191:17–21, 335:19–22, 540:24–541:5; Ex. 239, at 2.  The managed advice service was a service pursuant to which Transamerica earned investment management fees by offering asset allocation advice to participants in the Plan.  *See* Tr., at 191:22–192:1.

164.    Participants who elect to use the managed account service are charged an annual fee rate of 45 basis points assessed on their account balance.  Ex. 211, at 1, 4.  The total fees, in terms of dollars, that Transamerica makes off Plan participants using the managed account service is not disclosed to the Committee in any presentation made by Transamerica.  *See* Tr., at 1091:4–1091:18.  Defendants' own expert, Mr. Gissiner, testified that he saw no evidence that the Committee deliberated about the managed advice service, *see* Tr., at 1044:2–4, or ever considered the fees Transamerica actually made on the managed advice service.  *See* Tr., at 1092:8–11.

165.    Transamerica had previously offered its managed advice service to the Committee and Committee members testified that they were "leery" of adding the

product.[30]    *See* Tr., at 415:13–14.  Although Ms. Dhuper testified at trial that she thought the managed advice service would be beneficial, she conceded that she does not know how the service works.  *See* Tr., at 542:2–4.  Ms. Dhuper also testified that she did not remember the cost to participants who elected to use the managed account service (despite continuing to serve on the Committee to this day).  *See* Tr., at 541:4–7.

166.    The Committee added the managed advice service to the Plan without conducting any independent analysis to determine if the service was suitable for the Plan or whether the associated fees were reasonable.  *See* Tr., at 617:5–8.  Similarly, the Committee did not provide Fidelity, Empower or Milliman, the other recordkeepers that provided proposals, with an opportunity to make a proposal accounting for the provision of a proprietary managed account service, thereby foregoing the possibility of receiving reduced bids assuming the opportunity to manage proprietary assets from those service providers.  *See* Tr., at 614:14–615:15, 617:9–13.

167.    Although Transamerica disclosed the basis point charge associated with the managed advice service, it did not disclose to the Committee the amount of fees it received in connection with the managed advice service, which the basis point charge would be insufficient to show since the amount of fees Transamerica received is equal to the basis point charge multiplied by the assets enrolled in the managed advice service.  *See* Tr., at 948:16–23, 1092:1–11.

168.    Prime experienced the benefit of these fee reductions since fees for active participants were paid from Prime's corporate accounts at this time.  *See* Tr., at

---

[30]The fact that Transamerica offered managed advice services to Committee on several previous occasions belies Mr. Davis' testimony that managed advice was a "relatively new service to the 401(k) marketplace at the time and certainly brand new to Transamerica." *See* Tr., at 870:5–7.

521:18–22.  Active Plan participants did not benefit from the fee reductions in any way.  *See id.*

169.    The Committee did not require Transamerica to compete in the process on the same basis as prospective new recordkeepers.  *See* Tr., at 616:7–16.  Instead, Transamerica was permitted to forego the initial stage of the process and the Committee informed Transamerica of other providers' bids before requiring it to submit a proposal.  *See id.*

170.    Based on an evaluation of Plan documents and materials related to the 2020 Vendor Fee Benchmark, Mr. Geist concluded that the 2020 Vendor Fee Benchmark did not comport with minimum applicable standards for assessing the reasonableness of the Plan's recordkeeping fees.  *See* Tr., at 614:9–13.

*        *        *

171.    Mr. Geist concluded that Defendants did not satisfy minimum applicable standards with respect to monitoring the Plan's recordkeeping fees.  See Tr., at 609:17–22.  Mr. Geist concluded that the Committee did not engage in adequate evaluation to apprise itself of the reasonable market rate for the Plan's recordkeeping services.   See Tr., at 611:25–612:10.   Mr. Geist concluded that the Committee's monitoring of the Plan's asset-based fee structure in place until August 1, 2019 fell below minimum applicable standards as it did not ever evaluate the Plan's fees on a per-participant basis, review whether the increased revenues received by Transamerica under the asset-based fee structure were proportionate to any additional services provided, or act to cap the asset-based fee at a reasonable rate.  See Tr., at 612:3–10.

**B. Defendants Mishandled the Expense Budget Account**

172.    As part of the Plan's administrative fee arrangement under the Pension Services Agreement, the Plan has maintained an expense budget account.  Ex. 195, at 12.  An expense budget account is a plan-level unallocated account established by the Committee that collects amounts withdrawn from participant accounts to pay different

types of necessary plan expenses.  *See* Tr., at 922:22–923:5; Ex. 199, at 3.  Amounts accumulated in the Plan's expense budget account ("EBA") can be used to pay plan-related expenses approved by the employer or can be allocated to Plan participants at the end of the year or as soon as is administratively feasible following the end of the year at the direction of the employer.  *See* Tr., at 923:6–924:4; Ex. 199, at 3.

173.    As part of the Plan's administrative fee arrangement under the Pension Services Agreement, the Plan has maintained the EBA.  *See* Tr., at Ex. 195, at 12.  The EBA is a plan-level unallocated account established by the Committee that collects amounts withdrawn from participant accounts to pay different types of necessary plan expenses.   *See* Tr., at 922:22–923:5; Ex. 199, at 3.   Amounts accumulated in the EBA can be used to pay plan–related expenses approved by the employer or can be allocated to Plan participants at the end of the year or as soon as is administratively feasible following the end of the year at the direction of the employer.  *See* Tr., at 923:6–924:3; Ex. 199, at 3.

174.    The provision that Transamerica could return expenses "as soon as administratively feasible" is consistent with the capabilities of all national recordkeepers during the relevant period and reinforces the minimum standard that amounts retained in a plan expense account should be returned as soon as administratively feasible.  *See* Tr., at 635:17–636:7.  This provision appeared in each of the service agreements and amendments with Transamerica.  *See, e.g.*, 923:25–925:2.

175.    Effective October 1, 2011, participants began paying an asset-based fee of 5 basis points which Transamerica deposited in the EBA.  Ex. 195, at 12.  This amount was charged in addition to the *pro rata* fee assessed against participant accounts to pay Transamerica for its provision of recordkeeping services.  *See* Tr., at 634:4–24.  The Plan maintained the EBA following the Plan's switch to a flat per participant recordkeeping fee, which Prime's assumed responsibility for paying on behalf of active participants, but participants no longer paid 5 basis points of their

account balance into the EBA.  *See* Tr., at 907:19–908:4; Ex. 209, at 4.  After August
1, 2019, nothing prevented the Plan from continuing to receive revenue sharing
amounts through the EBA in order to distribute these funds back to participants.  *See*
Tr., at 907:19–908:4.

176.    The administrative fee of five basis points was greater than the amount
needed to pay the Plan's administrative expenses separate from Transamerica's
recordkeeping fees of 21 basis points.  *See* Tr., at 635:2–6.

### 1. Accumulations in the Expense Budget Account Should have been Timely Distributed to Participants

177.    The EBA built up a balance over time as Plan assets grew, whereby the
*pro rata* fee assessed to participant accounts and deposited into the EBA generated
more absolute dollars than the Plan's aggregate expenses cost.  *See* Tr., at 859:1–13.
Despite the language in the Pension Services Agreement describing the Committee's
options to allocate the balance in the EBA, the balance was not used in full to pay
Plan expenses or returned to participants as soon as administratively feasible at the
end of each year.  *See* Tr., at 624:13–20, 862:5–9.

178.    The Plan held the following unused, undistributed amounts in the EBA
as of the end of each year from the beginning of the Class Period through 2019:

| Year | Year End EBA Balance |
|------|----------------------|
| 2014 | $172,951 |
| 2015 | $295,055 |
| 2016 | $330,348 |
| 2017 | $534,831 |
| 2018 | $663,015 |
| 2019 | $288,299 |

Ex. 763; 193:11–25; *see also* Tr., at 20–25 (Mr. Davis testifying that the Committee
maintained the EBA after Prime nominally agreed to pay recordkeeping expenses
for active participants).

179.    These unused, unallocated assets represented the following amounts per Plan participant:

| Year | Unallocated $ *per capita* |
|------|------------------|
| 2014 | $8.48 |
| 2015 | $9.41 |
| 2016 | $8.54 |
| 2017 | $12.64 |
| 2018 | $15.40 |
| 2019 | $6.49 |

Ex. 763.

180.    Mr. Geist testified that fiduciaries acting inconsistent with the minimum standard of care would recognize the amounts held in an Expense Budget Account are "still Plan assets," since they are fees paid by participants. *See* Tr., at 634:4–24.  To the extent these Plan assets are not needed for Plan expenses, they should be return to participants as soon as administratively feasible. *See id.*  Monies held in the EBA are unallocated and typically invested in a cash equivalent investment product, so participants do not benefit from having their funds sitting in the EBA. *See id.*

### 2. Defendants Misappropriated the Expense Budget Account After Prime Agreed to Cover Recordkeeping Fees for Active Employees

181.    In a September 18, 2018 email, Captrust advised the Committee ahead of the Plan's impending fee changes "[w]e also think you should eliminate the current 0.05 percent EBA fee and allocate the approximately $500,000 back to participants." *See* Tr., at 419:3–8; Ex. 631, at 1.  A portion of this balance was used to pay existing invoices for Plan-related expenses, but the entire amount remaining in the EBA was used to pay Transamerica.  *See* Tr., at 419:3–420:3.  Going forward, Prime would

need to pick up any "ad hoc" Transamerica fees that would have been paid out of the EBA.  Ex. 631, at 1.[31]

182.    Captrust reiterated their advice in November 2018, indicating to the Committee that "you may want to consider reallocating the current balance, or a portion thereof, to Plan participants."  Ex. 634, at 2; *see also* Tr., at 859:19–20.

183.    Mr. Brady testified that the EBA would no longer be necessary after Prime began paying recordkeeping fees for active Plan participants.  *See* Tr., at 347:13–16.

184.    Despite Prime communicating to participants that it would be assuming responsibility for payment of the Plan's recordkeeping fees for active participants from August 1, 2019, the Committee directed Transamerica to begin using the remaining balance in the EBA after August 1, 2019 to pay for the Plan's recordkeeping fees until it was exhausted, thereby causing Plan assets to continue to pay recordkeeping fees for active participants.  *See* Tr., at 636:8–23.

185.    The Committee "elected to use the Expense Budget Account balance since it was no longer needed, because we were no longer having revenue share on most of the funds, they agreed the committee use those funds for its intended purpose of paying accrued expenses related to recordkeeping."  *See* Tr., at 192:5–19.  The Committee never directed Transamerica to return the amounts accumulated in the EBA to plan participants.  *See* Tr., at 635:8–23.

186.    Accordingly, the Committee directed the remaining assets in the EBA that were intended to be for the benefit of the Plan to be used to fulfill Prime's obligation to pay Plan recordkeeping fees.  *See* Tr., at 194:23–195:6; 420:15–19.

187.    Mr. Brady had no support other than his "understanding" for his suggestion that the remaining balance in the EBA was used to pay accrued

---

[31]In this same email, Mr. Davis wrote that he thought the new fee proposal from Transamerica "may still be a little bit high" and that [i]t might be forced down by taking the plan out to bid."  *See* Tr., at 902:3–9.

recordkeeping expenses as opposed to continuing expenses; Mr. Brady conceded that he did not make the payments from the EBA himself, and thus couldn't speak to the exact timing of the invoices it was used to pay.  *See* Tr., at 353:8–20.

188.    In fact, Ms. Langkamp testified that Transamerica's recordkeeping fees ***continued to be paid*** from the amounts accumulated in the EBA until those amounts were exhausted.  *See* Tr., at 950:2–6.

189.    Applicable minimum standards provide that, if a fiduciary implements a revenue sharing structure that deducts fees from plan assets[32] and then holds excess fees that are not needed to pay plan expenses, such assets should be returned to participants as soon as administratively feasible.  *See* Tr., at 634:14–16.

190.    Based on an evaluation of Plan documents and the Committee's deliberative materials, Mr. Geist concluded that the Committee's failure to timely return the amounts accumulated in the EBA did not comport with minimum applicable standards for managing an expense budget account.  *See* Tr., at 624:13–20.

### C. Defendants Failed to Appropriately Monitor Investment Management Fees

#### 1. There is no Material Difference Between Share Classes of an Investment Other than Associated Fees

191.    The only difference between different share classes of an investment option is the cost structure.  *See* Tr., at 631:10–13.  Regardless of share class, the investment is managed by the same portfolio manager and the underlying holdings are held in the exact same proportion.  *See id*; Ex. 680, at 1; Ex. 696, at 1.  The difference in the investment management expenses of various share classes of single investment option is attributable to the amount, if any, the share class provides as a

---

[32]Defendants' counsel examined Mr. Geist at trial as to whether he was offering opinions about what qualifies as a plan asset.  *See* Tr., at 640:25–641:2.  Mr. Geist explained that his opinions in this regard concern plan assets from a *practitioner's* perspective.  *See* Tr., at 641:3.

rebate back to a plan or plan's recordkeeper to pay other plan expenses. *See* Tr., at 631:14–22.

192.    Applicable minimum standards provide that fiduciaries must consider the net effective expenses of a share class. *See* Tr., at 630:24–631:7, 631:19–22. The share class with the lowest net investment expense, absent a specific rationale otherwise, is the most beneficial share class of an investment option. *See* Tr., at 632:1–3. Captrust's own materials affirmed this concept. *See* Tr., at 907:8–18; *see also* Tr., at 1112:1–6 (Mr. Gissiner testifying that Captrust's presented materials to the Committee that indicated one of the pros of revenue sharing is that such share classes are often more beneficial from a net cost perspective).

193.    A lower net investment expense produces a higher net return for participants, increasing the chances of better retirement outcomes for participants. *See* Tr., at 857:1–12.

194.    Mr. Geist noted in his testimony that Captrust itself publishes guidance on selecting the share class of an investment option with the lowest net effective expense. *See* Tr., at 630:19–631:7, 631:23–632:5. Defendants' own expert, Mr. Gissiner, has recently testified that "comparing share classes and expense ratios without taking into account revenue sharing is incorrect." Tr., at 1112:19–1113:21.

195.    Mr. Davis explained this concept to Mr. Brady in connection with the Committee's 2017 replacement of the Goldman Sachs Growth Opps Fund with the MassMutual Mid Cap Growth Fund ("MassMutual Fund"). Ex. 602, at 4; Ex. 610, at 3. In weighing whether to select the R5 or I share class of the MassMutual Fund, Mr. Davis advised that, while the expense ratio of the R5 share class was higher, since it returned 15 basis points in revenue sharing, its net effective cost was lower than the I share class, which had zero revenue sharing component. *Id.*; *see also* Ex. 678, at 2.

196.    Mr. Gissiner testified that most major recordkeepers offer fee leveling features that allow revenue sharing amounts to be returned on a *pro rata* basis to the

participants whose investment management expenses generated such amounts.  *See* Tr., at 1115:5–18; *see also* Tr., at 604:15–23 (Mr. Geist testifying about fee leveling).

### 2.  The Committee Needlessly Moved Participants into Share Classes with Higher Net Effective Expenses

197.    Although Mr. Brady testified that he believed Captrust had the ability to obtain for the Plan share classes of investments for which it would not otherwise qualify, Mr. Brady was unaware as to whether the Plan actually would have qualified for those share classes.  *See* Tr., at 127:1–17, 350:17–19.

198.    Committee members repeatedly testified that Captrust advised the Committee to transition solely to investment vehicles that do not offer revenue sharing after Prime nominally agreed to pay recordkeeping fees for active participants in the Plan because the Plan "no longer needed" revenue sharing.  *See* Tr., at 318:8–11, 331:13–14.  The Plan never "needed" revenue sharing.  *See* Tr., at 908:14–18 (Mr. Davis testifying that Plan could have implemented alternative fee structures to pay recordkeeping expenses at any time).  Mr. Brady conceded that recordkeeping fees could have been paid directly by Plan participants at any time, *see* Tr., at 355:1–7, 355:19–24, which would obviate the need for revenue sharing.  The Committee was repeatedly informed of this possibility throughout the relevant period.  *See id.* Captrust's presentation on this subject, however, stated that one of disadvantages of paying fees this way is that participants would see the amount they were paying.  *See* Tr., at 544:10–16.

199.    Mr. Brady understood that share classes that offered revenue sharing could result in the Plan paying lower investment management expenses than an institutional share class that offered no revenue sharing.  *See* Tr., at 342:14–19, 345:11–14.

200.    Mr. Geist testified that the Committee selected share classes of investment options in the Plan that had higher net investment expenses with no additional benefit to the Plan.  *See* Tr., at 624:21–625:1.

201.     Effective August 1, 2019, the Committee effected changes to the Plan investment lineup to largely eliminate revenue sharing, resulting in the replacement of several lower net expense investments with share classes with higher net investment costs.  Ex. 209, at 1; Ex. 56, at 1.  As a result of these share class changes, participants who invested in the Delaware Small Cap Value Fund, the Oakmark Equity and Income Fund, the Prudential Jennison Growth Fund, the Putnam Equity Income Fund, the T. Rowe Price Mid Cap Value Fund, and the Invesco Real Estate Fund began paying a higher net investment expenses to continue investing in those same funds:

| Investment | Effective Cost Before 8/1/19 | Effective Cost After 8/1/19 |
|---|---|---|
| Delaware Small Cap Value | 0.68% | 0.75% |
| Oakmark Equity & Income | 0.38% | 0.59% |
| Prudential Jennison Growth | 0.43% | 0.60% |
| Putnam Equity Income | 0.46% | 0.55% |
| T. Rowe Price Mid Cap Value | 0.65% | 0.66% |
| Invesco Real Estate | 0.54% | 0.61% |

Ex. 209, at 1, *compare* Ex. 723, at 7–8 with Ex. 723, at 9–10.

202.     Although Mr. Gissiner testified that the Captrust quarterly investment reviews included investment management fees, *see* Tr., at 1069:21–22, he pointed to no specific evidence that the Committee conducted any critical review or analysis to this information.

203.     Based on an evaluation of Plan documents and the Committee's deliberative materials, Mr. Geist concluded that the Committee did not comport with minimum applicable standards for monitoring the Plan's investment management fees through the selection of appropriate share classes.  *See* Tr., at 624:21–625:1.

## IV.    DEFENDANTS CAUSED THE PLAN TO RETAIN UNSUITABLE INVESTMENTS

### A. The Challenged Funds

204.    Prior to the start of the Class Period, the Plan began offering the Fidelity Freedom Funds ("Freedom Funds"), the Invesco Real Estate Fund ("Invesco Fund"), the Prudential Jennison Small Company Fund ("Prudential Jennison Fund"), the T. Rowe Price Mid Cap Value Fund ("T. Rowe Price Fund"), and the Oakmark Equity & Income Fund ("Oakmark Fund") (collectively, the "Challenged Funds"). Ex. 7, at 14. Each of the Challenged Funds is actively managed. *See* Tr., at 509:20–510:9.

205.    If a Plan participant or beneficiary does not provide an election for the investment of their Plan assets, their assets are directed into the Plan's Qualified Default Investment Alternative ("QDIA"). *See* Tr., at 36:4–7, 309:6–8; Stipulated Facts Appendix ¶ 181. Generally, a majority of a defined contribution plan's assets are directed into the plan's QDIA as a result of participant sophistication and behavior. *See* Tr., at 36:8–11, 502:21–25, 503:2–5. Indeed, the Freedom Funds were the Plan's QDIA and largest holding during the period in which the suite was included in the Plan. Stipulated Facts Appendix ¶ 180; *see also* Tr., at 309:9–12. At times during the relevant period, the Freedom Funds as QDIA had grown to greater than 50% of Plan assets. *See* Tr., at 520:9–12. From the start of the Class Period, over half of Plan participants had some portion of their assets invested in the Freedom Funds. Ex/ 336, at 3, 5.F

206.    The charter that was finally adopted in 2019 specified that the Committee had ultimate monitoring responsibility with respect to the Plan's QDIA. *See* Tr., at 43:24–44:6. The IPS contained an Appendix reiterating the importance of monitoring the Plan's QDIA. *See* Tr., at 218:10–17. Given the important role a QDIA plays in a plan, care must be taken when changing a QDIA to ensure the replacement investment is appropriate for the plan demographics. *See* Tr., at 67:14–17.

207.    Target date funds ("TDF(s)"), like the Freedom Funds, are internally diversified investment vehicles, often offered as a mutual fund, collective investment trust, or exchange traded fund ("ETF"), that provide an asset allocation that changes over time along a defined glidepath set by TDF managers. *See* Tr., at 36:17–24; *see also* Stipulated Facts Appendix ¶ 179.  Generally, TDF glidepaths provide for more aggressive asset allocations for investors further from retirement and more conservative asset allocations for investors closer to retirement. *See* Tr., at 36:20–24.

208.    Mr. Brady repeatedly testified that he does not believe all TDFs to be actively managed. *See* Tr., at 137:5–7, 138:13–16.  This is contrary to widespread understanding in the industry and the testimony of Defendants' own expert, Mr. Gissiner, that all TDFs are inherently actively managed, due to the decision-making involved in glidepath construction and determining the underlying fund allocation. *See* Tr., at 1109:20–1110:21.

## B. The Committee Failed to Appropriately Monitor the Plan's Investments

### 1. Standards for Investment Monitoring

209.    The Committee monitors investment performance to ensure that Plan investments remain in the best interests of participants. *See* Tr., at 508:11–17.  The Committee is the discretionary fiduciary with respect to Plan investments, meaning it can receive and take into consideration the advice of its non-discretionary fiduciary advisor, but the ultimate responsibility and authority for investment decisions lies with the Committee. *See* Tr., at 46:9–21.  A fiduciary committee must still ensure that the information provided by the investment advisor satisfies the requirements of the IPS and that recommendations it receives from its investment advisor comply with the IPS. *See* Tr., at 50:2–9.  A fiduciary committee must also understand the methodology of any investment rating or scoring system proprietary to the investment advisor and identify whether and to what degree that system departs from the tenets of the IPS.

*See* Tr., at 54:16–18.  Such a system can be used to assess investments in addition to, but not in lieu of, the requirements of an IPS.  *See* Tr., at 55:10–13.

210.    A fiduciary investment selection and monitoring process must be documented to "prove that there was a thoughtful and a considered rationale for the decisions that were made and why" and "to provide a historical record" of decisions and the reasons for those decisions to ensure consistency over time.  *See* Tr., at 47:19–24.  Meeting minutes are an important source of documentation of a fiduciary process, including because, as Ms. Wagner testified, minutes can support the notion of a duly diligent process.  *See* Tr., at 48:9–12.

211.    Appropriate investment monitoring processes include a system for tracking investments that have been considered under review from quarter to quarter. *See* Tr., at 57:19–58:5.

212.    An IPS is "effectively a roadmap" provided to plan fiduciaries that outlines processes and protocols to utilize in the monitoring of plan investments.  *See* Tr., at 37:10–13.  It should provide "effective and practical guidelines" for fiduciary investment monitoring.  *See* Tr., at 49:12–14.

213.    The three- and five-year performance criteria laid out in the Plan's IPS are "standard."  *See* Tr., at 41:5–6.  Three- and five-year return periods provide different insight: the three-year time horizon "would more readily reflect a particular event up or down" while the five-year time horizon "tends to smooth things out and show the implementation of a strategy over time."  *See* Tr., at 807:19–23.

214.    Sharpe Ratio is a risk-adjusted performance metric, measuring an investment's return per unit of risk.  *See* Tr., at 268:9–25.  Mr. Davis testified at trial that risk-adjusted performance is one way to review the absolute returns of an investment.  *See* Tr., at 807:2–14.

215.    Peer relative performance is an opportunity cost measure, enabling plan fiduciaries to review a strategy against other strategies available in the marketplace. *See* Tr., at 807:2–14.

216.    Actively managed investments tend to charge higher fees than passively managed investments because that expense will be justified in greater performance than the relevant index. *See* Tr., at 184:9–17. Accordingly, the Committee monitored the performance of actively managed Plan investments relative to their benchmark indexes. *See* Tr., at 510:15–18.

## 2. Defendants' Flawed Monitoring

217.    The Committee met 35 times from the start of the Class Period through the end of 2022, excluding one Vendor Search and Selection meeting at which respondents to the 2015 RFI presented.[33] According to the start and end times recorded in the minutes, the Committee meetings lasted approximately 1 hour and 7 minutes. *Id.* This refutes Mr. Davis' testimony at trial that Committee meetings typically lasted one and a half to two hours. *See* Tr., at 792:19–25. The average Captrust quarterly investment review presentation was 66 slides in length.[34] Mr.

---

[33]Meetings held on September 25, 2019 (Ex. 57), November 14, 2019 (Ex. 58), May 14, 2020 (Ex. 23), August 19, 2020 (Ex. 236), and February 24, 2021 (Ex. 238) lasted 45 minutes. Meetings held on August 28, 2014 (Ex. 8), December 15, 2014 (Ex. 48), June 30, 2015 (Ex. 49), September 29, 2015 (Ex. 1), November 13, 2015 (Ex. 10), February 25, 2016 (Ex. 225), May 25, 2016 (Ex. 50), September 15, 2016 (Ex. 51), November 29, 2016 (Ex. 227), April 20, 2017 (Ex. 52), November 7, 2017 (Ex. 53), March 8, 2018 (Ex. 54), June 5, 2018 (Ex. 55), June 5, 2019 (Ex. 56), March 16, 2020 (Ex. 234), and May 26, 2021 (Ex. 239) lasted 1 hour. The meeting held on February 19, 2015 (Ex. 224) lasted 1 hour and 15 minutes. Meetings held on June 28, 2017 (Ex. 229), September 27, 2017 (Ex. 18), August 31, 2018 (Ex. 19), November 14, 2018 (Ex. 20), March 29, 2019 (Ex. 22), September 8, 2021 (Ex. 240), February 10, 2022 (Ex. 242), June 1, 2022 (Ex. 243), September 21, 2022 (Ex. 244), and December 8, 2022 (Ex. 245) lasted 1 hour and 30 minutes. The meeting held on April 7, 2020 (Ex. 233) lasted 20 minutes. The meeting held on November 17, 2020 (Ex. 59) lasted 30 minutes. The meeting held on December 7, 2021 (Ex. 241) lasted 2 hours.

[34]Q2 2014 (Ex. 7, Ex. 248) is 68 slides, Q3 2014 (Ex. 249) is 60 slides, Q4 2014 (Ex. 61) is 72 slides, Q1 2015 (Ex. 251) is 71 slides, Q2 2015 (Ex. 252) is 69 slides, Q3 2015 (Ex. 9) is 61 slides, Q4 2015 (Ex. 253) is 62 slides, Q1 2016 (Ex. 254) is 64 slides, Q2 2016 (Ex. 60) is 78 slides, Q3 2016 (Ex. 256) is 72 slides, Q4 2016 (Ex. 257) is 70 slides, Q1 2017 (Ex. 258) is 63 slides, Q2 2017 (Ex. 259) is 62 slides, Q3

Heather testified that the investment review portion of Committee meetings lasted about 20 to 30 minutes, *see* Tr., at 42:11–13, and Mr. Brady testified that meetings would begin with a market and economic update that would last 10 to 25 minutes.  *See* Tr., at 373:25–374:14.  The average investment review content (including any *ad hoc* fund search slides) in the quarterly investment review presentations spanned 42 slides, meaning the Committee spent an average of 29 to 43 seconds per slide reviewing Plan investments.[35]

2017 (Ex. 261) is 61 slides, Q4 2017 (Ex. 262) is 66 slides, Q1 2018 (Ex. 263) is 63 slides, Q2 2018 (Ex. 264) is 69 slides, Q3 2018 (Ex. 62) is 68 slides, Q4 2018 (Ex. 265) is 72 slides, Q1 2019 (Ex. 266) is 66 slides, Q2 2019 (Ex. 267) is 66 slides, Q3 2019 (Ex. 268) is 66 slides, Q4 2019 (Ex. 269) is 63 slides, Q1 2020 (Ex. 270) is 73 slides, Q2 2020 (Ex. 271) is 69 slides, Q3 2020 (Ex. 272) is 72 slides, Q4 2020 (Ex. 273) is 70 slides, Q1 2021 (Ex. 275) is 58 slides, Q2 2021 (Ex. 276) is 58 slides, Q3 2021 (Ex. 277) is 64 slides, Q1 2022 (Ex. 278) is 63 slides, Q2 2022 (Ex. 279) is 60 slides, Q3 2022 (Ex. 280) is 62 slides, and Q4 2022 (Ex. 281) is 67 slides.

[35]Concerning investment review content: Q2 2014 (Ex. 7, Ex. 248) has 47 slides, Q3 2014 (Ex. 249) has 48 slides, Q4 2014 (Ex. 61) has 51 slides, Q1 2015 (Ex. 251) has 47 slides, Q2 2015 (Ex. 252) has 44 slides, Q3 2015 (Ex. 9) has 37 slides, Q4 2015 (Ex. 253) has 37 slides, Q1 2016 (Ex. 254) has 36 slides, Q2 2016 (Ex. 60) has 52 slides, Q3 2016 (Ex. 256) has 44 slides, Q4 2016 (Ex. 257) has 46 slides, Q1 2017 (Ex. 258) has 40 slides, Q2 2017 (Ex. 259) has 39 slides, Q3 2017 (Ex. 261) has 38 slides, Q4 2017 (Ex. 262) has 38 slides, Q1 2018 (Ex. 263) has 38 slides, Q2 2018 (Ex. 264) has 43 slides, Q3 2018 (Ex. 62) has 42 slides, Q4 2018 (Ex. 265) has 36 slides, Q1 2019 (Ex. 266) has 39 slides, Q2 2019 (Ex. 267) has 39 slides, Q3 2019 (Ex. 268) has 39 slides, Q4 2019 (Ex. 269) has 38 slides, Q1 2020 (Ex. 270) has 45 slides, Q2 2020 (Ex. 271) has 41 slides, Q3 2020 (Ex. 272) has 44 slides, Q4 2020 (Ex. 273) has 43 slides, Q1 2021 (Ex. 275) has 37 slides, Q2 2021 (Ex. 276) has 38 sides, Q3 2021 (Ex. 277) has 41 slides, Q1 2022 (Ex. 278) has 40 slides, Q2 2022 (Ex. 279) has 38 slides, Q3 2022 (Ex. 280) has 41 slides, Q4 2022 (Ex. 281) has 41 slides.

i.  **The Committee Routinely Failed to Identify Non–Compliant Investments Under the IPS**

a.  **The Committee Relied Solely on Captrust's Scoring System to Determine Non–Compliant Investments**

218.    The Committee did not review or discuss investments that failed to satisfy the IPS' three- and five-year performance criteria. *See* Tr., at 49:19–23. Instead, the Committee relied on Captrust's scoring system to monitor how the Plan's investments were performing against the Plan's IPS. *See* Tr., at 133:12–15. Mr. Bogert testified that "the Committee never made an independent determination that an investment was not in compliance with the IPS independent from the CAPTRUST scoring system[.]" *See* Tr., at 516:19–23. Mr. Bogert testified further that he "did not believe that the CAPTRUST scoring system ever failed to identify an investment that was noncompliant with the standards set forth in the IPS." *See* Tr., at 517:3–6.

219.    In Captrust's scoring system for active investments, 40% of the score was attributable to performance criteria and 60% was attributable to more qualitative criteria. *See* Tr., at 55:20–21. This had the effect of overemphasizing qualitative criteria.[36]  *See* Tr., at 55:22–25. As a result, underperforming investments that garnered positive qualitative scores based on their brand, management personnel, and related factors could still obtain scores that would keep them in good standing. *See* Tr., at 56:2–4.

220.    Captrust's scorecard provided a color-coded system under which investments that scored above 80 were in "good standing" and indicated with a green marker and investments that scored below 80 were not in good standing and "marked

---

[36]While Ms. Wagner acknowledged qualitative criteria are relevant, *see* Tr., at 97:7–8, she testified that the IPS' investment monitoring criteria required the Committee specifically consider certain performance criteria that were masked by the Captrust scorecard's overweighting of qualitative criteria. *See* Tr., at 98:19–99:10.

for review." *See* Tr., at 133:16–22; Stipulated Facts Appendix ¶ 171.  Investments that scored between 70 and 80 were indicated with a yellow marker.  *See* Tr., at 134:4–6; Stipulated Facts Appendix ¶ 172.  Investments that scored below 70 were indicated with a red marker and designated "consider for termination."[37]  *See* Tr., at 134:7–9; Stipulated Facts Appendix ¶ 173.

221.    Under Captrust's scoring system for actively managed investments, if an investment received the lowest possible score for performance and high marks on other criteria, it would still obtain a score of 70 and not be designated "consider for termination."  *See* Tr., at 139:12–20.  Stated differently, an investment could dramatically underperform both its benchmark and peer group on each a three- and five-year basis and still not be considered for termination under Captrust's scoring system.[38]  *See* Tr., at 139:21–25.

222.    Under Captrust's scoring system for TDFs, if an investment received the lowest possible score for performance and high marks on other criteria, it would still obtain a score of 85 and not be designated "consider for termination" or "marked

---

[37]"Consider for termination" was only available to be assigned as an investment's overall score, not the scores applied to the underlying components (*e.g.*, peer rank or risk-adjusted performance).  *See* Tr., at 427:22–24.  Notwithstanding this, several Committee members testified as to a misunderstanding that when underlying components received a yellow "marked for review" designation, they were not necessarily the worst performers.  *See* Tr., at 376:10–15, 378:4–18.  In other words, Committee members failed to recognize that investments were among the worst performing investments.  *See* Tr., at 376:10–15.

[38]In fact, the Captrust scorecard did not even indicate the numerical score an investment received across the various component criteria.  *See* Tr., at 428:13–15.

for review."[39]  *See* Tr., at 142:5–20.  In fact, TDFs could receive the lowest possible scores for performance and remain in "good standing" ***indefinitely***.[40]  *See id.*

223.    Although Mr. Brady testified that he considered it unlikely that an investment would receive exceedingly poor performance scores but high qualitative scores, *see* Tr., at 220:5–19, that would be something the Committee "would want to look into" and he believed the Captrust scoring would have flagged such a scenario. *See* Tr., at 220:18–23.  Plan investments regularly received poor performance scores and high qualitative scores and remained in "good standing" under the Captrust scoring system.  *See* Tr., at 372:13–373:4; 375:23–376:6; 378:4–379:16.  This is significant because the Committee did not spend meaningful (if any) time at meetings discussing investments that were designated as being in "good standing."  *See* Tr., at 425:13–25.

224.    No Committee member ever raised any concerns regarding the Captrust scoring methodology.  *See* Tr., at 134:18–21.

225.    Captrust's scoring system stated that "the scoring system is one tool for the Committee's use, not a system that supplants the fiduciary's role in prudently evaluating investment options[.]"  *See* Tr., at 135:15–21.

226.    Actively managed investments are expected to beat the relevant index under Captrust's scoring system.  *See* Tr., at 135:25–136:4, 364:24–25.  The IPS also provided that, on a quarterly basis, Captrust was to provide the Committee with a

---

[39]This is true notwithstanding Mr. Davis' testimony that absolute returns and risk-adjusted returns are principal means of evaluating target date funds and elaboration that looking at these metrics on a peer-relative basis is an "opportunity cost measure[.]"  *See* Tr., at 807:7–15.

[40]Mr. Gissiner's testimony about the sufficiency of the scoring system was premised on the understanding that the scorecard functioned to identify investments that are underperforming so the Committee could conduct additional analysis around the underperforming investment.  *See* Tr., at 1063:18–24.  Since the scoring system failed to satisfy this basic function, Mr. Gissiner's testimony in this regard is not credible.

report of each investment's relevant performance and relative rankings against appropriate indices. *See* Tr., at 365:6–14. Despite this, Mr. Brady testified that the Committee monitored active funds on the basis of risk-adjusted performance and performance compared to peers. *See* Tr., at 263:16–18. Mr. Brady testified that the same metrics were used to evaluate TDFs. *See* Tr., at 263:22–25.

