DARREN E. NADEL, Bar No. 154417
dnadel@littler.com
LITTLER MENDELSON, P.C.
1900 Sixteenth Street, Suite 800
Denver, CO 80202
Telephone: 303.362.2800
Fax. No.:   800.715.1330
[*additional counsel listed on signature page*]

*Attorneys for Defendants*
*Prime Healthcare Services, Inc. and the Prime*
*Healthcare Services, Inc. Benefits Committee*

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re Prime Healthcare ERISA Litigation* | Case No. 8:20-cv-1529-JLS (JDEx) |
| | **DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY** |
| | Trial Date:    APRIL 14, 2024 |

## <u>NOTICE OF SUPPLEMENTAL AUTHORITY</u>

Defendants Prime Healthcare Services, Inc. ("Prime") and the Prime Healthcare Services, Inc. Benefit Committee (the "Committee" and, collectively with Prime, "Defendants") respectfully submit the following Notice of Supplemental Authority.

Specifically, the Eleventh Circuit Court of Appeals recently issued its decision in the matter of *Pizarro v. Home Depot, Inc.*, No. 22-13643, 2024 WL 3633379 (11th Cir. Aug. 2, 2024). Defendants submit the *Pizzaro* decision as supplemental authority relevant to ¶¶ 512, 515-18, 583-604, 629-42, of their Proposed Findings of Fact and Conclusions of Law. (Doc. 222-1). Defendants further note that the district court's decision in *Pizarro* was cited by both parties in their respective Proposed Findings of Fact and Conclusions of Law. (Doc. 222-1, p. 142; Doc. 223-1, p. 165).

A copy of the Eleventh Circuit's full opinion is attached as **Exhibit A**.

| | |
|---|---|
| 1 | Dated:  August 21, 2024 |

By: */s/ Darren E. Nadel*
DARREN E. NADEL
Bar No. 154417
BRADLEY J. CROWELL
*(admitted pro hac vice)*
LITTLER MENDELSON, P.C.
dnadel@littler.com
bcrowell@littler.com
1900 16th Street, Suite 800
Denver, CO  80202
Telephone: 303.629.6200
Facsimile:  303.629.0200

WESLEY E. STOCKARD
*(admitted pro hac vice)*
RACHEL P. KAERCHER
*(admitted pro hac vice)*
JAMES FIELDING
*(admitted pro hac vice)*
LITTLER MENDELSON, P.C.
wstockard@littler.com
rkaercher@littler.com
jfielding@littler.com
3424 Peachtree Road, NE, Suite 1200
Atlanta, GA 30326
Telephone: 404.443.3502
Facsimile:  404.393.5353

PAMELA S.C. REYNOLDS
*(admitted pro hac vice)*
LITTLER MENDELSON, P.C.
preynolds@littler.com
375 Woodcliff Drive, Suite 2D
Fairport, NY  14450
Telephone: 585.203.3415
Facsimile:  585.486.1706

SARA ZIMMERMAN
Bar No. 300549
LITTLER MENDELSON, P.C.
szimerman@littler.com
18565 Jamboree Road, Suite 800
Irvine, CA  92612
Telephone: 949.705.3076
Facsimile:  949.724.1201

*Attorneys for Defendants*
*Prime Healthcare Services, Inc. and the*
*Prime Healthcare Services, Inc. Benefits*
*Committee*

DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY

# Exhibit A

[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-13643

_____

JAIME PIZARRO,
CRAIG SMITH,
on behalf of themselves
and all others similarly situated,
JERRY MURPHY,
RANDALL IDEISHI,
GLENDA STONE, et al.,

                                        Plaintiffs-Appellants,

GARTH TAYLOR,
on behalf of themselves
and all others similarly situated,

                                        Plaintiff,

*versus*

2                    Opinion of the Court                    22-13643

THE HOME DEPOT, INC.,
THE ADMINISTRATIVE COMMITTEE OF THE HOME
DEPOT FUTUREBUILDER 401(K) PLAN,
THE INVESTMENT COMMITTEE OF THE HOME DEPOT
FUTUREBUILDER 401(K) PLAN,

Defendants-Appellees,

FINANCIAL ENGINES ADVISORS, LLC,

Defendants.

————————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:18-cv-01566-SDG

————————————

Before Branch, Grant, and Ed Carnes, Circuit Judges.

Grant, Circuit Judge:

        The Employee Retirement Income Security Act of 1974
requires fiduciaries administering employee-benefit plans to
prudently investigate, choose, and monitor investments. 29 U.S.C.
§ 1104(a)(1)(B). Fiduciaries who fall short can be removed. *Id.*
§ 1109(a). But where a breach of that duty causes monetary losses,

fiduciaries also face financial liability—they must "make good to
such plan any losses to the plan resulting from each such breach."
*Id*.   Recovery of damages under § 1109 thus hinges on two
showings: a failure to prudently monitor, investigate, and evaluate
investments, and a financial loss caused by that failure.