227.    Mr. Brady frequently conflated a good Captrust score with good performance in his testimony. *See* Tr., at 376:16–377:3. When asked how the Invesco Fund performed during the time it was in the Plan, Mr. Brady noted that it scored "100 multiple times." *See* Tr., at 302:13–20. Asked the same question about the T. Rowe Price Fund, Mr. Brady noted that "with an exception of two quarters prior to my joining the Committee, it was in good standing." *See* Tr., at 306:11–17. Confronted with data demonstrating the Invesco Fund's five-year peer ranking being below the peer median from the Fourth Quarter of 2013 through the Fourth Quarter of 2016, but receiving a passing Captrust score for each quarter, Mr. Brady was adamant the fund was "performing well" due to the Captrust score reflecting it was in "good standing." *See* Tr., at 362:7–23; Ex. 762, at 1.

228.    Captrust's quarterly investment reviews did not separately show whether a Plan investment was in compliance with the performance criteria established under the IPS. *See* Tr., at 59:19–21.

229.    There were numerous instances throughout the relevant period in which Captrust reported to the Committee that an investment was in "good standing" even when it was not in compliance with the performance criteria established under the IPS. *See* Tr., at 60:23–61:3, 62:17–23, 63:6–9.

230.    Exclusive reliance on a proprietary scoring system that is inconsistent with a Plan's IPS does not meet applicable minimum standards of care. *See* Tr., at 56:5–7, 57:2–8.

**b. The Captrust Scoring System Masked Non–Compliance with the IPS**

231.    The Committee did little to probe into the rating the Challenged Funds received from Captrust, including whether the ratings were accurate or in compliance with the Plan's IPS.  *See* Tr., at 38:21–39:2.

232.    "The scoring methodology is consistent" between inclusion and evaluation of funds.  Tr., at 369:2–4; *see also* Tr., at 370:25–371:4.

233.    Each of the Challenged Funds was an actively managed investment.  *See* Tr., at 509:20–510:9.

234.    The Committee did not investigate the manner and degree in which Captrust's scorecard differed from the IPS in its provisions for monitoring investments.  *See* Tr., at 54:13–15, 56:12–19, 64:13–17.

235.    The quarterly investment reviews provided by Captrust did not indicate whether an investment was "marked for review" during prior periods.  *See* Tr., at 57:17–58:3.   This prevented effective tracking of Plan investments' historical compliance with IPS monitoring criteria.  *Id.*; *see also* Tr., at 95:20–6.

236.    Mr. Brady testified that an investment being "marked for review" or "considered for termination" were "some of the main reasons or main items that would get into meeting minutes."[41]   *See* Tr., at 157:16–21.  Indeed, during his deposition,

---

[41]Mr. Brady also testified that a designation of "marked for review" usually indicated that an investment was underperforming relative to their peers.  *See* Tr., at 214:23–25.   Notwithstanding that underperformance relative to peers was a basis for noncompliance with the IPS, investments were routinely in "good standing" despite underperforming relative to their peers.  *See, e.g.*, Ex. 762, at 1; Ex. 49; Ex. 10; Ex. 225; Ex. 50; Ex. 51; Ex. 227; Ex. 52.  Likewise, investments that were "marked for review" frequently went without discussion in Committee meetings or note in meeting minutes.  *See, e.g.*, Tr., at 431:8–13; Ex. 7, at 19; Ex. 249, at 12; Ex. 61, at 20; Ex. 8; Ex. 48; Ex. 224.

Mr. Brady testified that the meeting minutes always reflected investments that were "marked for review":

> Q: Did the meeting minutes, to the Committee's knowledge, always at least indicate when an investment, based on the scoring methodology, CAPTRUST utilized required that the investment be marked for review or considered for termination?

> A: I don't recall any instances where it was not mentioned in the meeting minutes. I can say that sometimes we talked about funds even when maybe they weren't marked for review or considered for termination.

*See* Tr., at 158:7–15.

237.   Mr. Brady testified that "if any investment was marked for review, it should be reflected in the meeting minutes[.]"  *See* Tr., at 183:21–25.  Mr. Davis likewise testified that he "certainly called out in the minutes when things are marked for review.  *See* Tr., at 882:6–8.  Mr. Davis, however, later was forced to concede there were occasions in which this was not true.[42]  *See* Tr., at 883:8–9, 886:21–23, 887:20–23.

238.   The Captrust scoring system was intended to be "considered in the context that the scoring system is one tool for the Committee's use," but the Committee's unshakable focus on the Captrust score caused it to frequently ignore investment performance that did not satisfy standards articulated elsewhere in the IPS. Ex. 3, at 11; Ex. 4, at 11.

239.   The Captrust scorecard consistently indicated that investments were in "good standing" despite failing the IPS' criteria that investments should rank in the top 50 percent of their given peer group for the three- or five-year annualized period. *See* Tr., at 165:8–14, 362:12–23, 378:4–379:15.

---

[42]In fact, Mr. Davis testified that the minutes called out the increase in the Plan's assets in the Fidelity Freedom funds was a "healthy sign" at a time when the Freedom Funds were marked for a review but no concerns were noted in the same emails.  *See* Tr., at 888:14–24.

240.    As shown in the compilation of data from Captrust quarterly investment review presentations below, the Invesco Fund received a Captrust score indicating "good standing" despite ranking in the bottom half of peers over both three- and five-year periods in the First Quarter of 2015 and every quarter from the Third Quarter of 2015 through the Fourth Quarter of 2016.  Ex. 762, at 1.

| | 3-Year Return | | 5-Year Return | | Captrust | |
|---|---|---|---|---|---|---|
| Quarter | Beat Index | Rank | Beat Index | Rank | Score | Committee Minutes |
| 4Q13 | * | * | No | 68 | * | * |
| 1Q14 | * | * | No | 78 | * | * |
| 2Q14 | No | 34 | No | 73 | 84 | No mention |
| 3Q14 | Yes | 29 | No | 70 | 87 | No mention |
| 4Q14 | No | 45 | No | 77 | 80 | No mention |
| 1Q15 | No | 55 | No | 69 | 84 | No mention |
| 2Q15 | No | 42 | No | 58 | 80 | No mention |
| 3Q15 | No | 53 | No | 59 | 80 | No mention |
| 4Q15 | No | 61 | No | 57 | 81 | No mention |
| 1Q16 | No | 62 | No | 57 | 83 | No mention |
| 2Q16 | No | 65 | No | 59 | 84 | No mention |
| 3Q16 | No | 61 | No | 53 | 83 | No mention |
| 4Q16 | No | 64 | No | 58 | 83 | No mention |
| 1Q17 | No | 30 | No | 29 | 93 | No mention |
| 2Q17 | No | 32 | No | 26 | 97 | No mention |
| 3Q17 | No | 42 | No | 30 | 95 | No mention |

Invesco Real Estate Fund

*information not produced

**EXHIBIT 762    Page 1 of 8**

241.    None of the minutes for the Committee meetings at which the above performance data was provided contain any discussion of the Invesco Fund's underperformance relative to its peer group or rationale for the decision to retain the fund.  Ex. 49; Ex. 10; Ex. 225; Ex. 50; Ex. 51; Ex. 227; Ex. 52.

242.    As shown in the compilation of data from Captrust quarterly investment review presentations below, the Prudential Jennison Fund received a Captrust score indicating "good standing" despite ranking in the bottom half of peers over both three- and five-year periods in the Second Quarter of 2015, the Fourth Quarter of 2015, and every quarter from the Fourth Quarter of 2017 through the Second Quarter of 2018. Ex. 762, at 2.

| | Prudential Jennison Small Company Fund | | | | | |
| | 3-Year Return | | 5-Year Return | | Captrust | |
| Quarter | Beat Index | Rank | Beat Index | Rank | Score | Committee Minutes |
|---|---|---|---|---|---|---|
| 4Q14 | No | 47 | No | 54 | 87 | No mention |
| 1Q15 | No | 33 | No | 56 | 87 | No mention |
| 2Q15 | No | 54 | No | 65 | 87 | No mention |
| 3Q15 | No | 31 | No | 51 | 87 | No mention |
| 4Q15 | No | 58 | No | 52 | 85 | No mention |
| 1Q16 | Yes | 22 | No | 32 | 94 | No mention |
| 2Q16 | Yes | 25 | No | 33 | 94 | No mention |
| 3Q16 | No | 30 | No | 51 | 93 | No mention |
| 4Q16 | Yes | 25 | No | 44 | 96 | No mention |
| 1Q17 | Yes | 28 | No | 33 | 95 | No mention |
| 2Q17 | No | 50 | No | 42 | 93 | No mention |
| 3Q17 | No | 72 | No | 39 | 90 | No mention |
| 4Q17 | No | 60 | No | 56 | 90 | No mention |
| 1Q18 | No | 68 | No | 59 | 85 | No mention |
| 2Q18 | No | 67 | No | 64 | 85 | No mention |
| 3Q18 | No | 91 | No | 76 | 78 | No mention |
| 4Q18 | No | 85 | No | 72 | 73 | Committee determined to replace the fund |

**EXHIBIT 762    Page 2 of 8**

243.    None of the minutes for the Committee meetings at which the above performance data was provided contain any discussion of the Prudential Jennison Fund's underperformance relative to its peer group or rationale for the decision to retain the fund.  Ex. 1; Ex. 225; Ex. 54; Ex. 230; Ex. 19.

244.    The T. Rowe Price Fund received a score indicating it was in "good standing" for the Third Quarter of 2015 despite ranking in the bottom half of peers over both three- and five-year periods.  Ex. 762, at 3.  The minutes of the Committee meeting on November 13, 2015 contain no discussion of the T. Rowe Price Fund's

underperformance relative to its peer group or rationale for the decision to retain the fund.  Ex. 10.

245.    The Oakmark Fund received a score indicating it was in "good standing" for the Second Quarter of 2016 despite ranking in the bottom half of peers over both three- and five-year periods.  Ex. 762, at 4.  The minutes of the Committee meeting on September 15, 2016 contain no discussion of the T. Rowe Price Fund's underperformance relative to its peer group or rationale for the decision to retain the fund.  Ex. 51.

246.    Under the IPS, Plan investments were to be reviewed according to the Investment Evaluation section, which included the prescription that investment performance be evaluated against appropriate indexes.  Ex. 3, at 7; Ex. 4, at 7; Ex. 5, at 7.  The Captrust scorecard consistently indicated that investments were in "good standing" despite failing this IPS criteria.

247.    As shown in the compilation of data from Captrust quarterly investment review presentations below, the Invesco Fund received a Captrust score indicating "good standing" despite failing to beat the index return over both three- and five-year periods in the Second Quarter of 2014 and every quarter from the Fourth Quarter of 2014 through the Third Quarter of 2017.  Ex. 762, at 1.

1

2

3

4

5

6

7

8

9

10

11

12

13

| Invesco Real Estate Fund | | | | | | |
| Quarter | 3-Year Return | | 5-Year Return | | Captrust Score | Committee Minutes |
| | Beat Index | Rank | Beat Index | Rank | | |
| 4Q13 | * | * | No | 68 | * | * |
| 1Q14 | * | * | No | 78 | * | * |
| 2Q14 | No | 34 | No | 73 | 84 | No mention |
| 3Q14 | Yes | 29 | No | 70 | 87 | No mention |
| 4Q14 | No | 45 | No | 77 | 80 | No mention |
| 1Q15 | No | 55 | No | 69 | 84 | No mention |
| 2Q15 | No | 42 | No | 58 | 80 | No mention |
| 3Q15 | No | 53 | No | 59 | 80 | No mention |
| 4Q15 | No | 61 | No | 57 | 81 | No mention |
| 1Q16 | No | 62 | No | 57 | 83 | No mention |
| 2Q16 | No | 65 | No | 59 | 84 | No mention |
| 3Q16 | No | 61 | No | 53 | 83 | No mention |
| 4Q16 | No | 64 | No | 58 | 83 | No mention |
| 1Q17 | No | 30 | No | 29 | 93 | No mention |
| 2Q17 | No | 32 | No | 26 | 97 | No mention |
| 3Q17 | No | 42 | No | 30 | 95 | No mention |

*information not produced

**EXHIBIT 762    Page 1 of 8**

14    248.    None of the minutes for the Committee meetings at which the above

15  performance data was provided contain any discussion of the Invesco Fund's

16  underperformance relative to the index or rationale for the decision to retain the fund.

17  Ex. 222; Ex. 224; Ex. 49; Ex. 1; Ex. 10; Ex. 225; Ex. 50; Ex. 51; Ex. 227; Ex. 52; Ex.

18  229; Ex. 18; Ex. 53.

19    249.    As shown in the compilation of data from Captrust quarterly investment

20  review presentations below, the Prudential Jennison Fund received a Captrust score

21  indicating "good standing" despite failing to beat the index return over both three- and

22  five-year periods every quarter from the Fourth Quarter of 2014 through the Fourth

23  Quarter of 2015, in the Third Quarter of 2016, and every quarter from the Second

24  Quarter of 2017 through the Second Quarter of 2018.  Ex. 762, at 2.

25

26

27

28

| Prudential Jennison Small Company Fund | | | | | | |
|---|---|---|---|---|---|---|
| | 3-Year Return | | 5-Year Return | | Captrust | |
| Quarter | Beat Index | Rank | Beat Index | Rank | Score | Committee Minutes |
| 4Q14 | No | 47 | No | 54 | 87 | No mention |
| 1Q15 | No | 33 | No | 56 | 87 | No mention |
| 2Q15 | No | 54 | No | 65 | 87 | No mention |
| 3Q15 | No | 31 | No | 51 | 87 | No mention |
| 4Q15 | No | 58 | No | 52 | 85 | No mention |
| 1Q16 | Yes | 22 | No | 32 | 94 | No mention |
| 2Q16 | Yes | 25 | No | 33 | 94 | No mention |
| 3Q16 | No | 30 | No | 51 | 93 | No mention |
| 4Q16 | Yes | 25 | No | 44 | 96 | No mention |
| 1Q17 | Yes | 28 | No | 33 | 95 | No mention |
| 2Q17 | No | 50 | No | 42 | 93 | No mention |
| 3Q17 | No | 72 | No | 39 | 90 | No mention |
| 4Q17 | No | 60 | No | 56 | 90 | No mention |
| 1Q18 | No | 68 | No | 59 | 85 | No mention |
| 2Q18 | No | 67 | No | 64 | 85 | No mention |
| 3Q18 | No | 91 | No | 76 | 78 | No mention |
| 4Q18 | No | 85 | No | 72 | 73 | Committee determined to replace the fund |

**EXHIBIT 762    Page 2 of 8**

250.    None of the minutes for the Committee meetings at which the above performance data was provided contain any discussion of the Prudential Jennison Fund's underperformance relative to the index or rationale for the decision to retain the fund.  Ex. 224; Ex. 49; Ex. 1; Ex. 10; Ex. 225; Ex. 227; Ex. 18; Ex. 53; Ex. 54; Ex. 230; Ex. 19.

251.    As shown in the compilation of data from Captrust quarterly investment review presentations below, the T. Rowe Price Fund received a Captrust score indicating "good standing" despite failing to beat the index return over both three- and five-year periods every quarter from the Second Quarter of 2014 through the Fourth Quarter of 2015.  Ex. 762, at 3.

| T. Rowe Price Mid-Cap Value Fund | | | | | | |
|---|---|---|---|---|---|---|
| | 3-Year Return | | 5-Year Return | | Captrust | |
| Quarter | Beat Index | Rank | Beat Index | Rank | Score | Committee Minutes |
| 1Q14 | * | * | No | 56 | * | * |
| 2Q14 | No | 44 | No | 72 | 84 | No mention |
| 3Q14 | No | 59 | No | 72 | 75 | No mention |
| 4Q14 | No | 48 | No | 76 | 77 | No mention |
| 1Q15 | No | 43 | No | 69 | 82 | No mention |
| 2Q15 | No | 45 | No | 65 | 86 | No mention |
| 3Q15 | No | 63 | No | 58 | 82 | No mention |
| 4Q15 | No | 51 | No | 40 | 92 | No mention |

*information not produced

**EXHIBIT 762    Page 3 of 8**

252.    None of the minutes for the Committee meetings at which the above performance data was provided contain any discussion of the T. Rowe Price Fund's underperformance relative to the index or rationale for the decision to retain the fund. Ex. 222; Ex. 48; Ex. 224; Ex. 49; Ex. 1; Ex. 10; Ex. 225.

253.    As shown in the compilation of data from Captrust quarterly investment review presentations below, the Oakmark Fund received a Captrust score indicating "good standing" despite failing to beat the index return over both three- and five-year periods every quarter from the Fourth Quarter of 2015 through the Fourth Quarter of 2018 except for the Third Quarter of 2016 and Third Quarter of 2017, as well as in the Third Quarter of 2019.  Ex. 762, at 4.

| Oakmark Equity & Income Fund | | | | | | |
|---|---|---|---|---|---|---|
| | 3-Year Return | | 5-Year Return | | Captrust | |
| Quarter | Beat Index | Rank | Beat Index | Rank | Score | Committee Minutes |
| 4Q15 | No | 29 | No | 45 | 89 | No mention |
| 1Q16 | No | 29 | No | 49 | 89 | No mention |
| 2Q16 | No | 52 | No | 62 | 82 | No mention |
| 3Q16 | No | 69 | No | 39 | 76 | No mention |
| 4Q16 | No | 43 | No | 29 | 81 | No mention |
| 1Q17 | No | 43 | No | 26 | 88 | No mention |
| 2Q17 | No | 47 | No | 24 | 88 | No mention |
| 3Q17 | No | 31 | Yes | 13 | 91 | No mention |
| 4Q17 | No | 40 | No | 15 | 91 | No mention |
| 1Q18 | No | 38 | No | 20 | 91 | No mention |
| 2Q18 | No | 54 | No | 26 | 87 | No mention |
| 3Q18 | No | 41 | No | 47 | 83 | No mention |
| 4Q18 | No | 34 | No | 62 | 84 | No mention |
| 1Q19 | No | 35 | No | 63 | 78 | No mention |
| 2Q19 | No | 15 | Yes | 59 | 87 | No mention |
| 3Q19 | No | 31 | No | 55 | 82 | No mention |
| 4Q19 | No | 65 | No | 63 | 74 | No mention |
| 1Q20 | No | 92 | No | 88 | 67 | Committee determined to replace the fund |

**EXHIBIT 762    Page 4 of 8**

254.    None of the minutes for the Committee meetings at which the above performance data was provided contain any discussion of the Oakmark Fund's underperformance relative to the index or rationale for the decision to retain the fund. Ex. 225; Ex. 50; Ex. 51; Ex. 52; Ex. 229; Ex. 18; Ex. 54; Ex. 230; Ex. 19; Ex. 20; Ex. 22; Ex. 58.

255.    Mr. Brady testified that any investment designated as "marked for review" or "consider for termination" was ostensibly on the "watch list," *see* Tr., at 215:13–16, but there was no actual with list or tracking of the history of investments that were designated as "marked for review" or "consider for termination." *See* Tr., at 430:13–19.

### ii.    The Meeting Minutes Reflect no Sufficient Consideration of Investments Calling for Investigation and Removal

256.    Minimum industry standards require documentation of the rationale for decisions made by plan fiduciaries and to provide a historical record that facilitates the application of a consistent process over time. *See* Tr., at 47:12–21.    This is

particularly important in the event a fiduciary determines not to comply with an IPS. *See* Tr., at 48:9–14. Indeed, both formal fiduciary training presentations to the Committee by Diane Thompson emphasize that the Committee "must be able to show investigation, deliberation, and rational decision making." Ex. 284, at 8; Ex. 285, at 8. Meeting minutes that do not comport with these standards have little utility to fiduciaries since they do not facilitate the application of a consistent, reasoned process. *See* Tr., at 48:5–8.

257. The Committee's minutes were effectively boilerplate, repeatedly stating that investments were reviewed but providing no detail on the nature of substance of any such review.[43]   *See* Tr., at 47:22–48:1. In fact, the minutes sometimes erroneously repeated data from prior minutes without revision. *See* Tr., at 169:22–25, 170:7–11. Committee members testified at trial that, at each meeting, the Committee approved minutes from the prior meeting and would make corrections to the minutes if they contained any inaccuracies. *See* Tr., at 506:12–507:2, 534:3–11.

258. There is no evidence in the record that demonstrates a discussion of investments that were "marked for review" under Captrust's scoring system. *See* Tr., at 53:12–19. Failing to discuss investments that were "marked for review" under Captrust's scoring system violated the Plan's IPS. *See* Tr., at 53:20–22.

259. The Prudential Jennison Fund scored a 78 and was "marked for review" in the Third Quarter of 2018, but no discussion, conclusion, or rationale for the decision to retain the fund is recorded in the meeting minutes. *See* Tr., at 172:6–173:4; Ex. 62, at 24; Ex. 231.

---

[43]Although Mr. Davis testified that the meeting minutes were similar to the meeting minutes kept for other plans, this is unsurprising since Mr. Davis' team prepared the minutes. *See* Tr., at 795:1–4, 877:19–24. Mr. Davis, however, did not testify to the other materials maintained by or practices of any other committees, let alone the circumstances of the plans or investments administered by those committees, rendering this testimony inconsequential. *See id.*

260.    The T. Rowe Price Fund scored a 75 and was "marked for review" in the Third Quarter of 2014 and scored a 77 and was "marked for review" in the Fourth Quarter of 2014, but no discussion, conclusion, or rationale for the decision to retain the fund is recorded in the meeting minutes for either consecutive quarter.  Ex. 249, at 10; Ex. 61, at 18; Ex. 48; Ex. 224.  Mr. Brady agreed that a such discussion, if it occurred, should have been reflected in the meeting minutes.  *See* Tr., at 183:13–184:3.

261.    The Oakmark Fund was "marked for review" in the Third Quarter of 2016, First Quarter of 2019, and Fourth Quarter of 2019, scoring 76, 78, and 74, respectively, but no discussion, conclusion, or rationale for the decision to retain the fund is recorded in the relevant meeting minutes.  Ex. 256, at 24; Ex. 266, at 24; Ex. 269, at 24; Ex. 227; Ex. 56; Ex. 234.  Mr. Brady agreed that the Oakmark Fund being "marked for review" should have been mentioned in the meeting minutes.  *See* Tr., at 184:18–22.

262.    The Freedom Funds were "marked for review" in three straight quarters from the Second Quarter of 2014 through the Fourth Quarter of 2014, scoring 79, 77, and 77, respectively, but no discussion, conclusion, or rationale for the decision to retain the suite is recorded in the relevant meeting minutes.  *See* Tr., at 431:8–13; Ex. 7, at 19; Ex. 249, at 12; Ex. 61, at 20; Ex. 8; Ex. 48; Ex. 224.

**a.  There is no Record Separate from Meeting Minutes that Reflects any Rationale for Retaining Non–Compliant Investments**

263.    The Committee consistently retained investments that were failing to meet the standards provided by the Plan's IPS and failed to indicate the rationale for such retention decisions.  *See* Tr., at 48:2–14.

264.    Mr. Heather testified that the only way to determine if and for how long a Plan investment had been put under review was to look at every previous Captrust quarterly investment review presentation.  *See* Tr., at 430:14–18.

265.    Mr. Bogert testified at trial that any Committee discussion concerning the appropriateness of the index benchmarks or peer groups chosen by Captrust against which to measure the Plan's investments would be reflected in the Committee's meeting minutes. *See* Tr., at 513:10–15.

266.    Mr. Davis would email the Committee members the quarterly investment review to be discussed at the meeting, along with a high-level "executive summary" of its contents and subjects "of particular interest."  Ex. 555; Ex. 556; Ex. 560; Ex. 566; Ex. 572; Ex. 574; Ex. 577; Ex. 580; Ex. 583; Ex. 589; Ex. 591; Ex. 595; Ex. 607; Ex. 615; Ex. 617; Ex. 620; Ex. 626; Ex. 627; Ex. 633; Ex. 636; Ex. 642; Ex. 653; Ex. 658; Ex. 662; Ex. 671; Ex. 675; Ex. 682; Ex. 688.  Mr. Davis' emails to the Committee for each quarter of 2014 contained the relevant quarterly investment review and providing commentary and information on particular Plan investments. Ex. 555; Ex. 556; Ex. 560; Ex. 566.  None of these four emails mention any concerns about the Freedom Funds; in fact, three of the emails don't mention the Freedom Funds at all, and one email mentions only that the Plan's allocation to the Freedom Funds continues to grow.  *See* Tr., at 882:18–883:9, 886:8–22; 887:14–22; 888:6–20. The Captrust scoring system marked the Freedom Funds for review every single quarter in 2014, but Mr. Davis' emails and the relevant meeting minutes reflect no discussion of the Freedom Funds.  *See* Tr., at 888:21–889:17; Ex. 247, at 19; Ex. 764, at 2; Ex. 765, at 1.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### C. Defendants Retained the Unsuitable Freedom Funds

#### 1. The Committee Used the Incorrect Benchmark and Peer Group to Review the Freedom Funds' Performance

267.    The glidepath of the Freedom Funds approximated the glidepath of the Morningstar Moderate Index rather than the Morningstar Conservative Index.  *See* Tr., at 50:21–51:2, 52:15–19, 168:9–19.  The following is a graphic included in each of the quarterly investment review presentations provided to the Committee by Captrust:





*See, e.g.*, Ex. 61, at 36 (indicating the glidepath of the Freedom Funds in red, the Morningstar Moderate Index in green, and the Morningstar Conservative Index in purple).  The Committee was provided this information every quarter, yet it never independently analyzed or questioned whether Captrust's provision of the Morningstar Conservative Index as a benchmark for the Freedom Funds was erroneous.

268.    Mr. Dirks analyzed the fit of the Freedom Funds' glidepath to both the Morningstar Moderate and Conservative Indexes and concluded that the Freedom Funds most closely aligned with the Morningstar Moderate Index both during and prior to the Class Period and that the Morningstar Moderate Index was the correct

benchmark for the Freedom Funds. *See* Tr., at 688:19–689:15. This opinion is unrebutted by either Ms. Allen or Mr. Gissiner. Mr. Dirks conducted a similar analysis to determine that the Morningstar Moderate peer group was more appropriate for the Freedom Funds than the Morningstar Conservative peer group. *See* Tr., at 690:11–18. This opinion is also unrebutted by either Ms. Allen or Mr. Gissiner.

269.    From prior to the Class Period until September 31, 2018, the Committee incorrectly received and reviewed comparative performance data for the Freedom Funds relative to the Morningstar Conservative Index and peer group. *See* Tr., at 171:10–15. The impact of provision of the Morningstar Conservative Index and peer group was to mask the Freedom Funds' underperformance and non-compliance with the IPS.

## 2. The Committee Received Incorrect Comparators for the Freedom Funds

270.    In 2013 and 2014, the Freedom Funds underwent a strategy change pursuant to which their investment managers increased their equity component and were permitted to deviate from their stated glidepath. *See* Tr., at 64:20–65:7; Ex. 246, at 22. During this same period, the Freedom Funds were consistently "marked for review" even under Captrust's scoring system. *See* Tr., at 65:8–9. Applicable minimum standards dictate that fiduciaries should evaluate the appropriateness of an investment option's benchmark in light of significant changes in an investment option. *See* Tr., at 65:22–66:7.[44]

271.    The Committee never made a determination that a benchmark or peer group provided by Captrust to evaluate the Plan's investments was incorrect. *See* Tr., at 120:15–22. Ms. Gomez testified that the Committee did not conduct any

---

[44]Although Ms. Wagner is not an investment advice fiduciary, she has substantial experience and is an expert in the procedures around appropriate benchmarking and the selection and monitoring of investment options in a plan. *See* Tr., at 74:18–21.

independent analysis of the selections made Captrust made for benchmarks and peer groups. *See* Tr., at 569:18–570:5.

272.    Mr. Brady speculated as to the reason Captrust provided the Morningstar Conservative Index as the benchmark for the Freedom Funds, but he testified that the Committee relied solely on Captrust to choose the benchmark.[45]  *See* Tr., at 152:12–153:20, 213:25–214:2; *see also* 381:6–7 (Mr. Heather testifying), 382:25–383:1 (same), 385:23–25 (same); 510:19–22 (Mr. Bogert testifying); 536:25–537:13 (Ms. Dhuper testifying); 569:21–23 (Ms. Gomez testifying); 812:15–17 (Mr. Davis testifying).  The Committee never conducted any independent analysis of the benchmarks or peer groups Captrust provided.  *See* Tr., at 569:24–570:5; *see also* 1109:8–12 (Mr. Gissiner testifying that he did not see anything in the record that reflected a discussion between Captrust and the Committee regarding Captrust's use of the Morningstar Conservative Index as the benchmark for the Freedom Funds), 1109:17–19 (Mr. Gissiner testifying that he did not see any evidence that any Committee member questioned Captrust about its use of the benchmark).  Yet, Mr. Davis testified that he had no knowledge of how benchmarks were assigned and himself never inquired into the appropriateness of the benchmarks presented to the Committee.[46]  *See* Tr., at 879:17–25 (Mr. Davis conceding that he does not know how Morningstar categorized the Freedom Funds and that his earlier testimony on the appropriate benchmark was simply "taken from the documents provided" that showed

---

[45]It is not credible to suggest, as Mr. Brady attempted, that the benchmark was belatedly changed to allow time for the strategy change to be reflected in performance metrics.  *See* Tr., at 390:22–25.  Among other reasons, as Mr. Brady conceded, the same benchmark was used for all review periods (including one-, three-, five-, and ten-year periods) and changed all at once.  *See* Tr., at 389:20–390:3.  Indeed, Mr. Brady conceded that he did even know the benchmark for the Freedom Funds before the strategy overhaul.  *See* Tr., at 391:1–4.

[46]Similarly, Mr. Davis' testimony suggested that he was not, at first, aware of a distinction between Conservative and Moderate strategies in the peer universe of TDFs evaluated by Morningstar.  *See* Tr., at 812:25–813:7.

the benchmark Captrust provided to the Committee), 893:22–894:9 (Mr. Davis testifying that selecting benchmarks "was not [his] function" and that, for his direct testimony about benchmarks, he was "[s]imply reading the material that was in front of [him]" during his testimony). Rather, Mr. Davis pointed to unspecified teams at Captrust whose roles were to download and analyze investment data.[47] *See* Tr., at 791:3–10, 892:6–10.

273.    In fact, Mr. Brady testified at his deposition that he believed the Morningstar Moderate Index was the benchmark for the Freedom Funds for the majority of the relevant period. *See* Tr., at 155:11–14. But at trial Mr. Brady testified that he was "operat[ing] under an incorrect assumption" that the Freedom Funds were being compared to a moderate peer group.[48] *See* Tr., at 156:13–18.

274.    Mr. Davis testified that he was "not sure" if the Freedom Funds were categorized as Moderate by Morningstar in 2011 and 2012, even though his testimony that the suite went from Conservative to Moderate based on changes in 2014 is predicated on his understanding that Morningstar had previously categorized the Freedom Funds as Conservative. *See* Tr., at 879:16–24. That understanding came only from Captrust documents, and not from any independent analysis or scrutiny. *See* Tr., at 879:25–880:3.

275.    During the relevant period, the changes that were made to the Freedom Funds made the investments ***more*** conservative, not less. *See* Tr., at 166:11–20, 455:4–12, 498:17–18. Despite this, Mr. Davis provided speculation in the place of meaningful testimony similar to that of Mr. Brady about the reason Captrust first provided the Morningstar Conservative Index before changing to the Morningstar

---

[47]Although Mr. Davis testified that individuals at Captrust meet with some of the managers of investments that clients used, he did not testify that those meetings ever informed Captrust's choice of benchmark. *See* Tr., at 791:11–14.

[48]Mr. Brady testified to his belief that it is better to evaluate the performance of a TDF against a peer group than an index. *See* Tr., at 270:12–15.

Moderate Index. *See* Tr., at 823:15–21, 824:20–22, 825:3–5, 825:18–25. When examined about benchmark changes, however, Mr. Davis passed the buck to unspecified colleagues and did not demonstrate that he had any understanding of the rationale for the changes. *See* Tr., at 832:12–14. The sum and substance of the testimony of Messrs. Brady and Davis can only be interpreted as them attempting to explain away the reason that the Plan's most important investment (the Freedom Funds) was compared to the wrong benchmark throughout most of the Class Period without any personal knowledge or foundation.

276.    When Captrust changed the benchmark for the Freedom Funds from the Morningstar Conservative Index to the Morningstar Moderate Index as of September 31, 2018, there was no documentation whatsoever reflecting the fact of the change or its rationale.[49] *See* Tr., at 171:10–15. There was no material change to the Freedom Funds' glidepath around the time Captrust quietly changed the benchmark for the Freedom Funds. *See* Tr., at 173:7–10. There was also no documentation of the same change made for the FIAM Blend Funds in the First Quarter of 2021, or the rationale for such change. *See* Tr., at 383:22–385:5.

277.    Despite Mr. Brady testifying that he routinely reviewed and considered the portfolio metrics provided to evaluate the Freedom Funds against various

---

[49]Although certain Committee members testified that the IPS was updated with respect to Morningstar group name changes, this does not refer to the choice of the Morningstar Conservative vs. Morningstar Moderate categories for benchmarks and peer groups against which the Freedom Funds would be evaluated. *See* Tr., at 205:25–206:4, 211:11–15, 266:25–267:4. Mr. Bogert testified, in fact, that the IPS did not specify whether the Freedom Funds should be evaluated against the Conservative, Moderate, or Aggressive Morningstar Index. *See* Tr., at 511:15–17; *see also* 821:13–16 (Mr. Davis testifying as to same). Mr. Bogert further testified that he was unaware of whether the IPS designation of benchmarks changed over the course of his entire time on the Committee. *See* Tr., at 511:18–22. Thus, the record is at odds with Mr. Davis' testimony that he or his colleague, Ms. Basch, would have "explain[ed] changes in classification" of investment options and peer groups to the Committee. *See* Tr., at 799:16–18, 800:1–4.

benchmarks and discussed this information at Committee meetings, *see* Tr., at 312:11–16, the Committee never realized that Captrust provided the incorrect benchmark to evaluate the Freedom Funds.

278.   When the FIAM Blend Funds replaced the Freedom Funds in the Plan, Committee members could not recall a conversation with Captrust about the selection of the benchmark against which they would be evaluated. *See* Tr., at 382:7–8, 382:19–22, 594:3–595:6.  In fact, Mr. Brady could not speak to the benchmark on the basis of the Captrust quarterly investment reviews but testified that he "would need more information to understand" the benchmark selection. *See* Tr., at 382:9–11.  Mr. Davis testified that the only discussion of the Morningstar categorization for the FIAM Blend Funds at this time would have been in the context of understanding the opportunity cost of selecting the FIAM Blend Funds instead of another investment. *See* Tr., at 892:19–893:4.

279.   Confirming the inconsistency of the Morningstar target date benchmarks and peer groups provided to the Committee, the quarterly investment review presentation for the Third Quarter of 2019 classifies the Freedom Funds, which had just been replaced, as Moderate and classifies the FIAM Blend Funds, which had just been added to the Plan, as Conservative.  *See* Tr., at 380:16–23; Ex. 268, at 22–23.  This incongruence is inexplicable, given that Mr. Davis wrote in an email to the Committee that "the **glidepath is identical** between the two sets." [emphasis added] Ex. 639, at 1 (emphasis added).

280.   Mr. Bogert testified unequivocally that "[i]f the Committee had ever discussed the appropriateness of the benchmarks, peer groups, or indices chosen by CAPTRUST against which to measure the plan's investment, that would be reflected in the Committee meeting minutes." *See* Tr., at 513:10–15.  Defendants' expert, Mr. Gissiner, however, testified that he did not see any discussion of the Morningstar Conservative Indexes in the meeting minutes.  *See* Tr., at 1109:8–19.  Mr. Davis'

testimony that he discussed the selection of peer groups with the Committee is not credible considering the foregoing record.  *See* Tr., at 813:11–12.