This case presents two questions: which party has the
burden to show loss causation, and how to meet that burden.  The
plaintiffs, a class of current and former Home Depot employees,
argue that the company failed to prudently manage its multi-
billion-dollar 401(k) retirement plan, resulting in excessive fees and
subpar returns.  The district court found an issue of material fact
on that duty-of-prudence question for all but one of the plaintiffs'
claims.  But on the second element, loss causation, the answer was
different—the court decided that the plaintiffs had not met their
burden for any claims.  Even if Home Depot did not appropriately
monitor and evaluate the service providers' fees and the plan's
investments, the court concluded, the plaintiffs had not shown that
Home Depot's investment choices were objectively imprudent.
And that, in turn, meant that any losses to the plan were not caused
by Home Depot's failure to investigate.

The plaintiffs say this approach is not correct—that the
burden should be flipped, which means ERISA fiduciaries are
required to show that their plans' losses were caused by something
other than their own failure to investigate and evaluate.  In other
words, show that the losses were *not* caused by their breach.

We cannot agree.  Our prior precedent forecloses adopting this burden-shifting framework, as do ordinary principles of civil liability.  Nor does ERISA's text help the plaintiffs—it offers no indication that Congress intended to require defendant fiduciaries to disprove loss causation.

The plaintiffs thus bore the burden, but they did not sustain it.  ERISA requires a prudent process, but it does not guarantee good results.  So to prove that losses were caused by a fiduciary's breach, plaintiffs must show that a hypothetical prudent fiduciary, armed with the information a proper evaluation would have yielded, would not have made the same choices.  The plaintiffs here have not done that—Home Depot's investment decisions were objectively prudent, whether or not it used the right process to evaluate and monitor them.  We agree with the district court that the damages claims fail, and we affirm its well-reasoned order granting summary judgment to Home Depot.

## I.

The Home Depot 401(k) Plan, called FutureBuilder, is a defined-contribution retirement plan.  It is among the largest 401(k) plans in the United States, with about 230,000 participants and $9.1 billion in assets as of year-end 2019.  The plan is headed by two committees—the Investment Committee and the Administrative Committee—both appointed by The Home Depot, Inc.[1]  These

---

[1] This opinion refers to The Home Depot, Inc., the Administrative Committee, and the Investment Committee collectively as "Home Depot."

committees have broad duties, including selecting and monitoring investment options, retaining service providers, and monitoring expenses and fees.

During the class period, Home Depot engaged a number of service providers and advisors to help administer the plan.  Three types of providers concern us here.  *First*, Home Depot engaged a recordkeeper, responsible for administering participants' accounts, maintaining plan records, processing individual transaction instructions, and sending disclosures.  *Second*, Home Depot retained an investment consultant, which analyzed the plan's investments, performance, and fees, and prepared discussion guides for the Committees' meetings.  And *third*, Home Depot hired a financial advisor to provide plan participants with investment advisory and managed account services.  The identities of these service providers and their relationships to one another varied over time.  Suffice it for now to state that these companies included Aon Hewitt, Aon Hewitt Investment Consultants, Financial Engines, Alight Solutions, and Alight Financial Advisors.

During the class period, the plan's financial advisor automatically provided all participants with its basic advisory services, which included retirement investment resources (like projected total savings based on savings rate and retirement age), analysis of the plan's investment options, and summaries of each participant's account and forecasted value.  Participants could also opt in to a managed account program, where the financial advisor

used algorithms to directly make investment decisions on each participant's behalf.

For these services, the financial advisor charged two types of fees. The "plan access fee" was a flat dollar fee charged to all plan participants for the basic advisory services. The "professional management fee" was a tiered asset-based fee charged only to participants enrolled in the managed account program. While the parties agree on what the fees were during the class period, they hotly contest how these fees compared to others available in the marketplace.

Participants in Home Depot's plan funded their individual accounts with deductions from their paychecks, plus matching funds contributed by the company. The participants (or the financial advisor, if the participant opted in to the managed account program) then chose from a menu of available funds curated by Home Depot. Four are at issue here.

The BlackRock family of target date funds, offered throughout the entire class period, was designed as a set of all-in-one solutions for retirement investing. Each fund held an asset portfolio that was diversified based on targeted retirement dates by year; these funds automatically rebalanced their holdings on predetermined "glide paths" to retirement, becoming less risky as the participant's retirement date approached. BlackRock's suite of target date funds employed a more conservative glide path than most peer funds, meaning that they would be comparatively less risky at the same point in the lifecycle, but could also expect smaller

returns. The BlackRock funds were popular—many other Fortune 500 companies' 401(k) plans offered the same target date funds during the class period.

The JPMorgan Stable Value Fund, as the name suggests, was a fund designed to protect investors' principal, earning consistent yet modest returns that would exceed those available from a money market account. This fund delivered on its promise, yielding positive returns to investors during the entire class period.

Finally, Home Depot offered two funds designed to invest mostly in small-capitalization companies with long-term growth potential. The TS&W Fund was added to the plan in 2009, and the Stephens Fund was introduced in 2013. After a rocky period of fluctuating performance, both plans were removed as options in 2017.