281.    Ms. Allen testified that she was not offering any opinion "about whether the Morningstar Conservative or Morningstar [Moderate] benchmark was a better fit" for the Freedom Funds.  *See* Tr., at 1162:5–8.  She further testified that she did not consider a distinction between Morningstar Conservative and Moderate peer groups as part of her analysis of the performance of the Freedom Funds.  *See* Tr., at 1150:2–3.

282.    Given the lower equity allocation in the Morningstar Conservative Index compared to the Morningstar Moderate Index, in periods where equity markets experience positive returns, the Freedom Funds will appear to have better relative performance when compared to the Morningstar Conservative Index than when compared to the Morningstar Moderate Index.  *See* Tr., at 689:16–22, 66:14–18.  This had the effect of masking underperformance and non-compliance with the IPS.

### 3.  The Committee Ignored Indicia of the Freedom Funds' Unsuitability

#### i.    The Performance and Risk–Adjusted Performance of the Freedom Funds Could not have Supported Retention

283.    The Sharpe Ratio metric measures the risk-adjusted return of an investment.[50]  *See* Tr., at 174:22–24.  Captrust provided the Committee with comparative Sharpe Ratio data for the Plan's target date funds and the S&P Target Date Indices, a commonly used proxy for the broad target date market.  *See, e.g.*, Ex. 250, at 38.  Captrust regularly provided the S&P Target Date Indices as a comparator for both the Freedom Funds and later the FIAM Blend Funds, including in every single Target Date Fund Selection Overview and Target Date Fund Comparison provided to

---

[50]Mr. Brady incorrectly testified that a Sharpe Ratio "doesn't tell you anything about return."  *See* Tr., at 268:23–24.

the Committee.  Ex. 21, at 12–15; Ex. 274, at 12–15; Ex. 716, at 11–14; Ex. 717, at 12-15; Ex. 718, at 12–15; Ex. 719, at 12–15; Ex. 720, at 12–15; Ex. 721, at 12–15. The Freedom Funds consistently underperformed the S&P Target Date Indices on a three-year risk-adjusted basis for four years.  *See* Tr., at 177:1–7.  The Captrust quarterly investment reviews included this information beginning in the Fourth Quarter of 2014 for three representative vintages: the 2015, 2025 and 2045 Funds, representing participants at or near retirement, approximately 10 years from retirement, and approximately 30 years from retirement.  *See* Tr., at 176:23–177:10; Ex. 761, at 1.

284.    Mr. Brady could not recall one time when the comparative risk-adjusted returns of the Freedom Funds to the S&P Target Date Indices were addressed in meeting minutes, *see* Tr., at 177:15–20, despite the IPS calling for review of risk-adjusted returns and the metric routinely appearing in materials provided by Captrust and was unaware of the relative underperformance those materials showed.  *See* Tr., at 175:11–14.  He was so unfamiliar with the S&P Target Date Index that he could not distinguish it from the Morningstar target date indexes.  *See* Tr., at 175:3–10.

285.    Mr. Brady never had a conversation with Captrust about the Freedom Funds consistently underperforming the S&P Target Date Indices on a risk-adjusted basis, *see* Tr., at 180:13–17, despite the IPS calling for review of risk-adjusted returns and the metric routinely appearing in materials provided by Captrust.

286.    From the Fourth Quarter of 2014 through the Fourth Quarter of 2018, the Freedom 2015 Fund did not have a better Sharpe Ratio than the S&P 2015 Target Date Index even once on a five-year basis, and failed to beat the S&P on a three-year basis in 15 out of 17 quarters. Ex. 761, at 1.  For the same period, the Freedom 2025 Fund did not have a better Sharpe Ratio than the S&P 2025 Target Date Index even once, on both a three- and five-year basis.  *Id.*  From the Fourth Quarter of 2014 through the Fourth Quarter of 2018, the Freedom 2045 Fund did not have a better

Sharpe Ratio than the S&P 2045 Target Date Index even once on a five-year basis, and failed to beat the S&P on a three-year basis in 16 out of 17 quarters. *Id.*

| | Fidelity Freedom Risk-Adjusted Return versus S&P Target Date Index | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2015 Fund | | 2025 Fund | | 2045 Fund | | Captrust | Committee |
| Quarter | Better 3-Year | Better 5-Year | Better 3-Year | Better 5-Year | Better 3-Year | Better 5-Year | Score | Minutes |
| 4Q14 | No | No | No | No | No | No | 77 | No mention |
| 1Q15 | No | No | No | No | No | No | 85 | No mention |
| 2Q15 | No | No | No | No | No | No | 85 | No mention |
| 3Q15 | No | No | No | No | No | No | 84 | No mention |
| 4Q15 | No | No | No | No | No | No | 86 | No mention |
| 1Q16 | No | No | No | No | No | No | 82 | No mention |
| 2Q16 | No | No | No | No | No | No | 82 | No mention |
| 3Q16 | No | No | No | No | No | No | 82 | No mention |
| 4Q16 | No | No | No | No | No | No | 82 | No mention |
| 1Q17 | No | No | No | No | No | No | 86 | No mention |
| 2Q17 | No | No | No | No | Yes | No | 87 | No mention |
| 3Q17 | No | No | No | No | No | No | 86 | No mention |
| 4Q17 | No | No | No | No | No | No | 90 | No mention |
| 1Q18 | Yes | No | No | No | No | No | 88 | No mention |
| 2Q18 | No | No | No | No | No | No | 88 | No mention |
| 3Q18 | No | No | No | No | No | No | 90 | No mention |
| 4Q18 | Yes | No | No | No | No | No | 94 | No mention |

**EXHIBIT 761    Page 1 of 2**

287.    As of the end of the Fourth Quarter of 2014, the three- and five-year Sharpe Ratios of the Freedom 2015, 2025 and 2045 Funds all trailed those of the relevant S&P Target Date Index. Ex. 61, at 38. Captrust assigned the Freedom Funds a score of 77, indicating an investment that was "marked for review." *Id.* at 20.

288.    As of the end of the First Quarter of 2015, the three- and five-year Sharpe Ratios of the Freedom 2015, 2025 and 2045 Funds all trailed those of the relevant S&P Target Date Index. Ex. 251, at 41. Captrust assigned the Freedom Funds a score of 85, indicating an investment that was in "good standing." *Id.* at 23.

289.    As of the end of the Second Quarter of 2015, the three- and five-year Sharpe Ratios of the Freedom 2015, 2025 and 2045 Funds all trailed those of the

relevant S&P Target Date Index. Ex. 252, at 41. Captrust assigned the Freedom Funds a score of 85, indicating an investment that was in "good standing." *Id.* at 24.

290.    As of the end of the Third Quarter of 2015, the three- and five-year Sharpe Ratios of the Freedom 2015, 2025 and 2045 Funds all trailed those of the relevant S&P Target Date Index. Ex. 9, at 40. Captrust assigned the Freedom Funds a score of 84, indicating an investment that was in "good standing." *Id.* at 23.

291.    As of the end of the Fourth Quarter of 2015, the three- and five-year Sharpe Ratios of the Freedom 2015, 2025 and 2045 Funds all trailed those of the relevant S&P Target Date Index. Ex. 253, at 42. Captrust assigned the Freedom Funds a score of 86, indicating an investment that was in "good standing." *Id.* at 24.

292.    As of the end of the First Quarter of 2016, the three- and five-year Sharpe Ratios of the Freedom 2015, 2025 and 2045 Funds all trailed those of the relevant S&P Target Date Index. Ex. 254, at 44. Captrust assigned the Freedom Funds a score of 82, indicating an investment that was in "good standing." *Id.* at 27.

293.    As of the end of the Second Quarter of 2016, the three- and five-year Sharpe Ratios of the Freedom 2015, 2025 and 2045 Funds all trailed those of the relevant S&P Target Date Index. Ex. 60, at 47. Captrust assigned the Freedom Funds a score of 82, indicating an investment that was in "good standing." *Id.* at 25.

294.    As of the end of the Third Quarter of 2016, the three- and five-year Sharpe Ratios of the Freedom 2015, 2025 and 2045 Funds all trailed those of the relevant S&P Target Date Index. Ex. 256, at 52. Captrust assigned the Freedom Funds a score of 82, indicating an investment that was in "good standing." *Id.* at 26.

295.    As of the end of the Fourth Quarter of 2016, the three- and five-year Sharpe Ratios of the Freedom 2015, 2025 and 2045 Funds all trailed those of the relevant S&P Target Date Index. Ex. 257, at 49. Captrust assigned the Freedom Funds a score of 82, indicating an investment that was in "good standing." *Id.* at 21.

296.    As of the end of the First Quarter of 2017, the three- and five-year Sharpe Ratios of the Freedom 2015, 2025 and 2045 Funds all trailed those of the

relevant S&P Target Date Index. Ex. 258, at 44. Captrust assigned the Freedom Funds a score of 86, indicating an investment that was in "good standing." *Id.* at 22.

297. As of the end of the Second Quarter of 2017, the three- and five-year Sharpe Ratios of the Freedom 2015 and 2025 Funds all trailed those of the relevant S&P Target Date Index. Ex. 259, at 43. The three-year Sharpe Ratio of the Freedom 2045 Fund beat the relevant S&P Target Date Index, while the five-year Sharpe Ratio trailed the S&P Target Date Index. *Id.* Captrust assigned the Freedom Funds a score of 87, indicating an investment that was in "good standing." *Id.* at 22.

298. As of the end of the Third Quarter of 2017, the three- and five-year Sharpe Ratios of the Freedom 2015, 2025 and 2045 Funds all trailed those of the relevant S&P Target Date Index. Ex. 261, at 42. Captrust assigned the Freedom Funds a score of 86, indicating an investment that was in "good standing." *Id.* at 22.

299. As of the end of the Fourth Quarter of 2017, the three- and five-year Sharpe Ratios of the Freedom 2015, 2025 and 2045 Funds all trailed those of the relevant S&P Target Date Index. Ex. 262, at 47. Captrust assigned the Freedom Funds a score of 90, indicating an investment that was in "good standing." *Id.* at 27.

300. As of the end of the First Quarter of 2018, the three- and five-year Sharpe Ratios of the Freedom 2025 and 2045 Funds all trailed those of the relevant S&P Target Date Index. Ex. 263, at 44. The three-year Sharpe Ratio of the Freedom 2015 Fund beat the relevant S&P Target Date Index, while the five-year Sharpe Ratio trailed the S&P Target Date Index. *Id.* Captrust assigned the Freedom Funds a score of 88, indicating an investment that was in "good standing." *Id.* at 24.

301. As of the end of the Second Quarter of 2018, the three- and five-year Sharpe Ratios of the Freedom 2015, 2025 and 2045 Funds all trailed those of the relevant S&P Target Date Index. Ex. 264, at 50. Captrust assigned the Freedom Funds a score of 88, indicating an investment that was in "good standing." *Id.* at 25.

302. As of the end of the Third Quarter of 2018, the three- and five-year Sharpe Ratios of the Freedom 2015, 2025 and 2045 Funds all trailed those of the

relevant S&P Target Date Index. Ex. 62, at 49. Captrust assigned the Freedom Funds a score of 90, indicating an investment that was in "good standing." *Id.* at 25.

303.    As of the end of the Fourth Quarter of 2018, the three- and five-year Sharpe Ratios of the Freedom 2025 and 2045 Funds all trailed those of the relevant S&P Target Date Index. Ex. 265, at 47. The three-year Sharpe Ratio of the Freedom 2015 Fund beat the relevant S&P Target Date Index, while the five-year Sharpe Ratio trailed the S&P Target Date Index. *Id.* Captrust assigned the Freedom Funds a score of 94, indicating an investment that was in "good standing." *Id.* at 25.

304.    None of the minutes for the Committee meetings at which the above risk-adjusted performance data was provided contain any discussion or even mention of the Freedom Funds' underperformance on a risk-adjusted basis relative to the S&P Target Date Indexes or rationale for the Committee's retention of the suite. Ex. 224; Ex. 49; Ex. 1; Ex. 10; Ex. 225; Ex. 50; Ex. 51; Ex. 227; Ex. 52; Ex. 229; Ex. 18; Ex. 53; Ex. 54; Ex. 230; Ex. 19; Ex. 20; Ex. 22.

305.    At and prior to the start of the Class Period, the Freedom Funds exhibited poor peer-relative absolute returns. Mr. Dirks testified that, as of the Second Quarter of 2013, across all vintages, the five-year returns of the Freedom Funds ranked from the 58th percentile to the 90th percentile. *See* Tr., at 746:11–15. Accordingly, every vintage of the Freedom Funds was in violation of the IPS by failing to rank in the top 50% of peers when measured against the Morningstar Moderate peer group. *See* Tr., at 746:22–25; Ex. 3, at 6. Mr. Dirks testified that, one year later, as of the Second Quarter of 2014, the Freedom Funds ranked similarly poorly across the suite, with many vintages ranking in the 80th or 90th percentiles. *See* Tr., at 746:16–17.

306.    For the seven consecutive quarters from the Third Quarter of 2013 through the First Quarter of 2015, every Freedom Fund vintage (except for one vintage, twice) underperformed the corresponding Morningstar Moderate Index. *See* Tr., at 1164:8–20.

307.    Accordingly, for at least the Third Quarter of 2013, the Fourth Quarter of 2013, the First Quarter of 2014, and the Second Quarter of 2014, the Freedom Funds failed IPS criteria on both a peer-relative basis and against an appropriate benchmark.

### ii.    The Reuters Report Confirms Widespread Awareness of the Freedom Funds' Issues

308.    On March 5, 2018, Reuters published a special report detailing how investors had lost confidence in the Freedom Funds and were pulling their assets from the suite entitled "Fidelity puts 6 million savers on risky path to retirement." Ex. 88, at 1.

309.    Mr. Brady testified that he was aware of the Reuters Report while he served on the Committee. *See* Tr., at 143:5–9. Mr. Brady did not recall any discussion of the Reuters Report by the Committee or with Captrust. *See* Tr., at 143:10–12, 143:22–24.

310.    Mr. Brady was dismissive of the Reuters Report, testifying "we probably had more access than what a Reuters journalist would have access to." *See* Tr., at 143:20–21. Mr. Brady also testified that he did not believe that the article would have supplied the Committee with any new information. *See* Tr., at 143:25–144:2. This is despite consistent and unrebutted testimony by Committee members that they did not regularly track net capital flows with respect to the Freedom Funds, *see* Tr., at 145:16–25, 146:9–15, and Mr. Brady's own testimony that he did not recall the Committee ever discussing that the Freedom Funds were losing assets. *See* Tr., at 144:22–24.

311.    The Reuters Report stated that the Freedom Funds' market share had "plunged to 21 percent of total target date fund assets down from 43 percent at the end of 2009," and cited a history of underperformance, frequent strategy changes and rising risk as reasons provided by plan sponsors and consults of plans that pulled money from the Freedom Funds. *See* Tr., at 150:10–12; Ex. 88, at 3. In addition to

naming several of the departing plans, the report specifically references a meeting of the committee for the El Camino Hospital plan, explaining their February 2015 decision to divest from the Freedom Funds as due to historic underperformance and the new "attempt to time global markets." *Id.* at 4.

312.    The Reuters Report stated that in the years before 2014, the Freedom Funds "largely failed to beat or match their internal benchmarks set by Fidelity over 1, 3, 5, and 10-year spans" and "[h]ad the funds been a sports team, their record against benchmarks would be 6 wins, 40 losses, and 1 tie." *See* Tr., at 149:1–5.  Mr. Brady reiterated that he was not a member of the Committee in 2014, but he was "aware . . . there was some underperformance in the past." *See* Tr., at 149:23–24.

313.    The Reuters Report observed that Fidelity's 2014 strategy overhaul that saw the Freedom Funds begin to implement what Fidelity calls active asset allocation ran contrary to the Fidelity's previously dismissive opinion of market-timing strategies in retirement funds as having a "low probability of repeated success." Ex. 88, at 4.  The article quoted the president of the research firm Target Date Solutions stating Fidelity had "gone further than its peers" in turning to riskier investments to boost target date returns. *Id.* at 2.  This was not the first time Fidelity had received criticism for strategy changes to the Freedom Funds, as the Reuters Report cites Morningstar's 2011 appraisal of prior Fidelity updates as "shocking" and "seemingly chaotic." *Id.* at 4.

7.    Mr. Brady was a member of the Committee when the Reuters Report was published, but he "didn't think it was important enough to discuss it at the Committee meeting[.]" *See* Tr., at 151:22–24.  Mr. Brady testified that he does not know if any other Committee members knew about the Reuters Report. *See* Tr., at 152:3–5.

314.    Despite Mr. Brady's testimony that the Committee preferred investments that provided downside protection,[51] *see* Tr., at 284:3–5, 387:11–15, 388:2–4, the Freedom Funds provided notably little downside protection.  Ex. 88, at 2.  Mr. Brady was not aware of this.  *See* Tr., at 388:25–389:7.

### iii.    Investors were Fleeing the Freedom Funds

315.    Following the Freedom Funds' strategy change, there were significant and well-publicized capital outflows.  *See* Tr., at 66:22–67:2.  This capital flight included net capital outflows of $16 billion in a four-year period and a significant market share loss.  *See id.*  The Committee did not ever review or discuss the Freedom Funds' significant loss in market share.  *See* Tr., at 67:3–5.

316.    Despite the length and magnitude of these net capital outflows, Mr. Davis attempted to minimize their import by calling them "short-term cash flows." *See* Tr., at 826:18.

317.    The Freedom Funds, which were launched in 1996, largely dominated the target date market as one of the first suites available and by virtue of its position as the top U.S. recordkeeper for 401(k) and other defined contribution plans.  Ex. 88, at 2, 4.  The suite's position at the top of the assets under management table has eroded, and of the top five target date providers in 2016 and 2017, Fidelity was the only one to have net withdrawals.  *Id.* at 3.

318.    Ms. Allen conceded that she does not know what percentage of any increases in total assets in the Freedom Funds during the Class Period was attributable to market appreciation versus cash inflows.  *See* Tr., at 1159:12–23.  Any use of an average of the Freedom Funds' assets under management during the Class Period obfuscates any information about the net flow of assets to or from the suite.  *See* Tr., at 1158:6–14.  The "high ranking" of the Freedom Funds by Brightscope to which Ms. Allen referred in her testimony is simply a ranking of the top target date funds by

---

[51]Mr. Brady also expressed a personal preference for passively implemented target date funds to "minimize the risk of underperformance."  Ex. 687, at 2.

assets under management and did not account for net capital flows. *See* Tr., at 1156:21–25.

### 4. The Committee Belatedly Replaced the Freedom Funds Under the Mistaken Assumption that it was Making a Share Class Change

319. In June 2018, Captrust prepared a Retirement Plan Analysis for this Committee that recommended potential investment lineup changes in connection with Transamerica's proposed new fee structure. Ex. 723. The presentation identified a number of potential share class changes to move the majority of the Plan investment lineup to institutional share classes. *Id.* at 4. One of the recommendations, highlighted in blue and identified as a "share class change", was replacing the Freedom Funds with the FIAM Blend Funds. *Id.* at 7, 9. The Retirement Plan Analysis describes investment share classes as having "identical investment philosophies and differing fee structures." *Id.* at 12. Minutes of Committee meetings at which the proposal was discussed note "there are ***collective trust versions*** of the Fidelity Freedom Funds" (emphasis added), Ex. 19, at 2, and describe "moving to a ***collective trust version*** of the Fidelity Freedom Funds." (emphasis added) Ex. 20, at 2. The Committee's minutes that record their decision regarding Captrust's investment recommendations note only "the proposal to move all funds to institutional share class funds was accepted" and does not distinguish the move from the Freedom Funds to the FIAM Blend Funds as any different. Ex. 22, at 2.

### i. The Committee Replaced the Freedom Funds with the FIAM Blend Funds in 2019

320. On August 1, 2019, concurrent with the share class changes and the implementation of the new fee structure with Transamerica, the FIAM Blend Funds replaced the Freedom Funds in the Plan. Ex. 268, at 21.

321.    Mr. Davis testified that the reason for the replacement of the Freedom Funds with the FIAM Blend Funds in 2019 was "[t]o lower cost to participants for investment management services." *See* Tr., at 827:3–5; *see also* Tr., at 1066:11–14 (Mr. Gissiner confirming the same understanding), 1068:1–2 (same).

### ii.    The FIAM Blend Funds are not an Implementation of the Freedom Funds

322.    The FIAM Blend Funds and the Freedom Funds are indisputably different investment products. *See* Tr., at 322:10–13. They have similar strategies and an identical glide path but differ by investment vehicle (mutual fund versus collective trust fund), mix of active versus passive implementation, underlying investment selection, and cost. *See* Tr., at 322:14–323:1; Ex. 639, at 1; Ex. 717, at 16, 18, 20. Captrust defined the Freedom Funds as an "active option"; the FIAM Blend Funds were considered a "hybrid option" that held both active and passive strategies. Ex. 717, at 16, 20. Where the Freedom Funds average 25 underlying fund holdings, the FIAM Blend Funds hold an average of 10. *Id.* at 18, 20. The two suites have similar but distinguishable risk and return characteristics. *Id.* at 10–14.

### iii.    The Committee Failed to Investigate Suitable Alternatives to the Freedom Funds when Switching to the FIAM Blend Funds

323.    When the Committee determined to replace the Freedom Funds with the FIAM Blend Funds, the Committee undertook an inadequate deliberative process. *See* Tr., at 38:14–16.

324.    The Committee treated the decision to replace the Freedom Funds with the FIAM Blend Funds as a share class change (*i.e.*, misapprehending that the FIAM Blend Funds are not simply a collective investment trust version of the Freedom Funds). *See* Tr., at 67:21–25. In fact, the FIAM Blend Funds are comprised of entirely different investments than the Freedom Funds. *See* Tr., at 68:1–7.

325.   The Committee did not consider any other target date funds as a replacement for the Freedom Funds.[52]   *See* Tr., at 570:17–21.   Seemingly admitting this fact, when asked if he could point to any other indication that the Committee evaluated the FIAM Blend Funds as more appropriate than any other acailable target date fund, Mr. Davis could point only to undocumented conversations about the Freedom Funds and about the FIAM Blend Funds, and critically to ***no other target date funds*** or comparative analysis.   *See* Tr., at 903:22–904:7.

### D. Defendants Failed to Timely Replace the Unsuitable Invesco Real Estate Fund

326.   As with the Freedom Funds, the Captrust scoring system masked IPS non-compliance and persistent and substantial underperformance of the Invesco Fund during the relevant period until it was belatedly removed in mid-2021.  Ex. 698, at 7.

327.   As of the end of the Fourth Quarter of 2013, the Invesco Fund's five-year return trailed the benchmark return and ranked in the 68th percentile among peer funds.  Ex. 762, at 1.

328.   As of the end of the First Quarter of 2014, the Invesco Fund's three-year return trailed the benchmark return and ranked in the 40th percentile among peer funds.   Ex. 247, at 28, 47.   The Invesco Fund's five-year return also trailed the benchmark return and ranked in the 77th percentile among peer funds.  *Id.*  Captrust assigned the Invesco Fund a score of 83, indicating an investment that was in "good standing."  *Id.* at 18.

329.   As of the end of the Second Quarter of 2014, the Invesco Fund's three-year return trailed the benchmark return and ranked in the 34th percentile among peer funds.   Ex. 248, at 29, 49.   The Invesco Fund's five-year return also trailed the benchmark return and ranked in the 73rd percentile among peers.  *Id.*  Captrust

---

[52]During his examination, Mr. Davis testified about a TDF review that was conducted in early 2018, almost two years before the Committee replaced the Freedom Funds with the FIAM Blend Funds.  *See* Tr., at 903:20–22.

assigned the Invesco Fund a score of 84, indicating an investment that was in "good standing." *Id.* at 18.

330.    As of the end of the Third Quarter of 2014, the Invesco Fund's three-year return beat the benchmark return and ranked in the 29th percentile among peer funds. Ex. 249, at 23, 43.  The Invesco Fund's five-year return trailed the benchmark return and ranked in the 70th percentile among peers.  *Id.*  Captrust assigned the Invesco Fund a score of 87, indicating an investment that was in "good standing." *Id.* at 11.

331.    As of the end of the Fourth Quarter of 2014, the Invesco Fund's three-year return trailed the benchmark return and ranked in the 45th percentile among peer funds.  Ex. 61, at 30, 48.  The Invesco Fund's five-year return also trailed the benchmark return and ranked in the 77th percentile among peers.  *Id.*  Captrust assigned the Invesco Fund a score of 80, indicating an investment that was in "good standing." *Id.* at 19.

332.    As of the end of the First Quarter of 2015, the Invesco Fund's three-year return trailed the benchmark return and ranked in the 55th percentile among peer funds.  Ex. 251, at 33, 55.  The Invesco Fund's five-year return also trailed the benchmark return and ranked in the 69th percentile among peers.  *Id.*  Captrust assigned the Invesco Fund a score of 84, indicating an investment that was in "good standing." *Id.* at 22.

333.    As of the end of the Second Quarter of 2015, the Invesco Fund's three-year return trailed the benchmark return and ranked in the 42nd percentile among peer funds.  Ex. 252, at 33, 55.  The Invesco Fund's five-year return also trailed the benchmark return and ranked in the 58th percentile among peers.  *Id.*  Captrust assigned the Invesco Fund a score of 80, indicating an investment that was in "good standing." *Id.* at 23.

334.    As of the end of the Third Quarter of 2015, the Invesco Fund's three-year return trailed the benchmark return and ranked in the 53rd percentile among peer

funds. Ex. 9, at 32, 54. The Invesco Fund's five-year return also trailed the benchmark return and ranked in the 59th percentile among peers. *Id.* Captrust assigned the Invesco Fund a score of 80, indicating an investment that was in "good standing." *Id.* at 22.

335.    As of the end of the Fourth Quarter of 2015, the Invesco Fund's three-year return trailed the benchmark return and ranked in the 61st percentile among peer funds. Ex. 253, at 34, 55. The Invesco Fund's five-year return also trailed the benchmark return and ranked in the 57th percentile among peers. *Id.* Captrust assigned the Invesco Fund a score of 81, indicating an investment that was in "good standing." *Id.* at 23.

336.    As of the end of the First Quarter of 2016, the Invesco Fund's three-year return trailed the benchmark return and ranked in the 62nd percentile among peer funds. Ex. 254, at 36, 57. The Invesco Fund's five-year return also trailed the benchmark return and ranked in the 57th percentile among peers. *Id.* Captrust assigned the Invesco Fund a score of 83, indicating an investment that was in "good standing." *Id.* at 26.

337.    As of the end of the Second Quarter of 2016, the Invesco Fund's three-year return trailed the benchmark return and ranked in the 65th percentile among peer funds. Ex. 60, at 39, 60. The Invesco Fund's five-year return also trailed the benchmark return and ranked in the 59th percentile among peers. *Id.* Captrust assigned the Invesco Fund a score of 84, indicating an investment that was in "good standing." *Id.* at 24.

338.    As of the end of the Third Quarter of 2016, the Invesco Fund's three-year return trailed the benchmark return and ranked in the 61st percentile among peer funds. Ex. 256, at 44, 65. The Invesco Fund's five-year return also trailed the benchmark return and ranked in the 53rd percentile among peers. *Id.* Captrust assigned the Invesco Fund a score of 83, indicating an investment that was in "good standing." *Id.* at 25.

339.    As of the end of the Fourth Quarter of 2016, the Invesco Fund's three-year return trailed the benchmark return and ranked in the 64th percentile among peer funds.  Ex. 257, at 41, 61.  The Invesco Fund's five-year return also trailed the benchmark return and ranked in the 58th percentile among peers.  *Id.*  Captrust assigned the Invesco Fund a score of 83, indicating an investment that was in "good standing."  *Id.* at 20

340.    As of the end of the First Quarter of 2017, the Invesco Fund's three-year return trailed the benchmark return and ranked in the 30th percentile among peer funds.  Ex. 258, at 36, 56.  The Invesco Fund's five-year return also trailed the benchmark return and ranked in the 29th percentile among peers.  *Id.*  Captrust assigned the Invesco Fund a score of 93, indicating an investment that was in "good standing."  *Id.* at 21.

341.    As of the end of the Second Quarter of 2017, the Invesco Fund's three-year return trailed the benchmark return and ranked in the 32nd percentile among peer funds.  Ex. 259, at 35, 55.  The Invesco Fund's five-year return also trailed the benchmark return and ranked in the 26th percentile among peers.  *Id.*  Captrust assigned the Invesco Fund a score of 97, indicating an investment that was in "good standing."  *Id.* at 21.

342.    As of the end of the Third Quarter of 2017, the Invesco Fund's three-year return trailed the benchmark return and ranked in the 42nd percentile among peer funds.  Ex. 261, at 34, 54.  The Invesco Fund's five-year return also trailed the benchmark return and ranked in the 30th percentile among peers.  *Id.*  Captrust assigned the Invesco Fund a score of 95, indicating an investment that was in "good standing."  *Id.* at 21

343.    Accordingly, for thirteen consecutive quarters from the Fourth Quarter of 2013 through the Fourth Quarter of 2016, the Invesco Fund's five-year return neither beat the index nor ranked in the top 50% of its given peer group.  For six consecutive quarters from the Third Quarter of 2015 through the Fourth Quarter of

2016, the Invesco Fund's three-year return neither beat the index nor ranked in the top 50% of its given peer group.

344.    For twelve consecutive quarters from the Fourth Quarter of 2014 through the Third Quarter of 2017, the Invesco Fund did not generate returns that exceeded the index on a three- or five-year basis.

345.    The Invesco Fund is not explicitly named in the minutes of any Committee meeting from the start of the Class Period until May 26, 2021, at which meeting the Committee voted to terminate the Invesco Fund.  Ex. 222; Ex. 48; Ex. 224; Ex. 49; Ex. 1; Ex. 10; Ex. 225; Ex. 50; Ex. 51; Ex. 227; Ex. 52; Ex. 229; Ex. 18; Ex. 53; Ex. 54; Ex. 55; Ex. 19; Ex. 20; Ex. 22; Ex. 56; Ex. 57; Ex. 58; Ex. 234; Ex. 233; Ex. 23; Ex. 236; Ex. 59; Ex. 238; Ex. 239.  The Committee documented no rationale for retaining the Invesco Fund despite prolonged and substantial performance concerns.  *See id.*  In fact, the Committee entirely failed to recognize these concerns given its total abdication to the Captrust scoring system.

**E. Defendants Failed to Timely Replace the Unsuitable Prudential Jennison Small Company Fund**

346.    The Captrust scoring system masked IPS non-compliance and persistent and substantial underperformance of the Prudential Jennison Fund during the relevant period.

347.    As of the end of the Fourth Quarter of 2014, the Prudential Jennison Fund's three-year return trailed the benchmark return and ranked in the 47th percentile among peer funds.  Ex. 61, at 30, 51.  The Prudential Jennison Fund's five-year return also trailed the benchmark return and ranked in the 54th percentile among peers.  *Id.* Captrust assigned the Prudential Jennison Fund a score of 87, indicating an investment that was in "good standing."  *Id.* at 19.

348.    As of the end of the First Quarter of 2015, the Prudential Jennison Fund's three-year return trailed the benchmark return and ranked in the 33rd percentile among peer funds.  Ex. 251, at 33, 51.  The Prudential Jennison Fund's

five-year return also trailed the benchmark return and ranked in the 56th percentile among peers. *Id.* Captrust assigned the Prudential Jennison Fund a score of 87, indicating an investment that was in "good standing." *Id.* at 22.

349.    As of the end of the Second Quarter of 2015, the Prudential Jennison Fund's three-year return trailed the benchmark return and ranked in the 54th percentile among peer funds. Ex. 252, at 33, 54. The Prudential Jennison Fund's five-year return also trailed the benchmark return and ranked in the 65th percentile among peers. *Id.* Captrust assigned the Prudential Jennison Fund a score of 87, indicating an investment that was in "good standing." *Id.* at 23.

350.    As of the end of the Third Quarter of 2015, the Prudential Jennison Fund's three-year return trailed the benchmark return and ranked in the 31st percentile among peer funds. Ex. 9, at 32, 53. The Prudential Jennison Fund's five-year return also trailed the benchmark return and ranked in the 51st percentile among peers. *Id.* Captrust assigned the Prudential Jennison Fund a score of 87, indicating an investment that was in "good standing." *Id.* at 22.

351.    As of the end of the Fourth Quarter of 2015, the Prudential Jennison Fund's three-year return trailed the benchmark return and ranked in the 58th percentile among peer funds. Ex. 253, at 34, 54. The Prudential Jennison Fund's five-year return also trailed the benchmark return and ranked in the 52nd percentile among peers. *Id.* Captrust assigned the Prudential Jennison Fund a score of 85, indicating an investment that was in "good standing." *Id.* at 23.

352.    As of the end of the First Quarter of 2016, the Prudential Jennison Fund's three-year return beat the benchmark return and ranked in the 22nd percentile among peer funds. Ex. 254, at 36, 56. The Prudential Jennison Fund's five-year return trailed the benchmark return and ranked in the 32nd percentile among peers. *Id.* Captrust assigned the Prudential Jennison Fund a score of 94, indicating an investment that was in "good standing." *Id.* at 26.

353.    As of the end of the Second Quarter of 2016, the Prudential Jennison Fund's three-year return beat the benchmark return and ranked in the 25th percentile among peer funds.  Ex. 60, at 39, 59.  The Prudential Jennison Fund's five-year return trailed the benchmark return and ranked in the 33rd percentile among peers.  *Id.* Captrust assigned the Prudential Jennison Fund a score of 94, indicating an investment that was in "good standing."  *Id.* at 24.

354.    As of the end of the Third Quarter of 2016, the Prudential Jennison Fund's three-year return trailed the benchmark return and ranked in the 30th percentile among peer funds.  Ex. 256, at 44, 64.  The Prudential Jennison Fund's five-year return also trailed the benchmark return and ranked in the 51st percentile among peers. *Id.*  Captrust assigned the Prudential Jennison Fund a score of 93, indicating an investment that was in "good standing."  *Id.* at 25.

355.    As of the end of the Fourth Quarter of 2016, the Prudential Jennison Fund's three-year return beat the benchmark return and ranked in the 25th percentile among peer funds.  Ex. 257, at 40, 60.  The Prudential Jennison Fund's five-year return trailed the benchmark return and ranked in the 44th percentile among peers.  *Id.* Captrust assigned the Prudential Jennison Fund a score of 96, indicating an investment that was in "good standing."  *Id.* at 20.

356.    As of the end of the First Quarter of 2017, the Prudential Jennison Fund's three-year return beat the benchmark return and ranked in the 28th percentile among peer funds.  Ex. 258, at 35, 55.  The Prudential Jennison Fund's five-year return trailed the benchmark return and ranked in the 33rd percentile among peers. *Id.*  Captrust assigned the Prudential Jennison Fund a score of 95, indicating an investment that was in "good standing."  *Id.* at 21.

357.    As of the end of the Second Quarter of 2017, the Prudential Jennison Fund's three-year return trailed the benchmark return and ranked in the 50th percentile among peer funds.  Ex. 259, at 34, 54.  The Prudential Jennison Fund's five-year return also trailed the benchmark return and ranked in the 42nd percentile among

peers. *Id.* Captrust assigned the Prudential Jennison Fund a score of 93, indicating an investment that was in "good standing." *Id.* at 21.

358.   As of the end of the Third Quarter of 2017, the Prudential Jennison Fund's three-year return trailed the benchmark return and ranked in the 72nd percentile among peer funds. Ex. 261, at 33, 53. The Prudential Jennison Fund's five-year return also trailed the benchmark return and ranked in the 39th percentile among peers. *Id.* Captrust assigned the Prudential Jennison Fund a score of 90, indicating an investment that was in "good standing." *Id.* at 21.