In 2018, the plaintiffs filed a class action lawsuit against Home Depot, alleging two violations of ERISA's fiduciary duty of prudence. *First*, they claimed that Home Depot failed to adequately monitor the fees charged by the plan's financial advisor for its investment advisory and managed account services, resulting in excessive costs for plan participants. *Second*, they alleged that Home Depot failed to prudently evaluate the four challenged investment options, and that this failure led Home Depot to keep the funds available despite their subpar performance. The plaintiffs sought damages, equitable relief, and attorney's fees. The district court certified a class of all participants in Home Depot's 401(k) plan who either received advisory services

from the plan's financial advisor or who invested in any of the challenged investment funds between April 12, 2012 and the date of the court's judgment.

Following discovery and cross-motions for summary judgment, the district court concluded that several genuine disputes of material fact existed—whether Home Depot had complied with its duty of prudence while monitoring plan fees, as well as whether it had complied with that duty while monitoring three of the four challenged funds. But the court went on to find that even if these disputes were resolved in the plaintiffs' favor, they could not show that the violations had caused them any financial loss. And that meant they had no statutory right to monetary relief. In addition to finding an absence of loss causation, the district court also found no genuine dispute on whether Home Depot had prudently monitored the Stephens Fund. Finally, it ruled that the plaintiffs had forfeited their requests for equitable relief by failing to mount any arguments on that front at the summary judgment stage. This is the plaintiffs' appeal.

## II.

We review a district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party and drawing all inferences in its favor. *Baker v. Upson Reg'l Med. Ctr.*, 94 F.4th 1312, 1316–17 (11th Cir. 2024). "Summary judgment is appropriate only when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law." *Id.* at 1317.

Allocation of the burden of proof is a legal question reviewed by this Court de novo. *Greenberg v. Comm'r*, 10 F.4th 1136, 1155 (11th Cir. 2021). "When the nonmoving party has the burden of proof at trial," the party moving for summary judgment can proceed in one of two ways. *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437–38 (11th Cir. 1991) (en banc) (emphasis omitted). It "may show—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 1438 (alterations adopted and quotation omitted). "Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.* "If the moving party shows the absence of a triable issue of fact by either method, the burden on summary judgment shifts to the nonmoving party, who must show that a genuine issue remains for trial." *Id.* If the nonmoving party fails to make this showing, the moving party is entitled to summary judgment. *Id.*

### III.

ERISA requires a fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). This duty of prudence is objective, judged by the information available at the time of each investment decision—not by the glow of hindsight. *Sacerdote v. New York Univ.*, 9 F.4th 95, 107 (2d Cir. 2021). The

inquiry centers not on the results of an investment, but on a fiduciary's process for choosing that investment.  *Id.*

Once a violation of this duty of prudence is shown, ERISA imposes a severe consequence—the fiduciary is personally liable for "any losses to the plan resulting from" the breach.  29 U.S.C. § 1109(a).  But the last words in this clause, "resulting from," impose an important limit on that liability—loss causation.  So for a damages claim to succeed, the breach of fiduciary duty must proximately cause the plaintiffs' losses.  *Willett v. Blue Cross & Blue Shield of Alabama*, 953 F.2d 1335, 1343 (11th Cir. 1992).

This appeal raises two questions.  *First*, who bears the ultimate burden of proof on loss causation?  And *second*, what must be proven to establish that element?

## A.

We begin with the burden of proof.  The plaintiffs, along with the United States Secretary of Labor as amicus curiae, argue that once a plaintiff shows that a fiduciary breached the duty of prudence and that the plan suffered a loss, the burden shifts to the fiduciary to prove that the loss was not caused by its breach.  They say this shift is necessary because the common law of trusts has an analogous requirement.  For its part, Home Depot responds that ERISA does nothing to disrupt the ordinary expectation that plaintiffs must prove each element of their claims.

Our precedent already answers this question.  ERISA does not impose a burden-shifting framework; instead, plaintiffs bear the ultimate burden of proof on all elements of their claims, including

loss causation. In *Willett v. Blue Cross & Blue Shield of Alabama*, we stated—quite explicitly—that if the plaintiffs succeeded in showing a breach, "[o]n remand, the burden of proof on the issue of causation will rest on the beneficiaries; they must establish that their claimed losses were proximately caused" by that breach. 953 F.2d at 1343. Though it offered little analysis, the case left no doubt—plaintiffs bear the burden.

The plaintiffs here cannot explain away *Willett*. They do try, pointing to a single line of that opinion, which notes that to obtain "a grant of summary judgment in its favor, [the fiduciary] would have had to establish the absence of causation by proving that the beneficiaries' claimed losses could not have resulted from" its breach. *Id.* Well, yes. That is an ordinary summary judgment burden—showing that the other side cannot prove its case. To be fair, the *Willett* court could have been more artful in pointing out that a party who does not bear the burden of proof at trial can win summary judgment in two ways: with affirmative evidence showing that the other side cannot win, or by pointing out an absence of evidence supporting the other side's claims. *Four Parcels of Real Prop.*, 941 F.2d at 1437–38. But in context, the sentence plaintiffs highlight is best understood as noting the ordinary Rule 56 summary judgment standard, that a party moving for summary judgment has the responsibility to show that the nonmoving party's case cannot succeed at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 607–08 (11th Cir. 1991). That standard applies no matter who bears the

ultimate burden of proof.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115–16 (11th Cir. 1993).