359.   As of the end of the Fourth Quarter of 2017, the Prudential Jennison Fund's three-year return trailed the benchmark return and ranked in the 60th percentile among peer funds. Ex. 262, at 39, 58. The Prudential Jennison Fund's five-year return also trailed the benchmark return and ranked in the 56th percentile among peers. *Id.* Captrust assigned the Prudential Jennison Fund a score of 90, indicating an investment that was in "good standing." *Id.* at 26.

360.   As of the end of the First Quarter of 2018, the Prudential Jennison Fund's three-year return trailed the benchmark return and ranked in the 68th percentile among peer funds. Ex. 263, at 36, 55. The Prudential Jennison Fund's five-year return also trailed the benchmark return and ranked in the 59th percentile among peers. *Id.* Captrust assigned the Prudential Jennison Fund a score of 85, indicating an investment that was in "good standing." *Id.* at 23.

361.   As of the end of the Second Quarter of 2018, the Prudential Jennison Fund's three-year return trailed the benchmark return and ranked in the 67th percentile among peer funds. Ex. 264, at 42, 61. The Prudential Jennison Fund's five-year return also trailed the benchmark return and ranked in the 64th percentile among peers. *Id.* Captrust assigned the Prudential Jennison Fund a score of 85, indicating an investment that was in "good standing." *Id.* at 24.

362.   As of the end of the Third Quarter of 2018, the Prudential Jennison Fund's three-year return trailed the benchmark return and ranked in the 91st percentile

among peer funds. Ex. 62, at 42, 60. The Prudential Jennison Fund's five-year return also trailed the benchmark return and ranked in the 76th percentile among peers. *Id.* Captrust assigned the Prudential Jennison Fund a score of 78, indicating an investment that was "marked for review." *Id.* at 24.

363.   As of the end of the Fourth Quarter of 2018, the Prudential Jennison Fund's three-year return trailed the benchmark return and ranked in the 85th percentile among peer funds. Ex. 265, at 40, 58. The Prudential Jennison Fund's five-year return also trailed the benchmark return and ranked in the 72nd percentile among peers. *Id.* Captrust assigned the Prudential Jennison Fund a score of 73, indicating an investment that was "marked for review." *Id.* at 24.

364.   Accordingly, for five consecutive quarters from the Fourth Quarter of 2014 through the Fourth Quarter of 2015 and again from the Fourth Quarter of 2017 through the Fourth Quarter of 2018, the Prudential Jennison Fund's five-year return neither beat the index nor ranked in the top 50% of its given peer group. For six consecutive quarters from the Third Quarter of 2017 through the Fourth Quarter of 2018, the Prudential Jennison Fund's three-year return neither beat the index nor ranked in the top 50% of its given peer group.

365.   For seventeen consecutive quarters from the Fourth Quarter of 2014 through the Fourth Quarter of 2018, the Prudential Jennison Fund did not generate returns that exceeded the index on a five-year basis. For thirteen of those same seventeen quarters, the Prudential Jennison Fund did not generate returns that exceeded the index on a three-year basis.

366.   The Prudential Jennison Fund is not explicitly named in the minutes of any Committee meeting from the start of the Class Period until March 29, 2019, at which meeting the Committee voted to terminate the Prudential Jennison Fund. Ex. 222; Ex. 48; Ex. 224; Ex. 49; Ex. 1; Ex. 10; Ex. 225; Ex. 50; Ex. 51; Ex. 227; Ex. 52; Ex. 229; Ex. 18; Ex. 53; Ex. 54; Ex. 55; Ex. 19; Ex. 20; Ex. 22. The Committee documented no rationale for retaining the Prudential Jennison Fund despite prolonged

and substantial performance concerns. *See id.* In fact, the Committee entirely failed to recognize these concerns given its total abdication to the Captrust scoring system.

**F.  Defendants Retained the Unsuitable T. Rowe Price Midcap Value Fund**

367.    The Captrust scoring system masked IPS non-compliance and persistent and substantial underperformance of the T. Rowe Price Fund during the relevant period.

368.    The Committee received information reporting that the T. Rowe Price Fund "has landed in the bottom half of the peer group in three of the last four years, with this year's underperformance being the most notable." *See* Tr., at 182:25–183:2.

369.    The T. Rowe Fund also consistently underperformed its index on a three-year and five-year basis. *See* Tr., at 183:5–9.

370.    As of the end of the First Quarter of 2014, the T. Rowe Price Fund's three-year return trailed the benchmark return and ranked in the 48th percentile among peer funds. Ex. 247, at 26, 37. The T. Rowe Price Fund's five-year return also trailed the benchmark return and ranked in the 56th percentile among peers. *Id.* Captrust assigned the T. Rowe Price Fund a score of 87, indicating an investment that was in "good standing." *Id.* at 17.

371.    As of the end of the Second Quarter of 2014, the T. Rowe Price Fund's three-year return trailed the benchmark return and ranked in the 44th percentile among peer funds. Ex. 248, at 27, 39. The T. Rowe Price Fund's five-year return also trailed the benchmark return and ranked in the 72nd percentile among peers. *Id.* Captrust assigned the T. Rowe Price Fund a score of 84, indicating an investment that was in "good standing." *Id.* at 17.

372.    As of the end of the Third Quarter of 2014, the T. Rowe Price Fund's three-year return trailed the benchmark return and ranked in the 59th percentile among peer funds. Ex. 249, at 21, 33. The T. Rowe Price Fund's five-year return also trailed the benchmark return and ranked in the 72nd percentile among peers. *Id.* Captrust

assigned the T. Rowe Price Fund a score of 75, indicating an investment that was "marked for review." *Id.* at 10.

373.    As of the end of the Fourth Quarter of 2014, the T. Rowe Price Fund's three-year return trailed the benchmark return and ranked in the 48th percentile among peer funds. Ex. 61, at 28, 42.  The T. Rowe Price Fund's five-year return also trailed the benchmark return and ranked in the 76th percentile among peers. *Id.*  Captrust assigned the T. Rowe Price Fund a score of 77, indicating an investment that was "marked for review." *Id.* at 18.

374.    As of the end of the First Quarter of 2015, the T. Rowe Price Fund's three-year return trailed the benchmark return and ranked in the 43rd percentile among peer funds. Ex. 251, at 31, 45.  The T. Rowe Price Fund's five-year return also trailed the benchmark return and ranked in the 69th percentile among peers. *Id.*  Captrust assigned the T. Rowe Price Fund a score of 82, indicating an investment that was in "good standing." *Id.* at 21.

375.    As of the end of the Second Quarter of 2015, the T. Rowe Price Fund's three-year return trailed the benchmark return and ranked in the 45th percentile among peer funds. Ex. 252, at 31, 45.  The T. Rowe Price Fund's five-year return also trailed the benchmark return and ranked in the 65th percentile among peers. *Id.*  Captrust assigned the T. Rowe Price Fund a score of 86, indicating an investment that was in "good standing." *Id.* at 22.

376.    As of the end of the Third Quarter of 2015, the T. Rowe Price Fund's three-year return trailed the benchmark return and ranked in the 63rd percentile among peer funds. Ex. 9, at 30, 44.  The T. Rowe Price Fund's five-year return also trailed the benchmark return and ranked in the 58th percentile among peers. *Id.*  Captrust assigned the T. Rowe Price Fund a score of 82, indicating an investment that was in "good standing." *Id.* at 21.

377.    As of the end of the Fourth Quarter of 2015, the T. Rowe Price Fund's three-year return trailed the benchmark return and ranked in the 51st percentile among

peer funds. Ex. 253, at 32, 46. The T. Rowe Price Fund's five-year return also trailed the benchmark return and ranked in the 40th percentile among peers. *Id.* Captrust assigned the T. Rowe Price Fund a score of 92, indicating an investment that was in "good standing." *Id.* at 22.

378. Accordingly, for seven consecutive quarters from the First Quarter of 2014 through the Third Quarter of 2015, the T. Rowe Price Fund's five-year return neither beat the index nor ranked in the top 50% of its given peer group.

379. For seven consecutive quarters from the Second Quarter of 2014 through the Fourth Quarter of 2015, the T. Rowe Price Fund did not generate returns that exceeded the index on a three- or five-year basis.

380. The T. Rowe Price Fund is not explicitly named in the minutes of any Committee meeting from the start of the Class Period through December 8, 2022. Ex. 222; Ex. 48; Ex. 224; Ex. 49; Ex. 1; Ex. 10; Ex. 225; Ex. 50; Ex. 51; Ex. 227; Ex. 52; Ex. 229; Ex. 18; Ex. 53; Ex. 54; Ex. 55; Ex. 19; Ex. 20; Ex. 22; Ex. 56; Ex. 57; Ex. 58; Ex. 234; Ex. 233; Ex. 23; Ex. 236; Ex. 59; Ex. 238; Ex. 239; Ex. 240; Ex. 241; Ex. 242; Ex. 243; Ex. 244; Ex. 245. The Committee documented no rationale for retaining the T. Rowe Price Fund despite prolonged and substantial performance concerns. *See id.* In fact, the Committee entirely failed to recognize these concerns given its total abdication to the Captrust scoring system.

## G. Defendants Retained the Unsuitable Oakmark Equity & Income Fund

381. The Captrust scoring system masked IPS non-compliance and persistent and substantial underperformance of the Oakmark Fund during the relevant period.

382. The Oakmark Fund consistently underperformed its index on a three-year and five-year basis. *See* Tr., at 184:2–5.

383. As of the end of the Fourth Quarter of 2015, the Oakmark Fund's three-year return trailed the benchmark return and ranked in the 29th percentile among peer funds. Ex. 253, at 29, 39. The Oakmark Fund's five-year return also trailed the

benchmark return and ranked in the 45th percentile among peers.  *Id.*  Captrust assigned the Oakmark Fund a score of 89, indicating an investment that was in "good standing."  *Id.* at 22.

384.   As of the end of the First Quarter of 2016, the Oakmark Fund's three-year return trailed the benchmark return and ranked in the 29th percentile among peer funds.  Ex. 254, at 31, 41.  The Oakmark Fund's five-year return also trailed the benchmark return and ranked in the 49th percentile among peers.  *Id.*  Captrust assigned the Oakmark Fund a score of 89, indicating an investment that was in "good standing."  *Id.* at 25.

385.   As of the end of the Second Quarter of 2016, the Oakmark Fund's three-year return trailed the benchmark return and ranked in the 52nd percentile among peer funds.  Ex. 60, at 34, 44.  The Oakmark Fund's five-year return also trailed the benchmark return and ranked in the 62nd percentile among peers.  *Id.*  Captrust assigned the Oakmark Fund a score of 82, indicating an investment that was in "good standing."  *Id.* at 23.

386.   As of the end of the Third Quarter of 2016, the Oakmark Fund's three-year return trailed the benchmark return and ranked in the 69th percentile among peer funds.  Ex. 256, at 39, 49.  The Oakmark Fund's five-year return also trailed the benchmark return and ranked in the 39th percentile among peers.  *Id.*  Captrust assigned the Oakmark Fund a score of 76, indicating an investment that was "marked for review."  *Id.* at 24.

387.   As of the end of the Fourth Quarter of 2016, the Oakmark Fund's three-year return trailed the benchmark return and ranked in the 43rd percentile among peer funds.  Ex. 257, at 36, 46.  The Oakmark Fund's five-year return also trailed the benchmark return and ranked in the 29th percentile among peers.  *Id.*  Captrust assigned the Oakmark Fund a score of 81, indicating an investment that was in "good standing."  *Id.* at 19.

388.   As of the end of the First Quarter of 2017, the Oakmark Fund's three-year return trailed the benchmark return and ranked in the 43rd percentile among peer funds.  Ex. 258, at 31, 41.  The Oakmark Fund's five-year return also trailed the benchmark return and ranked in the 26th percentile among peers.  *Id.*  Captrust assigned the Oakmark Fund a score of 88, indicating an investment that was in "good standing."  *Id.* at 20.

389.   As of the end of the Second Quarter of 2017, the Oakmark Fund's three-year return trailed the benchmark return and ranked in the 47th percentile among peer funds.  Ex. 259, at 30, 40.  The Oakmark Fund's five-year return also trailed the benchmark return and ranked in the 24th percentile among peers.  *Id.*  Captrust assigned the Oakmark Fund a score of 88, indicating an investment that was in "good standing."  *Id.* at 20.

390.   As of the end of the Third Quarter of 2017, the Oakmark Fund's three-year return trailed the benchmark return and ranked in the 31st percentile among peer funds.  Ex. 261, at 29, 39.  The Oakmark Fund's five-year return beat the benchmark return and ranked in the 13th percentile among peers.  *Id.*  Captrust assigned the Oakmark Fund a score of 91, indicating an investment that was in "good standing."  *Id.* at 20.

391.   As of the end of the Fourth Quarter of 2017, the Oakmark Fund's three-year return trailed the benchmark return and ranked in the 40th percentile among peer funds.  Ex. 262, at 35, 44.  The Oakmark Fund's five-year return also trailed the benchmark return and ranked in the 15th percentile among peers.  *Id.*  Captrust assigned the Oakmark Fund a score of 91, indicating an investment that was in "good standing."  *Id.* at 25.

392.   As of the end of the First Quarter of 2018, the Oakmark Fund's three-year return trailed the benchmark return and ranked in the 38th percentile among peer funds.  Ex. 263, at 32, 41.  The Oakmark Fund's five-year return also trailed the benchmark return and ranked in the 20th percentile among peers.  *Id.*  Captrust

assigned the Oakmark Fund a score of 91, indicating an investment that was in "good standing." *Id.* at 22.

393.    As of the end of the Second Quarter of 2018, the Oakmark Fund's three-year return trailed the benchmark return and ranked in the 54th percentile among peer funds.  Ex. 264, at 38, 47.  The Oakmark Fund's five-year return also trailed the benchmark return and ranked in the 26th percentile among peers.  *Id.*  Captrust assigned the Oakmark Fund a score of 87, indicating an investment that was in "good standing." *Id.* at 23.

394.    As of the end of the Third Quarter of 2018, the Oakmark Fund's three-year return trailed the benchmark return and ranked in the 41st percentile among peer funds.  Ex. 62, at 37, 46.  The Oakmark Fund's five-year return also trailed the benchmark return and ranked in the 47th percentile among peers.  *Id.*  Captrust assigned the Oakmark Fund a score of 83, indicating an investment that was in "good standing." *Id.* at 23.

395.    As of the end of the Fourth Quarter of 2018, the Oakmark Fund's three-year return trailed the benchmark return and ranked in the 34th percentile among peer funds.  Ex. 265, at 35, 44.  The Oakmark Fund's five-year return also trailed the benchmark return and ranked in the 62nd percentile among peers.  *Id.*  Captrust assigned the Oakmark Fund a score of 84, indicating an investment that was in "good standing." *Id.* at 23.

396.    As of the end of the First Quarter of 2019, the Oakmark Fund's three-year return trailed the benchmark return and ranked in the 35th percentile among peer funds.  Ex. 266, at 35, 44.  The Oakmark Fund's five-year return also trailed the benchmark return and ranked in the 63rd percentile among peers.  *Id.*  Captrust assigned the Oakmark Fund a score of 78, indicating an investment that was "marked for review." *Id.* at 24.

397.    As of the end of the Second Quarter of 2019, the Oakmark Fund's three-year return trailed the benchmark return and ranked in the 15th percentile among peer

funds.  Ex. 267, at 35, 44.  The Oakmark Fund's five-year return beat the benchmark return and ranked in the 59th percentile among peers.  *Id.*  Captrust assigned the Oakmark Fund a score of 87, indicating an investment that was in "good standing."  *Id.* at 24.

398.    As of the end of the Third Quarter of 2019, the Oakmark Fund's three-year return trailed the benchmark return and ranked in the 31st percentile among peer funds.  Ex. 268, at 35, 44.  The Oakmark Fund's five-year return also trailed the benchmark return and ranked in the 55th percentile among peers.  *Id.*  Captrust assigned the Oakmark Fund a score of 82, indicating an investment that was in "good standing."  *Id.* at 26.

399.    As of the end of the Fourth Quarter of 2019, the Oakmark Fund's three-year return trailed the benchmark return and ranked in the 65th percentile among peer funds.  Ex. 269, at 32, 41.  The Oakmark Fund's five-year return also trailed the benchmark return and ranked in the 63rd percentile among peers.  *Id.*  Captrust assigned the Oakmark Fund a score of 74, indicating an investment that was "marked for review."  *Id.* at 24.

400.    As of the end of the First Quarter of 2020, the Oakmark Fund's three-year return trailed the benchmark return and ranked in the 92nd percentile among peer funds.  Ex. 270, at 35, 44.  The Oakmark Fund's five-year return also trailed the benchmark return and ranked in the 88th percentile among peers.  *Id.*  Captrust assigned the Oakmark Fund a score of 67, indicating an investment that was "considered for termination."  *Id.* at 25.

401.    Accordingly, for eighteen consecutive quarters from the Fourth Quarter of 2015 through the First Quarter of 2020, the Oakmark Fund did not generate returns that exceeded the index on a three-year basis.  For sixteen of those same eighteen quarters, the Oakmark Fund did not generate returns that exceeded the index on a five-year basis.

402.    The Oakmark Fund is not explicitly named in the minutes of any Committee meeting from the start of the Class Period until May 14, 2020, at which meeting the Committee voted to terminate the Oakmark Fund.  Ex. 222; Ex. 48; Ex. 224; Ex. 49; Ex. 1; Ex. 10; Ex. 225; Ex. 50; Ex. 51; Ex. 227; Ex. 52; Ex. 229; Ex. 18; Ex. 53; Ex. 54; Ex. 55; Ex. 19; Ex. 20; Ex. 22; Ex. 56; Ex. 57; Ex. 58; Ex. 234; Ex. 233; Ex. 23.  The Committee documented no rationale for retaining the Oakmark Fund despite prolonged and substantial performance concerns.  *See id.*  In fact, the Committee entirely failed to recognize these concerns given its total abdication to the Captrust scoring system.

## V.    PRIME FAILED TO APPROPRIATELY MONITOR DELEGATED FIDUCIARIES

403.    Based on the Plan's governance, documents, the Committee's deliberative materials, and the testimony of Committee members, Ms. Wagner concluded that Prime, acting through the Board, did not carry out sufficient oversight of the Committee.  *See* Tr., at 39:10–12.

404.    In the Captrust service agreements, Prime represented that it is the "responsible plan fiduciary for the selection and monitoring of service providers and investment managers for the plan in accordance with the requirements of ERISA and the governing plan documents."  *See* Tr., at 398:17–23, 399:12–15.

405.    The charter that was ultimately adopted in 2019 required the Committee to provide a formal written report to the Board each year.  *See* Tr., at 44:7–9.  The report was to summarize the business of the Committee for the preceding year and evaluate the performance of investment funds that hold Plan assets.  Ex. 2, at 2.  This reporting standard had been confirmed to be aligned with Prime's reporting structure.  Ex. 374, at 2.  Such a report was only made to the Board once during the relevant period.  *See* Tr., at 44:14–15, 72:22–73:2.

406.    Mr. Heather did not believe the Board had any role in monitoring the Plan's investment.  *See* Tr., at 396:21–23, 397:4–6.  Likewise, Ms. Dhuper testified

that she does not know whether the Board had ***any*** responsibility to supervise the Committee and was unaware of whether there are any documents that govern the relationship between the Committee and the Board.  *See* Tr., at 535:5–13.

407.    Neither Mr. Heather nor any Committee member ever presented to the Board regarding the Plan's recordkeeping arrangement or fees.  *See* Tr., at 407:15–20, 408:13–18.

408.    Given the Board's express residual fiduciary responsibility, *see* Tr., at 398:17–23, 399:12–15, it should have sought information regarding the Plan's investments and service arrangements in order to exercise oversight of the Committee. Likewise, the Committee should have provided the Board regular updates under the terms of the charter.  *See* Tr., at 44:7–9.  Instead, the Board was out of the loop regarding matters of Plan management and administration.

## VI.    CREDIBILITY DETERMINATIONS

### A. Unsubstantiated Testimony of Committee Deliberations

409.    Committee members and Mr. Davis repeatedly testified at trial to the occurrence of discussions, in the absence of any recorded evidence or other documented support, to substantiate claims of various investment and fee monitoring activities.  The Court cannot credit this testimony as evidence of a deliberative process by the Committee.

410.    Mr. Brady's testimony as to why he answered differently at trial versus his deposition when asked whether the Freedom Funds' benchmarks and peer groups provided by Captrust were appropriate is an undocumented conversation with Captrust that "might have happened."  *See* Tr., at 153:18–23.

411.    When asked about the Freedom Funds' absence from the minutes of meetings at which the funds had received a Captrust score in the 70s (earning a "marked for review" designation), and which he himself did not attend, Mr. Brady said "I wasn't there, but I would suspect it would have been discussed in the meeting."  *See* Tr., at 183:13–23.

412.    When asked if he was aware of other Committee members having discussions with Captrust outside of Committee meetings, Mr. Brady stated "I believe that occurred.  I believe Mike Heather has had conversations outside of the formal meetings." *See* Tr., at 212:11–15.

413.    When asked about the Oakmark Fund receiving a score of 82 despite underperforming on both a risk-adjusted and peer-relative basis over three- and five-year periods, Mr. Brady insisted it was important not to disregard such underperformance and instead seek to understand it, and "that is what we would have done." *See* Tr., at 373:10–12.  When pressed about whether he had an independent recollection that such action took place, Mr. Brady conceded that he couldn't recall the exact conversation, but "I can tell you the general cadence of meetings and what would happen." *See* Tr., at 373:13–24.

414.    Mr. Brady testified he would not be concerned to see investments "marked for review" omitted from meeting minutes because "we would have talked about [it]." *See* Tr., at 375:21–22.

415.    Concerning the benchmarks provided by Captrust, Mr. Brady insisted "[i]f I noticed something that seemed like an error, I would definitely bring it up." *See* Tr., at 383:3–4.

416.    When asked whether Captrust communicated to the Committee it was changing the benchmarks for the Plan's target date funds, Mr. Brady couldn't point to any documentation, but said he "would be surprised if they didn't." *See* Tr., at 384:19–21.

417.    Mr. Heather testified that "we would have discussed" that the Freedom Funds were "marked for review" by the scoring system, despite there being no record of any discussion in the minutes. *See* Tr., at 427:7–10; Ex. 8, at 1.

418.    When asked about the Committee's discussions concerning the Freedom Funds prior to Mr. Brady joining the Committee, Mr. Heather insisted "they talked a lot" but noted only "some of it is in these reports." *See* Tr., at 456:8–11.

419.    When asked about the chart comparing the glidepaths of the Freedom Funds and Morningstar Target Date Indices, Ms. Gomez testified that, "I'm sure it was discussed," and noted that while she didn't remember the chart specifically, "it was in the presentation, so we went over it." *See* Tr., at 594:16–17, 594:21–22.

420.    Mr. Davis insisted on the existence of conversations with the Committee concerning the Freedom Funds and, later, the FIAM Blend Funds despite no documented evidence of such conversations in the minutes or elsewhere. *See* Tr., at 830:5–7, 904:1–7.

421.    When asked if the Committee discussed taking further steps to assess the reasonableness of Transamerica's recordkeeping fees after the 2017 Vendor Fee Benchmark, Mr. Davis stated "it was a constant discussion with the Committee." *See* Tr., at 847:15–18.

422.    Mr. Davis frequently testified, without substantiation, that discussions with the Committee about particular topics occurred "at length", including: (i) the glidepath for the target date funds in the Plan, *see* Tr., at 809:8–10; (ii) the Freedom Funds' strategy change, *see* Tr., at 823:7–9; (iii) the difference between a mutual fund and a collective trust fund, *see* Tr., at 828:15–19; (iv) the client specific screening criteria used in the 2012 Vendor Fee Benchmark, *see* Tr., at 834:14–16; and (v) the change in the gap between the total dollars that would be paid to Transamerica under the per capita and asset-based fee proposals, *see* Tr., at 855:9–11, 858:19–22.

423.    Although Mr. Bogert testified that he took notes during Committee meetings, he threw those notes away in November 2020 when he left employment at Prime—after this lawsuit was filed. *See* Tr., at 521:1–3.

424.    This testimony, which is at odds with the trial record and asks the Court to simply trust that review occurred in the absence of corroborating evidence, is not credible.

## B. Mr. Brady's Testimony About Pre-2016 Deliberations and Actions

425.    Mr. Brady joined the Committee in 2016 and has no personal knowledge of what the Committee discussed in meetings prior to that time. *See* Tr., at 148:1–3.

426.    Mr. Brady's only knowledge was obtained from counsel in preparation for his deposition as a corporate designee of Prime under Federal Rule of Civil Procedure 30(b)(6). *See* Tr., at 359:4–8.  To prepare for his deposition, Mr. Brady testified that he reviewed meeting minutes and other meeting materials. *See* Tr., at 359:9–360:9.  Mr. Brady testified that he derived knowledge from unspecified "conversations," but he could not recall any such conversations. *See* Tr., at 360:25–361:5.

427.    Mr. Brady's testimony about the Committee's deliberations and actions prior to the time he joined the Committee in 2016 is not persuasive to the Court's determination as to whether such deliberations or actions occurred.

## C. Mark Davis' Testimony About Typical Practices

428.    Mr. Davis was responsible for 42 or 43 client relationships during his tenure at Captrust. *See* Tr., at 785:9–11.  When examined about whether he worked with plans with over $1 billion in assets, Mr. Davis testified that he worked with "Commercial Metals Corporation in Dallas, one or two others." Tr., at 787:15–16. Although Mr. Davis testified that he benefitted from all of Captrust's collective experience with plans with over $1 billion in assets, he did not personally service others. *See* Tr., at 787:20–22.

429.    Mr. Davis' testimony that "Prime was more involved than a typical client would be," *see* Tr., at 796:15–16, is not credible in light of the substantial record demonstrating the Committee's near-total reliance on Captrust, failure to make reasonable inquiries in the face of red flags with respect to the Plan's investments, benchmarks, and recordkeeping data, among other things, and misunderstandings of fundamental plan management concepts.

430.    Although Mr. Davis was dismissive of Mr. Dirk's investment removal framework and testified that "there are times and instances when [it] may make sense to withhold judgment for any number of reasons," *see* Tr., at 817:11–13, Mr. Davis did not elaborate on any such reasons or address Ms. Wagner's testimony that the standard of care dictates documenting those reasons and the rationale for retention of investments in the face of IPS noncompliance or persistent performance concerns. *See* Tr., at 48:13–18.  Similarly, while Mr. Davis testified that the IPS was intended to provide the Committee with wide discretion regarding investment monitoring, he did not address how that discretion should be workably applied.  *See* Tr., at 816:6–11, 818:11–16, 819:1–3.

431.    Mr. Davis testified that "[w]e went all the time to Transamerica to ask for recordkeeping adjustments."  *See* Tr., at 853:18–19.  In the absence of documentation reflecting periodic negotiation with Captrust and considering no fee reductions were obtained between 2012 and 2019, this testimony is not entitled to credibility.  *See* Tr., at 410:11–17, 418:14–17, 538:11–14, 538:21–24, 568:6–23.

432.    Mr. Davis' testimony that he thoroughly discussed changes in the benchmark for the Freedom Funds, *see* Tr., at 892:11–13, is not credible considering his admissions that he does not know how Captrust assigned the benchmarks and deferrals to other professionals at Captrust.  *See* Tr., at 791:3–10, 879:17–25, 892:6–10.

### D. Sarah Langkamp Testimony About Typical Practices

433.    Ms. Langkamp has three plan clients with over $1 billion in assets, one of which is Prime.  *See* Tr., at 916:19–20, 944:15–20.  Over the course of her career, Ms. Langkamp has worked with 14 healthcare organizations but the majority of those clients did not have over $1 billion in assets.  *See* Tr., at 916:19–25.

434.    Ms. Langkamp began working as client executive for the Plan in April 2017.  *See* Tr., at 917:9–10.  Ms. Langkamp does not have personal knowledge of any process undertaken by the Committee with respect to the Plan's recordkeeping before

that time. *See id.* In fact, Ms. Langkamp testified that much of the merger and acquisition activity undertaken by Prime occurred prior to her joining the client service team for the Plan. *See* Tr., at 931:13–14.

435. Ms. Langkamp was not involved in quoting or setting pricing for the Plans with which she worked. *See* Tr., at 919:23–25.

436. Ms. Langkamp's testimony is not credible to support a finding that the Plan was uniquely complex or more costly to administer than other similarly-sized plans in healthcare or non-healthcare industries.

### E. Marcia Wagner

437. Ms. Wagner holds a bachelor's degree from Cornell University, where she studied economics and political science. *See* Tr., at 26:5–6. Ms. Wagner also holds a *juris doctor* from Harvard Law School. *See* Tr., at 26:7. Ms. Wagner founded and manages the Wagner Law Group, which is one of the preeminent employee benefits law firms in the United States. *See* Tr., at 26:9–12. Prior to founding the Wagner Law Group, Ms. Wagner led the employee benefits practice at two significant law firms. *See* Tr., at 26:15–17. Ms. Wagner was appointed by the Secretary of the Treasury to the Internal Revenue Service Tax Exempt and Governmental Entity Advisory Committee and chaired its Employee Benefits Subcommittee. *See* Tr., at 28:22–25. For her work, Ms. Wagner received the Commissioner's Award, the highest honor conferred by the Internal Revenue Service. *See* Tr., at 29:1–2.

438. Ms. Wagner has authored or co-authored 24 books and hundreds of articles, including a book entitled, "Plan Disqualification and ERISA Litigation." *See* Tr., at 29:6–11. Ms. Wagner received the BNA Tax Management Portfolio Series distinguished author commendation for her contribution to the literature on these issues. *See* Tr., at 29:12–13.

439. Ms. Wagner has represented retirement plan sponsors, fiduciaries, parties in interest, and participants throughout her career. *See* Tr., at 26:22–24. These representations have involved work with respect to fiduciary and prohibited

transaction rules, Internal Revenue Service and Pension Benefit Guarantee Corporation issues, and tax qualification matters with respect to retirement plans. *See* Tr., at 27:1–7. Ms. Wagner's experience with respect to retirement plans has spanned the life cycle of plan administration from inception to termination, including the processes, protocols, and procedures regarding monitoring investments in a retirement plans. *See* Tr., at 27:10–13.

440. Ms. Wagner has been involved in establishing and implementing fiduciary committee practices, *see* Tr., at 27:16–18, drafted investment policy statements, *see* Tr., at 27:23–24, and advised on service provider due diligence, *see* Tr., at 28:1–2. Ms. Wagner has attended fiduciary committee meetings and provided fiduciary training. *see* Tr., at 28:3–5.

441. Ms. Wagner has provided testimony on behalf of plaintiffs and defendants in litigation on dozens of occasions. *See* Tr., at 29:19–30:5. The areas in which Ms. Wagner's testimony has been accepted by courts in the United States include generally accepted fiduciary practices and principles and the minimum standards applicable to fiduciaries of employee benefit plans. *See* Tr., at 30:14–16.

442. To conduct her analysis, Ms. Wagner reviewed core Plan governance documents (including the Plan document, investment policy statements, and the Committee's charter adopted in 2019), deliberative materials of the Committee (including meeting minutes, agendas, CAPTRUST's quarterly presentation materials, and correspondence), the Plan's administrative service agreements, deposition testimony. *See* Tr., at 31:20–32:9. Ms. Wagner's reviewed included the entire volume of potential trial exhibits designated by Plaintiffs and Defendants. *See* Tr., at 104:7–8, 105:5–10.

443. The Court finds Ms. Wagner to be qualified to provide expert opinions on the subjects of her testimony at trial and finds that Ms. Wagner applied reliable methods to render her expert opinions.

### F. Michael Geist

444.    Mr. Geist holds a bachelor's degree from Towson University, as well as a *juris doctor* from the University of Baltimore and a Master of Business Administration from the University of Maryland.  *See* Tr., at 601:19–22.  Mr. Geist holds Series 7, 24, and 63 securities licenses and has obtained the Certified Fiduciary Plan Advisor certification from the national Association of Plan Advisors.  *See* Tr., at 605:21–606:1.

445.    Mr. Geist is the principal of ClearSage Advisory Group ("ClearSage"), which provides retirement plan consulting services to clients including plan sponsors, fiduciaries, and service providers, as well as asset managers and banks.  *See* Tr., at 601:24–602:5, 602:10–13.  Mr. Geist, through ClearSage, provides services including research and analysis regarding retirement plan fees, retirement plan fee benchmarking, soliciting bids, conducting RFP processes, negotiating with service providers regarding fees, and monitoring service providers.  *See* Tr., at 602:3–9, 602:13–18.

446.    Prior to founding ClearSage, Mr. Geist worked for T. Rowe Price Retirement Plan Services ("T. Rowe") for over 10 years in the retirement plan services division, which provides recordkeeping and administrative services to retirement plans.  *See* Tr., at 602:21–24.  At T. Rowe Price, Mr. Geist worked in senior management roles, beginning as a sales producer, becoming national sales operations manager, sales support and business development manager, national pricing governance and data strategy manager, and finally senior product development manager.  *See* Tr., at 602:25–604:23.  In those roles, Mr. Geist was responsible for developing and governing the pricing for all new proposals submitted by T. Rowe for new business.  *See* Tr., at 603:5–10, 603:17–21.  As national pricing governance and data strategy manager, Mr. Geist was responsible for all pricing proposals by T. Rowe

for new and existing business, which he had done informally in his prior roles.[53]  *See* Tr., at 604:5–8.  As senior product development manager, Mr. Geist was responsible for launching a fee leveling solution, which returns revenue sharing amounts proportionally to the participants that generated those amounts.  *See* Tr., at 604:15– 23.  During his tenure at T. Rowe, Mr. Geist was involved with over 20,000 pricing proposals for over 10,000 plans in all segments of the market.  *See* Tr., at 605:1–14.

447.    Mr. Geist has been accepted as an expert by Courts in the United States on subjects including the standard of care for fiduciaries with respect to monitoring recordkeeping services and pricing, determining the reasonable market rate for a plan's recordkeeping services, and measuring losses suffered by a plan as a result of paying fees greater than the reasonable market rate for its services.  *See* Tr., at 606:14– 23.

448.    To conduct his analysis, Mr. Geist reviewed core Plan governance documents (including the Plan document, investment policy statements, and the Committee's charter adopted in 2019), deliberative materials of the Committee (including meeting minutes, agendas, Captrust's quarterly presentation materials, and correspondence), the Plan's administrative service agreements, deposition testimony, and publicly available Form 5500 filings and fee disclosures.  *See* Tr., at 608:3–10.

---

[53]Defendants' counsel examined Mr. Geist about T. Rowe's "pricing model," about which Mr. Geist testified at his deposition.  *See* Tr., at 642:25–645:1.  Any attempt to diminish Mr. Geist's experience on grounds that he did not "control" the pricing model and was not charged with developing the pricing model (as opposed to bids) is unavailing.  *See* Tr., at 644:5–645:1.  Mr. Geist testified at trial about his involvement in the process of developing bids at T. Rowe, *see* Tr., at 643:21–644:1, and that there were occasions in which Mr. Geist was involved in discussion about and development of bids without solely relying on T. Rowe's pricing model.  *See* Tr., at 644:10–15.  Moreover, Mr. Geist was authorized as a senior executive to make exceptions to the pricing model when issuing bids and cited a specific occasion on which he did so.  *See* Tr., at 646:11–647:1.

There were no materials that Mr. Geist requested in connection with his assignment that he was not provided.  *See* Tr., at 608:11–13.

449.   The Court finds Mr. Geist to be qualified to provide expert opinions on the subjects of his testimony at trial and finds that Mr. Geist applied reliable methods to render his expert opinions.