So this Court has already settled the question—the burden of proving loss causation lies with the plaintiff.  And though we are bound by the prior-panel precedent rule to enforce that holding, we also endorse it, offering here some of the reasoning we elided there.  *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008).

As always, the "touchstone for determining the burden of proof under a statutory cause of action is the statute itself."  *Thomas v. George, Hartz, Lundeen, Fulmer, Johnstone, King, & Stevens, P.A.*, 525 F.3d 1107, 1110 (11th Cir. 2008).  The text of ERISA imposes personal liability on a fiduciary only for damages "resulting from" its breach of duty.  29 U.S.C. § 1109(a).  Proximate causation is the key link between a breach of duty and a recoverable loss.  *Willett*, 953 F.2d at 1343.

ERISA, like many other statutes, does not explicitly assign the burden of proof on every issue—including loss causation.  But the "ordinary default rule" is "that plaintiffs bear the burden of persuasion regarding the essential aspects of their claims."  *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56–57 (2005).  Congress legislates against this default, so without any evidence that Congress intended to vary from it, "we will conclude that the burden of persuasion lies where it usually falls, upon the party seeking relief."  *Id.* at 57–58.

The ordinary rule resolves this case.  Requiring a defendant to *disprove* causation so long as a plaintiff can show a breach and

some loss would turn the usual principles of civil liability on their
head.  If Congress had intended this departure from the norm, it
could have said so; absent any affirmative indication to that end,
we decline to impose it ourselves.[2]

    To be sure, there are exceptions to this ordinary rule, but
they do not apply here.  The burden of proof can be shifted on
specific elements if they can "fairly be characterized as affirmative
defenses or exemptions."  *Id.* at 57.  Such shifts occur because those
who invoke "a special exception to the prohibitions of a statute"
ordinarily bear "the burden of proving justification."  *FTC v. Morton
Salt Co.*, 334 U.S. 37, 44–45 (1948).  Here, though, causation is not
an affirmative defense; it is an element of the plaintiff's claim.  It is
no surprise, then, that none of the textual or structural indications
suggesting that an element is an affirmative defense or an

---

[2] The Tenth Circuit also rejects a burden-shifting framework for the element
of loss causation.  *Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Tr. v.
Alerus Fin., N.A.*, 858 F.3d 1324, 1337 (10th Cir. 2017).  The Sixth, Seventh, and
Ninth Circuits too have stated that plaintiffs bear the burden of proving loss
causation, though without commenting on the burden-shifting argument.
*Saumer v. Cliffs Nat. Res. Inc.*, 853 F.3d 855, 863 (6th Cir. 2017); *Peabody v. Davis*,
636 F.3d 368, 373 (7th Cir. 2011); *Wright v. Oregon Metallurgical Corp.*, 360 F.3d
1090, 1099 (9th Cir. 2004).  The First, Fourth, Fifth, and Eighth Circuits, on the
other hand, shift the burden of proof on causation to the defendants.
*Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 35–39 (1st Cir. 2018); *Tatum v. RJR
Pension Inv. Comm.*, 761 F.3d 346, 361–63 (4th Cir. 2014); *McDonald v. Provident
Indem. Life Ins.*, 60 F.3d 234, 237 (5th Cir. 1995); *Martin v. Feilen*, 965 F.2d 660,
671 (8th Cir. 1992).  Finally, the Second Circuit has published opinions
endorsing both approaches.  *Compare Silverman v. Mut. Benefit Life Ins.*, 138 F.3d
98, 104 (2d Cir. 1998), *with Sacerdote*, 9 F.4th at 113.

exemption are present here. *See United States v. Kloess*, 251 F.3d 941, 944–46 (11th Cir. 2001). Indeed, the plaintiffs do not suggest otherwise. Put simply, it is "impossible to look at the text and structure of" ERISA and § 1109(a) and conclude loss causation is anything other than a core element of a plaintiff's case. *Meacham v. Knolls Atomic Power Lab'y*, 554 U.S. 84, 93 (2008).

Nor does the common law of trusts provide a lifeline for those who wish to shift the burden. It is true—in "determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Tibble v. Edison Int'l*, 575 U.S. 523, 528–29 (2015). And at least some authorities say that at common law, "when a beneficiary has succeeded in proving that the trustee has committed a breach of trust and that a related loss has occurred, the burden shifts to the trustee to prove that the loss would have occurred in the absence of the breach." Restatement (Third) of Trusts § 100 cmt. f (Am. L. Inst. 2012).[3] One justification for this rule is "the trustee's superior (often, unique) access to information about the trust and its activities." *Id.*

But ERISA is not the common law. It is a complex statutory scheme, and this Court has long "reject[ed] the unselective incorporation of trust law rules into ERISA." *Useden v. Acker*, 947 F.2d 1563, 1581 (11th Cir. 1991); *see also Moore v. Am. Fed'n of*

---

[3] Home Depot identifies sources from the time of ERISA's passage that disagree, rejecting a burden-shifting rule. Because we find that ERISA did not adopt such a rule, we need not decide whether it existed in the background common law of trusts to begin with.