### G. Martin Dirks

450.   Mr. Dirks founded Investment Strategy Analysis, which provides investment research and analysis to financial services provider, and he is an adjunct professor at Golden Gate University in San Francisco and advisor to two early state companies, Inferess and Hedgesight, which provide data services to the investment industry.  *See* Tr., at 681:17–24.  Mr. Dirks previously held a Series 65 securities license and he is certified as an arbitrator with the Financial Industry Regulatory Authority (also known as FINRA).  *See* Tr., at 683:4–6.

451.   Mr. Dirks is on the investment committee for the endowment and retirement funds of the San Francisco Zen Center and for eight years served as a board member and member of the investment committee for the San Jose Federate Retirement System, a retirement system for the city employees of San Jose, California.  *See* Tr., at 681:25–682:6.

452.   Mr. Dirks previously worked at Milliman, an international consulting company, where he was an investment advisor and consultant to endowments, foundations, and pension plans, like Captrust's role with respect to the Plan.  *See* Tr., at 682:7–10.  He has also served in several executive and portfolio management roles at investment advisors, money managers, and hedge funds.  *See* Tr., at 682:15–16.  In these capacities, Mr. Dirks has provided asset allocation studies and select investment managers and he has monitored investment managers for compliance with written guidelines in investment policy statements.  *See* Tr., at 682:19–683:1.

453.   Mr. Dirks has written numerous articles and published business school cases that are available in the Harvard Business School repository and used at multiple

universities.  *See* Tr., at 683:9–13.   Mr. Dirks has been a speaker at industry conferences and universities dozens of times over the last decade.  *See* Tr., at 683:14–15.

454.    Mr. Dirks has provided testimony on behalf of plaintiffs (including the Department of Labor and the Securities and Exchange Commission) and defendants in litigation on dozens of occasions.  *See* Tr., at 683:16–24, 747:5–9.  Mr. Dirks has been accepted as an expert witness by courts in the United States on subjects including investment management and analysis and methods for calculating losses, in the context of retirement plans and in other contexts.  *See* Tr., at 684:5–8.

455.    To carry out his assignment, Mr. Dirks developed a framework for determining when a fiduciary carrying out a reasonable investment monitoring process would have removed investments from the Plan.[54]  *See* Tr., at 684:22–25, 685:13–14.  Mr. Dirks also determined a suitable replacement investment at the time identified in the first part of his analysis.  *See* Tr., at 685:1–3, 685:15–19.  Mr. Dirks also determined the Plan's losses resulting from the retention of the Challenged Funds instead of the suitable alternative investments he identified at that same time.[55]  *See* Tr., at 685:4–5.

456.    To develop a framework to approximate a reasonable investment monitoring process, Mr. Dirks applied the criteria in the investment policy statement and his experience acting in similar capacities in the industry.  *See* Tr., at 686:9–687:2. Mr. Dirks explained that he utilized a five-year review period because it encompasses

---

[54]Mr. Dirks only analyzed whether the Challenged Funds would be removed pursuant to this framework.  *See* Tr., at 755:10–11.

[55]Defendants' counsel, when cross examining Mr. Dirks, attempted to suggest that Mr. Dirks' testimony as to the scope of his assignment does not match the assignment described in his expert report disclosed during the litigation.  *See* Tr., at 749:5–7.  Mr. Dirks explained that his description of his assignment "aligns quite closely," *see* Tr., at 749:8–9, with his disclosed opinions, including his investment removal framework. *See* Tr., at 751:22–24.

the three-year period, represents a more stringent metric, and is a customary removal period.[56]   *See* Tr., at 687:3–6, 757:20–758:15.   Under this framework, when an investment had five-year returns that underperformed its five-year return benchmark and, at the same time, its ranking fell in the bottom 50% of its peer group, it would be placed on a hypothetical watch list.[57]   *See* Tr., at 687:17–20.   If the investment remained in the bottom 50% of its peer group and its five-year performance underperformed its benchmark for the next three quarters (for a total of four quarters), it is removed.[58]   *See* Tr., at 687:20–688:2.   Mr. Dirks obtained the data necessary to

---

[56]This is consistent with Mr. Davis' testimony as to Captrust's belief that five-year review periods present "a more accurate view of the long-term effects of a given investment decision."  *See* Tr., at 804:14–16.  Indeed, the Captrust scoring system also more heavily weights five-year periods, Ex. 3, at 11; Ex. 4, at 11, and the Captrust quarterly investment review presentations provide comparative risk and return metrics for each Plan investment, its benchmark, and its peer group on a five-year basis, but not a three-year basis.  *See, e.g.,* Ex. 7, at 39, providing five-year standard deviation, Sharpe Ratio alpha, beta, R-Squared, up market capture, down market capture, and Information Ratio statistics for the T. Rowe Price Fund.

[57]Mr. Dirks explained that he did not include qualitative criteria in this part of his framework because qualitative factors tend to be constant over time and would typically be brought to the attention of a fiduciary as a separate matter by a consultant. *See* Tr., at 742:9–16.  Including those factors in a scoring system can camouflage changes in performance, which are critical to specially monitor and change on a more frequent basis.  *See* Tr., at 742:17–25, 764:5–6.

[58]Mr. Dirks explained that this framework is consistent with the common practice of retirement plans specifying criteria for the replacement of investments and consistent with the IPS.  *See* Tr., at 741:10–742:4, 765:23–25.  Mr. Dirks further explained that failing both benchmark and peer-group criteria for four consecutive quarters is more conservative than typical in his experience.  *See id.*  While Defendants adduced on cross examination that Mr. Dirks had not previously drafted an investment policy statement with this specific criteria, Mr. Dirks testified as to his experience developing and implementing investment policy statements.  *See* Tr., at 762:11–763:4.  In addition, although Defendants' counsel attempted to suggest that Mr. Dirks undertook his methodology at the direction of Plaintiffs' counsel, Mr. Dirks testified that his methodology is a "very fundamental analysis that would done in evaluating the performance of any investment fund."  *See* Tr., at 767:1–5.

perform this analysis from plan documents and Morningstar, a widely-used database in the investment industry. *See* Tr., at 688:5–8. The benchmarks used were the same as those provided by Captrust for the Challenged Funds, except for the Freedom Funds. *See* Tr., at 688:13–15. For the Freedom Funds, Mr. Dirks used the Morningstar Moderate Index. *See* Tr., at 688:17–18.

457. Although Captrust used provided the Morningstar Conservative Index, the correct benchmark for the Freedom Funds is the Morningstar Moderate Index. *See* Tr., at 688:23–689:19. Mr. Dirks analyzed the glidepath of the Freedom Funds and the respective Morningstar indices to determine the correct benchmark. *See id.* Mr. Dirks performed this analysis with respect to the entire relevant period (and before) and determined that the Morningstar Moderate Index was always the correct benchmark.[59] *See id.* As Mr. Dirks explained, the impact of using the Morningstar Conservative Index instead of the Morningstar Conservative Index is that the Freedom Funds would appear to have better performance than they did.[60] *See* Tr., at 689:19–22. Mr. Dirks explained that the Freedom Funds were near the bottom of their peer group for the period ending June 30, 2013 through the period ending June 30, 2014. *See* Tr., at 746:13–24. This is relevant because relative performance between a Plan investment and its benchmark is one of the most important criteria fiduciaries would use in determining the suitability of an investment. *See* Tr., at 689:24–690:2.

458. Again, Mr. Dirks used the same peer groups as those provided by Captrust for the portion of his analysis analyzing peer-relative performance, except for the Freedom Funds. *See* Tr., at 690:9–10. Mr. Dirks explained that he made this

---

[59] Mr. Davis admitted that he never inquired into the appropriateness of the benchmark during the relevant period. *See* Tr., at 879:17–25.

[60] This is borne out in Ms. Allen's observation that the Freedom Funds would not have failed Mr. Dirks' removal framework if erroneously compared to the Morningstar Conservative Index. *See* Tr., at 1139:14–24.

determination based on the same analysis as he used in evaluating the correct benchmark for the Freedom Funds. *See* p Tr., at 690:14–18.

459.    Pursuant to the foregoing analysis, Mr. Dirks determined the Freedom Funds should have been removed after the Committee's review of the June 30, 2014 results,[61] the Invesco Real Estate Fund should have been removed after the Committee's review of the September 30, 2014 results, the Prudential Jennison Fund should have been removed after the Committee's review of the September 30, 2015 results, and the T. Rowe Price Fund should have been removed after the Committee's review of the December 31, 2014 results.   *See* Tr., at 690:25–691:7.   Mr. Dirks determined that, although the Oakmark Fund had poor performance, including four consecutive quarters with five-year performance below its benchmark, it would not have been removed pursuant to his proffered framework since it did not rank in the bottom 50% of its peer group in those same four quarters.   *See* Tr., at 691:12–20.

460.    To determine a suitable replacement investment at the time identified in the first part of his analysis, Mr. Dirks created a composite score using well-established industry standard metrics to evaluate the universe of potential replacement funds and identify suitable alternative investments.   *See* Tr., at 692:4–8.   These metrics included the investment's return, alpha, Sharpe Ratio, and others.   *See* Tr., at 692:12–13.   Alpha is a measure of an investment's outperformance against a benchmark and Sharpe Ratio compares the performance of a fund, less the risk-free rate, to its volatility.   *See* Tr., at 692:16–23.   Mr. Dirks determined the American Funds Target Date Funds were the most suitable alternative investment for the Freedom Funds at the putative time of replacement identified by his analysis.[62]   *See* Tr., at 693:2–6.   Mr.

---

[61]When a determination is made to replace an investment in a plan, there is a period of administrative lag before the investment can actually be replaced, which results from the process of coordinating with the plan recordkeeper as well as outgoing and incoming investment managers.   *See* Tr., at 295:4–9.

[62]In response to examination by Defendants' counsel, Mr. Dirks explained that while

Dirks determined the PIMCO Real Estate Return Fund was the most suitable alternative investment for the Invesco Fund at the putative time of replacement identified by his analysis.[63]  *See* Tr., at 693:7–13.  Mr. Dirks determined the Emerald Growth A Fund was the most suitable alternative investment for the Prudential Jennison Fund at the putative time of replacement identified by his analysis.  *See* Tr., at 693:14–19.  Mr. Dirks determined the JP Morgan Mid Cap Value Fund was the most suitable alternative investment for the T. Rowe Price Fund at the putative time of replacement identified by his analysis.  *See* Tr., at 693:7–13.

461.    The Court finds Mr. Dirks to be qualified to provide expert opinions on the subjects of his testimony at trial and finds that Mr. Dirks applied reliable methods to render his expert opinions.

**H. Steven Gissiner**

462.    Mr. Gissiner's testimony that the Committee's process was diligent and consistent, *see* Tr., at 1012:6–13, does not withstand an objective review of the trial

---

he has never done a study of how common it is for a plan to contain actively managed, he has observed that actively managed investments are commonly offered in retirement plans.  *See* Tr., at 758:23–759:11, 760:25–761:7.

[63]Mr. Dirks explained that, when he analyzed suitable alternative investments for the Invesco Fund, he determined that the two potential suitable replacements that scored highest under his composite scoring system had almost indistinguishable scores well above the rest of the peer group: the PIMCO Real Estate Fund and the Nuveen Real Estate Fund.  *See* Tr., at 768:1–6.  Mr. Dirks determined that the PIMCO Real Estate Fund was the most suitable replacement because it has a more established manager and greater assets under management, thus representing the more credible alternative investment, and it was the most favorable suitable alternative.  *See* Tr., at 768:11–18, 769:7–9.  Mr. Dirks testified that he understood from counsel that the most favorable alternative is an acceptable alternative under ERISA for purposes of calculating plan losses.  *See id.*  Mr. Dirks only took into account these additional qualitative factors in connection with his analysis to determine suitable alternative investments, not when analyzing the appropriate removal date.  *See* Tr., at 769:1–14.  For example, Mr. Dirks applied this uniform removal methodology and determined the Oakmark fund would not have been removed pursuant to the methodology.  *See* Tr., at 691:8–20.

record.[64]  This is consistent with Mr. Gissiner's testifying history, as he has never offered an opinion in any case that the fees paid by a retirement plan were unreasonable.  *See* Tr., at 1087:8–10.

463.    Mr. Gissiner's process opinions and criticisms of Ms. Wagner's and Mr. Geist's opinions are based on nit-picks and unexplained standards derived from inapplicable circumstances.  Mr. Gissiner did not seek to articulate any standards forming the basis of his testimony that the process carried out by the Plan's fiduciaries was "reasonable and consistent with what [he] would view to be typical industry practices.  *See* Tr., at 1010:13–19.

464.    Mr. Gissiner has been the principal of Orchard Hills Consulting for about 20 years and today works with approximately 30 recurring clients and several non-recurring clients from time to time.  *See* Tr., at 958:20–959:10.  Although Mr. Gissiner testified that he has worked between 20 and 30 hospitals over the course of his career, he largely identified plans much smaller than the Plan.  *See* Tr., at 961:24–25.  Among his clients, Mr. Gissiner identified Tallahassee Memorial and Lee Health as healthcare plans serviced by Transamerica.  *See* Tr., at 962:19–22.  The Tallahassee Memorial plan has less than 10,000 participants.  *See* Tr., at 1106:5–7.  The Lee Health plan has more than 10,000 participants today.  *See* Tr., at 1106:16–17.  Each of these healthcare plans serviced by Transamerica is of a substantially different size than the Plan.  *See* Tr., at 1106:5–7, 1106:16–17.

465.    Although Mr. Gissiner interviewed Ms. Langkamp as part of his expert engagement, *see* Tr., at 1009:22–24, Mr. Gissiner did not inquire in the additional administrative burden that the Plan's purported complexity created compared to other

---

[64]It bears noting that although Mr. Gissiner initially testified that his testimony had never been excluded by a federal court to his knowledge, he immediately conceded that was not truthful.  *See* Tr., at 1086:13–19.  In the case Mr. Gissiner suddenly recalled, his testimony was excluded because the court found he was seeking to introduce an improper factual narrative through his testimony.  *Romano v. John Hancock Life Ins. Co. (USA)*, 2022 WL 1447733, at *26 (S.D. Fla. May 9, 2022).

plans or otherwise inquire into the services of any other plans. *See* Tr., at 1096:6–1097:2. Mr. Gissiner took no notes of the interview, which occurred more than a year before his trial testimony. *See* Tr., at 1096:6–12. Despite this interview, Mr. Gissiner admitted that he did not inquire into how much more time, if any, per pay period Transamerica spent on the Plan than any other plans. *See* Tr., at 1096:15–18. Nor did Mr. Gissiner inquire into how the fees that Transamerica charged to the Plan compared to the fees that it charged to other multiple employer plans. *See* Tr., at 1097:3–5. Mr. Gissiner also did not view Transamerica's educational materials or attempt to understand whether they differed among Prime employment sites. *See* Tr., at 1097:19–1098:2.

466.    Mr. Gissiner criticizes Mr. Geist for "not tak[ing] into account any of the services that Transamerica provided to the plan" or the level of services of the comparator plans in his analysis. *See* Tr., at 1011:16–18, 1071:10–11, 1079:7–12. Yet, none of Mr. Gissiner's analyses of the comparator plans he relies on to suggest Mr. Geist's opinion about the reasonable market rate (which Mr. Gissiner ignores is based in large part on the actual rates obtained by the Plan as early as 2014) accounts for the services obtained by any of those plans. *See* Tr., at 1102:11–13; 1105:18–25. Mr. Gissiner's testimony that he determined the Plan's level of services was "a bit above average, relative to similar plans," *see* Tr., at 1029:3–4, is not credible since Mr. Gissiner admittedly did not consider the services of any other plans in reaching his opinions. *See* Tr., at 1089:10–1090:6, 1101:22–24; *see also* Tr., at 1030:8–10 (Mr. Gissiner testifying that "Transamerica provided a high level of services that they didn't charge extra for" despite his admission that he did not consider the services of any other plans). In addition, while Mr. Gissiner opined that multiple employer plans differ from single employer plans in terms of administrative services, *see* Tr., at 1013:4–6, Mr. Gissiner later conceded that he included multiple and single employer

plans without distinction in his analysis of comparator plans, belying any suggestion they cannot be compared from a pricing perspective.[65]  *See* Tr., at 1097:15–18.

467.    Mr. Gissiner criticizes Mr. Geist for "relying on [Form] 5500 data in support of his fee number," *see* Tr., at 1071:8–10.  While these criticisms of Mr. Geist's analysis are not legitimate, Mr. Gissiner admitted that he used Form 5500 data as part of his own survey.  *See* Tr., at 1105:6–20.

468.    Mr. Gissiner's opinions that the Plan's recordkeeping fees were reasonable throughout the relevant period are undercut by his testimony Transamerica's fee of 23 basis points or $39.45 per participant in 2012 was reasonable.  *See* Tr., at 1049:16–1050:12.  The Court cannot credit Mr. Gissiner's opinion that the Plan's subsequent payment of greater fees on a per-participant basis was reasonable.  Mr. Gissiner's testimony that the fees were declining during this period as the market for recordkeeping fees was becoming more competitive further undercuts these conclusions.  *See* Tr., at 1054:11–16.

469.    Mr. Gissiner's testimony that the Plan's fees were competitive on the basis of comparison to NEPC survey data is not persuasive.  *See* Tr., at 1056:9–10.  As Mr. Gissiner noted, the largest segment of plans in the NEPC data forming the basis of his opinion was plans with over 15,000 participants and a median plan size of 12,000 participants, both substantially smaller than the Plan.  *See* Tr., at 1101:25–1102:10.  Mr. Gissiner's testimony that the Plan's fees were competitive on the basis of his own survey data is based on even more dubious data, *see* Tr., at 1058:17–1059:1, as his benchmarking group included plans with less than 5,000 participants.  *See* Tr., at 1104:24–1105:2.  Mr. Gissiner did not review any information on the

---

[65]Mr. Gissiner's testimony that "it would be fair to state that the Prime plan is probably very unique within the Transamerica environment" such that it has greater servicing requirements than other plans is not based on evidence in the record or an explicable methodology or standard.  *See* Tr., at 1097:9–14.  This absence of substantiation is especially noteworthy considering Mr. Gissiner interviewed Ms. Langkamp.

services obtained by the Plans in the NECP survey.  *See* Tr., at 1102:11–13.  Nor did Mr. Gissiner undertake any evaluation concerning whether the plans included in the NEPC survey were paying inappropriately high fees.  *See* Tr., at 1102:14–17.

470.    Mr. Gissiner testified that Mr. Geist derived the reasonable market rate of $34 per participant from the 2020 Vendor Fee Benchmark, *see* Tr., at 1070:14–15, but ignores that Mr. Geist derived this rate from the Plan's actual fees paid as early as 2015.  *See* Tr., at 628:10–14.

471.    Mr. Gissiner's criticism that Mr. Geist ignored "that there was a period of time in 2019, roughly five months, where Prime paid the recordkeeping fees for active employees," Tr., at 1080:16–18, is demonstrably false since the Committee directed payment of recordkeeping fees from the EBA until it was exhausted in 2020. *See supra* III.B.2.

**I. Lucy Allen**

472.    As an initial matter, Defendants did not offer or present Ms. Allen as an expert witness during trial.

473.    Ms. Allen's stated assignment was "[t]o analyze the performance of the [C]hallenged [F]unds, and in particular looking at how they do relative to their peers, and to review and analyze the expert report of plaintiff's expert, Mr. Dirks."  Tr., at 1120:17–20.  Ms. Allen's stated assignment did not relate to fiduciary governance or process, fiduciary investment monitoring standards, or whether hypothetical prudent fiduciaries would have retained the Challenged Funds.  *See id.*  Although Ms. Allen has been working with National Economic Research Associates ("NERA") for 30 years, *see* Tr., at 1119:3–7, she is not an investment professional and has not served as an investment advisor or fiduciary to retirement plans; Ms. Allen's experience with retirement plans is limited to expert witness work.  *See* Tr., at 1152:17–20; 1120:12–15.

474.    Ms.  Allen's  findings  that  the  Challenged  Funds  "generally outperformed their peers," Tr., at 1123:23–24, is based on artificial, cherry-picked

time frames.  Ms. Allen testified that she compared the Freedom Funds to their Morningstar and Lipper averages "through the end of 2018." Tr., at 1124:15–1125:9, 1127:15–1129:8, 1132:12–13.  This date is entirely arbitrary, as the Freedom Funds were in the plan from the beginning of the relevant period until August 1, 2019.[66]  *See* Stipulated Facts Appendix ¶ 178.  Ms. Allen's selection of year-end 2018, which is not connected to any substantive or procedural aspect of Plaintiffs' claims, appears artificially chosen to support her opinion that the Freedom Funds compared favorable to peer investments.  *See* Tr., at 1153:17–21.  Similarly, for the T. Rowe Price Fund, Ms. Allen testified that she analyzed the performance T. Rowe Price Fund from the beginning of the Class Period to the end of 2021.  *See* Tr., at 1130:17–24, 1131:5–6.  It also bears noting that Ms. Allen omitted from her testimony comparisons of the Invesco Fund and the Prudential Jennison Fund to their Morningstar and Lipper peer groups, which would have shown the Challenged Funds underperforming their peer groups.  *See* Tr., at 1155:1–12.  Ms. Allen also conceded that this portion of her analysis was based on "hindsight" review of performance data.  *See* Tr., at 1161:22–24.  This stands in contrast to Mr. Dirks' analysis, which is based only on data that would have been known to the Committee at the time of its investment decisions.

475.  Ms. Allen's testimony concerning the performance of the Freedom Funds compared to peer investments is also undercut by Ms. Allen's testimony that Ms. Allen did not know what peer groups Morningstar offered for TDFs.  *See* Tr., at 1149:7–9.  For her analysis, Ms. Allen did not make any distinction between the

---

[66]Ms. Allen also testified that she performed the same calculations as Mr. Dirks but ended her analysis in the fourth quarter of 2020.  *See* Tr., at 1142:6–14, 1143:14–19.  While Ms. Allen attempted to explain that this was "the date that the complaint was filed," *see id.*, this is incorrect.  Plaintiffs' initial complaint was filed August 18, 2020.  *See* Stipulated Facts Appendix ¶ 4.  Ms. Allen offered no testimony regarding the Plan's losses as of the correct date this action was filed.  *See* Tr., at 1142:6–14, 1143:14–19.  Again, it appears Ms. Allen used an arbitrary date in a flawed attempt to criticize Mr. Dirks' analysis of the Plan's losses.

moderate and conservative peer groups. *See* Tr., at 1150:2–3. Ms. Allen also betrayed a lack of knowledge or inquiry regarding the composition of the Morningstar peer group she used for purposes of comparison with the Freedom Funds. *See* Tr., at 1150:16–23 (Ms. Allen testifying that she does not know how many TDFs comprise the Morningstar peer group she used in her analysis), 1153:9–14 (Ms. Allen testifying that she does not know the range of assets under management of the TDFs in the Lipper or Morningstar peer groups she used in her analysis).

476.    Ms. Allen's finding that the Freedom Funds "were a well-regarded and popular investment choice," Tr., at 1123:24–25, ignores significant red flags associated with the Freedom Funds. *See* Tr., at 1158:12–1159:23 (Ms. Allen testifying that she did not consider substantial negative net asset flows or negative press coverage of the Freedom Funds). Although Ms. Allen reviewed ratings by Morningstar,[67] Kiplinger,[68] and Brightscope,[69] she entirely ignored sources disclosing investor sentiment concerning the Freedom Funds. *See* Tr., at 1132:2–7. Critically, while Ms. Allen reviewed assets under management, her testimony is unpersuasive insofar as she neglected to analyze *net capital flows*, which would have revealed that investors were exiting the Freedom Funds. *See* Tr., at 1133:8–12, 1134:20–24,

---

[67]Ms. Allen's review of Morningstar ratings was only of "medal" ratings, of which the Freedom Funds received a bronze medal (the lowest medal rating) in 2016. *See* Tr., at 1157:1–11. Ms. Allen was not aware that the Freedom Funds did not receive any medal ratings from 2013 through 2015. *See id.* These medal ratings are immaterial in the face of the indicia of imprudence apparent on this record.

[68]Ms. Allen was not aware that the first year that Kiplinger provided a high rating of the Freedom Funds was in 2019, the year the Freedom Funds were removed from the Plan. *See* Tr., at 1157:21–1158:5. Accordingly, the award is not relevant to the Court's analysis of whether prudent fiduciaries would have retained the Freedom Funds before that time.

[69]The Brightscope rating Ms. Allen reviewed only reflected a ranking of assets under management, *see* Tr., at 1156:21–25, which would not have reflected that the Freedom Funds were experiencing net capital outflows.

1158:12–14.  Ms. Allen did not credibly address the $16 billion in outflows during several years of the relevant period.  *See* Tr., at 1134:25–1135:8.  Similarly, Ms. Allen did not consider whether the other TDFs that she reviewed for assets under management were increasing in assets under management while the Freedom Funds were decreasing in assets under management.  *See* Tr., at 1159:1–8.

477.    Ms. Allen's testimony that Mr. Dirks' methods are arbitrary insofar as he employs different frameworks for determining when prudent fiduciaries would have removed the Challenged Funds and identifying suitable alternative investments ignores the different purposes of the steps in Mr. Dirks' analysis, as well as the structure of remedies under ERISA and the law of trusts.[70]

478.    Ms. Allen's testimony that Mr. Dirks' methodology has "no academic support" is not credible in light of judicial, industry, and academic recognition of methods directly analogous to Mr. Dirks.  Moreover, Ms. Allen testified that she has no opinion about the principal that, "[e]valuating whether to keep a fund in a retirement plan based on that fund's performance over a set number of consecutive quarters" (*i.e.*, Mr. Dirk's investment removal methodology) is a well-established practice in the field of retirement income advice.  Tr., at 1160:11–16.

---

[70]Ms. Allen advances the additional criticism that Mr. Dirks' methods are arbitrary because the suitable alternative investment his analysis identified for the T. Rowe Price Funds (*i.e.*, the PIMCO Fund) would have been eligible for removal at some point after its putative selection pursuant to his framework.  *See* Tr., at 1140:7–11.  Ms. Allen ignores that the suitable alternative investment is identified for purposes of establishing a measure of the Plan's losses under ERISA and the law of trusts.  Even setting that aside, if the PIMCO fund was replaced with another suitable investment when it became eligible for removal, the Plan's losses would be larger.

## VII. THE PLAN'S LOSSES

### A. The Plan's Losses Resulting from Defendants' Failure to Monitor the Plan's Recordkeeping Fees

479.    Mr. Geist determined the maximum reasonable market rate for the Plan's recordkeeping services was $34 per participant. *See* Tr., at 625:17–19. Mr. Geist then measured the difference between the Plan's actual fees and the reasonable market rate he determined in the first part of his analysis. *See* Tr., at 625:20–22.

480.    To determine the maximum reasonable market rate for the Plan's fees, Mr. Geist evaluated record evidence establishing that the Committee was able to obtain an effective fee rate of $34 per participant in 2015. *See* Tr., at 628:10–14. That amount is validated by the $34 per participant rate again obtained by the Committee in 2020. *See* Tr., at 628:20. As Mr. Geist explained, the Plan's complexity (vis-à-vis merger and acquisition needs or otherwise) was known to Transamerica and baked into the proposals it provided and fees it charged.[71] *See* Tr., at 670:3–671:20; *see also* Tr., at 934:22–25 (Ms. Langkamp testifying that these costs are "built into the pension services agreement"), 953:20–22 (Ms. Langkamp testifying that any complexity created by "decentralization" is "built into the fee structure").

481.    Mr. Geist further validated this determination through a review of the fees paid by comparator plans during the relevant period. *See* Tr., at 628:21–630:7. This review included publicly available 404(a) participant fee disclosures that reflect the total recordkeeping fees (from all sources) paid by a retirement plan. *See* Tr., at 629:1–8. Using publicly available 404(a) disclosures from comparable plans, Mr. Geist created a trend line like those that recordkeepers create when providing pricing proposals. *See* Tr., at 629:9–12; 661:13–24; 663:16–22, 669:3–11. Plotting the Plan's

---

[71]As Mr. Geist explained, an acquisitive company like Prime is an attractive prospect to a recordkeeper, as it results in greater fees by way of more participants and assets on the recordkeeping platform as well as cross-selling opportunities. *See* Tr., at 671:24–672:9, 676:18–25.

fees along this trend line validates Mr. Geist's opinion that $34 is the maximum reasonable market rate for the Plan's recordkeeping services. *See* Tr., at 629:1–12; 661:13–662:5. Mr. Geist also conducted a similar analysis using Form 5500 filings[72] for comparable plans that have sufficiently transparent fee structures.[73] *See* Tr., at 629:13–19; 663:16–22, 672:25–673:10, 674:8–675:12. Certain of the plans included in Mr. Geist's analyses were healthcare plans.[74] *See* Tr., at 667:12–22. This analysis also validates Mr. Geist's opinion that $34 is the maximum reasonable market rate for the Plan's recordkeeping services.[75] *See* Tr., at 629:13–630:7.

---

[72]Form 5500 is a form jointly developed by the Department of Labor, Internal Revenue Service, and Pension Benefit Guaranty Corporation the Annual Returns/Reports of Employee Benefit Plan and is a required annual filing used to report information concerning employee benefit plans. *See* Instructions for Form 5500, DEP'T OF LABOR, INTERNAL REVENUE SERV., PEN. BEN. GUAR. CORP. (2023), https://www.dol.gov/sites/dolgov/files/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2023-instructions.pdf.

[73]Mr. Geist explained why it is reliable to compare the Plan's fees to the fee data derived from select Form 5500 filings because of the transparent fee structure of the plans in this sample. *See* Tr., at 659:10–15. Mr. Geist further explained on cross examination that the structure of the market for recordkeeping services and the way plans are priced supports the reliability of his analysis without specifically comparing the service agreements for these plans. *See* Tr., at 664:5–10. Specifically, the bundled services obtained by these plans are priced as a commodity and any differences in services are immaterial from a pricing perspective. *See id.* Mr. Geist also noted that the 2017 Vendor Fee Benchmark that Defendants claim illustrates an adequate process regarding the monitoring of recordkeeping fees contains no comparison of services. *See* Tr., at 665:1–3, 675:14–676:1.

[74] Mr. Geist explained that there are no material differences in the bundled services provided by a recordkeeper to a plan sponsored by a healthcare organization. *See* Tr., at 667:23–668:2.

[75]During cross-examination, Defendants' counsel conflated the grounds for Mr. Geist's analysis, *see, e.g.*, Tr., at 657:8–15, but Mr. Geist explained that his opinion of the reasonable market rate was derived from the fees actually obtained by the Plan, *see* Tr., at 655:6–7, and validated by his additional analyses of comparable plans. *See* Tr., at 656:24–25.

482.    Applying the foregoing methodology, Mr. Geist calculated the Plan's losses on an annual basis and applied a market-based interest rate to determine the losses associated with participants' missed investment opportunity resulting from the Plan's excessive fees.  *See* Tr., at 626:24–627:3.  The interest rate Mr. Geist applied to determine the present value of the Plan's losses is the mutual fund VIIIX, which is an investable proxy for the returns of the S&P 500.  *See* Tr., at 627:16–22.

483.    Mr. Geist determined that the value of the Plan's losses through the end of 2023 is $3,041,253.

### B. The Plan's Losses Resulting from Defendants' Failure to Utilize Share Classes with the Lowest Net Effective Expense

484.    To determine the Plan's losses resulting from Defendants' failure to utilize share classes with the lowest net effective expense, Mr. Geist measured the difference in the year-end assets in the relevant Plan investment assuming investment in the share class with the lowest net expense and the Plan's actual year-end assets in the same investment.  *See* Tr., at 632:25–633:7.  Mr. Geist then took the year-end losses he identified by the foregoing method and created an adjusted year-end balance for each successive year, applying the returns of the share class with the lowest net effective expense.  *See* Tr., at 633:7–14.

485.    Mr. Geist's methodology reasonably estimates and accounts for the excessive fees that were paid by participants utilizing the share class that is more expensive than the Committee could have otherwise obtained.  *See* Tr., at 633:7–14.

486.    Mr. Geist's methodology applies the performance of the underlying holdings to determine the updated value of the Plan's losses.  *See* Tr., at 633:24–634:3.

487.    Mr. Geist determined that the value of the Plan's total losses resulting from this breach through the end of 2023 are $1,632,112.  *See* Tr., at 633:18–21.

## C. The Plan's Losses Resulting from Defendants' Failure to Timely Return Amounts Accumulated in the EBA

488.    To determine the Plan's losses resulting from Defendants' failure to timely return amounts accumulated in the EBA, Mr. Geist accounted for the excessive amount retained in the EBA at the end of each year and applied a performance-based interest rate to determine the losses associated with participants' missed investment opportunity resulting from the Plan's excessive fees.  *See* Tr., at 637:9–15.

489.    Mr. Geist determined that the value of the Plan's losses through the end of 2023 is $584,742.  *See* Tr., at 636:20–21.

\*      \*      \*

490.    Mr. Geist determined that the Plan's total losses through the end of 2023 resulting from Defendants' failure to monitor the Plan's recordkeeping fees, failure to utilize share classes with the lowest net effective expense, and failure to timely return amounts accumulated in the EBA is $5,258,108.

## D. The Plan's Losses Resulting from Defendants' Retention of Unsuitable Investments

491.    To measure the Plan's losses resulting from Defendants' failure to replace the Challenged Funds with suitable replacement investments at the times identified above, Mr. Dirks modeled a scenario where the replacement fund started at the same balance (*i.e.*, the same amount of assets) as the Plan's actual case and used the investment returns for the replacement fund to determine the asset balances the Plan would have obtained at a terminal point[76] had Defendants replaced the Challenged Funds with suitable alternative investments.  *See* Tr., at 694:3–14.  Mr. Dirks also calculated the net flows into or out of the Challenged Funds in each period

---

[76]This terminal point was either the time at which the Committee ultimately replaced the relevant Challenged Fund or when Plan data was no longer available.  *See* Tr., at 695:3–5.

to account for intra-period transactions such as contributions and withdrawals.  *See* Tr., at 694:14–25.  This ensured the loss calculations performed by Mr. Dirks only accounted for the difference in asset appreciation resulting from the retention of the Challenged Funds and not inflows or outflows from other sources.  *See id.*

492.    Put simply, this methodology determines how the performance of a suitable alternative investment would have driven wealth creation for participants and computes the Plan's losses as the difference between the but-for scenario modeled by Mr. Dirks and the Plan's experience.  *See* Tr., at 695:24–696:2.

493.    After the end of the period for which Plan data was available to Mr. Dirks, he ascertained the present value of the Plan's losses by applying the rate of return of the suitable replacement fund he identified, as those are the funds in which Plan assets would have been invested had replacement occurred according to his analysis.  *See* Tr., at 696:8–12.  Consequently, the losses calculated by Mr. Dirks do not account for future contributions to the Challenged Funds that remained in the Plan.  *See* Tr., at 697:6–9.  This is a conservative assumption, as greater balances resulting from future contributions would result in greater losses.  *See* Tr., at 697:10–12.

494.    The last period for which Mr. Dirks had plan data available was the quarter ending September 30, 2021.  *See* Tr., at 743:2–4.  Mr. Dirks explained that he reviewed the losses as of that date as well as other dates throughout the relevant period and determined that September 30, 2021 is an anomalous date and his model shows no losses as of that date.  *See* Tr., at 743:19–744:5.  Mr. Dirks reviewed each of the other period ends through September 30, 2021 and determined that most of those quarterly calculations show a loss.  *See* Tr., at 743:15–744:2.  Since Mr. Dirks had beginning balance data (*i.e.*, as of September 30, 2021) for the quarter ending December 31, 2021, as well as the investment returns of the American Funds Target Date Funds and the Freedom Funds, Mr. Dirks' model calculates the Plan's losses through the end of that period.  *See* Tr., at 744:20–745:11.  Mr. Dirks did not extrapolate further since he did not have precise beginning balances for quarters after

the quarter ending December 31, 2021.[77]  *See id.*  Mr. Dirks' model does not, as Ms. Allen suggests, assume that participant will sell their plan holdings, but rather does not measure new accrued losses after December 31, 2021 and only applies a performance-based interest calculation to losses ascertainable as of that date.  *See id.*; *contra* Tr., at 1143:25–1144:7 (Ms. Allen testifying), 1145:13–16 (same), 1146:11–17.  It is telling that Ms. Allen apparently analyzed data through December 31, 2021 as part of her analysis but did not perform her own calculations through December 31, 2021.  *See* Tr., at 1172:11–18.