*Television & Radio Artists*, 216 F.3d 1236, 1244 n.17 (11th Cir. 2000). Our responsibility is always "to give effect to the plain meaning of the statute" first.  *Moore*, 216 F.3d at 1244 n.17.  "ERISA is a comprehensive and reticulated statute, bearing the marks of circumspect drafters."  *Useden*, 947 F.2d at 1581 (quotation omitted).  "[W]hile it is obvious that ERISA is informed by trust law, the statute is, in its contours, meaningfully distinct from the body of the common law of trusts."  *Id*.  We therefore proceed carefully, and "only incorporate a given trust law principle if the statute's text negates an inference that the principle was omitted deliberately from the statute."  *Id*.

Here, the statute lacks any language suggesting that Congress's omission of trust law's burden-shifting framework for loss causation was anything but deliberate.  And the plaintiffs' rationale for burden shifting—the informational advantages of trustees over beneficiaries—does not cleanly apply to ERISA. ERISA imposes on fiduciaries a comprehensive scheme of mandatory disclosure and reporting, both to plan participants and to the public at large.  *See* 29 U.S.C. §§ 1021–32.  The statute itself thus enforces a suite of requirements mitigating the informational advantage imputed to the trustee at common law.  These disclosures, combined with the "proper use of discovery tools," mean that ERISA fiduciaries lack the informational advantage that would justify shifting the burden of proof.  *Thomas*, 525 F.3d at 1113–14; *see also Schaffer*, 546 U.S. at 60–61.  So ERISA's text, if anything, suggests that Congress dealt with the information imbalance problem by shrinking the gap, not shifting the burden.

In sum, "where Congress does not squarely address the
question, where the statute's structure and language do not suggest
a shift of the burden to the defendant," and "where plaintiffs are
not peculiarly at a disadvantage in the discovery of necessary facts,
we will not shift the burden of proof, or any element thereof, to
the defendant." *Thomas*, 525 F.3d at 1114. As *Willett* has already
provided, and as we elaborate today, plaintiffs must prove loss
causation for an ERISA breach-of-fiduciary-duty claim under
§ 1109(a).

## B.

Now that we know who has the burden of proving loss
causation—the plaintiffs—the next question is what will satisfy that
burden. A fiduciary's breach of its duty to prudently evaluate and
monitor a plan's investments does not automatically result in a loss
because an imprudent process can sometimes yield a prudent
investment. That may happen, as then-Judge Scalia vividly put it,
"through prayer, astrology or just blind luck." *Fink v. Nat'l Sav. &
Tr. Co.*, 772 F.2d 951, 962 (D.C. Cir. 1985) (Scalia, J., concurring in
part and dissenting in part). And even an "objectively prudent"
investment can sometimes turn out to be a losing one. *Id.* So
liability turns not only on an imprudent process, but also on that
process resulting in an imprudent investment. In other words,
losses are only compensable if they are caused by a fiduciary's bad
decisions rather than by the usual vagaries of the market.

To recover damages then, plaintiffs must show that the
investments made were not objectively prudent. That means they

must have fallen outside the "range of reasonable judgments a fiduciary may make based on her experience and expertise," such that a hypothetical prudent fiduciary in the same circumstances as the defendant, armed with the information that a proper evaluation would have yielded, would not (or could not) have made the same choice. *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022).

Our standard recognizes the fact-laden, judgment-heavy nature of investment decisions. An ERISA fiduciary's management of an employee-benefit plan does not consist of a series of yes-or-no, up-or-down choices in a vacuum. In any single set of circumstances, there might be—indeed, likely will be—many objectively prudent choices a fiduciary could make. ERISA recognizes that managing an employee-benefit plan "will implicate difficult tradeoffs" yielding a range of reasonable options. *Id.* No one—not even the most diligent fiduciary—can predict the future. Different prudent fiduciaries, facing the same set of circumstances, can exercise their judgment and reach different conclusions in light of that uncertainty.

The parties spill considerable ink arguing about semantics—whether an objectively prudent investment is one that a hypothetical prudent fiduciary "would have" also made, or whether it is one that such a fiduciary "could have" also made. This mirrors the debate in the Fourth Circuit's decision in *Tatum v. RJR Pension Investment Committee*, 761 F.3d 346 (4th Cir. 2014). There, the majority said "would," while the district court said "could." *Id.*

at 363–66. But here, the would-versus-could debate is a sideshow. *See id.* at 377 (Wilkinson, J., dissenting) (criticizing the would/could debate as "semantics at its worst"). That's because *Tatum* shifted the burden of proving loss causation onto the fiduciary, while we keep that burden with the plaintiffs. *Id.* at 363 (majority opinion). There is a real difference between requiring proof that a reasonable fiduciary "would have" picked the same investment versus requiring proof that it "could have" done so.[4] But that gap does not hold up when plaintiffs have the burden—if a plaintiff shows that a hypothetical prudent fiduciary "could not have" made the same choice as the defendant, she has also shown that a hypothetical prudent fiduciary "would not have" made the same choice, and vice versa. It is simply an imprudent choice.