495.    Mr. Dirks determined that the Plan's losses resulting from the retention of the Freedom Funds instead of a suitable alternative investment are $7.9 million.[78]  *See* Tr., at 697:13.

496.    Mr. Dirks determined that the Plan's losses resulting from the retention of the Invesco Fund instead of a suitable alternative investment are $600,000.  *See* Tr., at 697:14.

497.    Mr. Dirks determined that the Plan's losses resulting from the retention of the Prudential Jennison Fund instead of a suitable alternative investment are $1.2 million.[79]  *See* Tr., at 697:15.

---

[77]Although Ms. Allen suggested ending Mr. Dirks' model on September 30, 2021 would show no losses, Ms. Allen failed to address Mr. Dirks' explanation of this aspect of his analysis.  *See* Tr., at 1142:23–1143:12, 1146:7–9.

[78]Ms. Allen criticizes the application of Mr. Dirks' methodology regarding the start dates for his loss calculations, *see* Tr., at 1146:23–1148:8, but Ms. Allen testified that correcting this criticism would result in the following losses: $7.4 million for the Freedom Funds, $800,000 for the Invesco Fund, and $300,000 for the Prudential Jennison Fund.  *See* Tr., at 1175:6–1176:25.  Ms. Allen's testimony in response to questioning from Defendants' counsel that correcting all of the purported issues she identifies with Mr. Dirks' analysis would result in a measurement that the Plan did better off by $7 million is subject to the same arbitrary dates and other mistaken assumptions discussed in this section.  *See* Tr., at 1177:12–16.

[79]Mr. Dirks' same analysis applied to the T. Rowe Price Fund did not calculate losses associated with that investment.  *See* Tr., at 697:18.

# CONCLUSIONS OF LAW

## I.    GENERAL

1.    This Court has subject matter jurisdiction under 28 U.S.C. §1331 because this is an action under ERISA §502(a)(2), 29 U.S.C. § 1132(a)(2), for which federal district courts have exclusive jurisdiction under ERISA §502(e)(1). 29 U.S.C. § 1132(e)(1); *see also* ECF No. 196, Final Pretrial Conference Order, at 2.

2.    The Plan is an individual account, defined contribution plan under ERISA § 3(34), 29 U.S.C. § 1002(34), and an employee pension benefit plan under ERISA § 3(2)(A).  29 U.S.C. § 1002(2)(A).

3.    The Plan was "established and maintained pursuant to a written instrument" under ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

4.    Plaintiffs are participants within the meaning of ERISA § 3(7).  29 U.S.C. § 1002(7).

5.    Plaintiffs have standing to bring each of their claims against Defendants. First, Plaintiffs have statutory authority to pursue the claims in this case on behalf of the Plan pursuant to ERISA §502(a)(2). 29 U.S.C. § 1132(a)(2).  ERISA authorizes any participant, beneficiary, fiduciary, or the U.S. Secretary of Labor to bring civil action to seek relief on behalf of a plan. *See id.*  Any action brought under ERISA § 502(a)(2) "seeks recovery only for injury done to the plan," not the individual. *Munro v. Univ. of S. Cal.*, 896 F.3d 1088, 1092-93 (9th Cir. 2018).  There is no dispute that Plaintiffs are "participants" in the Plan as defined by ERISA § 3(7). 29 U.S.C. § 1002(7); *see also* Stipulated Facts ¶ 6. As participants, Plaintiffs may bring this action on the Plan's behalf.  Second, Plaintiffs have Article III standing since Plaintiffs have presented evidence of their investments in Challenged Funds and payment of the allegedly excessive recordkeeping fees during the Class Period and the resulting harm to her individual account arising from Defendants' fiduciary breaches. *See, e.g.*, *Cutrone v. Allstate Corp.*, 2021 WL 4439415, at *5 (N.D. Ill. Sept. 28, 2021) ("Plaintiffs claim that they lost retirement savings because defendants breached their

fiduciary duties, either by selecting and retaining the suite of Northern Trust funds or by causing the plan to pay excessive fees. ERISA . . . authorizes recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account. Plaintiffs have alleged that defendants caused a concrete and particularized injury for which the law provides redress. Article III requires no more.") (citing 29 U.S.C. § 1132(a)(2)).    This is consistent with the Court's previous holdings regarding Plaintiffs' standing to bring each of their claims. *See In re Prime Healthcare ERISA Litig.*, 2023 WL 9319290, at *3–4 (Dec. 28, 2023) (finding Plaintiffs have standing to assert claims related to funds in which they did not invest); ECF No. 194 (denying motions *in limine* seeking exclusion of evidence of Challenged Funds in which Plaintiffs did not personally invest).    This reasoning has likewise been embraced by several Courts of Appeals that recently found that retirement plan participants have standing under Article III to challenge fiduciary monitoring processes for investments in their plans beyond those in which they personally invested. *See Albert v. Oshkosh Corp.*, 47 F.4th 570, 577–78 (7th Cir. 2022); *Boley v. Universal Health Servs., Inc.*, 36 F.4th 124, 132 (3d Cir. 2022).

6.    All claims asserted against Defendants were and are timely under ERISA § 413, 29 U.S.C. § 1113, requiring an action to be commenced six years after the latest date on which a fiduciary could have cured a breach based on an omission. 29 U.S.C. § 1113; *see Howard Elec., Inc. v. Am. Bank & Tr. Co.*, 1990 U.S. LEXIS 770, at *31–38 (N.D. Cal. Apr. 2, 1990).

7.    Prime, the Board, and the Committee, as well as the individual members of the Board and the Committee, were and are fiduciaries of the Plan by virtue of their designations as such, *see* 29 U.S.C. § 1002(21), and because they exercised "discretionary authority or discretionary control respecting management of [the] plan," "authority or control respecting management or disposition of its assets," and "discretionary authority or discretionary responsibility over the administration of [the] plan." 29 U.S.C. § 1002(21).

8.　　In ERISA actions, liability for a breach committed by a corporation's officers and directors is imputed to the corporation. *Sharp v. Coopers & Lybrand*, 649 F.2d 175, 182 n.8 (3d Cir. 1981) ("Officers are able to make policy and generally carry authority to bind the corporation. Their action on behalf of the corporation is therefore primary, and holding a corporation liable for their actions does not require respondeat superior."); *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1353 (4th Cir. 1995) ("Since the acts of a corporation are acts of human beings, to say that the 'corporation' has committed some wrong . . . simply means that someone at the decision-making level in the corporate hierarchy has committed the wrong; the deliberate act of such a person is the corporation's deliberate act.") (quoting *Hunter v. Allis-Chalmers Corp.*, 797 F.2d 1417, 1422 (7th Cir. 1986) (Posner, J.)); *Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.*, 381 F.2d 245, 250 (4th Cir. 1967) ("Ordinarily knowledge of officers and directors having substantial control of all activities of a corporation is imputed to the corporation.").

9.　　"Actions under ERISA are governed by the federal common law of agency." *Woods v. Qwest Information Techs.*, 334 F. Supp. 2d 1187, 1194–95 (D. Neb. 2004) (collecting cases). Under these principles, the Board and the Committee are Prime's agents and may each be held liable. *See id.* (finding administrative committee may be held liable because it "acted as either an ERISA fiduciary or its agent in exercising these discretionary duties for the employer."); *see also In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 284 F. Supp. 2d 511, 660 (S.D. Tex. 2003) (quoting *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 80–81 (1995)) ("[B]ecause only natural persons can make decisions and because principles of corporate law provide ready-made rules for determining who has the authority to make decisions on behalf of a corporation, an ERISA plan need not specify individuals or bodies within the "Company" to show who has the authority to perform the action on behalf of the corporation"). Prime sponsors the Plan and is a fiduciary, and the Board and the

Committee, as Prime's designees and agents in carrying out plan management and administration, may clearly be held liable. *See id.*

## II.    ERISA'S FIDUCIARY DUTIES

10.    ERISA § 404 imposes on fiduciaries twin duties of loyalty and prudence. *See* 29 U.S.C. § 1104(a)(1)(A)–(B).

11.    ERISA's duty of loyalty requires a plan fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" and act "for the exclusive purpose of (i) providing benefits to participants and their beneficiaries and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). To fulfill its duty under these sections, an ERISA fiduciary must "exclude all selfish interest and all consideration of the interests of third persons[.]" *Pegram v. Herdrich*, 530 U.S. 211, 224 (2000).

12.    Under the duty of prudence, a fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" and act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]" 29 U.S.C. § 1104(a)(1)(B).

13.    "Prudence is measured according to the objective 'prudent person' standard developed in the common law of trusts." *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984) (quoting *Donovan v. Mazzola*, 716 F.2d 1226, 1231 (9th Cir. 1983)); *see also Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 363 (4th Cir. 2014) (same). "The court's task is to inquire 'whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment.'" *Katsaros*, 744 F.2d at 279 (quoting *Mazzola*, 716 F.2d at 1232. Whether a fiduciary has fulfilled his duty of prudence depends on "the totality of the circumstances." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 (4th Cir. 2007).

14.    "To enforce these duties, 'the court focuses not only on the merits of [a] transaction, but also on the thoroughness of the investigation into the merits of [that] transaction.'" *DiFelice*, 497 F.3d at 418 (4th Cir. 2007) (quoting *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996)).  Good faith does not provide a defense to a claim of a breach of these fiduciary duties; "a pure heart and an empty head are not enough."  *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983).

15.    The Second Circuit recently explained: "While the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not . . . suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith.  In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021).  The Seventh Circuit has similarly explained that the presence of a superficial process or merely observing formalities is not sufficient to prove that a prudent process was carried out.  *See George v. Kraft Foods Global Inc.*, 641 F.3d 786, 795 (7th Cir. 2011) ("Despite all this discussion . . . we can find nothing in the record indicating that defendants ever made a decision on these matters—*i.e.*, that they actually determined whether the costs of making changes . . . outweighed the benefits, or vice versa.").

16.    ERISA requires a fiduciary to "secure reliable information" and "exercise his own judgment" in selecting funds, "making such investments and only such investments as a prudent person would make of his own property."  *In re Unisys Sav. Plan Litig.* ("*Unisys I*"), 74 F.3d 420, 434 (3d Cir. 1996) (quoting Rest. (Second) of Trusts §227 (1959)).  So, too, when monitoring service providers.  *See id.*  Merely "engag[ing] in discussions"—even extensive ones—is not enough to discharge the duty of prudence; instead, there must be record evidence showing that the fiduciary "actually determined whether the costs" of a particular course of action "outweighed

the benefits, or vice versa." *George*, 641 F.3d at 795. If an investment or service provider is retained due to "inertia" rather than "a deliberate decision," the fiduciary has failed to discharge its duty of prudence. *Id*. at 796.

17.    A prudent investigation requires a reasoned decision-making process that considers all relevant factors. *See George*, 641 F.3d at 796. "Under ERISA, a fiduciary's failure to exercise his or her discretion—*i.e.*, to balance the relevant factors and make a reasoned decision as to the preferred course of action—under circumstances in which a prudent fiduciary would have done so is a breach of the prudent man standard of care." *Id.* (citing *DiFelice*, 497 F.3d at 420–21; *Armstrong v. LaSalle Bank N.A.,* 446 F.3d 728, 733–34 (7th Cir. 2006)).

18.    A fiduciary must, at a minimum, "examine the characteristics of an investment, including its risk characteristics and its liquidity, to ensure that it is an appropriate plan investment, and that it is in the best interests of the plan participants." *DiFelice*, 397 F. Supp. 2d at 773; *see also* 29 C.F.R. §2550.404a1(b)(2)(I) (fiduciary must give "appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties.").

19.    Since fiduciaries under ERISA are held to the standard that a prudent person "acting in a like capacity and *familiar with such matters* would use in the conduct of an enterprise of a like character and with like aims," ERISA §404(a)(1)(B) (emphasis added), they are effectively held to the standard of a prudent expert. *See Katsaros*, 744 F.2d at 279 ("A trustee's lack of familiarity with investments is no excuse"); s*ee also* 29 C.F.R. § 2550.404a-1. The prudence standard "does not require merely the level of care expected of a prudent layperson[.]" *In re Meridian Funds Grp. Sec. & ERISA Litig*., 917 F. Supp. 2d 231, 240 (S.D.N.Y. 2013). Rather,

"prudence is measured against hypothetical sophisticated and prudent investment professionals." *Id.* A fiduciary who lacks the requisite expertise has a "duty to seek outside assistance." *Katsaros*, 744 F.2d at 279; *Tatum*, 761 F.3d at 358 (duty of prudence may require "seeking outside legal and financial expertise"). A fiduciary who lacks the requisite expertise and makes investment decisions based "exclusively on the representations" of the entity offering the investment has acted imprudently. *Katsaros*, 744 F.2d at 279–80.

20.    "ERISA's fiduciary duties 'draw much of their content from the common law of trusts . . . .'" *Tatum*, 761 F.3d at 357 (quoting *DiFelice*, 497 F.3d at 417); *Trs. of the Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 569 (2d Cir. 2016) (the "common law of trusts 'offers a starting point for analysis of ERISA'") (quoting *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 250 (2000)). "In determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015).

21.    The trust law principles which inform ERISA's duty of prudence establish that fiduciaries have a "continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1828. This means the fiduciary "cannot assume" that investments prudent at one-time "will remain so indefinitely." *Id*. at 1828 (quoting A. Hess, G. Bogert, & G. Bogert, Law of Trusts and Trustees §684, pp. 145-146 (3d ed. 2009) (Bogert 3d)). Rather, the fiduciary "must 'systematic[ally] conside[r] all the investments of the trust at regular intervals' to ensure that they are appropriate." *Id*. (quoting Bogert 3d §684). "A fiduciary 'who simply ***ignores changed circumstances that have increased the risk of loss*** to the trust's beneficiaries ***is imprudent***.'" *PBGC ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.* ("*PBGC*"), 712 F.3d 705, 717 (2d Cir. 2013) (quoting *Armstrong v. LaSalle Bank Nat'l Assoc.*, 446 F.3d 728, 734 (7th Cir. 2006)). When fiduciaries fail to appropriately monitor plan investments, evidence of knowable quantitative and

qualitative concerns with at-issue investments may support a finding that prudent monitoring would have led the removal of such investments. *See id.*; *In re Lehman Brothers Sec. and ERISA Litig.*, 113 F. Supp. 3d 745, 757 (S.D.N.Y. 2015) ("changed circumstances can trigger a fiduciary's obligation to review the prudence of an investment"); *see also Tatum*, 761 F.3d at 360 ("By conducting no investigation, analysis, or review of the circumstances surrounding the divestment, RJR acted with procedural imprudence no matter what level of scrutiny is applied to its actions.").

22.    *See also Tibble v. Edison*, 2017 WL 3523737, at *11 (C.D. Cal. Aug. 16, 2017) ("even if an initial investment decision was made outside of the six-year statutory period specified by ERISA, [] if plan fiduciaries did not conduct the sort of review that a prudent fiduciary would have conducted, regarding the investment within that time period, they breached their fiduciary duty) (internal quotation omitted); *Tussey v. ABB, Inc.*, 746 F.3d 327, 337 (8th Cir. 2014) (same).    Fiduciaries breach their duties when they fail to "investigate suspicions" related to a plan. *Barker v. Am. Mobil Power Corp.*, 64 F.3d 1397, 1403 (9th Cir. 1995) (citing *Fink v. National Sav. & Trust Co.*, 772 F.2d 951, 955 (D.C. Cir. 1985)).

## III.    ERISA'S REMEDIES

23.    Any participant or beneficiary of an ERISA plan is empowered to bring a civil action "for appropriate relief under §1109." ERISA §502(a)(2), 29 U.S.C. § 1132(a)(2).  An action under §502(a)(2) is "brought in a representative capacity on behalf of the plan as a whole." *LaRue v. Dewolff, Boberg & Assocs.*, 458 F.3d 359, 363 (4th Cir. 2006) (quoting *Mass. Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 141 n.9 (1985)).

24.    ERISA §409 provides for broad remedies against a breaching fiduciary, including holding that individual "personally liable for damages." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 252 (1993).  Specifically, the statute provides that a fiduciary who breaches any of its duties is "personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any

1  profits of such fiduciary which have been made through use of assets of the plan by

2  the fiduciary, and shall be subject to such other equitable or remedial relief as the

3  court may deem appropriate, including removal of such fiduciary[.]" ERISA §409(a),

4  29 U.S.C. § 1109(a).

5       25.    Courts have consistently resolved issues in breach of fiduciary duty

6  actions under ERISA through the application of equitable principles that afford the

7  courts wide latitude to restore beneficiaries. *See Brotherston v. Putnam Invs. LLC*,

8  907 F.3d 17, 31–32 (1st Cir. 2018) (ERISA should be read in concert with "Congress's

9  clear intent to provide the courts with broad remedies for redressing the interests of

10  participants and beneficiaries when they have been adversely affected by breaches of

11  fiduciary duty.") (citing *Eaves v. Penn.*, 587 F.2d 453, 462 (10th Cir. 1978)).  With

12  respect to remedies, as with other aspects of ERISA, "[t]he common law of trusts is

13  incorporated into analysis of ERISA claims unless inconsistent with the statute's

14  language, structure or purpose." *Cal. Ironworkers Field Pen. Tr. v. Loomis Sayles &*

15  *Co.*, 259 F.3d 1036, 1046 (9th Cir. 2001).

16  **IV.    OVERRELIANCE ON CAPTRUST**

17       26.    A consultant's advice does *not* "operate as a complete whitewash which,

18  without more, satisfies ERISA's prudence requirement." *Donovan v. Bierwirth*, 680

19  F.2d 263, 272 n.8 (2d Cir. 1982).  At a minimum, "[t]he fiduciary must (1) investigate

20  the expert's qualifications, (2) provide the expert with complete and accurate

21  information, and (3) make certain that reliance on the expert's advice is reasonably

22  justified under the circumstances." *Howard*, 100 F.3d at 1489 (citations omitted); *see*

23  *also Gregg v. Transp. Workers of Am. Int'l*, 343 F.3d 833, 843 (6th Cir. 2003)

24  ("Independent expert advice is not a 'whitewash[.]'"); *George v. Kraft Foods Global,*

25  *Inc.*, 641 F.3d 786, 799 (7th Cir. 2011) ("relying on the advice of consultants" is not

26  a complete defense); *Tibble v. Edison Int'l*, 729 F.3d 1110 (9th Cir. 2013) ("Engaging

27  consultants, even well-qualified and impartial ones, will not alone satisfy the duty of

28  prudence).

27.    The fiduciary "cannot reflexively and uncritically adopt investment recommendations." *Tibble*, 729 F.3d at 1138, *vacated in part on other grounds*, 135 S.Ct. 1823 (2015).  The fiduciary's duty to conduct an independent investigation requires reviewing the consultant's data, grappling with the advice to assess its significance, supplementing the data and "question[ing] the methods and assumptions that do not make sense." *Id*. (citing *Unisys I*, 74 F.3d at 435–36; *Howard*, 100 F.3d at 1490).

28.    Rather, the fiduciary has a "duty to exercise his own judgment in the light of the information and advice which he receives." *Donovan v. Mazzola*, 716 F.2d 1226, 1234 (9th Cir. 1983) (citation omitted).  While the fiduciary need not "duplicate the expert's analysis," it must "review that analysis to determine the extent to which any emerging recommendation can be relied upon." *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 301 (5th Cir. 2000).

29.    To fulfill its duty, a fiduciary must "make an honest, objective effort to read the [recommendation], understand it, and question the methods and assumptions that do not make sense.  If after a careful review of the [recommendation] and a discussion with the expert, there are still uncertainties, the fiduciary should have a second firm review the [recommendation]." *Howard*, 100 F.3d at 1490.

30.    ERISA recognizes two different investment fiduciary roles—under ERISA § 3(21) and § 3(38), respectively.  *See* 29 U.S.C. §§ 1002(21), 1002(38).  ERISA § 3(21) provides that an individual or entity is a fiduciary with respect to a plan to the extent it "renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so." 29 U.S.C. § 1002(21)(A).  An investment advisor under § 3(21) does not exercise discretion over investment decision, but merely provides advise to a principal fiduciary (such as the Committee) that retains ultimate discretion over investment decisions with respect to the plan.  *See id.*  ERISA § 3(38) provides, "[t]he term 'investment manager' means any fiduciary (other than a trustee

or named fiduciary . . . (A) who has the power to manage, acquire, or dispose of any assets of a plan; (B) who (i) is registered as an investment adviser [under federal or (ii) state law]; . . . (C) has acknowledged in writing that he is a fiduciary with respect to the plan." 29 U.S.C. § 3(38). This distinction among investment fiduciaries is significant, as "ERISA was deliberately structured so that legal responsibility for management of ERISA plans would be clearly located." *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1218 (2d Cir. 1987). If Defendants wished to take a backseat to an investment fiduciary, they could have engaged Captrust or another provider as an investment manager under ERISA § 3(38)—indeed, Captrust repeatedly offered to serve in this capacity. *See* Tr., at 436:15–437:2, 883:19–884:3. Since Defendants retained fiduciary responsibility themselves, however, engaging Captrust in the more limited role of investment advisor under ERISA § 3(21), they were obligated to take reasonable steps to investigate the advice and information provided by Captrust and make independent decisions when presented with reason to question the propriety of the advice and information they received.

## V.    DEFENDANTS ARE PLAN FIDUCIARIES

31.    A plan document must "provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." 29 U.S.C. §1102(a)(1).

32.    In addition to the "named fiduciary" identified in the plan document, 29 U.S.C. §1102(a)(2), "a party not named in the plan" becomes a fiduciary if it engages in certain specified conduct, *Santomenno v. Transamerica Life Ins. Co.*, 883 F.3d 833, 837 (9th Cir. 2018); see 29 U.S.C. §1002(21)(A); *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993) ("ERISA . . . defines 'fiduciary' not in terms of formal trusteeship, but in functional terms of control and authority over the plan."). Under this functional definition, a person is a "fiduciary" to a plan to the extent:

(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."

29 U.S.C. §1002(21)(A).  "Person" includes corporate entities. 29 U.S.C. §1002(9).

33.     Given "ERISA's broadly protective purposes" and Congress's choice to "commodiously impose[] fiduciary standards on persons whose actions affect the amount of benefits retirement plan participants will receive," *John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*, 510 U.S. 86, 96 (1993), this "fiduciary" definition must be broadly construed, *Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1461 (9th Cir. 1995).  The same standards of conduct and liability apply to named and functional fiduciaries alike.  *Santomenno*, 883 F.3d at 837.

34.     A plan document may expressly provide for a procedure for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities under the Plan.  29 U.S.C. § 1105(c)(1).  The designated person becomes a fiduciary by performing the functions set forth in 29 U.S.C. § 1002(21)(A).

35.     The Committee is the named fiduciary responsible for operating and administering the Plan.  Stipulated Facts ¶ 6.  Prime represented in the Captrust Agreement that it was "the responsible plan fiduciary for the selection and monitoring of service providers and investment managers for the Plan in accordance with the requirements of ERISA and the governing Plan documents" and "that it has retained and will exercise, final decision-making authority and responsibility for the implementation of any recommendation made" by Captrust. *See* Tr., at 398:11–399:3; Ex. 14, at 9; Stipulated Facts Appendix ¶ 40.

36.     Prime and the Committee functioned as fiduciaries with respect to the Plan because they each had and excised discretionary authority and discretionary control respecting management of the Plan, and they each had and exercised authority and control over the management or disposition of Plan assets.  *See* 29 U.S.C. § 1002(21)(A)(i)–(iii).

## VI.    DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES UNDER ERISA

### A. Defendants Breached the Duty of Prudence by Failing to Appropriately Monitor the Plan's Fees

#### i.  Legal Standard

37.     In a defined contribution plan, participants' retirement benefits "are limited to the value of their own individual investment accounts," which means excessive fees can "significantly reduce the value" of retirement savings. *Tibble*, 135 S. Ct. at 1826.  "It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) (en banc).

38.     Among ERISA's fiduciary duties is the duty to ensure that the Plan pays no more than reasonable expenses of administration.  *See* ERISA §§ 403(c)(1), 404(a)(1)(A), 406(a)(1)(C), 408(b)(2); *George*, 641 F.3d at 789 (ERISA "states that plan administrative costs must be reasonable").  Trust law instructs that because "[w]asting beneficiaries' money is imprudent . . .  trustees are obliged to minimize costs." *Tibble v. Edison Int'l*, 843 F.3d at 1198 (quoting Unif. Prudent Investor Act §7).

39.     In monitoring plan recordkeeping fees to ensure they are reasonable, plan fiduciaries need information about all compensation to be received by the service provider. *See* Reasonable Contract Or Arrangement Under Section 408(b)(2) – Fee Disclosure, 72 Fed. Reg. 70988, 70989 (Dec. 13, 2007).  A prudent fiduciary must ensure plan recordkeeping fees are reasonable by considering all sources of the

recordkeeper's compensation from plan investments, determining whether the recordkeeper's pricing is competitive, and leveraging the plan's size to reduce fees. *See Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

40. According to the Department of Labor, fiduciaries must obtain information regarding "all fees or compensation received by" a recordkeeper— "including any revenue sharing"—and assess whether that amount is reasonable for the services provided. DOL Advisory Op. 2013-03A, at 4 (July 3, 2013). A prudent and loyal fiduciary also must ensure that each fee a plan service provider receives is reasonable, and not just determine whether all plan fees are reasonable as an aggregate total fee. *See* DOL Adv. Op. 97-15A (May 22, 1997); DOL Adv. Op. 97-16A (May 22, 1997); DOL Adv. Op. 97-19A (Aug. 28, 1997). This is particularly so as to recordkeeping fees, which the DOL has addressed in numerous advisory opinions, which carry considerable weight. *Stern v. IBM Corp.*, 326 F.3d 1367, 1372 (11th Cir. 2003).

41. The Department of Labor's Employee Benefits Security Administration ("EBSA") has promulgated regulations addressing the requirements for monitoring service provider compensation in the context of ERISA's prohibited transaction provisions, which the Ninth Circuit has applied in determining whether a fiduciary has breached its fiduciary duty by failing to monitor a recordkeeper's compensation. *See Bugielski v. AT&T Servs., Inv.*, 76 F.4th 894, 910–11 (9th Cir. 2023). "EBSA further explained that the phrase "in connection with" should "be construed broadly" to encompass compensation the party receives "based in whole or in part" on its contract with the plan." *Id.* at 911. "In amending § 2550.408b-2, EBSA explained that, when 'evaluating the reasonableness' of the contract for services, 'responsible plan fiduciaries have a duty to consider compensation that will be received by a [party in interest] *from all sources* in connection with the services it provides to a covered plan pursuant to the [party in interest's] contract or arrangement." *Id.* at 910–13 (emphasis in original). The Ninth Circuit was clear:

> In short, to determine whether "no more than reasonable compensation is paid" for a party in interest's services, EBSA envisioned that a fiduciary would consider the compensation received by the party "from all sources in connection with the services it provides to a covered plan pursuant to" the contract, not just the compensation the party receives directly from a plan.

*Id.* (citing Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 77 Fed. Reg. at 5650).

42.    While ERISA does not set forth requirements for the frequency and design of RFPs, "[a]t the very least, trustees have an obligation to (i) determine the needs of a fund's participants, (ii) review the services provided and fees charged *by a number of different providers* and (iii) select the provider whose service level, quality and fees best matches the fund's needs and financial situation." *Liss*, 991 F. Supp. at 300. Courts in this District have found breaches where fiduciaries failed to engage "in any comparative shopping or the solicitation and consideration of other bids." *Id.*

### ii.    Defendants' Deficient Monitoring of Recordkeeping Fees was a Breach of Fiduciary Duty

43.    Based on the record discussed above, Defendants failed to follow a prudent process to monitor the Plan's recordkeeping fees. The following deficiencies provide strong evidence of Defendants' procedural imprudence:

44.    *First*, the Defendants' fiduciary governance structure failed to provide members of the Committee with appropriate guidance or training regarding their investment monitoring responsibilities. Committee members were haphazardly selected to join the Committee and received little to no training when they began on the Committee. Until 2019, the Committee lacked a charter or other source of specific guidance regarding the specific responsibilities of the Committee members and other individuals and entities involved in Plan management and administration. *See, e.g.*, *Terraza*, 2019 WL 12872958, at *1.

45.    *Second,* the Committee insufficiently documented its decision-making process concerning the Plan's service provider arrangements and fees.    The Committee's meeting minutes were largely boilerplate documents that failed to establish a record of Committee deliberations or provide a touchstone for the application of a consistent process.  As a result of its insufficient training and records, the Committee defaulted to near-total reliance on its advisor Captrust and, with respect to its recordkeeping services, Transamerica.

46.    *Third*, throughout the relevant period, the Committee never undertook measures sufficient become informed of the reasonable market rate for the Plan's services or sufficiently leverage the Plan's size to obtain reasonable fees, evidencing a breach of fiduciary duty.  *See Tussey*, 746 F.3d at 336.  The Committee failed to undertake a single RFP process during the relevant period and, although Captrust provided a series of Vendor Fee Benchmarks, each suffered from flaws that rendered them inadequate to provide the Committee with accurate, current, and appropriate information to evaluate the fees Transamerica collected from the Plan.   The Committee apparently did not retain records of the 2015 Vendor Fee Benchmark, further evidencing the inadequacy of its procedures for documenting its decision-making.  From what little information remains of the 2015 Vendor Fee Benchmark, the exercise appears to have been akin to an RFI, in which the Committee received proposals from several recordkeepers.  Notably, the Committee did not require Transamerica to compete on the same footing as other recordkeepers to retain the Plan's business. Ultimately, the Committee did not achieve a fee reduction.  The 2017 Vendor Fee Benchmark consisted of a one-page benchmark analysis from a sample of plans that smaller than the Plan by orders of magnitude.   Several Committee members (including those who worked most closely with the Plan's recordkeeper) were entirely unaware of the plan comprising the sample.  The Committee achieved no fee reduction.  The 2020 Vendor Fee Benchmark occurred after Prime agreed to begin paying recordkeeping fees on behalf of active Plan participants.  Like the 2015

Vendor Fee benchmark, Captrust conveyed bids provided by several recordkeepers. The Committee again gave Transamerica an inside lane to retaining the business and, although the Committee eventually achieved a fee reduction, it came in exchange for the addition of Transamerica's managed advice service, for which Transamerica received additional revenues.  In none of the Vendor Fee Benchmarks did the Committee require prospective recordkeepers to provide multiple bids under proprietary asset assumptions or multiple rounds of negotiation.  The failure to engage in a competitive process for the Plan's service providers is strong evidence of a breach. *See Liss*, 991 F. Supp. at 30.  In addition, Plaintiffs' experts establish that the Vendor Fee Benchmarks did not comport with the standard of care for performing evaluations of recordkeeping fees.

47.     *Fourth*, from the beginning of the relevant period until August 1, 2019, the Plan paid a contractual rate of 21 basis points to Transamerica.  Plaintiffs' experts establish that industry standards require fiduciaries to monitor fees closely to ensure that growth in asset levels do not result in fees increasing precipitously.  The Plan's assets grew sharply during the relevant period, resulting in dramatic increases in the fees paid to Transamerica.  Defendants never sought to negotiate a per-participant cap or reduction in fees conditioned on increasing asset levels.

48.     *Fifth*, Defendants failed to review the total fees paid to Transamerica on a per-participant basis and, after the managed advice service was added to the Plan, total fees from all sources.  The failure to consider all fees paid to a service provider evidences a breach of fiduciary duty. *See Bugielski*, 76 F.4th at 910–11.

49.     *Sixth*, Defendants caused the Plan recordkeeping costs associated with Prime's mergers and acquisition to be paid by the Plan.  These costs may be described as settlor expenses that are not appropriate for payment from Plan assets, as they advance the corporate interests of Prime rather than participants.  Even if they are appropriate expenses to pass to charge to participants, such still must be reasonable.

*See Lee v. Verizon Comm's, Inc.*, 837 F.3d 523, 541 (5th Cir. 2016). The Department of Labor has issued an advisory opinion that provides:

> Expenses incurred in connection with the performance of settlor functions would not be reasonable expenses of a plan as they would be incurred for the benefit of the employer and would involve services for which an employer could reasonably be expected to bear the cost in the normal course of its business operations. However, reasonable expenses incurred in connection with the implementation of a settlor decision would generally be payable by the plan.

50.    Dept. of Labor Advisory Opinion 2001-01A (January 18, 2001) (emphasis added). The evidence establishes that Prime could have, at any time, borne the portion of Transamerica's fees attributable to merger and acquisition services and, in any event, the Committee failed to evaluate the reasonableness of the fees attributable to merger and acquisition services.

51.    The Court credits the testimony of Mr. Geist and Ms. Wagner[80] concerning applicable standards around the process for monitoring recordkeeping fees. Further, the Court credits Mr. Geist's testimony that the reasonable market rate the Plan's recordkeeping services was no more than $34 per participant during the relevant period.

---

[80]During their examination of Ms. Wagner, Defendants appeared to begin an attempt to fabricate a disconnect between Ms. Wagner's opinions and the losses to the Plan. *See* Tr., at 74:4–75:25. This mistakes Plaintiffs' claims and their well-established theory of liability under ERISA. Plaintiffs claim that Defendants failed to appropriately monitor the Plan with respect to its investments and fees and caused losses to the Plan as a result of the retention of unsuitable investments and payment of excessive fees. Ms. Wagner's opinions concerning the deficiencies in Defendants' processes for monitoring the Plan's investments and fee amply support the findings made herein that Defendants' breaches caused losses to the Plan. Ultimately, there is little daylight between Ms. Wagner's opinions going to Defendants' liability and the Plan's losses, much less the record supporting these opinions.

### iii. Defendants' Failure to Timely Return Amounts Accumulated in the EBA was a Breach of Fiduciary Duty

52.   The Court also find that Defendants' actions with respect to the EBA did not comport with minimum standards concerning the administration of plan expense accounts.  The Court credits Mr. Geist's testimony concerning applicable minimum standards around the administration of plan expense accounts.

53.   Defendants' failure to timely distribute accumulated amounts in the EBA to participants, particularly after Prime agreed to pay recordkeeping expenses on behalf of active participants, is a breach of fiduciary duty.

### iv. Defendants Retention of Excessively Priced Share Classes was a Breach of Fiduciary Duty

54.   The record establishes that the Committee's process for monitoring the Plan's investment management expenses was deficient.  In particular, the Court credits Mr. Geist's testimony concerning applicable minimum standards around the process for monitoring investment management fees determined by the share class of investment vehicles in a retirement plan.

55.   Defendants' own expert, Mr. Gissiner, recently testified at trial in another matter that "[c]omparing share classes without taking into account revenue sharing and expense ratios" is "in [his] view, incorrect."  *Nunez v. B. Braun Medical, Inc.*, No. 5:20-cv-04195-EGS, ECF No. 133 (Transcript of Civil Non-Jury Trial Day 3), at 61:20–23 (E.D. Pa. Aug. 18, 2023).  Similarly, Mr. Gissiner testified that it is "reasonable and consistent" to "continually assess share classes and focus[] on achieving what I would call lowest net expense ratio fund."  *Id.*, at 61:23–25.  The evidence establishes that Defendants failed to do what their own expert has elsewhere testified is "reasonable and consistent."[81]  *Id.*

---

[81]While Mr. Gissiner speculated about the fiduciaries reasoning for selecting higher cost share classes, there is no evidence that the Committee actually made any of the considerations that Mr. Gissiner suggested.