   In sum, to succeed on a breach-of-fiduciary-duty claim, a plaintiff must convince a factfinder that the fiduciary's choice was

---

[4] For what it is worth, we agree with Judge Wilkinson's dissent that requiring a defendant to prove that a hypothetical prudent fiduciary *would* have also made the same choice "ignore[s] the fact that there is not one and only one 'same decision' that qualifies as objectively prudent." *Tatum*, 761 F.3d at 378 (Wilkinson, J., dissenting). To illustrate, imagine that, faced with a particular decision, there are three (and only three) reasonable investment choices: *A*, *B*, and *C*. By our read, the *Tatum* majority's rule requires a fiduciary who chose *A* to show that each and every other prudent fiduciary would have also chosen *A*, even though *B* and *C* were also prudent choices. Because a fiduciary will not be able to make that showing, the *Tatum* rule would impose liability on a fiduciary even though it made an objectively prudent choice—completely contrary to ERISA's loss causation requirement.

objectively unreasonable—that it was not one that a prudent fiduciary would also have made.

### IV.

We now apply that legal standard.  The plaintiffs advance two discrete claims on appeal.  *First*, the plan's financial advisor—Financial Engines until 2017, Alight Financial Advisors after that—charged Home Depot excessive fees.[5]  And *second*, Home Depot should have dropped four funds after they underperformed alternative investment options and certain market benchmarks. Viewing the evidence in the light most favorable to the plaintiffs, and drawing all reasonable inferences in their favor, the plaintiffs have not shown a genuine dispute of material fact on loss causation for either of their claims.

### A.

We start with fees.  As we have said, Home Depot paid two types of fees over the class period, first to Financial Engines and then to Alight Financial Advisors: plan access fees and professional management fees.  Plaintiffs challenge only the prudence of the latter.  Home Depot negotiated and secured several decreases over the years in the professional management fee.  The fee dropped in 2014 and again in 2017 before a broader overhaul in 2021 resulted

---

[5] In 2017, Alight Financial Advisors became the plan's direct financial advisor. It took over the managed account services, but Financial Engines continued to provide investment advice to plan participants as a subcontractor for Alight Financial Advisors.

in new asset thresholds and fees for the tiers.[6]  These decreases, however, are not enough to show that the fees were objectively prudent throughout the class period.  The plaintiffs' evidence that they were not falls into three buckets.

The first is that competitors of Financial Engines and Alight Financial Advisors charged lower fees for comparable services.  But assuming that's true, simply showing that there were other reasonable choices does not mean that retaining Financial Engines and Alight Financial Advisors was not also reasonable, given the Home Depot plan's size and goals.  In fact, Financial Engines was the most popular service provider for 401(k) plans of similar size and complexity to Home Depot's.  That many other sophisticated investment professionals managing similarly sized plans made the same choice as Home Depot suggests objective prudence; it is direct evidence that other fiduciaries "acting in a like capacity and familiar with such matters" made the same choice "in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B); *see Pfeil v. State St. Bank & Tr. Co.*, 806 F.3d 377, 388 (6th Cir. 2015).  Such evidence is not dispositive on its own, of course, and other evidence can show that a popular choice was still imprudent.  The problem for the plaintiffs is that they cannot make that showing here.

The plaintiffs identify other service providers that compete with Financial Engines and Alight Financial Advisors, but that

---

[6] We previously granted Home Depot's unopposed motion to file proprietary pricing information under seal.

effort is fundamentally flawed.  Though the plaintiffs' chosen comparators also offer advisory and managed account services, ERISA requires a more granular analysis tailored to a plan's "character" and "aims."  29 U.S.C. § 1104(a)(1)(B).  "[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund [or service provider] (which might, of course, be plagued by other problems)."  *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009), *abrogated on other grounds by Hughes*, 595 U.S. 170.

The competitors that have been identified differ in key respects that make it impossible for the plaintiffs to show at trial that no prudent fiduciary in Home Depot's shoes would have chosen the financial advisors it did.  We have already noted that Financial Engines was the leading service provider to large plans like Home Depot's.  It also offered preexisting integration with Home Depot's recordkeeper, Aon Hewitt (later rebranded as Alight Solutions).  So did Alight Financial Advisors, a wholly owned subsidiary of Alight Solutions.  Other firms Home Depot could have selected were smaller or lacked the seamless integration with Aon Hewitt's website and services that Financial Engines and Alight Financial Advisors offered.  The plaintiffs offer no evidence that a hypothetical prudent fiduciary managing Home Depot's 401(k) plan—among the largest in the nation—would have considered its financial advisors' fees unreasonable in comparison to their competitors given their large capacity, experience with similarly sized plans, and integration with Home Depot's recordkeeper.

The plaintiffs' next argument is that Financial Engines and
Alight Financial Advisors charged higher fees to Home Depot than
they did to other comparable clients.   This point is fiercely
contested by Home Depot, and the parties disagree about whether
Home Depot's fees should be calculated by dollars per participant
or basis points, as well as which plans served by Financial Engines
and Alight Financial Advisors are an appropriate baseline for
comparison.[7]  But even taking the plaintiffs' preferred approach for
both variables—which unsurprisingly produces the worst outcome
for Home Depot—the record shows that Home Depot's top-tier
fee, measured in basis points, is by no means an outlier when
compared to other plans with roughly the same assets.  The fee the
plaintiffs highlight, charged to more than 90 percent of participants,
was at or better than the median in two years during the class
period, and was never worse than the second quintile.  The fees for
half of all plans will, by definition, be worse than the median; a fee
somewhat higher than median in a handful of years during the class
period is a far cry from being such an objectively unreasonable
charge for the providers' services that a prudent fiduciary would
not have stayed the course.