56.    When Defendants reflexively switched to a zero-revenue sharing fee structure and inadvertently added share classes with higher net effective expenses, they violated their duty to "actually determine[] whether the costs" of a particular course of action "outweigh[] the benefits, or vice versa." *George*, 641 F.3d at 795.

### B. Defendants Breached the Duty of Prudence by Retaining the Challenged Funds

#### i.    Legal Standard

57.    Plan fiduciaries must monitor all designated investment alternatives; under ERISA the "trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1828. Prudence requires a review at "regular intervals." *Id.* (quotation omitted). "When deciding whether a plan fiduciary has acted prudently, a court must inquire whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *DiFelice*, 497 F.3d at 420 (quoting *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 86 (2d Cir. 2001)); *Tatum*, 761 F.3d at 356. Whether a fiduciary has fulfilled his duty of prudence depends on "the totality of the circumstances." *DiFelice*, 497 F.3d at 418.

58.    The duty of prudence is both substantive and procedural, obligating fiduciaries to make prudent decisions and to follow prudent processes. *Tibble*, 843 F.3d at 1197 ("[T]he court focuses not only on the merits of the transaction, but also on the thoroughness of the investigation into the merits of the transaction.") (quoting *Howard*, 100 F.3d at 1488).

59.    The procedural duty of prudence under ERISA requires fiduciaries to employ "'the appropriate methods to investigate the merits of the investment' at the time of the challenged transaction." *Mills*, 2023 WL 6538381, at *6 (quoting *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1097 (9th Cir. 2004)); *accord Mazzola*, 716 F.2d at 1232. A thorough investigation requires "a reasoned decision-making process." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir.

2014)) (internal quotations omitted). Thus, courts evaluate "whether a fiduciary employed the **appropriate methods** to investigate and determine the merits of a particular investment, not merely whether there were any methods whatsoever." *Sacerdote*, 9 F.4th at 111 (2d Cir. 2021) (citation omitted) (emphasis added); *see also Pledger*, 2019 WL 10886802, at *20-21 (prudence duty requires an "intensive and scrupulous" investigation "discharged with the greatest degree of care that could be expected under all the circumstances") (citation omitted).

60.    The substantive duty of prudence under ERISA requires fiduciaries to affirmatively ensure that the investment options offered in the plan are prudent and to remove any imprudent investments within a reasonable time. *See, e.g.*, *Hughes v. Nw. Univ.*, 595 U.S. 170, 176 (2022) ("[P]lan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options. . . . If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty."). Prudence is judged from the standpoint of the time of the challenged decisions, and not based on a look at results in hindsight. *See Wright*, 360 F.3d at 1097. Additionally, the fiduciary's decision must be substantively prudent based on the circumstances prevailing at the time of the challenged decisions. *See, e.g.*, *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016).

61.    The circumstances prevailing at the time of the challenged decisions include a Plan's governing documents and a plan fiduciary's failure to follow an IPS is an independent basis for liability under ERISA. *See, e.g.*, *Cal. Ironworkers*, 259 F.3d at 1042–43 (9th Cir. 2001) (acknowledging precedent affirming failure to follow IPS to constitute independent breach under ERISA); *Mills v. Molina Healthcare, Inc.*, 2022 WL 17825534, at *10 (C.D. Cal. Dec. 8, 2022) (same); *Dardaganis v. Grace Cap., Inc.*, 889 F.2d 1237, 1240-41 (2d Cir. 1989) (finding failure to adhere to adopted investment guidelines as constituting independent breach under ERISA); *Goldenberg*

*v. Indel, Inc.*, 741 F. Supp. 2d 618, 636-37 (D.N.J. 2010) (same); *Sellers v. Trustees of Coll.*, 647 F. Supp.3d 14, 35 (D. Mass. 2022) (same).

62.    Courts have found the use of inappropriate benchmarks is evidence of imprudence. *See, e.g.*, *Mills*, 2023 WL 6538381, at *7 (denying summary judgment where experts disputed appropriate benchmarks for challenged investments).  In this regard, if a fiduciary's analysis is an empty exercise without legitimate scrutiny and action, that further bolsters a finding of imprudence. *See, e.g.*, *Lauderdale*, 2022 WL 17260510, at *8 (disputed whether analysis was thorough, legitimate, or sham)

### ii.    Defendants' Deficient Investment Monitoring Process

63.    Based on the record discussed above, Defendants failed to follow a prudent process to monitor the Challenged Funds.  The following deficiencies provide strong evidence of Defendants' procedural imprudence:

64.    *First*, the Defendants' fiduciary governance structure failed to provide members of the Committee with appropriate guidance or training regarding their investment monitoring responsibilities.  This left Committee members unequipped to independently and scrupulously monitor the Plan's investments, confirm the appropriateness of Captrust's advice when necessary, and act to investigate and consider replacement of investments when presented with information that indicated their potential imprudence, particularly under the IPS ratified by the Committee.  As other courts have recognized, a fiduciary's lack of proper fiduciary training provides evidence to support a finding that fiduciaries breach their duty of prudence. *See, e.g.*, *Terraza*, 2019 WL 12872958, at *1.

65.    *Second*, the Committee insufficiently documented its decision-making process, such that it was unable to implement a consistent and replicable process with respect to investment monitoring.  This resulted in a "check the box" exercise in which no independent investigation or scrutiny was applied to determine when investments fell out of compliance with the IPS and applicable standards for prudent fiduciary investing.  Although courts have previously found that the minutes of fiduciary

committee meeting may not always reflect everything discussed, the record in this case belies the suggestion that there was a deliberative process not evidenced in the meeting minutes, particularly given the repeated testimony of Committee members that any significant discussions or action items would be documented in the Committee's minutes. *Contra Stegemann v. Gannett Co., Inc.*, 2023 WL 8436056, at *3 n.1 (E.D. Va. Dec. 5, 2023).

66.    *Third*, the Committee's near-total reliance on Captrust and, for purposes of investment monitoring, the scoring system it provided, prevented the Committee from identifying when the Challenged Funds became non-compliant under the Plan's IPS. Failure to act consistently with an IPS is evidence of an imprudent monitoring process. *See Lauderdale*, 2022 WL 17260510, at *10; *Pizarro v. Home Depot, Inc.*, 634 F. Supp. 3d 1260, 1294 (N.D. Ga. 2022). This is particularly true under circumstances where a fiduciary ratifies an IPS with specific investment monitoring criteria and then acts in willful ignorance of those very criteria. Here, each of the Challenged Funds underwent prolonged and substantial periods of underperformance under the criteria established by the Plan's IPS and the Committee failed to analyze the continuing prudence of retaining the Challenged Funds. Indeed, despite reserving for itself the duty to make all decisions regarding the Plan including its investment alternatives and ratifying an IPS that provided specific evaluative criteria, Defendants effectively abdicated their monitoring role to the Captrust scoring system (which itself indicated that it should not be the sole determinant for retention of an investment in the Plan). ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." *Hughes*, 595 U.S. at 176; *see also Harley v. Minnesota Mining & Mfg. Co.*, 42 F. Supp. 2d 898, 906 (D. Minn. 1999) (fiduciaries must "undertake an independent investigation of the merits of an investment and to use appropriate, prudent methods in conducting the investigation").

67. *Fourth*, the Committee failed to recognize the mismatch between the IPS and Captrust's scoring system, which prevented the Committee from prudently monitoring the Challenged Funds. Indeed, the Captrust scoring system routinely failed to apprise Committee members of when the Challenged Funds failed to comply with the requirements of the Plan's IPS. A prudent fiduciary monitoring the Challenged Funds would have reviewed whether the Challenged Funds were meeting the criteria established by the IPS and, if not, inquired into why the Captrust scoring system continued to designate investments that were non-compliant with the IPS as being in "good standing" under the scoring system. A fiduciary's investigation may be found to be insufficiently thorough, intensive, and scrupulous when the fiduciary creates standards lacking in accountability or fails to act in the face of underperformance. *Mills*, 2023 WL 6538381, at *7 (evidence of imprudence included "impossible framework of no accountability"); *Terraza*, 2019 WL 12872958, at *4 (fiduciary recommended doing little or nothing in face of underperformance).

68. *Fifth*, the Committee failed to identify that Captrust provided an inappropriate benchmark to monitor the Freedom Funds, which resulted in the Freedom Funds appearing markedly better in Captrust's review materials than warranted under the Plan's IPS. Where fiduciaries use inappropriate benchmarks, that alone is evidence of imprudence. *See, e.g.*, *Mills*, 2023 WL 6538381, at *7 (denying summary judgment given dueling expert reports on appropriate benchmarks). If a fiduciary's analysis is a sham rather than a thorough or legitimate action, that further bolsters a finding of imprudence. *See, e.g.*, *Lauderdale*, 2022 WL 17260510, at *8 (disputed whether analysis was thorough, legitimate, or sham). Although a fiduciary may not always need to investigate the benchmarks its investment advisor provides for purposes of evaluating plan investments, when the information provided by an investment advisor indicates that a benchmark may not be appropriate, it is necessary for a fiduciary to make a reasonable inquiry into the benchmark.

69.    *Sixth*, the Committee failed to consider and analyze critical negative information about the Challenged Investments, including the Reuters Report and other indications of capital flight with respect to the Freedom Funds and persistent underperformance with respect to the other Challenged Funds.  Fiduciaries breach ERISA's duty of prudence when they fail to consider "critical information" or "red flags." *Vellali v. Yale Univ.*, 2022 WL 13684612, at *18 (D. Conn. Oct. 21, 2022) (fiduciaries failed to consider "critical information"); *Walsh*, 2023 WL 1966921, at *24–26 (finding imprudence where "red flags" were ignored); *see also Mills*, 2023 WL 6538381, at *7 (fiduciaries were unaware of basic and important details).  The Committee did not adequately consider or analyze important items of information that, under the circumstances, a prudent fiduciary would have considered.

70.    At a most basic level, the duty of prudence requires a fiduciary entrusted with the responsibility to make decisions to exercise that responsibility. *See, e.g.*, *Marshall*, 2019 WL 4058583, at *10 (C.D. Cal. Aug. 14, 2019) (committee required to adequately weigh the costs and benefits of an active management strategy against a passive management strategy) (citing *George*, 641 F.3d at 796); *see George*, 641 F.3d at 795 ("Despite all this discussion . . . we can find nothing in the record indicating that defendants ever made a decision on these matters—i.e., that they actually determined whether the costs of making changes . . . outweighed the benefits, or vice versa."). Under ERISA, "a fiduciary's failure to exercise his or her discretion—i.e., to balance the relevant factors and make a reasoned decision as to the preferred course of action—under circumstances in which a prudent fiduciary would have done so is a breach of the prudent man standard of care." *George*, 641 F.3d at 795 (citing *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 420–21 (4th Cir. 2007); *Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728, 733–34 (7th Cir. 2006)).

71.    In light of the foregoing, Defendants failed to sufficiently consider alternative investments to the Challenged Funds. *See, e.g.*, *Davis v. Magna Int'l of Am., Inc.*, 2023 WL 3821807, at *6-7 (E.D. Mich. June 5, 2023); *Omnicom*, 2022 WL

18674830, at *16; *Bell v. Pension Comm. of ATH Holding Co., LLC*, 2019 WL 387214, at *4-6 (S.D. Ind. Jan. 30, 2019); *see* DOL Advisory Op. No. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (prudence requires consideration of "the availability, riskiness, and potential return of alternative investments"); *see also Cryer*, 2018 WL 6267856, at *9 (failure to weigh costs and benefits of different investments).

### iii.    Retention of Imprudent Investments

72.    Based on the ample record discussed above of the Challenged Funds' non-compliance with the Plan's IPS, underperformance pursuant to prevailing fiduciary investing principles, and quantitative and qualitative indicia of their unsuitability for the Plan, Defendants' retention of the Challenged Funds was substantively imprudent.  This conclusion is made in light of the circumstances prevailing over the Plan's fiduciaries at the time of their retention of the Challenged Funds.  29 U.S.C. § 1104(a)(1)(B); *see also Roth*, 16 F.3d at 919 (the prudence determination requires "taking into account everything that the trustees should have known at the time of their decision.").  The Court need not determine that fiduciaries of all plans would have reached the same determination, as other fiduciaries may be subject to different investment policies, considered different participant populations, or accounted for other decisional factors.

73.    There can be circumstances where a fiduciary may prudently retain an investment experiencing short-term underperformance but whether this is a prudent judgment is highly fact-intensive. *Compare Reetz*, 2021 WL 4771535, at *57 (finding that "a fiduciary investment manager must, in light of poor investment performance, at some point change an investment that is hurting Plan participants").  The extent to which a fiduciary may accept short-term underperformance is further limited by the principle that imprudent investments must be removed "within a reasonable time." *Hughes v. Nw. Univ.*, 595 U.S. 170, 176 (2022).  The Committee conducted no analysis sufficient to justify a determination to retain the Challenged Funds in the face

of quantitative and qualitative red flags and persistent non-compliance with the Plan's IPS.

74.    Mr. Dirks' methodology is also reliable evidence that Defendants' retention of the Challenged Funds was imprudent.  As several courts have recognized, "[e]valuating whether to keep a fund in a retirement plan based on that fund's performance over a set number of consecutive quarters is both a common-sense and well-established practice in the field of retirement investment advice." *Id*.  In *Terraza v. Safeway*, Jude Tigar of the Northern District of California found that a similar analysis by Mr. Dirks was supported professional journals which discussed the same four quarter standard applied by Mr. Dirks in this case.[82]  *Terraza v Safeway*, 2019 WL 1332721, at *3 (N.D. Cal. Mar. 18, 2019).  Judge Tigar ultimately concluded that Mr. Dirks' methodology was "neither new nor exotic." *Id.*  These conclusions were recently reinforced Judge Payne of the Eastern District of Virginia, who found that a similar methodology for determining when at-issue investments would have been removed by prudent fiduciaries was reliable.  *See Trauernicht v. Genworth Fin.*, *Inc.*, No. 3:22-cv-00532-REP, ECF No. 309 (E.D. Va. May 29, 2024).  The investment removal methodology in *Genworth* used the same four-quarter watchlist and removal framework proffered by Mr. Dirks.  *See id.*, at 3–4.  In fact, the court in *Genworth* found "it is not at all unusual that some investment plans themselves actually specify a removal framework based on the failure to meet evaluative criteria over a set number of quarters." *See id.*, at 16.  The *Genworth* court reached this conclusion based on a review of numerous cases.  *See Baird v. Blackrock Inst'l Tr. Co., N.A.*, 403 F. Supp. 3d 765, 779 (N.D. Cal. 2019) (IPS stated that committee "may make a decision to retain or replace a fund that is on watch within four quarters of the fund being placed

---

[82] *See* Sheldon M. Geller, *Prudent Management of 401(k) Plan Fund Selection*, 18 J. Compensation & Benefits (July/August 2002); Robert D. Klausner, State and Local Government Retirement Law: A Guide for Lawyers, Trustees, and Plan Administrators § 17:15 (2017).

on the watch list"); *Lauderdale v. NFP Ret., Inc.*, 2022 WL 17260510, at *2 (C.D. Cal. Nov. 17, 2022) (IPS providing a fund would be considered for removal if it "remained on a 'watch list' for three consecutive quarters or four of the following seven quarters"); *Tussey v. ABB, Inc.*, 2012 WL 1113291, at *17 (W.D. Mo. Mar. 31, 2012) (removal process involved "examining a three to five-year period, determining if there are five years of underperformance, and if so, plac[ing] the fund onto a 'watch list,' and then remov[ing] the fund within six months."). Of particular relevance, the *Genworth* court also found that the expert may acceptably use their "experience and expertise to give an explicit meaning to the IPS'[] subjective language," as "the whole point of [the expert's] testimony is to apply the IPS' criteria to the [at-issue funds] the way that a reasonable fiduciary would have done, if proper monitoring had been done." *Id.*, at 22. The reliability of Mr. Dirks' application of this methodology is buttressed by the fact that neither Defendants nor their experts offered evidence to rebut Mr. Dirks' application of a four quarter watchlist period before removal or other substantive aspects of the framework he applied.[83]

75. Mr. Dirks' methodology for identifying suitable alternative investments is also reliable and analogous to methods embraced by courts under similar circumstances. *See, e.g.*, *Omnicom*, 2022 WL 18674830; *Reed v. Medstar*, 2023 WL 5154507 *9–11 (D. Md. Aug. 10, 2023) (Bredar, C.J.). For example, in *Omnicom*, the Honorable Colleen McMahon, former Chief Judge of the Southern District of New York, held that an expert's analysis identifying the American Funds TDFs as a suitable alternative investment for the Freedom Funds based on an analogous methodology was reliable. 2022 WL 18674830, at *7. Like the investment expert in the *Omnicom* case, Mr. Dirks employed a composite scoring analysis based on

---

[83]Indeed, Defendants' rebuttal expert, Ms. Allen, does not claim to have experience or expertise in fiduciary investment monitoring and, on Mr. Dirks' removal methodology, did not provide persuasive evidence that Mr. Dirks methodology is not supported by industry practice.

industry-standard evaluative criteria in his replacement framework.  The fact that Mr. Dirks arrived at the same result as the expert in *Omnicom* suggests that his analytical method is reliable as standard investment evaluation criteria were used to arrive at a similar result.    In *Genworth*, the court found that a similar composite scoring methodology for determining a suitable replacement investment was reliable.  *See* No. 3:22-cv-00532-REP, ECF No. 309, at 4–5.  Mr. Dirks also established through his testimony the reasonableness of the metrics included in his composite scoring system and criteria for screening potential replacement investments.  *See* Tr., at 761:1–6, 767:15–16.  The reliability of Mr. Dirks' application of this methodology is supported by the fact that neither Defendants nor their experts offered evidence to rebut Mr. Dirks' application of an asset threshold for screening potential replacement funds or other substantive aspects of the framework he applied.[84]  *See* Tr., at 1152:21–1153: 8 (Ms. Allen testifying that she has not formed an opinion as to the minimum assets under management in a TDF that would be appropriate for the Plan).

76.    Contrary to Ms. Allen's criticisms, *see* Tr., at 1124:5–11, Mr. Dirks' methodologies are not arbitrary, unsupported, or inconsistent, and Mr. Dirks implemented these methodologies appropriately.

77.    Defendants cannot seek exoneration for their fiduciary breaches by hindsight, as "the ultimate outcome of an investment is not proof of []prudence." *DeBruyne v. Equitable Life Assurance Soc'y of U.S.*, 920 F.2d 457, 465 (7th Cir. 1990); *see also PBGC*, 712 F.3d at 716 ("We judge a fiduciary's actions based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight"); *see In re Biogen, Inc. ERISA Litig.*, 2021 WL 3116331, at *5 (D. Mass. July 22, 2021) ("[W]hether a fiduciary's actions are prudent

---

[84]In contrast, Defendants' expert, Ms. Allen, indicated that she did not consider (or even know) the assets under management of the investments included in the peer universes she included in her analysis of the Freedom Funds.  *See* Tr., at 1153:9–14.

1    cannot be measured in hindsight, whether this hindsight would accrue to the

2    fiduciary's detriment or benefit.").

3        78.    The decision in *Ramos v. Banner Health*, 461 F. Supp. 3d 1067 (D.

4    Colo. 2020), which found that the fiduciaries of the plan at issue did not breach their

5    duty of prudence by failing to appropriately monitor the plan's investments and

6    retaining the Freedom Funds, is distinguishable.  Indeed, *Ramos* presented a series of

7    entirely different issues.  In fact, read in proper context, the *Ramos* decision supports

8    Plaintiffs' claims.  The court assessed the fiduciaries' decisions to retain the Freedom

9    Funds from the second quarter of 2011 to May 2015.  *Id.* at 1129.  Critically, in 2014,

10   "when the longer-term performance of the Fidelity Freedom Funds proved

11   unsatisfactory, and it became increasingly apparent that the changes to the glide path

12   had not resulted in the anticipated improvements," the fiduciaries, with the support of

13   their investment advisor, "engaged in a formal review of its target date fund options"

14   and, within a matter of months, removed the Freedom Funds from the plan.  *Id.* at

15   1131.  Defendants took no similar action and retained the Freedom Funds for an

16   additional *four years* after the fiduciaries in *Ramos* responded to changed

17   circumstances and removed the Freedom Funds.  *See id.*; *see also PBGC*, 712 F.3d at

18   717.  In sum and substance, the fiduciaries in *Ramos* did what Defendants here failed

19   to do.[85]

20   _____

21   [85]To the extent Defendants argue that recent judgments for defendants in *Lauderdale v. NFP Ret., Inc.*, 2024 WL 751005 (C.D. Cal. Feb. 23, 2024), and *Mills v. Molina*,

22   2024 WL 1216711 (C.D. Cal. Mar. 20, 2024), support a similar outcome, such an

23   argument is misplaced.  In *Lauderdale*, Judge Selna found the plan's 3(38) investment manager demonstrated a prudent process in designing the TDFs because it "spent

24   years evaluating the TDF universe, assessing plan participant risk profiles, and

25   evaluating innovative investment designs to improve participant outcomes" and

26   maintained a matrix that "analyzes over 60 TDFs and more than a dozen TDF models, including their glidepaths, asset class coverage, risk level, investment manager

27   turnover, and performance."  2024 WL 751005, at*27.  Defendants process here was

28   nothing of the sort.  In *Mills*, the Court found that the plaintiffs had not shown any

1                                    *      *      *

2      79.     Defendants breached their fiduciary duty of prudence with respect to

3  their retention of the Challenged Funds and the Plan's payment of excessive fees.

4  While Plaintiffs claim Defendants breached their fiduciary duties in several ways, "it

5  is important to keep in mind the mosaic that emerges when all the allegations are

6  looked at together," because ERISA requires a holistic evaluation of fiduciaries'

7  conduct. *Liss v. Smith*, 991 F. Supp. 278, 295 (S.D.N.Y. 1998).

8      80.     Defendants are jointly and severally liable for all breaches of fiduciary

9  duty because under ERISA §405(a)(2), by their failure to monitor, they enabled the

10  Committee to commit this breach.  Further, they knew or should have known of the

11  Committee's breaches but did not make reasonable efforts to remedy the breach.

12  **VII.   EXPERTS**

13      81.     Rule 702 should be applied with a "liberal thrust" favoring admission.

14  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993).  In essence, expert

15  testimony is admissible if it "rests on a reliable foundation and is relevant to the task

16  at hand." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (citation omitted).  The

17  inquiry is a flexible one and must be "tied to the facts of a particular case" with

18  attention to "the nature of the issue, the expert's particular expertise, and the subject

19  of his testimony." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999).

20  Consistent with the Court's previous orders denying Defendants' motions seeking

21  exclusion of Defendants' experts under *Daubert*, the Court finds the testimony of

22  Plaintiffs' experts is admissible.

23      82.     To the extend Defendants argue that the testimony of Plaintiffs' experts

24  should not be admitted or credited on the basis of decisions of other courts under

25  different circumstances (including different kinds of plans, different at-issue

26  ───────────────────

27  loss to the plan because the plan would have earned more if it had been invested in
   each of the reasonable comparators offered by the plaintiffs' expert. *See* 2024 WL

28  1216711, at *16.  This record here supports the opposite conclusion.

investments, and different service arrangements), they ignore the fact-specific analysis that the Court must conduct. Moreover, each of Plaintiffs' experts have been admitted and credited by Courts in cases involving breach of fiduciary duty claims under ERISA. *See, e.g.*, *Marshall v. Northrop Grumman Corp.*, 2019 WL 6354371, at *2 (C.D. Cal. Oct. 16, 2019) (admitting Ms. Wagner's "testimony as to the factual and legal issues presented by ERISA's fiduciary requirements"); *Sacerdote v. New York Univ.*, 328 F. Supp. 3d 273, 304 n. 67 (S.D.N.Y. 2018) ("Wagner was highly credible; the Court finds her qualified as an expert on retirement plan processes.");[86] *In re Omnicom ERISA Litig.*, 2022 WL 18674830, at *10 (S.D.N.Y. Dec. 23, 2022) (finding Mr. Geist's methodology reliable); *Garthwait v. Eversource Energy Co.*, 2022 WL 3019633 (D. Conn. July 29, 2022) (same); *Wehner v. Genentech, Inc.*, No. 3:20-cv-06894-RS, ECF No. 128 (N.D. Cal. Aug. 8, 2023) (same);[87] *Terraza v*

---

[86]While the retirement plans at issue in *Sacerdote* were 403(b) pension plans, the court recognized Ms. Wagner's expertise as to "retirement plan processes" and ERISA in general. *See Sacerdote*, 328 F. Supp. 3d at 304 n. 67. Further, another court in this District has recognized the material similarities of 401(k) and 403(b) plans in ERISA cases. *See Munro*, 2022 WL 16955481, at *8 (accepting testimony considering 401(k) and 403(b) plans together because the plans often use the same recordkeeping system, bidding process, and pricing methodology); *see also Rosenthal-Zuckerman v. Epstein, Becker & Green Long Term Disability Plan*, 39 F. Supp. 3d 1103, 1106 (C.D. Cal. 2014) ("A § 403(b) pension plan is similar to the popular 26 U.S.C. § 401(k) savings account . . . ."). Accordingly, there can be no credible suggestion that Ms. Wagner's acceptance as an expert in *Sacerdote* is distinguishable on this basis.

[87]Although certain testimony offered by Mr. Geist has been excluded from federal court proceedings, the analyses offered by Mr. Geist in those cases was fundamentally different. *See Pledger v. Reliance Tr. Co.*, 2019 WL 4439606 (N.D. Ga. Feb. 25, 2019); *Troudt v. Oracle Corp.*, 369 F. Supp. 3d 1134 (D. Colo. 2019); *Sacerdote v. New York Univ.*, 328 F. Supp. 3d 273 (S.D.N.Y. 2018). In *Pledger* and *Oracle*, Mr. Geist derived estimates of reasonable recordkeeping fees for the plan at issue from his experience alone. *See Pledger*, 2019 WL 4439606, at *16–18; *Oracle*, 369 F. Supp. 3d at 1139. At trial, Mr. Geist explained specifically the distinguishing factors between the circumstances of this action and *Sacerdote*, where his exclusion was based on the Plan's status as a 403(b) plan not 401(k), participant investment in TIAA

*Safeway*, 2019 WL 1332721, at *3 (N.D. Cal. Mar. 18, 2019) (finding analogous methodology by Mr. Dirks was reliable and based on well-accepted principles).

83.    As discussed above, *see supra* VI.H–I, the testimony of each of Defendants' experts suffers from fundamental flaws.  The Court credits the testimony of Plaintiffs' experts on the applicable fiduciary governance and process standards, investment and fee monitoring issues, and losses.

## VIII.  FAILURE TO MONITOR CO-FIDUCIARIES

84.    ERISA requires fiduciaries to monitor and review the performance of any appointed fiduciaries to ensure that they are fulfilling their fiduciary obligations. *See Mills v. Molina Healthcare, Inc.*, --- F. Supp. 3d ----, 2023 WL 6538381, at *9 (C.D. Cal. Sept. 27, 2023).  The named fiduciary named fiduciary cannot simply delegate responsibilities "and then turn a blind eye to the performance of their appointees." *Agway, Inc. Employees' 401(k) Thrift Inv. Plan v. Magnuson*, 2006 WL 6903738, at *19 (N.D.N.Y. July 13, 2006).

85.    This duty to monitor "is derived from the common law of trusts" and applies on an ongoing basis. *Tibble*, 575 U.S. at 528–29.  The appointing fiduciary must "act with prudence in supervising or monitoring the agent's performance and compliance with the terms of the delegation." *Mills*, 2023 WL 6538381, at *9 (quoting Restatement (Third) of Trusts § 80 cmt. d(2)).  The appointing fiduciaries should "review the performance of their appointees at reasonable intervals and in such a manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards." *Lauderdale*, 2024 WL 751005, at *33 (quotation omitted); *see also* 29 CFR. §2509.75-8, at FR-17 (providing same).  This requires the appointing authority to adopt routine monitoring procedures, adhere to the routine monitoring procedures, review the results of the

---

annuities, and transitioning large plans from multiple to single recordkeepers. *See* Tr., at 652:22–653:6.

monitoring procedures, the monitoring procedures must alert the appointing authorities to possible deficiencies, and the appointing authority must act to take required corrective action. *See Perez v. WPN Corp.*, 2017 WL 2461452, at *13 (W.D. Pa. June 7, 2017).

86.     Prime failed to adequately monitor the Committee, which was delegated certain fiduciary responsibilities of monitoring the Plan's investments and service provider arrangements.  Among other things, a fiduciary breaches its duty to monitor appointed fiduciaries if the appointing fiduciary gives the  appointee "carte blanche" and never consciously monitors the delegee's performance. *Lauderdale*, 2022 WL 17260510, at *24.  Here, Prime gave the Committee "carte blanche" to perform its monitoring of the investment options in the Plan with little oversight, and Prime did not monitor the Committee's performance.

87.     Section 405(a) of ERISA, 29 U.S.C. § 1105(a), renders a fiduciary liable for the losses caused by the breach of other fiduciaries, "(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with [the prudent man standard of 29 U.S.C. § 1104(a)(1)] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach." 29 U.S.C. § 1105(a); *Carr v. Int'l Game Tech.*, 770 F. Supp. 2d 1080, 1096 (D. Nev. 2011).  A finding of co-fiduciary liability under subsections (1) or (3) requires actual knowledge, while subsection (2) requires merely that the fiduciary's failure to comply with its duties under ERISA enabled another fiduciary's breach. *Id.* at 1097.

88.     The Committee is liable under subsections (1) and (3) because it knowingly kept the Board in the dark and never prompted the Board to make retention decisions concerning the Plan's investments or service providers.  The Committee

knew how little information it provided Prime via the Board (indeed, it was the source of the Board's information) and knew Prime was not consciously exercising its fiduciary responsibility to make decisions for the Plan. *Cf. Walsh*, 2023 WL 1966921, at \*27 (director defendants could be liable under § 1105(a) for trustee's breaches where evidence showed directors enabled breach or knew of it and did nothing); *Acosta v. Saakvitne*, 355 F. Supp. 3d 908, 924 (D. Haw. 2019) (complaint sufficiently alleged actual knowledge of co-fiduciary's breach); *In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*, 2009 WL 3246994, at \*11 (W.D. Wash. Oct. 5, 2009) (same). Under subsection (2), the Committee is liable because its imprudent monitoring of the Challenged Funds and Plan expenses and failure to recommend their remediation enabled the Board's to act. *Cf. DeFazio v. Hollister, Inc.*, 854 F. Supp. 2d 770, 804 (E.D. Cal. 2012)*, aff'd sub nom. DeFazio v. Hollister Emp. Share Ownership Tr.*, 612 F. App'x 439 (9th Cir. 2015); *In re Coca-Cola Enterprises Inc., ERISA Litig.*, 2007 WL 1810211, at \*16 (N.D. Ga. June 20, 2007) (co-fiduciary liability exists where defendants should have prevented each other's failures).

89.    Prime is liable under subsection (2) because it was willfully blind, failing to seek information from the Committee that it needed to make prudent decisions on retention or removal of the Challenged Funds or payment of only appropriate fees.  Prime's failure to require information from the Committee about the Challenged Investments and fees enabled the Committee's breaches.  Prime is also liable under subsection (3) because it knew or should have known of the Challenged Funds and excessive fees.  The Board did not undertake reasonable efforts to require the Committee to remedy its breaches.

## IX.    LOSSES

90.    ERISA is a statute aimed at fortifying the common law of trusts previously applied to employee benefit schemes. *See Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996) (citing *Cent. States, Se. & Sw. Areas Pen. Fund v. Cen. Trans., Inc.*, 472 U.S. 559, 570 (1985)); *cf. Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101,

10 (1989) ("ERISA's legislative history confirms that the Act's fiduciary responsibility provisions . . . codify and make applicable to ERISA fiduciaries certain principles in the evolution of the law of trusts.") (citations omitted).  Indeed, the Supreme Court has found that ERISA's heightened protections reflect a Congressional determination that the common law of trusts did not go far enough to protect pension beneficiaries.  *See id.*; *see also Shaw v. Dela Airlines, Inc.*, 463 U.S. 85, 90 (1983) ("ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans.").

91.     Under trust law, an "appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust." *Donovan v. Bierwirth* ("*Bierwirth II*"), 754 F.2d 1049, 1056 (2d Cir. 1985) (citing Restatement (Second) of Trusts § 205(c) (1959)).

92.     The Ninth Circuit has adopted the "anti-netting rule" from trust law:

> A trustee who is liable for a loss caused by a breach of trust may not reduce the amount of the liability by deducting the amount of a profit that accrued through another and distinct breach of trust; but if the breaches of trust are not separate and distinct, the trustee is accountable only for the net gain or chargeable only with the net loss resulting therefrom.

*Cal. Ironworkers*, 259 F.3d at 1047–1048 (citing Restatement (Third) of Trusts § 213).   To the extent Defendants assert that a lower damages amount is more appropriate, Defendants have the burden to prove that amount. *See, e.g.*, *Dardaganis*, 889 F.2d at 1244 ("[T]he errant fiduciary bears the burden of proving that the fund would have earned less than this amount.") (citing *Bierwirth*, 754 F.2d at 1056). Where the damages amount is uncertain, such uncertainties are resolved against the breaching fiduciary." *Kim v. Fujikawa*, 871 F.2d 1427, 1431 (9th Cir. 1989) (ruling that "uncertainties in fixing damages will be resolved against the wrongdoer") (quoting *Bierwirth*, 754 F.2d at 1056).

93.    Trust law principles are instructive on the evidence necessary to establish that a retirement plan has suffered a loss as a result of deficient investment monitoring:

> Illustrative of more difficult "loss" determinations is the determination of the recovery from a trustee for imprudent or otherwise improper investments. The recovery in such a case ordinarily would be the difference between (1) the value of those investments and their income and other product at the time of surcharge and (2) the amount of funds expended in making the improper investments, increased (or decreased) by a projected amount of total return (or negative total return) that would have accrued to the trust and its beneficiaries if the funds had been properly invested.
>
> *    *    *
>
> Depending on the type of trustee and the nature of the breach involved, the availability of relevant data, and other facts and circumstances of the case, the projected returns on indefinite hypothetical investments during the surcharge period may appropriately be based, ***inter alia***, on: the return experience (positive or negative) for other investments, or suitable portions of other investments, of the trust in question; average return rates of portfolios, or suitable parts of portfolios, of a representative selection of ***other trusts having comparable objectives and circumstances***; or return rates of ***one or more suitable common trust funds***, or suitable index mutual funds or market indexes (with such adjustments as may be appropriate).

Restatement (Third) of Trusts § 100 (2012) (emphasis added).

94.    The Restatement makes plain that determinations of loss are flexible and depend upon the available data, facts, and circumstances of a particular case. *See id.* On its face, the Restatement's list of grounds for establishing the "projected returns on indefinite hypothetical investments" is ***non-exhaustive***. *See id.* Thus, the Court may look beyond the specifically identified sources for evidence of projected returns. Moreover, in providing examples of bases for the appropriate measure of the projected returns of hypothetical alternative investments, the Restatement includes the return rates of "other trusts having comparable objectives and circumstances" and "return

rates of one or more suitable common trust funds, or suitable index mutual funds or market indexes (with such adjustments as may be appropriate)." *Id.*

95. In the context of participant-directed 401(k) plans, where beneficiaries make elections from a menu of investments set by the fiduciaries (rather than experience the returns of a trustee's discretionary investing), the Restatement's references to "other trusts having comparable objectives and circumstances" and "suitable common trust funds" must refer to the investment alternatives available to fiduciaries for selection to the plan menu. *See DiFelice v. US Airways, Inc.*, 235 F.R.D. 70, 75 (E.D. Va. 2006) (quoting *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985)) (finding in impudent investment cases "[t]he measure of loss applicable under ERISA section 409 requires a comparison of what the Plan actually earned on the [imprudent] investment with what the Plan would have earned had the funds been available for other Plan purposes."). Plan losses are not established only by a decrease in assets, but also reduced earnings compared to a prudent alternative. *See Dardaganis v. Grace Capital, Inc.*, 889 F.2d 1237, 1243 (2d Cir. 1989). For this reason, courts determining breach of fiduciary duty claims in the context of defined contribution retirement plans routinely accept evidence of loss by way of comparison of an at-issue investment's actual returns to the returns of a suitable alternative investment. *See id.* (finding the injury determination "in this context requires only that the [at-issue investment] underperformed as compared to a prudent alternative.").