Every other comparison results in a better—much better—
outlook for Home Depot.  In terms of dollars per participant,
Home Depot paid lower fees to Financial Engines and Alight
Financial Advisors than 96 percent of all other plans in every year
during the class period.  And in terms of basis points, the top-tier

---

[7] A "basis point" is equal to one one-hundredth of one percent (0.01%).

fee charged to Home Depot was equal to or lower than the top-tier
fee of at least half of all other plans in every year during the class
period. In the end, no matter how the evidence is evaluated, there
is no triable issue of fact on the objective prudence of the fees
charged by Home Depot's financial advisors.

The plaintiffs' last contention is that the fees were excessive
because they were inflated by a kickback paid by Financial Engines
to the plan's recordkeeper, Aon Hewitt. Home Depot, they now
argue, was imprudent for failing to recoup the value of this
payment from Financial Engines. But the plaintiffs never raised
this theory below—instead, they argued at summary judgment
only that Home Depot was imprudent for failing to recoup the
alleged kickback from *Aon Hewitt*. The district court granted Home
Depot summary judgment on this claim, concluding that the
plaintiffs had failed to plead it in their complaint. The plaintiffs do
not challenge that determination on appeal; instead, they try to
sidestep that ruling by recharacterizing the alleged kickback
scheme as evidence that the fees charged by *Financial Engines* were
excessive. Because they did not make this argument at summary
judgment, we will not consider it for the first time on appeal. *T.R.*
*ex rel. Brock v. Lamar Cnty. Bd. of Educ.*, 25 F.4th 877, 884–85 (11th
Cir. 2022).

## B.

We turn next to the plaintiffs' claims that Home Depot
should have dropped four specific funds from its 401(k) plan. At
the outset, we note that the plaintiffs' attacks on the four funds

suffer from a common flaw—the principal evidence is drawn only from short time periods during which the funds underperformed their peers. A few here-and-there years of below-median returns, however, are not a meaningful way to evaluate a plan's success as a long-term investment vehicle. The plaintiffs, in other words, cannot show that a fund is objectively imprudent by just "pointing to another investment that has performed better in a five-year snapshot of the lifespan of a fund that is supposed to grow for fifty years." *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1166 (6th Cir. 2022); *see also Jenkins v. Yager*, 444 F.3d 916, 925–26 (7th Cir. 2006). In fact, selling a fund too soon because of disappointing short-term losses "is one of the surest ways to frustrate the long-term growth of a retirement plan." *Smith*, 37 F.4th at 1166.

Getting to the specifics, we start with BlackRock. The plaintiffs argue that the BlackRock target date funds underperformed their peers, focusing on the third quarter of 2013. The first problem is that, qualitatively, these funds were popular options offered by other employers' plans of comparable size and complexity, and consistently received positive ratings from industry analysts.

Quantitatively, the plaintiffs fare no better. They argue that the BlackRock funds underperformed both the median target date fund in the market and the specific target date funds their expert selected. As the district court found, these are "apples and oranges." Target date funds are not all created equal—funds from different sponsors may have different glide paths, which means

they also have different risk-return profiles. In years when the equity market is hot, a more aggressive target date fund that retains equities longer will appear to outperform a fund that shifts toward more conservative assets like bonds sooner. But that snapshot does not mean it is objectively imprudent to adopt a more conservative strategy—the tables turn when the market is down.

When adjusting for these different glide path choices, the BlackRock target date funds' returns matched those of their peers and market benchmarks almost perfectly. Home Depot's investment consultant, Aon Hewitt Investment Consultants, benchmarked each fund against a custom index created by BlackRock that weighted the universe of comparison target date funds against the glide path allocation of BlackRock's offerings, creating an apples-to-apples comparison. BlackRock's target date funds' three- and five-year returns closely matched these custom indexes throughout the entire class period.[8] ERISA does not require that fiduciaries choose the maximally aggressive option in each investment class; the plaintiffs cannot show that a prudent fiduciary would not have also retained these funds in light of Home Depot's investment objectives.

---

[8] Even this comparison slightly underrates the BlackRock target date funds because the funds' actual performance is reported net of investment management fees, while it is generally not possible to obtain the returns of the idealized comparison benchmark without paying any transaction or management fees.

The plaintiffs' arguments about the JPMorgan Stable Value Fund suffer from a similar problem.  That fund's principal objective was capital preservation—which it achieved by delivering positive returns in every year during the class period.  It outperformed its benchmark (an index tracking the three-month treasury bill rate) on a one-, three-, five-, and ten-year basis for the entire class period, with just a single exception: the one-year return ending in the fourth quarter of 2019 missed its benchmark by two basis points (0.02%).  With the exception of a handful of quarters at the beginning of the class period, it also consistently outperformed the benchmarks selected for it by Aon Hewitt Investment Consultants.