96. This flexibility is consistent with bedrock trust law principles. Courts have discretion in fixing the measure of a beneficiary's loss and trust law establishes that courts should be mindful that the purpose of imposing liability for breaches of trust is to prevent losses to trust beneficiaries. *See* G. Bogert & G. Bogert, Law of Trusts and Trustees § 701. "In estimating the value of use or loss of income due to a breach of an investment obligation, the court must be allowed a reasonable latitude in choosing between different rates of interest, simple and compound interest, and ***other measures***. No remedy should be adopted which gives the wrongdoing trustee any

advantage from his own breach of trust." *See id.* (citing Unif. Trust Code § 1002(a)) (emphasis added). As part of this analysis, courts may rely on estimated income from trust property and "*opinion evidence* may be taken as to value" in remedying breaches of trust from capital losses. *Id.* (emphasis added); *see also Martin*, 965 F.2d at 672 ("Of course, the measure of such damages need not be exact—'it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.'") (citation omitted).[88] The Court may, accordingly, consider the opinions of Plaintiffs' experts regarding suitable alternative investments against which the Plan's losses may be measured.

97.    Trust law also establishes the burden-shifting framework applicable to the loss causation analysis in breach of fiduciary duty claims under ERISA:

> When a plaintiff brings suit against a trustee for breach of trust, the plaintiff generally bears the burden of proof. This general rule, however, is moderated in order to take account of the trustee's duties of disclosure (§ 82) and of recordkeeping and reporting (§ 83) as well as the trustee's superior (often, unique) access to information about the trust and its activities, and also to encourage the trustee's compliance with applicable fiduciary duties.

> [I]n matters of causation (Comment e), when a beneficiary has succeeded in proving that the trustee has committed a breach of trust and that a related loss has occurred, the burden shifts to the trustee to prove that the loss would have occurred in the absence of the breach.

---

[88] Courts have recognized an obligation under ERISA "to fashion the remedy best suited to the harm" even in the absence of a precise damages theory. *Tussey v. ABB, Inc.*, 850 F.3d 951, 960 (8th Cir. 2017) (reversing award of no damages after finding of breach). Accordingly, reasonable approximations of damages suffered by a plan are preferable to nominal damages under ERISA. *See Cal. Ironworkers Field Pen. Tr. v. Loomis Sayles & Co.*, 259 F.3d 1036, 1047 (9th Cir. 2001) (citing *Sutton v. Earles*, 26 F.3d 903, 918 (9th Cir. 1994) ("When precise calculations are impractical, trial courts are permitted significant leeway in calculating a reasonable approximation of the damages suffered.").

Restatement (Third) of Trusts § 100 (2012); *see also* G. Bogert & G. Bogert, Law of Trusts and Trustees § 701 ("Once the beneficiary has proven that a breach of trust occurred and loss resulted, then the burden shifts to the trustee to prove that the loss would have occurred, regardless of the breach."); *Confederated Tribes v. United States*, 248 F.3d 1365, 1371 (Fed. Cir. 2001) ("It is a principle of long standing in trust law that once the beneficiary has shown a breach of the trustee's duty and a resulting loss, the risk of uncertainty as to the amount of the loss falls on the trustee."). This burden-shifting framework has been adopted by the Fourth Circuit and many of its sister Circuits in the context of ERISA breach of fiduciary duty actions. *See Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 362 (4th Cir. 2014); *see also Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 35 (1st Cir. 2018); *Sacerdote v. New York Univ.*, 9 F.4th 95, 113 (2d Cir. 2021); *McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234, 237 (5th Cir. 1995); *Martin v. Feilen*, 965 F.2d 660, 671 (8th Cir. 1992); *Kim v. Fujikawa*, 871 F.2d 1427, 1430–31 (9th Cir. 1989).

98.     A retirement plan's losses resulting from a fiduciary's breach of the duty of prudence under ERISA may be calculated through "a comparison of what the Plan would have earned had the funds been available for other Plan purposes." *Peters v. Aetna Inc.*, 2 F.4th 199, 222 (4th Cir. 2021) (quoting *Bierwirth*, 754 F.2d at 1056). If courts are uncertain about computing the amount of the award, courts may refer to the common law of trusts and enforce whichever remedy is "'most advantageous to the participants and most conducive to effectuating the purposes of the trust.'" *Peters*, 2 F.4th at 223 (quoting *Eaves v. Penn*, 587 F.2d 453, 462 (10th Cir. 1978)); *Trustees of Upstate New York Engineers Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 567 (2d Cir. 2016).

99.     The Restatement provides that losses may be measured by taking the difference between the return of at-issue investments and "projected amount of total

return (or negative total return) that would have accrued to the trust and its beneficiaries if the funds had been properly invested." Restatement (Third) of Trusts § 100, cmt. b(1) (2012). If this comparison shows that a plan would have earned more through replacement of the at-issue investment with a suitable alternative investment, there is a loss attributable to the conduct of the breaching fiduciary. *See Peters*, 2 F.4th at 222 (citing *Bierwirth*, 754 F.2d at 1056).

100.    The Ninth Circuit has made clear that the anti-netting rule also precludes the offsetting of losses attributable to a breach with gains from non-breaching conduct:

> [A]t least one other circuit has adopted the approach set forth in comment c, noting that even if losses attributable to the breach are more than balanced by gains resulting from appropriate investments, the plan beneficiaries are entitled to "the greater profits the Plan might have earned if the Trustees had invested in other Plan assets" rather than the impermissible assets. *Donovan v. Bierwirth*, 754 F.2d 1049, 1054 (2d Cir.1985). We join the Second Circuit in adopting this approach.

*Cal. Ironworkers*, 259 F.3d at 1048.

101.    "When precise calculations are impractical, trial courts are permitted significant leeway in calculating a reasonable approximation of the damages suffered." *Id.* at 1047 (citing *Sutton v. Earles*, 26 F.3d 903, 918 (9th Cir.1994)). Courts may generally rely on the help of expert analysis to show losses resulting from breaches of fiduciary duty. *See Brotherston v. Putnam Invs., LLC*, 2017 WL 2634361, at *12 n 18 (D. Mass. June 19, 2017), *aff'd in part, vacated in part, remanded*, 907 F.3d 17 (1st Cir. 2018) (citing *Evans v. Akers*, 534 F.3d 65, 74 (1st Cir. 2008).

### A. Losses Caused by Defendants' Failure to Appropriately Monitor Recordkeeping Fees

102.    Plaintiffs have established that the maximum reasonable market rate for the Plan's recordkeeping services was $34 per participant between 2014 and 2020.

103.    With respect to Plaintiffs' claims that Defendants caused the Plan to pay excessive recordkeeping fees, Plaintiffs have properly demonstrated that the Plan's losses through the end of 2023 are $3,041,253.  This represents the difference between the recordkeeping fees actually paid by the Plan and the reasonable market rate of $34 per participant and an appropriate performance-based interest rate on the Plan's cumulative losses.

### B. Losses Caused by Retaining Excessively Priced Share Classes

104.    With respect to Plaintiffs' claims that Defendants caused the Plan to pay excessive investment management fees through the selection of share excessively priced share classes, Plaintiffs have properly demonstrated that the Plan's losses through the end of 2023 are $1,632,112.

### C. Losses Caused by Defendants' Failure to Timely Return Amounts Accumulated in the EBA

105.    With respect to Plaintiffs' claims that Defendants failed to timely return amounts accumulated in the EBA, Plaintiffs have properly demonstrated that the Plan's losses through the end of 2023 are $584,742.

### D. Losses Caused by Retaining the Challenged Investments

#### 1.  Plaintiffs' Proved the Plan's Losses

106.    With respect to Plaintiffs' claims that Defendants failed to appropriately monitor the Plan's investments and consequently retained unsuitable investments in the Plan, Plaintiffs have properly demonstrated that the Plan suffered $9,700,000 in losses from the beginning of the Class Period through December 31, 2022.  This figure represents the difference between the Plan's actual investment returns and what it would have earned had the subject funds been invested during the same period in proper transactions. *Tibble v. Edison Int'l*, 2017 WL 3523737, at *13 (C.D. Cal. Aug. 16, 2017) (citing *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985)).

*    *    *

107.    Plaintiffs have proven that Defendants breached their fiduciary duties and that a related loss occurred.  This shifts the burden to Defendants to disprove that their breach of fiduciary duty causes losses to the plan.    As discussed below, Defendants have not carried this burden.

## 2.  Defendants Failed to Disprove that any of the Losses were Caused by Their Breaches

108.    "[A] plaintiff who has proved the defendant-fiduciary's procedural imprudence and a prima facie loss prevails *unless* the defendant-fiduciary can show, by a preponderance of the evidence, that a prudent fiduciary *would have* made the same decision."  *Tatum*, 761 F.3d at 364.  The Fourth Circuit has noted;

> The "would have" standard is, of course, more difficult for a defendant-fiduciary to satisfy.  And that is the intended result.  "Courts do not take kindly to arguments by fiduciaries who have breached their obligations that, if they had not done this, everything would have been the same." *In re Beck Indus., Inc.*, 605 F.2d 624, 636 (2d Cir.1979).  ERISA's statutory scheme is premised on the recognition that "imprudent conduct will usually result in a loss to the fund, a loss for which [the fiduciary] will be monetarily penalized." *Plasterers'*, 663 F.3d at 218 (quoting *Brock,* 830 F.2d at 647).  We would diminish ERISA's enforcement provision to an empty shell if we permitted a breaching fiduciary to escape liability by showing nothing more than the mere possibility that a prudent fiduciary "could have" made the same decision.

*Tatum*, 761 F.3d at 365.

109.    "This approach is aligned with the Supreme Court's instruction to 'look to the law of trusts' for guidance in ERISA cases."  *Sacerdote*, 9 F.4th at 113 (quoting *Tibble*, 575 U.S. at 529).  Trust law acknowledges the need, in certain instances, to shift the burden to the trustee, who commonly possesses "superior (often, unique) access to information about the trust and its activities . . . ."  Restatement (Third) of Trusts, § 100 cmt. F (2012); *cf. Dardaganis*, 889 F.2d at 1243 ("There may be cases in which a defendant comes forward with particularly reliable evidence that, had the funds not been improperly invested, they would have been put into a particular

alternative investment.").  The First Circuit, in endorsing the burden-shifting approach in *Tatum* noted:

> Common sense strongly supports this conclusion in the modern economy within which ERISA was enacted.  An ERISA fiduciary often—as in this case—has available many options from which to build a portfolio of investments available to beneficiaries.  In such circumstances, it makes little sense to have the plaintiff hazard a guess as to what the fiduciary would have done had it not breached its duty in selecting investment vehicles, only to be told "guess again."  It makes much more sense for the fiduciary to say what it claims it would have done and for the plaintiff to then respond to that.

*Brotherston*, 907 F.3d at 38.

110.    Defendants have offered no evidence sufficient to disprove that any of the losses established by Plaintiffs were caused by their breaches of fiduciary duty.

111.    With respect to the Challenged Funds, the only evidence that Defendants sought to offer to disprove loss causation was Ms. Allen's testimony that the Challenged Funds outperformed suitable alternative investments identified by Mr. Dirks.  As already discussed, Ms. Allen's testimony is premised on inconsistent and arbitrary time periods.  *See supra* VI.I.  Ms. Allen offered no testimony regarding alternative time periods or the effect of correcting the dates used in her analysis.  In fact, Ms. Allen was forced to concede that the Challenged Funds *did not* outperform the alternative investments identified by Mr. Dirks when appropriate time periods are considered.  *See id.*  In addition, Ms. Allen's analysis does not attempt to consider the Plan's governing circumstances or IPS, which courts have found to be error in connection with the loss causation analysis.  *See Tatum*, 761 F. 3d at 367 ("the district court erred by failing to factor into its causation analysis RJR's lack of compliance with the governing Plan document.").

112.    With respect to the Plan's excessive recordkeeping fees, Defendants offered no evidence to disprove loss causation, by way of showing that a prudent fiduciary would have retained Transamerica at a rate greater than $34 per participant

or otherwise.  Mr. Gissiner's rebuttal testimony to Mr. Geist's testimony that the reasonable market rate for the Plan's recordkeeping fees during the relevant period was no more than $34 per participant is not evidence that a prudent fiduciary would have paid more.

113.   Although Mr. Gissiner testified as to reasons why a fiduciary *might* select a higher-cost share class, *see* Tr., at 1084:17–1085:6, there is no evidence that the Committee *in fact* selected share classes that did not provide the lowest net effective expense ratio for any of the hypothetical reasons he provides.  To the contrary, all indications are that the Committee reflexively adopted an investment menu that provided no revenue sharing without analyzing the impact on the Plan's investment management expenses.  *See, e.g.*, Tr., at 318:8–11, 331:13–14, Ex. 209, at 1, Ex. 56, at 1.  This is insufficient to carry Defendants' burden to disprove the Plan's losses resulting from the Committee's selection of excessively-priced share classes of Plan investments.

## X.   DEFENDANTS HAVE NOT ESTABLISHED AN AFFIRMATIVE DEFENSE

114.   "The burden of proof for an affirmative defense to a civil claim generally falls on the party asserting the defense."  *Adobe Sys. Inc. v. Christenson*, 809 F.3d 1071, 1078 (9th Cir. 2015).  Defendants have failed to establish the affirmative defenses they asserted in the Final Pretrial Conference Order.  *See* ECF No. 196, at 5.

### A. Plaintiffs' Claims are not Barred by any Statute of Limitations of Repose

115.   Defendants assert that Plaintiffs' claims are barred by the applicable statute of limitations.  *See* ECF No. 196, Final Pretrial Conference Order, at 5.

116.   ERISA breach of fiduciary duty suits generally must be brought within six years of the date of the last action which constitutes a part of the breach or violation.  *See Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct. 768, 773–74 (2020)

(citing 29 U.S.C. § 1113(1)).  However, a plaintiff with "actual knowledge" of a breach must file suit within three years of the earliest date on which the plaintiff had actual knowledge.  *See id.*  A showing of actual knowledge requires "more than evidence of disclosure alone."  *Id.* at 777 (holding plaintiff did not have actual knowledge where he had received notices, fund factsheets, and disclosures by email, as well as posts on an internal website that he reviewed, but he did not review or analyze such disclosure sufficient to put him on notice of the alleged breaches of fiduciary duty).

117.    "Unlike other ERISA limitations periods—which also form § 1113(2)'s context—§ 1113(2) begins only when a plaintiff actually is aware of the relevant facts, not when he should be.  And a given plaintiff will not necessarily be aware of all facts disclosed to him; even a reasonably diligent plaintiff would not know those facts immediately upon receiving the disclosure."  *Sulyma*, 140 S. Ct. at 778.  Since Defendants have adduced no evidence that Plaintiffs were actually aware of the relevant facts before filing this lawsuit, they have not established that ERISA's three-year statute of limitations applies instead of the default six-year statute of limitations. *See id.*; *see also Guenther v. Lockheed Martin Corp.*, 972 F.3d 1043, 1055 (9th Cir. 2020) ("[T]he key is that, whatever the underlying ERISA claim, the limitation period begins to run once the plaintiff has sufficient knowledge to be alerted to the particular claim."); *Davis v. Stadion Money Management LLC*, 2020 WL 1248580 *4 (D. Ct. Neb. Mar 16, 2020) ("Simple disclosure of transactions does not communicate an underlying breach.  Defendants needed to show that the plaintiff was actually aware of the nature of the breach more than three years before the suit was filed.").  This reasoning has been applied in the context of recordkeeping claims.  *See Bouvy v. Analog Devices Inc.*, 2020 WL 3448385 (S.D. Cal. Jun. 24, 2020) (plaintiff lacked knowledge about defendant's fiduciary process so "the availability of fee and expense ratios did not provide plaintiff with 'actual knowledge of the specifics of Defendant's decision-making process,' and accordingly fail to demonstrate actual knowledge.").

118.    Nor does ERISA's limitations period bar recovery simply because the selection of the Challenged Funds predated the Class Period.  As the Supreme Court has explained:

> In short, under trust law, a fiduciary normally has a continuing duty of some kind to monitor investments and remove imprudent ones. A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. In such a case, ***so long as the alleged breach of the continuing duty occurred within six years of suit, the claim is timely***. The Ninth Circuit ***erred by applying a 6–year statutory bar*** based solely on the initial selection of the three funds without considering the contours of the alleged breach of fiduciary duty.

*Tibble*, 575 U.S. at 530 (emphasis added); *cf. Meyer v. Berkshire Life Ins. Co.*, 250 F. Supp. 2d 544, 569–70 (D. Md. 2003), *aff'd*, 372 F.3d 261 (4th Cir. 2004) (allowing recovery for six years prior to suit in case involving continuing breach).

119.    The Court finds that Defendants have failed to meet the burden of establishing their purported statute of limitations defense.  Plaintiffs have established that they did not acquire actual knowledge of Defendants' breaches until shortly before filing this action.  *See supra* I.B.  Thus, they may recover losses associated with Defendants' breaches six years before the filing of Plaintiffs' original complaint. Likewise, since Defendants did not offer any evidence at trial that could establish the actual knowledge of absent class members, any purported statute of limitations defense cannot preclude or limit recovery on behalf of the Plan or the Class.

120.    Defendants' affirmative defense that Plaintiffs' (or the Plan's) claims are barred by the applicable statute of limitations or repose fails.

### B. There is no Defense Available Under ERISA § 404(c)

121.    Defendants claim that Plaintiffs exercised independent control over their investment elections in the Plan sufficient to establish Defendants' entitlement to a safe harbor under ERISA § 404(c), 29 U.S.C. § 1104(c).

122.    Defendants' reliance on the safe harbor is misplaced.  The exemption only applies to losses that directly and necessarily resulted from the participant's exercise of control over his or her investments.  *See* ERISA §404(c)(1)(A)(ii); 29 U.S.C. § 1104(c)(1)(A)(ii).  ERISA §404(c), however, "does not insulate a fiduciary from liability for assembling an imprudent menu in the first instance." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3 (4th Cir. 2007); *see also DiFelice v. U.S. Airways, Inc.*, 397 F. Supp. 2d 758, 777 (E.D. Va. 2005) ("a breach of a fiduciary's duty to exercise prudence in selecting Plan investment options is not the type of breach for which §404(c)(1) provides a defense").

123.    "[T]he selection of plan investment options and the decision to continue offering a particular investment vehicle are acts to which fiduciary duties attach, and that the safe harbor [of section 404(c)] is not available for such acts." *Howell v. Motorola, Inc.*, 633 F.3d 552, 567 (7th Cir. 2011); *Pfeil v. State St. Bank & Tr. Co.*, 671 F.3d 585, 599 (6th Cir. 2012) ("[T]he safe harbor defense does not apply . . . because it does not relieve fiduciaries of the responsibility to screen investments."). As the Seventh Circuit explained in *Howell v. Motorola, Inc.*:

> The language used throughout section 404(c) thus creates a safe harbor only with respect to decisions that the participant can make.  The choice of which investments will be presented in the menu that the plan sponsor adopts is not within the participant's power.  It is instead a core decision relating to the administration of the plan and benefits that will be offered to participants.

633 F.3d at 567; *see also Kokoshka v. Inv. Advisory Comm. of Columbia Univ.*, 2021 3683508, at *7 (S.D.N.Y. Aug. 19, 2021) (finding section 404(c) inapplicable to challenged decisions over which the plaintiff had no control).

124.    If the Plan did not offer an acceptable alternative, a participant could not have the freedom and the control to decide how his or her assets were ultimately invested. *Unisys I*, 74 F.3d at 446–47.  The Third Circuit has explained that section 404(c) may apply when "a participant's or a beneficiary's control was a cause-in-fact,

as well as a substantial contributing factor in bringing about the loss incurred." *Id.* at 445. [89]  The loss at issue here is that suffered by the Plan because of Defendants' imprudent monitoring and management of the Plan.  Plaintiffs' individual investment decisions were neither a cause-in-fact nor a substantial contributing factor to this loss.  Rather, the loss was entirely caused by Defendants' fiduciary failures.

125.    Defendants cannot evade their fiduciary duties merely because there were other options available in the Plan.  *See Hughes v. Northwestern Univ.*, 595 U.S. 170, 176 (2022) (finding it was error to rely on "participants' ultimate choice over their investments to excuse allegedly imprudent decisions by respondents.").  To the contrary, "even in a defined-contribution plan where participants choose their investments, plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." *Id.* (citing *Tibble v. Edison Int'l*, 575 U.S. 523, 529–30 (2015)); *see also DiFelice*, 497 F.3d at 424 (noting that a contrary holding would mean that "[a]ny participant-driven 401(k) plan structured to comport with section 404(c) of ERISA would be prudent [] so long as a fiduciary could argue that a participant could, and should, have further diversified").

126.    Defendants' affirmative defense under ERISA §404(c) fails.

---

[89]The Court further notes that *Unisys I* was decided before the text of the Department of Labor regulation regarding section 404(c) was amended in 2010 "to explicitly provide that the safe harbor provision 'does not serve to relieve a fiduciary from its duty to prudently select and monitor any service provider or designated investment alternative offered under the plan.'"  *In re Suntrust Banks, Inc. ERISA Litig.*, 2015 WL 12734077, at *2 (N.D. Ga. Oct. 8, 2015) (quoting 29 C.F.R. § 2550.404c-1(d)(2)(iv) and noting that "[t]he DOL's position is entitled to significant deference").

### C. Defendants have not Established that a Hypothetical Prudent Fiduciary Would have made the same Decisions

127.    Defendants assert an affirmative defense on the basis that a hypothetical prudent fiduciary would have made the same decisions. *See* ECF No. 196, Final Pretrial Conference Order, at 5.

128.    To the extent the law recognizes a "hypothetical prudent fiduciary" defense under these circumstances, such a defense requires a showing that similar situated fiduciaries ***would have*** made the same decisions as the fiduciaries, not merely that they ***could have***. *See Tatum*, 761 F.3d at 363–64; *see also Sacerdote*, 9 F.4th at 120 (adopting "would have" test); *Peabody v. Davis*, 636 F.3d 368, 375 (7th Cir. 2011) (same); Bussian *v. RJR Nabisco, Inc.*, 223 F.3d 286, 300 (5th Cir. 2000) (same); *In re Unisys Savings Plan Litig.* ("*Unisys II*"), 173 F.3d 145, 153 (3d Cir. 1999) (same). "Under this standard, a plaintiff who has proved the defendant-fiduciary's procedural imprudence and a prima facie loss prevails unless the defendant-fiduciary can show, by a preponderance of the evidence, that a prudent fiduciary would have made the same decision. Put another way, a plan fiduciary carries its burden by demonstrating that it would have reached the same decision had it undertaken a proper investigation." *Tatum*, 761 F.3d at 363–64

129.    To assess the prudence of Defendant's conduct, the Court must consider "the circumstances then prevailing" over the Plan's fiduciaries—not all plan fiduciaries—and what a prudent fiduciary in such a position would have done. 29 U.S.C. § 1104(a)(1)(B). "To say that their decision was objectively reasonable would require taking into account everything that the trustees should have known at the time of their decision." *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 919 (8th Cir. 1994).

130.    ERISA "requires fiduciaries to act in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA]." *Tatum*, 761 F.3d at 367 (citing 29 U.S.C. § 1104(a)(1)(D)).

Courts have held the documents and instruments governing a plan include a plan's investment policy statement. *See Lauderdale v. NFP Retirement, Inc.*, 2022 WL 17260510, at *10 (C.D. Nov. 17, 2022) (citing *Cal. Ironworkers Pen. Tr. v. Loomis Sayles & Co*., 259 F.3d 1036, 1042 (9th Cir. 2001)); *Dardaganis v. Grace Capital, Inc.*, 889 F.2d 1237, 1241–1242 (2d Cir. 1989)(a fiduciary's failure to follow plan documents "is not merely evidence of imprudent action but may, in itself, be a basis for liability under section 1109."); *cf. Baird v. BlackRock Inst. Tr. Co., N.A.*, 2021 WL 105619, at *2 (C.D. Cal. Jan. 12, 2021) (finding genuine disputes of material fact as to whether defendants failed to follow IPS and thereby violated fiduciary duties).

131.    The relevant analysis is whether a prudent fiduciary ***in the shoes of the Plan's fiduciaries***, using objective and unbiased methods, to evaluate investments within the context of the Plan's prevailing governing documents and circumstances. The Fourth Circuit has held that it is error for a district court to "fail[] to factor into its causation analysis" fiduciaries' "lack of compliance" with governing plan documents. *Tatum*, 761 F.3d at 367.

132.    Defendants have not established that a hypothetical prudent fiduciary would have retained the Challenged Funds under the Plan's governing documents and circumstances.   Indeed, Defendants' retention of the Challenged Funds despite consistent and substantial non-compliance with the evaluative criteria established under the Plan's IPS, which would have been apparent if the fiduciaries had looked beyond Captrust's scoring system, is inconsistent with actions that a hypothetical prudent fiduciary in Defendants' shoes would have taken.   Unlike in *Sacerdote*, in which the Second Circuit affirmed the district court's finding that the benchmarks used by the fiduciaries to evaluate the investments at issue were reasonable and credited the district court's finding that the investments were "performing as well as could be expected from contemporaneous assessments," 9 F.4th at 120–21, the Court finds the Committee's disregard of the evaluative metrics established by the IPS and failure to address real-time indicia of imprudence compels the opposite conclusion.

Similarly, with respect to the Freedom Funds, Defendants' failure to follow up on real time indicia of the Freedom Funds' unsuitability, including repeated non-compliance with the IPS, substantial net capital outflows, and negative press coverage, is at odds with a reasonable fiduciary process. As other courts have recognized, evidence of other fiduciaries freezing or terminating contributions to the challenged investment precludes a finding that hypothetical prudent fiduciaries would have made the same decision. *See Sellers v. Trs. of Boston College*, --- F. Supp. 3d. ----, 2024 WL 1586755, at *40. Defendants' failure to follow up on Captrust's provision of the incorrect benchmark for the Freedom Funds underscores this conclusion.

133. Plaintiffs have proven that Defendants caused the Plan to pay more than the reasonable market rate for the Plan's recordkeeping services. Since higher fees cause a "beneficiary's investment [to] shrink[]," *Tibble*, 843 F.3d at 1198, and trust law instructs that "[w]asting beneficiaries' money is imprudent," *id.* (quoting Unif. Prudent Investor Act §7), to establish a defense, Defendants must show that a hypothetical prudent fiduciary would have retained Transamerica at a higher rate. Although Defendants have offered evidence in an attempt to rebut Plaintiffs' evidence of the reasonable market rate, they have presented no evidence establishing that a hypothetical prudent fiduciary would have retained Transamerica at the Plan's contractual rates or any other excess rate over the reasonable market rate established by Plaintiff. This conclusion is also compelled by evidence establishing that Defendants failed to fully apprise themselves of the amounts Transamerica received from the Plan. *See Bugielski*, 76 F.4th at 910–11. Prudent fiduciaries are required to understand the compensation a recordkeeper receives from all sources, *see id.*, so the Court cannot conclude Defendants actions were the same as a hypothetical prudent fiduciary that was fully informed of the fees collected by Transamerica.

134. Likewise, Defendants have advanced no evidence sufficient to enable the Court to conclude that a prudent fiduciary would have allowed substantial funds to accumulate in the EBA and delayed in returning those funds to participants—let

alone announcing that Prime would pay recordkeeping fees on behalf of Plan participants and nonetheless satisfying Prime's obligation to pay with participant assets from the EBA. *See Tibble*, 843 F.3d at 1198.

135.    Defendants offered no evidence establishing that a hypothetical prudent fiduciary in the shoes of the Committee **would have** made the same decision.

### D. Plaintiffs' Claims are not Subject to a Release or Waiver

136.    Defendants' affirmative defense that Plaintiffs' claims are subject to a release or waiver is foreclosed by binding Ninth Circuit authority concerning whether agreements signed by individual participants in a retirement plan may alter or impair the rights and remedies of the plan as a whole. *See Munro v. Univ. of Southern California*, 896 F.3d 1088 (9th Cir. 2018).  In *Munro*, the Ninth Circuit affirmed denial of a motion to compel arbitration of plan-wide breach of fiduciary duty claims based on an arbitration agreement in employment contracts signed by individual participants in the plan. *See id.*, at 1090.  The Ninth Circuit held, consistent with established precedent, that ERISA breach of fiduciary duty claims seeking plan-wide relief may not be impaired by agreements with individual participants. *See Munro*, 896 F.3d at 1093 ("In *Bowles v. Reade*, 198 F.3d 752, 760 (9th Cir. 1999), we held that a plaintiff seeking relief under ERISA § 409(a) may not settle a claim on behalf of a plan, but rather can only settle if the plan consents to the settlement.").

137.    Any argument that the Supreme Court's decision in *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248 (2008), compels a different conclusion is misplaced.  The Ninth Circuit has rejected this reasoning: "the Court made clear [in *LaRue*] that it had not reconsidered its longstanding recognition that it is the plan, and not the individual beneficiaries and participants, that benefit from a winning claim for breach of fiduciary duty, even when the plan is a defined contribution plan." *Munro*, 896 F.3d at 1093.  Still, the Ninth Circuit found that, even if the Supreme Court had intended to alter these principles in *LaRue*, breach of fiduciary duty claims like Plaintiffs "arise from alleged fiduciary misconduct as to the Plans in their entireties

and are not, as in *LaRue*, limited to mismanagement of individual accounts." *Id.* at 1094 (citing *LaRue* 552 U.S. at 250–51).

138. Other Circuits have embraced the same reasoning. For example, the Sixth Circuit recently found that "[a]lthough § 502(a)(2) claims are brought by individual plaintiffs, it is the plan that takes legal claim to the recovery, suggesting that the claim really 'belongs' to the Plan." *Hawkins v. Cintas Corp.*, 32 F.4th 625, 632–33 (6th Cir. 2022). In *Hawkins*, the Sixth Circuit held that, "because § 502(a)(2) claims 'belong' to the Plan, an arbitration agreement that binds only individual participants cannot bring such claims into arbitration." *Id.* At least one subsequent court has held that the Sixth Circuit's reasoning in *Hawkins* applies to release agreements. *See Arnold v. Paredes*, --- F. Supp. 3d ----, 2024 WL 356751, at *7 (M.D. Tenn. Jan. 31, 2024); *see also In re Schering Plough Corp.*, 589 F.3d 585, 594 (3d Cir. 2009) ("The vast majority of courts have concluded that an individual release has no effect on an individual's ability to bring a claim on behalf of an ERISA plan under § 502(a)(2)."); *see also Leber v. Citigroup 401(k) Plan Inv. Comm.*, 323 F.R.D. 145, 161 (S.D.N.Y. 2017) (collecting cases) ("In cases brought on behalf of a plan, most courts have held that 'individuals do not have the authority to release a defined contribution plan's right to recover for breaches of fiduciary duty'; the consent of the plan is required for a release of 29 U.S.C. § 1132(a)(2) claims.").

139. Likewise, the Second and Third Circuits each recently held that provisions of an employment agreement purporting to prospectively waive a participant's right to seek remedies on behalf of a retirement plan are unenforceable. *See Henry on behalf of BSC Ventures Holdings, Inc. Employee Stock Ownership Plan v. Wilmington Tr. NA*, 72 F.4th 499, 507–08 (3d Cir. 2023); *accord Cedeno v. Sasson*, --- F.4th ----, 2024 WL 1895053, at *6 (2d Cir. May 1, 2024).

140. Even assuming *arguendo* Defendants had established at trial that Plaintiffs or any members of the Class had signed agreements purporting to release or waive ERISA breach of fiduciary duty claims (which Defendants did not attempt to

show), agreements of such a nature would be ineffective in releasing or waiving the Plan's claims under ERISA § 502(a)(2).

141.   Defendants' affirmative defense that Plaintiffs' claims are subject to a release or waiver fails.

## XI.   PLAINTIFFS ARE ENTITLED TO AN AWARD OF ATTORNEYS FEES AND COSTS

142.   Under ERISA § 502(g), the Court, "in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g).

143.   A prevailing plan participant such as Plaintiffs "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Echague v. Metropolitan Life Ins. Co.*, 69 F. Supp. 3d 990, 994 (N.D. Cal. 2014) (citing *Smith v. CMTA–IAM Pension Trust*, 746 F.2d 587, 589 (9th Cir. 1984) (internal quotations omitted)); *see also Mason Tenders Dist. Council v. Aurash Const. Corp.*, 2006 WL 647884, at *3 (S.D.N.Y. Mar. 15, 2006) (awarding attorneys' fees to prevailing plaintiffs under ERISA). "The test is not whether plaintiffs prevail on all of their claims, but whether they 'succeed on any significant issue in litigation which achieves some of the benefit [they] sought in bringing suit.'" *Echague*, 69 F. Supp. 3d at 994 (citing *Smith*, 746 F.2d at 589 (internal quotations omitted)).

144.   Given the Court's findings of liability and damages, it appropriate to award fees and costs to Plaintiffs. The Court will hold further proceedings to determine the appropriate quantum of attorneys' fees and costs to award.

## XII.   JUDGEMENT TO BE ENTERED

145.   Defendants must make good the Plan's losses resulting from its breach of fiduciary duty by depositing the damages amount into the Plan within 30 days.

146.   This amount must be brought forward through the date of judgment. To the extent Plaintiffs need additional information from Defendants to calculate damages through the date of judgment, Defendants shall cooperate with Plaintiffs and

provide such information forthwith. *See Tibble v. Edison Int'l*, 2010 WL 2757153, at *39 (C.D. Cal. July 8, 2010).

Dated: June 3, 2024                    Respectfully submitted,


                                        /s/ *James C. Shah*
                                        James C. Shah (SBN 260435)
                                        MILLER SHAH LLP
                                        19712 MacArthur Boulevard
                                        Suite 222
                                        Irvine, CA 92612
                                        Telephone: (866) 540–5505
                                        Facsimile: (866) 300–7367
                                        Email: jcshah@millershah.com

                                        James E. Miller (SBN 262553)
                                        Laurie Rubinow
                                        MILLER SHAH LLP
                                        65 Main Street
                                        Chester, CT 06412
                                        Telephone: (866) 540–5505
                                        Facsimile: (866) 300–7367
                                        Email: jemiller@millershah.com
                                               lrubinow@millershah.com

                                        Alec J. Berin
                                        MILLER SHAH LLP
                                        1845 Walnut Street, Suite 806
                                        Philadelphia, PA 19103
                                        Telephone: (866) 540–5505
                                        Facsimile: (866) 300–7367
                                        Email: jcshah@millershah.com
                                               ajberin@millershah.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mark K. Gyandoh
CAPOZZI ADLER, P.C.
312 Old Lancaster Road
Merion Station, PA 19066
Telephone: (610) 890–0200
Facsimile: (717) 233–4103
Email: markg@capozziadler.com

Donald R. Reavey
CAPOZZI ADLER, P.C.
2933 North Front Street
Harrisburg, PA 17110
Telephone: (717) 233–4101
Facsimile: (717) 233–4103
Email: donr@capozziadler.com

*Counsel for Plaintiffs, the Plan, and the Class*