The plaintiffs' arguments that the JPMorgan fund was objectively imprudent depend on changing the index against which the fund was benchmarked.  But whether an investment is objectively imprudent must be assessed against the actions of a hypothetical prudent fiduciary with "like aims."  29 U.S.C. § 1104(a)(1)(B).  We cannot say "that a plan fiduciary's choice of benchmark, where such a benchmark is fully disclosed to participants, can be imprudent by virtue of being too conservative."  *Ellis v. Fid. Mgmt. Tr. Co.*, 883 F.3d 1, 10 (1st Cir. 2018).  Home Depot offered the stable value fund because it was conservative, advertised it as conservative, and benchmarked it against a conservative metric.  Because the fund met the expectations set for it, the plaintiffs' breach-of-fiduciary-duty claim relying on comparisons to other, more aggressive benchmarks fail.

As for the TS&W Small Cap Value Fund, the plaintiffs marshalled no evidence beyond a few years of underperformance to show that retaining these funds was not objectively prudent. Again, short periods of relative underperformance alone do not meet a plaintiff's burden to establish objective imprudence. The TS&W fund serves as an object lesson in why: the plaintiffs criticize Home Depot for not removing that fund in the second quarter of 2012. At that point, its three- and five-year returns had underperformed the fund's peers for a handful of quarters, with its three-year returns ranking as low as the 99th percentile in its peer group. Its three-year return (though not its five-year return) had also consistently trailed its benchmark index. By the first quarter of 2015, however, the fund's three- and five-year returns had dramatically rebounded—after that, it significantly outperformed its benchmark and ranked among the very top funds in its peer group. Later, the fund's performance declined again relative to its peers before Home Depot dropped it from the plan. Plaintiffs argue that any data past the second quarter of 2012 is irrelevant, but these metrics show that the objective prudence of a long-term retirement option cannot be measured only by referencing short-term shifts in the market.

Lastly, the Stephens Fund. Here too the plaintiffs attack the fund using only a few years of underperformance, but unlike for the other three funds, the district court found no genuine dispute of material fact about the prudence of Home Depot's monitoring process. We affirm that conclusion too.

28                      Opinion of the Court                      22-13643

ERISA fiduciaries must give "appropriate consideration to those facts and circumstances that" they "know[] or should know are relevant to the particular investment or investment course of action involved." 29 C.F.R. § 2550.404a-1(b)(1)(i). And they must "conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." *Hughes*, 595 U.S. at 176. "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Id.*; *see also GIW Indus., Inc. v. Trevor, Stewart, Burton & Jacobsen, Inc.*, 895 F.2d 729, 732–33 (11th Cir. 1990). The "content of the duty of prudence turns on the circumstances prevailing at the time the fiduciary acts," so the inquiry is necessarily "context specific." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014) (alteration adopted and quotation omitted).

Home Depot added the Stephens Fund to its plan in late-2013 and removed it about four years later. Throughout this period, Home Depot scrutinized the fund's performance—the Investment Committee's meeting minutes show that it received briefings on the fund's performance from Aon Hewitt Investment Consultants as well as directly from the fund's managers. The plaintiffs complain that Home Depot should not get off the hook for "passively accept[ing]" Aon Hewitt's advice, but the record shows that Home Depot did anything but. It asked Aon Hewitt several times whether the fund's disappointing returns in the short term justified its continued inclusion in the plan. While Aon Hewitt counseled continued patience, Home Depot removed the

fund.  On this record, there is no genuine dispute of material fact on the prudence of Home Depot's monitoring process for the Stephens Fund.

In sum, the plaintiffs failed to offer enough evidence to show that the four challenged funds were objectively imprudent investments, or that Home Depot violated its duty of prudence while monitoring the Stephens Fund.  They thus cannot succeed on their breach-of-fiduciary-duty claims.

## V.

Finally, we agree with the district court that the plaintiffs forfeited their claims for equitable relief.  The district court is not required to "distill every potential argument that could be made based upon the materials before it on summary judgment." *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (en banc).  Instead, it is up to the parties to formulate their arguments—grounds not relied on at summary judgment are abandoned.  *Id.*; *see also Rd. Sprinkler Fitters Loc. Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994).

Home Depot's motion put the plaintiffs on notice that the company sought summary judgment on "all claims asserted by Plaintiffs."  Had the plaintiffs contended that Home Depot's arguments did not defeat their entitlement to equitable relief, the district court would have had the opportunity to evaluate those arguments in the first instance—and we would have a reasoned decision to review.

30                    Opinion of the Court                    22-13643

But that is not what happened.  The plaintiffs did not make any equitable relief arguments below; the only mention of equitable relief in any of their summary judgment papers was a perfunctory reference to its availability in the legal standard section of the opposition brief.  The plaintiffs therefore forfeited any such claims.

*        *        *

ERISA tasks fiduciaries with prudently administering the employee-benefit plans under their charge.  Here, the plaintiffs cannot show that a prudent fiduciary in the same position as Home Depot would have made different choices on either the plan's service providers or the four challenged funds.  We therefore **AFFIRM** the district court's grant of summary judgment to Home Depot.