1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re: Prime Healthcare ERISA Litig.* | Case No.  8:20-cv-1529-JLS-JDE <br><br> **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

The Court held a bench trial from April 9, 2024, through April 16, 2024.  Having considered the testimony presented at trial, the exhibits admitted into evidence, and the parties' post-trial submissions, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52.[1]  The Court concludes that Defendants used a prudent process to select, monitor, and retain investments; to monitor the Plan's recordkeeping and administration fees; and to monitor the share classes of the investments in the Plan.  Therefore, the Court rules against Plaintiffs[2] and in favor of Defendants[3] on all of Plaintiffs' claims.

# I.    FACTUAL BACKGROUND

Prime owns and operates hospitals and clinics in fourteen states.  (FPTC Order, Doc. 196 ¶ 6.)  Prime sponsors the Prime Healthcare Services, Inc. 401(k) Plan (the "Plan"), which is a defined contribution 401(k) retirement plan subject to the Employee Retirement Income Security Act ("ERISA").  (*Id.*)  Participants in the Plan make tax-deferred contributions to their individual accounts and then can choose one or more of the investment options offered by the Plan.  (*Id.*)  The Plan is a multiple-employer plan.  (Day 5 Trial Tr., Doc. 216 at 1012:14–19 (Gissiner)); *see* 29 C.F.R. § 4001.2 (defining a multiple-employer plan as a plan "maintained by two or more contributing sponsors . . . under which all plan assets are available to pay benefits to all plan participants and

---

[1] After trial, the parties submitted Proposed Findings of Fact and Conclusions of Law, as well as responses to the other side's submission.  Because Plaintiffs separately numbered the paragraphs under their Findings of Fact and Conclusions of Law headings, the Court cites the parties' Findings of Fact and Conclusions of Law separately for clarity.  (*See* Pls.' Proposed Findings of Fact ("Pls.' Proposed FOFs"), Doc. 223-1; Pls.' Proposed Conclusions of Law ("Pls.' Proposed COLs"), Doc. 223-1; Defs.' Proposed Findings of Fact ("Defs.' Proposed FOFs"), Doc. 222-1; Defs.' Proposed Conclusions of Law ("Defs.' Proposed COLs"), Doc. 222-1; *see also* Pls.' Resp., Doc. 224; Defs.' Resp., Doc. 225.)

[2] Named Plaintiffs are Maria D. Ornelas, Chantell Campbell, and Brian Horton.  (FPTC Order, Doc. 196 ¶ 1.)  For each claim, Named Plaintiffs represent a Class of all participants and beneficiaries in the Prime Healthcare Services, Inc. 401(k) Plan during the relevant Class Period.  (Class Certification Order, Doc. 190 at 1.)

[3] Defendants are Prime Healthcare Services, Inc. ("Prime") and the Prime Healthcare Services, Inc. Benefit Committee ("Committee") (collectively, "Defendants").  (FPTC Order ¶ 1.)

beneficiaries").  As the Court describes more fully below, the Plan is a particularly complex and decentralized multi-employer Plan that is composed of sixty-eight different employers.  (*Infra* section VI.H.)

During the relevant Class Periods, the Committee used a third-party investment consultant, Captrust Financial Partners ("Captrust"), to assist with its management of the Plan and the Plan's investments.  Also during the relevant Class Periods, the Committee used Transamerica Retirement Solutions, Inc. ("Transamerica") as the Plan's recordkeeper.  (*See* Stipulated Facts App., Doc. 196, Ex. A ¶¶ 35–39.)

### A.    Plaintiffs' Claims and Theories of Liability

As set forth in Plaintiffs' operative complaint and the Court's Pre-Trial Conference Order ("FPTC Order"), Plaintiffs assert four claims in this action—three against the Committee and one against Prime itself for allegedly inadequately monitoring the Committee.  (*See* FPTC Order ¶ 8.[4])

### 1.    Claim 1: The Committee's Alleged Failure to Prudently Monitor the Plan's Investments

Plaintiffs' initial claim is that the Committee allegedly breached its "fiduciary duty of prudence under 29 U.S.C. § 1004(a)(1)(B) by failing to appropriately monitor certain investments in the Plan, causing the Plan to retain these imprudent investments" and thereby incur losses.  (FPTC Order ¶ 8.)  Specifically, Plaintiffs fault the Committee for allegedly failing to prudently monitor the following funds, which the parties collectively refer to as the "Challenged Funds": the actively managed Fidelity Freedom Funds (the "Active Suite"); the Fidelity Institutional Asset Management Collective Trust Blend Funds (the "FIAM Blend Funds"); the Prudential Jennison Small Company Fund (the

---

[4] In the FPTC Order, the parties presented this case as involving three claims—each asserted against both the Committee and Prime itself.  (*See* FPTC Order ¶ 8.)  In this order, the Court adopts the framing used by the parties in their post-trial submissions that present this case as involving four claims, with those claims divided between the underlying claims against the Committee and the derivative claim against Prime itself.  This difference between the parties' pre- and post-trial submissions is one of form, not substance.

"Prudential Fund"); the Invesco Real Estate Fund (the "Invesco Fund"); the T. Rowe Price Mid-Cap Value Fund (the "T. Rowe Price Fund"); and the Oakmark Equity & Income Fund (the "Oakmark Fund"). (*See* Pls.' Proposed FOFs ¶ 204; Defs.' Proposed FOFs ¶ 1; Stipulated Facts App. ¶¶ 178–192.) The Class Period for this claim is August 18, 2014, to the present. (Class Certification Order, Doc. 190 at 1.) In support of this first claim, Plaintiffs offer six different theories of liability or categories of evidence that allegedly show the Committee acted imprudently. (*See* Pls.' Proposed COLs ¶¶ 63–71.)

*First*, Plaintiffs contend that what they refer to as "Defendants' fiduciary governance structure" was inadequate. (*Id.* ¶ 64.) By this, Plaintiffs refer to three aspects of the Committee's governance structure: (1) its alleged lack of training; (2) its pre-2019 lack of a written charter; and (3) its allegedly amorphous Investment Policy Statement ("IPS"). (*See id.* ¶ 64.)

*Second*, Plaintiffs contend that the Committee "insufficiently documented its decision-making process," which allegedly "resulted in a 'check the box' exercise" that fell below what the ERISA-imposed duty of prudence requires. (*Id.* ¶ 65.)

*Third*, Plaintiffs contend that the Committee reflexively deferred to Captrust when it came to monitoring the Plan's investment options. (*Id.* ¶ 66.)

*Fourth*, Plaintiffs contend that the Committee violated the IPS by retaining certain investments that were favorably rated by Captrust's scoring system but which—according to Plaintiffs—failed to meet the IPS's criteria. (*Id.* ¶ 67.)

*Fifth*, Plaintiffs contend that the Committee "failed to identify that Captrust provided an inappropriate benchmark to monitor the Freedom Funds." (*Id.* ¶ 68.)

*Sixth*, Plaintiffs contend that the Committee overlooked certain alleged "red flags" regarding the Active Suite—particularly a "Reuters Report and other indications of capital flight" from those funds. (*Id.* ¶ 69.)

**2.    Claim 2: The Committee's Alleged Failure to Prudently Monitor the Plan's Recordkeeping Fees**

Plaintiffs' next claim is that the Committee breached its "fiduciary duty of

prudence under 29 U.S.C. § 1004(a)(1)(B) by causing the Plan to pay excessive recordkeeping and administrative ('RKA') fees [to Transamerica] through 2019." (FPTC Order ¶ 8.) The Class Period for this Claim is August 18, 2014, to July 31, 2019. (Class Certification Order at 1.) Like the previous claim, Plaintiffs offer six different theories of liability or categories of evidence that they contend show the Committee acted imprudently. (*See* Pls.' Proposed COLs ¶¶ 43–49.[5])

**First,** Plaintiffs repeat their contention that what they refer to as "Defendants' fiduciary governance structure" was inadequate. (*Id.* ¶ 44; *accord id.* ¶ 64.) Here, Plaintiffs point to two aspects of that structure: (1) the Committee's alleged lack of training; and (2) the Committee's pre-2019 lack of a written charter. (*See id.* ¶ 44.)

**Second,** Plaintiffs also repeat their contention that the Committee "insufficiently documented its decision-making process." (*Id.* ¶ 45; *accord* ¶ 65.) In this context, Plaintiffs contend that the allegedly inadequate documentation caused the Committee to lack "a touchstone for the application of a consistent process," which in turn led to "near-total reliance" on Captrust's analysis of recordkeeping fees. (*Id.* ¶ 45.)

**Third,** Plaintiffs contend that "the Committee never undertook measures sufficient [to] become informed of the reasonable market rate for the Plan's services." (*Id.* ¶ 46.) This theory of liability, in turn, has two components. Plaintiffs fault the Committee for never undertaking a formal request for proposals. (*See id.*) And Plaintiffs criticize as flawed the 2015, 2017, and 2020 vendor-fee benchmark exercises that the Committee and Captrust did conduct. (*See id.*)

**Fourth,** Plaintiffs contend that the Committee failed to ensure that the Plan's fee remained reasonable as the assets under the Plan grew significantly. (*Id.* ¶ 47.)

---

[5] Because Plaintiffs' claims are so multifaceted—with twelve different theories of liability across these first two claims—and because many of the Court's factual findings relate only to certain of those theories, the Court finds it necessary to intersperse its Findings of Fact and Conclusions of Law. Accordingly, instead of having one standalone section of Findings of Fact and one standalone section for Conclusions of Law, the Court makes factual findings and draws legal conclusions in sections corresponding to Plaintiffs' various theories of liability.

*Fifth,* Plaintiffs contend that Defendants failed to "review the total fees paid to Transamerica on a per-participant basis" and failed to "consider all fees paid to [Transamerica] from all sources." (*Id.* ¶ 48.)

*Sixth,* Plaintiffs contend that Defendants improperly "caused the Plan['s] recordkeeping costs associated with Prime's mergers and acquisitions to be paid by the Plan." (*Id.* ¶ 49.)

### 3. Claim 3: The Committee's Alleged Failure to Prudently Monitor the Plan's Share Classes

Plaintiffs' next claim is that the Committee allegedly breached its "fiduciary duty of prudence under 29 U.S.C. § 1004(a)(1)(B) by failing to appropriately monitor certain share classes of the Plan's investments, causing the Plan to pay excessive investment management expenses." (FPTC Order ¶ 8.)  The Class Period for this claim is August 18, 2014, to the present.  (Class Certification Order at 1.)

### 4. Claim 4: Prime's Alleged Failure to Prudently Monitor the Committee

Plaintiffs' final claim is that "Prime failed to adequately monitor the Committee, which was delegated certain fiduciary responsibilities." (Pls.' Proposed COLs ¶ 86.)

### 5. Unpled Claim: The Committee's Alleged Mishandling of the Plan's Expense Budget Account

Plaintiffs also contend that Defendants "misappropriated the Expense Budget Account." (*See* Pls.' Proposed FOFs ¶¶ 172–190; Pls.' Proposed COLs ¶ 52–53 (capitalization standardized).)  Plaintiffs, however, never pled this claim; nor is it included in the FPTC Order.  For the reasons described more fully below, the Court declines to consider this eleventh-hour claim suggested for the first time at trial and expressly asserted for the first time in Plaintiffs' post-trial submission.  (*Infra* section IX.)

1  II.     **JURISDICTION**

2          This Court has federal-question jurisdiction under 28 U.S.C. §1331 because this is

3  an action arising under ERISA.

4  III.    **LEGAL STANDARD**

5          A.     **ERISA's Duty of Prudence**

6          ERISA imposes a duty of prudence on plan fiduciaries:  Plan fiduciaries must act

7  "with the care, skill, prudence, and diligence under the circumstances then prevailing that

8  a [person] acting in a like capacity and familiar with such matters would use in the

9  conduct of an enterprise of a like character and with like aims."  29 U.S.C.

10  § 1104(a)(1)(B).  Prudence has two aspects:  "'[T]he court focuses not only on [1] the

11  merits of the transaction, but also on [2] the thoroughness of the investigation into the

12  merits of the transaction.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) (en

13  banc) (quoting *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996)).  When assessing

14  procedural prudence, the "court's task" is to determine whether the fiduciaries "'employed

15  the appropriate methods to investigate the merits of the [challenged] investment.'"  *Wright*

16  *v. Or. Metallurgical Corp.*, 360 F.3d 1090, 1097 (9th Cir. 2004) (quoting *Donovan v.*

17  *Mazzola*, 716 F.2d 1226, 1233 (9th Cir.1983)).  Plaintiffs cannot prevail unless they make

18  a showing of procedural imprudence.  *See, e.g.*, *White v. Chevron Corp.*, 752 F. App'x

19  453, 455 (9th Cir. 2018) (unpublished) (affirming dismissal of a complaint because "the

20  allegations showed only that [the defendant] could have chosen different vehicles for

21  investment that performed better during the relevant period, or sought lower fees for

22  administration of the fund").

23          "Because the content of the duty of prudence turns on 'the circumstances . . .

24  prevailing' at the time the fiduciary acts,' the appropriate inquiry will necessarily be

25  ***context specific***."  *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014)

26  (emphasis added) (quoting 29 U.S.C. § 1104(a)(1)(B)).  And "'[t]he appropriate yardstick

27  of a fiduciary's duty of prudence under ERISA is not that of a prudent lay person, but

28  rather that of a prudent fiduciary ***with experience dealing with a similar enterprise***.'"

*Ramos v. Banner Health*, 461 F. Supp. 3d 1067, 1122 (D. Colo. 2020) (emphasis added) (quoting *Troudt v. Oracle Corp.*, 2019 WL 1006019, at *5 (D. Colo. Mar. 1, 2019)).  As such, courts often rely on expert testimony regarding common practice in the retirement-benefits industry to inform their decisions regarding what ERISA's duty of prudence requires in a particular situation.  *Lauderdale v. NFP Ret., Inc.*, 2022 WL 17324416, at *3 (C.D. Cal. Nov. 17, 2022) (noting that, while there is "a difference between what is sufficiently 'prudent' in the industry" and what "is considered *legally* sufficient . . . under ERISA," experts "are permitted to opine [on] . . . standards of [the] industry").  That said, industry practice is not "coextensive with ERISA" prudence, and "the duty of prudence under ERISA may be informed by other considerations."  *Troudt v. Oracle Corp.*, 369 F. Supp. 3d 1134, 1142–43 & n.6 (D. Colo. 2019).

Finally, "ERISA's fiduciary duty of care requires prudence, not prescience." *Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 63–64 (2d Cir. 2016) (cleaned up); *see also Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 918 (8th Cir. 1994) ("The prudent person standard . . . is a test of how the fiduciary acted viewed from the perspective of the time of the challenged decision rather than from the vantage point of hindsight."  (cleaned up)).  "At times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise."  *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022).

### B.    Expert Witnesses

Federal Rule of Evidence 702 provides that an expert opinion is admissible "if the proponent demonstrates to the court that it is more likely than not" that: (1) the witness has "scientific, technical, or other specialized knowledge"; (2) the witness's specialized knowledge "will help the trier of fact to understand the evidence or to determine a fact in issue"; (3) "the testimony is based on sufficient facts or data"; (4) "the testimony is the product of reliable principles and methods"; and (5) the expert has reliably applied "the principles and methods to the facts of the case."

There is not a "definitive checklist" of factors to consider when applying Rule 702's reliability requirement. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150–51 (1999) (describing *Daubert* factors as "helpful, not definitive" and acknowledging that the reliability inquiry must be tailored to "particular circumstances of the particular case at issue"). However, the Supreme Court has set forth several factors that help guide courts' reliability analysis: "[w]hether a 'theory or technique . . . can be (and has been) tested'"; "[w]hether it 'has been subjected to peer review and publication'"; "[w]hether, in respect to a particular technique, there is a high 'known or potential rate of error' and whether there are 'standards controlling the technique's operation'"; and "[w]hether the theory or technique enjoys 'general acceptance' within a 'relevant [technical] community.'" *Kumho Tire*, 526 U.S. at 149–50 (quoting *Daubert*, 526 U.S. at 592–94).

"Vigorous cross-examination, presentation of contrary evidence, and careful [consideration of] the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 526 U.S. at 596.

## IV.   FACTUAL FINDINGS REGARDING EXPERT WITNESSES

Before trial, the Court denied Defendants' *Daubert* motions to exclude Plaintiffs' proffered experts. (*See* FPTC Minutes, Doc. 194.[6]) As the Court explained from the bench at the FPTC, "*Daubert* is meant to protect juries from being swayed by dubious scientific testimony. When the district court sits as the finder of fact, there is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for [herself]." *United States v. Flores*, 901 F.3d 1150, 1165 (9th Cir. 2018) (emphasis omitted) (quotation omitted); *see also FTC v. BurnLounge, Inc.*, 753 F.3d 878, 888 (9th Cir. 2014) ("[W]e are mindful that there is less danger that a trial court will be unduly impressed by the expert's testimony or opinion in a bench trial." (quotation omitted)). Therefore, "in bench trials, the district court is able to make its reliability determination

---

[6] Plaintiffs never challenged the ability of Defendants' expert witnesses to testify under Rule 702.

during [or after], rather than in advance of, trial." *Flores*, 901 F.3d at 1165 (quotation omitted).  That is, a court in a bench trial has the flexibility "later to exclude [evidence] or disregard it" in its Rule 52 order if the expert's testimony "turns out not to meet the standard of reliability established by Rule 702." *Id.*

Having reserved the issue of both the admissibility and weight of the parties' proffered experts, the Court now draws conclusions as to each proffered expert whose testimony is relevant to the Court's order.[7]

### A.    Marcia Wagner

The Court assumes without deciding that the testimony of Plaintiffs' proffered process expert, Marcia Wagner, is admissible under Rule 702.  However, the Court finds as a factual matter that Wagner's testimony is entitled to no probative value in this case.

The Court does not question Wagner's ***general qualifications*** to opine on industry practice among benefits committees.  Wagner founded and manages the Wagner Law Group, which is an employee-benefits law firm.  (*Id.* at 26:10–12 (Wagner).)  Prior to founding the Wagner Law Group, she led the employee-benefits practice at two law firms.  (*Id.* at 26:15–19.)  Wagner's experience has spanned the life cycle of plan administration.  (*Id.* at 27:10–13.)  However, the Court finds Wagner's testimony ***specific*** to this case to be unpersuasive for the following four reasons.

#### 1.    Generic, Conclusory Nature

First, the Court finds that the weight of Wagner's testimony is severely undermined by her failure to describe the purported industry practices against which she found the Committee's practices to be deficient.  Wagner simply offered the *ipse dixit* that the

---

[7] Because the Court finds that Plaintiffs have not proven a breach of fiduciary duty, the Court does not address causation and damages.  Accordingly, the Court does not here discuss the parties' damages experts: Martin Dirks and Lucy Allen.  Below, however, the Court does explain why it finds unpersuasive one of Dirks's opinions that Plaintiffs offer in support of their contention that the Committee imprudently monitored the Plan's investments.  (*Infra* section V.E.1 (not crediting Dirks's opinion about the Active Suite's glidepath).)

Committee's process was insufficient.[8]  For example, Wagner opined "that the IPS did not provide any effective or practical guidelines that the committee could utilize." (*Id.* at 49:9–14.)  Wagner never, however, described what industry practice is for the content of an IPS; nor does she identify any particular clauses or sections that she believed were either missing or inadequately drafted in the Plan's IPS.  As described more fully below, the IPS is, when taking into account its appendices, a twenty-page document that overviews the selection of funds, their monitoring, their removal, Captrust's advisory role to the Committee, and Captrust's scoring methodology.  (*Infra* section V.B.3.)  Measured against such a document, Wagner's *ipse dixit* testimony severely undermines her credibility.

### 2.    Unexplained Discarding of Countervailing Evidence

Second, the Court finds that the weight of Wagner's testimony is diminished by her no-true-Scotsman approach to evidence that ran counter to her proffered opinions.  Instead of acknowledging that certain evidence ran counter to her opinions, she dismissed that evidence as irrelevant.  For example, Wagner opined that "[t]here was no adequate training for the committee members at all."  (Day 1 Tr. at 34:15–16 (Wagner).)  With regard to fiduciary-duty litigation updates that Captrust routinely provided to the Committee at the start of each quarterly meeting, Wagner simply dismissed those updates without any explanation of why doing so would be appropriate: "[T]his was not fiduciary training."  (*Id.* at 34:21–22.)  Elsewhere, she again discards these updates without any explanation: "[I]t was, like, training light, if I can say that."  (*Id.* at 45:16–18.)

### 3.    Internally Inconsistent Opinions

Third, the Court finds that the weight of Wagner's testimony is undermined by its internally inconsistent nature.

For example, as mentioned above, Wagner opined that the Plan's IPS "did not

---

[8] Although Wagner occasionally used terminology in her direct examination that suggested she was offering legal conclusions, she clarified on cross-examination that her intent was to testify as to whether a practice "was typical" in the industry or "whether it's something that [she] ha[s] seen or something [she] would have advised."  (Day 1 Tr. at 76:18–77:4 (Wagner).)

provide any effective or practical guidelines that the committee could utilize." (*Id.* at 49:9–14; *see also infra* section V.B.3.)  However, she elsewhere categorically testified that the Committee failed to comply with the IPS.  (*Infra* section V.D.)  For example, Wagner was asked, "Did the committee follow the requirements of the IPS?"  To which she responded, "No.  No.  It routinely did not, in fact."  (Day 1 Tr. at 42:12–13 (Wagner).)  A necessary premise of Wagner's opinion that the Committee "routinely" violated the IPS is that the IPS's requirements can be discerned.  Wagner never explained how, at one point in her testimony, she could describe the IPS as vague and amorphous, while, at another point, she could allege the Committee's clear violation of the IPS's requirements.

To take another example, Wagner opined that it is inappropriate for a fiduciary to imbue a single consideration with a "formulaic" quality and she further opined that qualitative considerations are important in addition to quantitative ones when assessing an investment option's performance.  (*Id.* at 60:8–12, 96:24–97:11.)  But she elsewhere imbued the 3- and 5-year performance metrics with such a formulaic quality that she believed removal of a fund could be premised solely on those metrics.  (*See id.* at 56:14–16 ("[T]he three- and five-year performance criteria that were called out . . . as important on three specific occasions in the IPS itself . . . ."); *id.* at 59:17–19 ("So the IPS requires [evaluation of three- and five-year performance], three times for a reason . . . ."); *id.* at 55:22–25 (the scoring mechanism "seems to completely miss this three- and five-year rolling requirement on performance"); *id.* at 55:7–8 (the scoring system "did not provide the factors that were required by the IPS").

These unexplained internal inconsistencies suggest that Wagner's opinions were litigation-driven and not based on a considered application of her industry experience to the facts with which she was presented.

### 4.    Reliance on Only Limited Documents

Fourth, the Court finds that the weight of Wagner's testimony is undermined by the artificially limited world of documents on which she based her opinions.  Wagner's opinions as to the scope of the Committee's discussions were based only on the

1  Committee meetings' minutes.  Wagner contended that outside of the meeting minutes,

2  "[t]here was nothing to tell me what was discussed and what wasn't." (*Id.* at 105:23–24.)

3  The Court rejects this implausible factual contention.  Wagner herself conceded

4  that minute meetings "are not meant to be treatises." (*Id.* at 104:20–23.)  Moreover, the

5  Court finds that Mark Davis—the principal advisor to the Plan from Captrust—credibly

6  testified that the minutes "focus[ed] on changes to be implemented and responsibilities for

7  those changes." (Day 4 Tr., Doc. 215 at 794:5–7 (Davis); *see also* Day 1. Tr. at 123:23

8  (Brady) ("action items").)  And the Court finds that Davis and the Committee-member

9  witnesses credibly testified that the minutes—when considered in isolation—were under-

10  inclusive of what was discussed.  As such, the Court finds that the Captrust introductory

11  emails, presentations, and Quarterly Investment Reports ("QIRs") are reliable indications

12  of what was discussed at a particular Committee meeting.  (*See* Day 2 Tr., Doc. 213 at

13  276:7–22, 285:5–13, 359:9–17, 374:16–24 (Brady); *id.* at, 430:16–23 (Heather); Day 3

14  Tr., Doc. 214 at 524:4–12 (Heather); *id.* at 532:14–534:2 (Dhuper); *id.* at 594:23–595:3

15  (Gomez); Day 4 Tr. at 793:25–794:24, 880:8–13, 881:12–882:4 (Davis).)

16  * * *

17  The Court finds Wagner's testimony was conclusory, internally inconsistent, and

18  not credible in its factual assumptions and characterization of evidence.  Therefore, the

19  Court affords Wagner's testimony little to no weight.

20  **B.    Michael Geist**

21  Michael Geist is Plaintiffs' proffered expert on industry practice surrounding the

22  evaluation of recordkeeping fees.  The Court assumes without deciding that Geist's

23  testimony on this subject is admissible under Rule 702.  However, the Court finds as a

24  factual matter that Geist's proffered opinions are—like Wagner's—entitled to little to no

25  weight.  In particular, the Court finds that Geist has only minimal relevant industry

26  experience and that, like Wagner's, his testimony is undermined by its conclusory, *ipse*

27  *dixit* nature.

28  Geist is the current owner of Clear Sage Advisory Group, where he provides

retirement plan consulting services to plans.  (Day 3 Tr. at 601:23–602:18 (Geist).)  Since founding Clear Sage, he has conducted vendor-fee assessments for only about 10 clients.  (*Id.* at 647:25–649:25 (Geist).)  And Geist did not meaningfully describe any of the clients for whom he has performed work at Clear Sage, leaving the Court in the dark as to the industry, complexity, and size of those clients.

Prior to Clear Sage, Geist worked at T. Rowe Price for approximately 10 years.  (*Id.* at 602:19–602:14.)  There, Geist was involved in preparing new client pricing proposals for T. Rowe Price's recordkeeping division.  But to prepare these proposals, Geist simply inputted client information into a pricing model, developed by T. Rowe Price, and the model "would spit out a price from a contract."  (*Id.* at 643:8–18.)  Indeed, Geist candidly stated at trial: The "pricing model that is put in the hands of a sales person" like himself at the time "is made to be dummy proof."  (*Id.*)  Inputting numbers into a "dummy proof" model does not render Geist qualified to opine on the methods retirement plans commonly use to assess whether they are paying reasonable recordkeeping fees.

And while Geist's work at ClearSage Advisory Group is relevant, the Court finds that his experience there is amorphous (he never described his clients) and limited (he has performed vendor-fee assessments for only about 10 clients).  This limited relevant experience undermines the probative value of Geist's testimony.

Additionally, Geist's testimony suffered from the same *ipse dixit* flaw that Wagner's does.  Geist, again who has only limited relevant professional experience, rattled off several aspects of the Committee's process that allegedly departed from industry practice—several of which were hyper-specific:

- "It's well understood in the standard of care to know that soliciting proprietary bids is the conduct that is required";
- The Committee "failed to abide by the minimum standard of care" because "if you were going to require the competitors . . . to make presentations, you would also require the incumbent to make a presentation as well";
- Relying on pricing databases is "not consistent with the minimum standard of care

to achieve the best outcomes for plan participants";

- Had the Committee "followed the standard of care, they would have then gone back to Fidelity and Empower . . . and ask[ed] . . . what their fee rate would have be[en] if they were given the opportunity to manage account services"; and

- "[T]o conclude that a plan's fees" are reasonable if they are "are . . . around [the] average" paid by materially similar plans "is an erroneous conclusion in this industry";

- "It's the standard . . . to always evaluate fees for recordkeeping administration on a per participant basis";

- "[I]f a plan chooses to utilize an asset-based fee structure with the record keeper, then the fiduciaries are required to evaluate the impact of that asset-based fee structure on a much more regular basis."

(*Id.* at 612:8–10, 615:11–15, 615:20–616:4, 621:5–8, 622:17–20.)

Though Geist hinted that he relied on more than his limited experience when formulating these opinions, he never explained what that information was.  (*See id.* at 641:16–18 ("Q.  Mr. Geist, you relied on your professional experience in the retirement industry in delivering the opinions you just gave; is that right?  A.  I wouldn't limit it to that necessarily, but, of course, yes.").)  Geist's failure to articulate the basis for his opinions severely undermines the probative value of his testimony—particularly his more counter-intuitive opinions.  For example, if ERISA requires fiduciaries to act with the prudence of a "a [person] acting in a like capacity," 29 U.S.C. § 1104(a)(1)(B), it is unclear why—as Geist opines—it is erroneous to equate the average fee paid by similar plans with a substantively reasonable fee.  (*See* Day 3 Tr. at 621:2–8 (Geist).)  Geist's unexplained and sometimes counter-intuitive opinions read more like a list of quibbles with the Committee's process than well-founded opinions on industry practice.

This brings the Court to a more fundamental flaw in Geist's testimony: He appears to misunderstand both ERISA's requirements and his role as a proffered expert witness in an ERISA case.  First, Geist's testimony reflects that he believes ERISA requires

1    fiduciaries to have pursued the best possible course of action at every turn—as judged in

2    hindsight.  This understanding was stated explicitly in one of his opinions:  "[T]hat's not

3    consistent with the minimum standard of care to achieve the *best outcomes* for plan

4    participants."  (*Id.* at 616:15–16 (emphasis added); *see also id.* at 635:19  (equating "the

5    best practice and the minimum standard of care").)  But the Supreme Court has instructed

6    that courts are to give "due regard to *the range of reasonable judgments* a fiduciary may

7    make based on her experience and expertise."  *Hughes*, 595 U.S. at 177 (emphasis added).

8    Second, Geist's testimony was repeatedly framed in terms of the legal question of what

9    the standard of care is—not the factual question of what processes are commonly

10   followed in the retirement-benefits industry.  But "an expert witness cannot give an

11   opinion as to [a] legal conclusion, i.e., an opinion on an ultimate issue of law."  *United*

12   *States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017) (emphasis omitted) (cleaned up).

13                                           * * *

14        Geist has only minimal industry experience, his opinions were conclusory, his

15   testimony reflects a misunderstanding of his role as a proffered industry-practice expert,

16   and he left unexplained what sources he drew from other than his own minimal

17   experience.  Therefore, the Court affords Geist's testimony little to no weight.

18        **C.    Steven Gissiner**

19        The Court concludes that, pursuant to Rule 702 and *Daubert*, Defendants'

20   proffered process expert, Steven Gissiner, can offer an expert opinion regarding the

21   process commonly used in the retirement-benefits industry to monitor a fund's

22   investments, recordkeeping fees, and share classes.  Moreover, given his substantial

23   experience in the retirement-benefits industry, his work with plans similar to Prime's, and

24   his reliance on formal research, the Court finds his testimony to be highly probative.

25        The Court finds that Gissiner has broad, longstanding, and substantial experience

26   in the retirement-benefits industry.  Gissiner has worked in industry for about 43 years.

27   (Day 4 Tr. at 958:13–15 (Gissiner).)  He currently owns Orchard Hills Consulting, LLC

28   ("Orchard Hills"), where he has worked for approximately 20 years.  (*Id.* at 958:18–22.)

At Orchard Hills, Gissiner provides retirement plan consulting services to clients, including advising on investments, conducting recordkeeping-fee assessments, and providing recordkeeping consulting. (*Id.* at 958:23–959:4.) Gissiner has approximately 30 recurring clients at Orchard Hills, and "another ten or so" non-recurring clients where he provides services based on need. (*Id.* at 959:5–9.) Prior to Orchard Hills, Gissiner worked at a compensation and retirement-plan consulting firm, Clark Bardis; was a Partner in the Human Capital Practice at Arthur Anderson; and managed PriceWaterhouseCoopers' defined-contribution-retirement-plan and benefits-outsourcing practices. (*Id.* at 959:10–960:14.) Over the course of his career, Gissiner has provided consulting services to ***thousands*** of retirement plans. (*Id.* at 960:15–22.)

The Court further finds that Gissiner has experience assisting clients similar to Prime. At Orchard Hills, Gissiner's retirement-plan clients had assets ranging from less than $5,000,000 to over $10,000,000,000 and participants ranging from less than 100 participants to over 50,000 participants. (*Id.* at 960:23–961:3.) Gissiner's clients include healthcare organizations, including Memorial Herman, Scripps Health, Orlando Health, the Moffit Cancer Center of Tampa, Tallahassee Memorial Hospital, Lakeland Regional Medical Center, and Riverside Hospital. (*Id.* at 961:11–24.) Gissiner has worked with multiple employer plans like Prime's Plan. (*Id.* at 961:25–962:10.) And Gissiner has experience advising retirement plans for companies that, like Prime, acquired other entities and merged those entities and their retirement plans into an existing plan. (*Id.* at 964:21–24.) Finally, Gissiner supplemented his substantial industry experience by citing outside sources—most notably, a 2017 survey of retirement plans inquiring into how they assessed the reasonableness of their recordkeeping fees. (*Id.* at 1045:13–1046:13.)

Given Gissiner's broad experience in the retirement-benefits industry, his specific experience specific working with clients similar to Prime, and his reliance on formal research into industry practice, the Court finds Gissiner's testimony to be highly probative of common industry practice when it comes to managing the investments, recordkeeping fees, and share classes of a Plan similar in size and nature to that of Prime.

1
2

## V.     CLAIM 1: THE COMMITTEE'S ALLEGED FAILURE TO PRUDENTLY MONITOR THE PLAN'S INVESTMENTS

3        The Court concludes that the Committee prudently selected, monitored, and

4    retained the Challenged Funds.  *See Wright*, 360 F.3d at 1097 (holding that the "court's

5    task" is to determine whether the fiduciaries "employed the appropriate methods to

6    investigate the merits of the [challenged] investment").  The Court finds that Plaintiffs

7    presented no credible evidence showing that the Committee's investment-monitoring

8    process fell below common industry practice.  Moreover, the Court finds that Plaintiffs

9    failed to otherwise prove that the Committee's investment-monitoring process lacked the

10   "the care, skill, prudence, and diligence under the circumstances then prevailing that a

11   [person] acting in a like capacity and familiar with such matters would use in the conduct

12   of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).  The

13   Court offers a high-level review of  the Committee's general process and composition

14   before turning to the specific flaws that Plaintiffs contend were present in that process.

15       **A.     Factual Findings Regarding the Committee's Process and Composition**

16       The Committee generally met quarterly during the Class Period to review the

17   investments in the Plan, review administrative topics related to the Plan, review

18   recordkeeping for the Plan, and discuss other relevant Plan-related topics.  (*See* Stipulated

19   Facts App. ¶ 42; Day 1 Tr. at 119:7–10, 123:3–8, 145:3–8, 161:14–163:1, 179:4–10,

20   201:17–25, 204:6–208:2, 221:16–222:5 (Brady); Day 2 Tr. at 277:24–278:18, 279:10–

21   280:1, 289:3–290:7, 293:24–295:21, 302:21–303:12, 306:18–308:17, 309:13–312:7,

22   313:25–315:3, 318:19–319:22, 320:24–321:25, 373:25–374:4 (Brady); *id.* at 421:11–

23   422:8, 425:6–426:24, 442:11–443:20, 446:4–447:13 (Heather); Day 3 Tr. at 530:5–11

24   (Dhuper); *id.* at 598:21–599:1 (Gomez); Day 4 Tr. at 789:6–12 (Davis).)

25       The Committee members and representatives from Captrust and Transamerica

26   generally attended every Committee meeting during the Class Period.  (*See* Stipulated

27   Facts App. ¶¶ 42–115.)  The Committee generally met for about an hour.  (Day 2 Tr. at

28   374:3–4 (Brady)), and the Committee was composed of the following members:

- **Jamie Gomez:** Gomez is the Human Resources Benefits Manager for Prime and has served on the Committee since 2005 (Stipulated Facts App. ¶¶ 5–6);

- **Arti Dhuper:** Dhuper is Prime's Vice President of Human Resources and has served on the Committee since 2012 (*id.* ¶¶ 7–8);

- **Mike Heather:** Heather was Prime's Chief Financial Officer ("CFO") and served on the Committee from 2013 to 2020 (*id.* ¶¶ 9–10);

- **Steve Aleman:** Aleman was Heather's successor as CFO and has served on the Committee since 2020 (*id.* ¶¶ 11–12);

- **Michael Bogert:** Bogert was Prime's Hospital System CFO and President of Corporate Finance and served on the Committee from 2008 to 2020 (*id.* ¶¶ 13–14);

- **Mike Sarian:** Sarian was Prime's President of Hospital Operations and served on the Committee from 2012 to 2020 (*id.* ¶¶ 15–16);

- **Owen Shen:** Shen was Prime's Corporate Controller and Director of Finance and served on the Committee from 2015 to 2020 (*id.* ¶¶ 17–18); and

- **Brian Brady:** Brady was Prime's Director of Investments and served on the Committee from 2016 to 2023 (*id.* ¶¶ 19–20).

While Dhuper and Gomez—HR professionals—were more involved in the "administrative" aspects of the Plan (*e.g.*, recordkeeping), Brady and Heather—each of whom has a finance background—were more involved on the "investment side." (Day 4 Tr. at 937:14–20 (Davis).[9]

Captrust assisted the Committee with its monitoring of the Plan's investments. (Stipulated Facts App. ¶¶ 37–40.) Captrust has provided services to at least 48 defined contribution Plans that have over $500,000,000 in total assets. (Day 5 Tr. at 1021:14–19 (Gissiner).) Davis, a former Senior Vice President at Captrust, served as the principal Captrust representative for the Plan and attended Committee meetings. (*See* Stipulated

---

[9] Plaintiffs' expert, Wagner, testified that "it's a very good thing" to have an "investment officer as a Committee member." (Day 1 Tr. at 101:18–23 (Wagner).) And she agreed that "it's also good to include people from finance, HR, and . . . benefits." (*Id.* at 101:24–102:3.)

Facts App.  ¶¶ 37–110.)

The Court finds that Davis has substantial experience in the retirement-benefits industry.  At Captrust, Davis advised plan sponsors of retirement plans and fiduciaries responsible for operating retirement plans.  In this role, he helped clients understand their alternatives in terms of recordkeeping administrators and recordkeeping fees and costs; assisted clients in the selection, monitoring, and replacement of investments; provided fiduciary training; and generally provided data to clients to assist with their fiduciary responsibilities.  (Day 4 Tr. at 782:14–783:3 (Davis).).  Davis was responsible for more than 40 separate client relationships, which consisted of approximately 60 to 70 retirement plans.  (*Id.* at 785:6–10.)  Davis credibly testified that Captrust differentiates itself from its competitors by meeting "face to face" with the investment managers that their clients use.  (*Id.* at 791:10–792:4; *see also* Ex. 2016 Q3 Presentation, Ex. 256 at 32–34 ("Captrust's research team visited Fidelity's headquarters in Boston . . . .").)

Davis began working in the financial services industry in 1991 with Fidelity, where he provided employee education training and printed materials for plan sponsors that hired Fidelity.  (*Id.* at 783:9–19.)  Thereafter, Davis joined Charles Schwab where he worked on various mutual funds.  And after Charles Schwab, Davis created his own independent advisory firm before eventually joining Captrust.  (*Id.* at 783:20–24.)

Davis, or other Captrust representatives, emailed the Committee members in advance of each quarterly Committee meeting and provided them with Quarterly Investment Reports ("QIRs").  (*See* Tr. Exs. 555–556, 560, 566, 572, 574, 577, 580, 583, 589, 591, 598, 607, 615, 617, 620, 626, 627, 633, 636, 642, 653, 658, 662, 671, 675, 682, 688 (Captrust emails); Exs. 6–7, 9, 13, 21, 60–62, 79, 246–254, 256–259, 261–281, and 716–724 (Captrust QIRs).)  The Court finds that the QIRs contained detailed information regarding the market, updates for the Committee regarding their fiduciary duties, the total Plan assets in each fund in the Plan, the scores under Captrust's scoring system for each fund in the Plan, and detailed commentary regarding each fund in the Plan.  (*See* Exs. 7, 9, 60–62, 246–254, 256–259, 261–281.)

Finally, the Court credits Davis's testimony that the Committee's engagement at meetings was "higher" than most Captrust clients, and the Committee "was more involved than a typical client would be."  (Day 4. Tr. at 796:11–15 (Davis).)

\* \* \*

To summarize, the Court finds that the Committee met quarterly; was composed of well-qualified individuals with diverse professional backgrounds, including multiple individuals with financial and/or investment experience; received and reviewed substantial amounts of information from Captrust, a well-qualified advisor; and actively engaged with the material Captrust presented.  The Court now turns to the procedural deficiencies that Plaintiffs assert and find that they—whether viewed individually or collectively—do not rise to the level of a breach of the fiduciary duty of prudence.

### B.  Allegedly Inadequate Fiduciary-Governance Structure

Plaintiffs' first theory of liability is that "Defendants' fiduciary governance structure" was inadequate.  (Pls.' Proposed COLs ¶ 64.)  By this, Plaintiffs refer to three aspects of the Committee's process: (1) the Committee's alleged lack of training; (2) the Committee's pre-2019 lack of a written charter; and (3) the Committee's allegedly amorphous Investment Policy Statement ("IPS").  (*See id.* ¶ 64.)

The Court concludes that Plaintiffs selected, monitored, and retained the Plan's investments pursuant to a prudent fiduciary-governance structure.  As to each challenged aspect of Defendants' fiduciary-governance structure, Plaintiffs rely on the testimony of their proffered process expert, Wagner, regarding putative industry practice.  However, the Court finds that there is no credible evidence in the record showing (1) that the training the Committee received fell below industry practice; (2) that having a written charter is common industry practice; or (3) that the IPS's contents fell below industry standards for specificity.  Moreover, the Court concludes that Plaintiffs failed to otherwise show that Defendants' fiduciary-governance structure was imprudent.

### 1.  Alleged Lack of Training

The Court concludes that Defendants received a prudent level of training.

1    Plaintiffs' contention is based on the testimony of their process expert, Wagner, who

2    contended that, based on her review of meeting minutes, formal fiduciary training "was

3    minimal and sporadic." (Day 1 Tr. at 45:1 (Wagner).) However, as explained, the Court

4    finds that Wagner's testimony in general (*supra* section IV.A) and her testimony on this

5    specific subject (*supra* section IV.A.2) has no probative value. Moreover, the record

6    refutes her contention that the Committee received only "minimal and sporadic" training.

7         The Court finds that the Committee received regular fiduciary updates as part of

8    their quarterly Committee meetings. (Day 1 Tr. at 202:24–203:10, 204:19–205:8 (Brady);

9    Day 2 Tr. at 393:18–393:22, 443:21–444:24 (Heather); Day 4 Tr. at 782:23–783:1,

10   789:18–22 (Davis); *see also* Ex. 9 at 15; Ex. 60 at 15–17; Ex. 246 at 50–61; Ex. 248 at

11   10–11; Ex. 250 at 10; Ex. 251 at 13–15; Ex. 252 at 10–14; Ex. 253 at 15–16; Ex. 254 at

12   13–19; Ex. 256 4–7l Ex. 257 at 7; Ex. 258 at 4–7; Ex. 259 at 4–8; Ex. 261 at 4–7; Ex. 262

13   at 7–9; Ex. 263 at 4–6; Ex. 264 at 4–6; Ex. 265 at 6; Ex. 266 at 4–5; Ex. 267 at 4–7; Ex.

14   268 at 4–7; Ex. 269 at 5; Ex. 270 at 4–8; Ex. 271 at 5–9; Ex. 272 at 4–6; Ex. 273 at 6–7;

15   Ex. 275 at 4–8; Ex. 276 at 4–7; Ex. 277 at 4–10; Ex. 278 at 4–8l; Ex. 279 at 4–5; Ex. 280

16   at 4–8; Ex. 281 at 4–11.) The Court further finds that Captrust routinely flagged these

17   fiduciary-training sections in the QIRs for the Committee in the emails that preceded the

18   Committee meetings. (*See* Ex. 555 at 1–2; Ex. 566 at 1–2; Ex. 572 at 1; Ex. 574 at 1; Ex.

19   577 at 1–2; Ex. 580 at 1; Ex. 583 at 1; Ex. 589 at 2; Ex. 591 at 1–2; Ex. 595 at 2; Ex. 607

20   at 1; Ex. 615 at 1–2; Ex. 617 at 2; Ex. 620 at 2; Ex. 626 at 1; Ex. 627 at 1; Ex. 633 at 1;

21   Ex. 636 at 2; Ex. 642 at 2; Ex. 653 at 1; Ex. 658 at 1; Ex. 662 at  1; Ex. 671 at 2–3; Ex.

22   675 at 2; Ex. 682 at 2; Ex. 688 at 2.) And as the Court previously found, Wagner provides

23   no explanation for her counter-intuitive proposition that the fiduciary-duty updates that

24   regularly formed part of Captrust's QIRs and presentations are somehow not fiduciary

25   training. (*Supra* section IV.A.2.) Nor does anything else in the record support that

26   proposition. Therefore, the Court finds that the Committee received regular and

27   substantive training on their fiduciary duties.

28

### 2. Pre-2019 Lack of a Written Charter

The Court concludes that Plaintiffs have not proven that the Committee's pre-2019 lack of a written charter was imprudent.

Plaintiffs' contention is again based on Wagner's testimony. As discussed, the Court finds that Wagner's testimony in this case is deserving of little to no weight. (*Supra* section IV.A.) Moreover, the Court finds that Wagner's testimony on this specific subject was thoroughly undermined on cross-examination. She testified on direct examination: "Without a[] charter . . . that tells [the Committee members] what to do and how to accomplish their roles and responsibilities, they really didn't know what to do . . . ." (Day 1 Tr. at 42:23–43:1 (Wagner).) However, on cross-examination, Wagner agreed that "[n]ot all plans have charters," and she further admitted that she did not "even know what percentage of plans actually do have charters." (*Id*. at 101:10–14.) Moreover, Gissiner—Defendants' process expert whose testimony the Court finds to be highly probative given his substantial industry experience—testified that it is not a "universal industry practice" to have a written charter. (Day 5 Tr. at 1016:15–17; *supra* section IV.C.). Without any evidence of the prevalence of written charters, the Court cannot conclude it is industry practice to have one. [10] Moreover, there is no other evidence in the record supporting the proposition that a reasonably diligent person "acting in a like capacity" would have adopted a written charter for the Plan. 29 U.S.C. § 1104(a)(1)(B).

### 3. Allegedly Amorphous IPS

The Court concludes that Defendants selected, monitored, and retained the Plan's funds pursuant to a prudent IPS. Plaintiffs' criticism of the IPS is based on the testimony of their process expert, Wagner, who opined that "[t]here was no practical, no effective

---

[10] The Court's conclusion is not meant to suggest that plaintiffs must produce empirical evidence to support their contention that something is industry practice. On cross-examination, Wagner was asked whether she knew of any studies on the commonality of written charters—to which she responded, no. Nowhere did she testify on direct or cross-examination as to what quantum of Plans (some, most, all) she believed have written charters. And Plaintiffs elected not to conduct any re-direct examination of Wagner.

1    guidelines that were provided to the committee in the IPS itself."  (Day 1 Tr. at 35:21–22

2    (Wagner); *see also id.* at 49:12–14 ("[T]he IPS did not provide any effective or practical

3    guidelines that the [C]ommittee could utilize.").)  However, as explained above, the Court

4    finds that Wagner's testimony in general (*supra* section IV.A) and her testimony on this

5    specific subject (*supra* sections IV.A.1, IV.A.3) is conclusory, internally inconsistent, and

6    entitled to essentially no weight.  Moreover, the Court finds that a review of the IPS itself

7    shows that it provides the Committee members with guidance on how to select, monitor,

8    and remove funds from the Plan.  (*See* IPS, Ex. 3 at 4 ("[T]he IPS[] . . . [1] establishes a

9    prudent process for selecting appropriate investment options . . . ; [2] [e]stablishes a

10    prudent process by which selected investment options generally will be monitored for

11    compliance with this IPS; and [3] [d]evelops methods for . . . replacing existing

12    investment options that do not comply with the terms of the IPS.").[11])

13        **Selection.**  In a section entitled "Investment Selection," the IPS states that the

14    "following screening criteria will be among those applied to the available actively

15    managed options": (1) Fees, (2) Style Consistency, (3) Volatility and Diversification, (4)

16    Performance, (5) Management and Organization, and (6) Additional Factors.  (IPS at 7.)

17    The IPS then explains each of these factors in further detail.  For example, the IPS

18    explains the third factor—Volatility and Diversification—as follows:

19
20            Unless chosen to deliver investment performance that is
            characteristic of a specific industry or sector of the investment
21            spectrum, investment options generally will be broadly
            diversified portfolios and will avoid unreasonable
22            overweighing in a given investment, industry or sector.
            Volatility, as measured by Standard Deviation of returns,
23            should be within reasonable ranges for the given peer group.
            Other risk measures including Sharpe ratio, information ratio
24            and beta, may be used as well.
25

26    ───────────────

27    [11] This trial exhibit is the 2013 IPS.  (*See id.*)  Although there are two other versions of the IPS
     admitted into evidence, for the sake of convenience, the Court cites only the 2013 IPS, as Wagner
     testified that there are no "material differences between" the three versions of the Plan's IPS.
28    (Day 1 Tr. at 42:6–10 (Wagner); *see also id.* at 211:5–19 (Davis).)

(*Id.* at 6.)  As to the fourth factor—Performance—the IPS explains:

> With few exceptions, all actively managed investment options should rank in the top 50% of their given peer group for the 3 or 5 year annualized period at the time of their selection.  While past performance is not indicative of future returns, peer-relative performance offers the Committee perspective on how the investment has performed over a reasonably demonstrative period of time relative to other choices.  In addition to performance, the Committee should consider other variables . . . in order to develop a holistic view about a strategy and its appropriateness within the Plan.

(*Id.* at 6.)

**Monitoring.**  In a section entitled "Investment Evaluation," the IPS provides that "the Committee will monitor the investment options made available within the Plan to ensure they remain compliant with the criteria used to initially select them for inclusion in the Plan under this IPS or such other or additional criteria as appropriate."  (*Id.* at 6.)  The IPS further provides that, "[a]s part of that process, the Committee may consider the ranking of investment options relative to their peers using a comprehensive Scoring System proprietary to the Investment Consultant/Advisor" and cites three appendices to the IPS overviewing that Scoring System.  (*Id.* at 6–7.)  The IPS also "outline[s] . . . the evaluation process":

> - On a quarterly basis, the Plan's Investment Consultant/Advisor will provide the Committee with a comprehensive report of each investment option's relevant performance and relative rankings against appropriate indexes, and within appropriate peer groups.  The investment Consultant/Advisor will review the report with the Committee at least annually, but generally on a quarterly basis.
>
> - The investment Consultant/Advisor will also communicate with the Committee on an ad hoc basis, as appropriate, concerning any material changes affecting any of the selected investment options.  Material changes may include management changes, changes to the

investment option's pricing structure or significant changes in the investment option's fundamental policies and procedures that the Investment Consultant/Advisor feels warrant Committee review.

- The Committee normally will meet with the Investment Consultant/Advisor, at least annually, to evaluate each investment option as well as the overall status of the Plan's Investment Policy Statement.

- If the Investment Consultant/Advisor's proprietary Scoring System indicates that a given investment option may no longer meet the appropriate and reasonable standards required to remain included in the Plan's menu, the Committee will take appropriate steps.

(*Id.* at 7.)

**Removal.** In a section entitled "Replacement of Selected Investment Options," the IPS states: "Since the intention of the Plan is to provide opportunities for long-term asset accumulation for participants and beneficiaries, it is not expected that either the investment universe or specific investment options will be changed or deleted frequently." (*Id.*) The IPS then cautions: "It is possible that changes may become desirable or necessary, however, based upon factors such as[] . . . [t]he need to replace or eliminate one of the Plan's investment options after noncompliance with the IPS has been established, or appears likely." (*Id.* at 8.)

**Captrust's Role.** The IPS provides that Captrust would be responsible for, among other things, "[e]ducating the Committee on issues concerning the selection of investment options for the Plan," "[a]ssisting in the analysis and initial selection of investment options made available for participant investment," [a]ssisting the Committee with the on-going review of the investment universe made available within the Plan's chosen administrative environment, and "[a]ssisting the Committee with the review of the performance of the selected investment options." (*Id.* at 4–5.)

**Captrust's Scoring System.** The IPS provides a scoring system for evaluating

actively managed funds "relative to their peers using a comprehensive scoring system proprietary to [Captrust]." (*Id.*)  The IPS emphasizes that the "scoring system is designed to serve as a guide and an aid to the Committee when evaluating investment options, providing a baseline for measurement and discussion" and that "[t]he scoring system is not intended to trigger an automatic and mandated fiduciary outcome or decision for a given score." (*Id.* at 11 (emphasis omitted).)

The scoring system for actively managed options measured "eight (8) quantitative areas and two (2) qualitative ones." (*Id.* at 11.)  The quantitative measurements include Risk Adjusted Performance on a 3- and 5-year basis, Performance versus Peer Groups on a 3- and 5-year basis, Style Attribution on a 3- and 5-year basis, and Confidence on a 3- and 5-year basis. (*Id.*)  The qualitative measurements included Management Team and Investment Family Items. (*Id.*)  The IPS details the points that an investment can attain for each measurement and explains the bases for how points are awarded for each measurement.  Funds that receive a total score of 80 or above are in "Good Standing"; funds that receive a score between 70 and 79 are "Marked for Review"; and funds that receive a score of 69 or below are "Consider[ed] for Termination." (*Id.* at 11–12.)

For target date funds ("TDFs"), the IPS explains that "the principles behind target date evaluation mirror those of the scoring system for traditional options, [however] target date investments are much more complex due to the shifting nature of the portfolios through time, and therefore require a more complex scoring framework." (*Id.* at 16.)  To that end, the IPS provides separate measurements for evaluating TDFs, which includes performance (20 points), glidepath risk (10 points), regression to global equity index (10 points), portfolio construction (15 points), underlying investment vehicles (15 points), management team (25 points), and the fund's firm (5 points). (*Id.* at 16–19.)

***Gissiner's Testimon**y*.  In addition to the Court's own review of the IPS, the Court credits Gissiner's testimony that the Committee's IPS is "very similar to others that [he has] seen." (Day 5 Tr. at 1015:14–22 (Gissiner).).

* * *

The Court finds that the IPS provides appropriate and reasonable guidance to the Committee on the selection, monitoring, and replacement of investment options and delineates the respective roles and responsibilities of the Committee and Captrust.

### C.    Alleged Insufficient Documentation

Plaintiffs next contend that the Committee "insufficiently documented its decision-making process," which allegedly "resulted in a 'check the box' exercise" that fell below what the ERISA-imposed duty of prudence requires. (Pls.' Proposed COLs ¶ 65.)

Though the parties discuss the factual issue of whether the Committee's recordkeeping complied with industry standards, the parties do not provide any legal authority for the proposition that procedural prudence contains a recordkeeping element. Here, the Court assumes without deciding that recordkeeping defects can fall under procedural prudence's rubric, but finds that the Committee adequately documented its decision-making process. Plaintiffs' contention to the contrary is based on Wagner's opinion, which in turn is based on her view that the meeting minutes—and ***not*** Captrust's emails, QIRs, and presentations—are the only relevant documentation of the Committee's process. As explained, the Court finds that there is no sound reason to adopt Wagner's myopic view of what constitutes relevant documentation. (*Supra* section IV.A.4.) Moreover, the Court credits Gissiner's testimony that the Committee's documentation— consisting of the meeting minutes and incorporated materials—was "[p]retty consistent" with his experience with other retirement plans and "typical" of similar plans. (Day 5 Tr. at 1019:22–1020:3 (Gissiner).). Accordingly, the Committee's recordkeeping met industry standards, and Plaintiffs introduced no other evidence showing that the Committee's recordkeeping lacked "the care, skill, prudence, and diligence under the circumstances then prevailing that a [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

### D.   Alleged Failure to Comply with the IPS

Plaintiffs contend that the Committee violated the IPS by retaining certain investments that were favorably rated by Captrust's scoring system but which were allegedly required to be removed by the IPS.  (Pls.' Proposed COLs. ¶ 67.)[12]  This contention is based on the testimony of Plaintiffs' process expert, Wagner.  In her view, Captrust's scoring methodology was "inconsistent with the IPS" and the Committee acted imprudently by using that scoring methodology to assess investment options.  (Day 1. Tr. at 56:10–13 (Wagner); *see also id.* at 42:12–13 ("Q.  Did the committee follow the requirements of the IPS?  A.  No.  No.  It routinely did not, in fact.").)  In particular, Wagner reads the 3- and 5-year performance metrics specified in the IPS to be standalone, categorical requirements—that once an investment falls in the bottom-half of its peer ranking for either of those lookback periods, the investment must be removed.  (*See id.* at 56:14–16 ("[T]he three- and five-year performance criteria . . . were called out . . . as important on three specific occasions in the IPS itself . . . ."); *id.* at 59:17–19 (the IPS references these metrics "three times for a reason"); *id.* at 55:22–25 (the scoring mechanism "seems to completely miss this three- and five-year rolling requirement on performance"); *id.* at 55:7–8 (the scoring system "did not provide the factors that were required by the IPS").

### 1.   Legal Standard

Plan fiduciaries are required to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA]."  29 U.S.C. § 1104(a)(1)(D).  This includes a plan's IPS.  *See Lauderdale*, 2022 WL 17260510, at *10 (citing *Cal. Ironworkers Pen. Tr. v. Loomis Sayles & Co.*, 259 F.3d 1036, 1042 (9th Cir. 2001)); *Baird v. BlackRock Inst. Tr. Co., N.A.*, 2021 WL 105619, at *2 (C.D. Cal. Jan. 12, 2021).

---

[12] The Court addresses this contention out of order because Plaintiffs' contention regarding the Committee's alleged reflexive deference to Captrust is premised on the Court accepting their interpretation of the IPS.  (*See* Pls.' Proposed COLs ¶ 66.)

1

2.    **Factual Findings**

2         The Court concludes that Plaintiffs and Wagner's reading of the IPS is, frankly,

3    non-sensical and belied by the record.  The Court, therefore, finds that the Committee

4    complied with the IPS.  Given this factual finding, the Court concludes that the

5    Committee acted "in accordance with the documents and instruments governing the plan

6    insofar as such documents and instruments are consistent with [ERISA]."  29 U.S.C.

7    § 1104(a)(1)(D).

8         First, the Captrust scoring system cannot be "inconsistent with the IPS" because

9    that scoring system is itself *part* of the IPS.  The IPS expressly provides that the

10   Committee will evaluate investment options' performance "relative to their peers using a

11   comprehensive *scoring system proprietary to [Captrust]*."  (IPS at 6–7 (emphasis added).)

12   The IPS then explains that scoring system's mechanics in details—breaking it down by

13   investment type.  (*See supra* section 11–13.)

14        Second, the IPS contemplates that its provisions are "guidelines" and that "[t]here

15   may be specific circumstances that the Fiduciary determines warrant a departure from the

16   guidelines contained herein."  (IPS at 1.)

17        Third, even if the Court were to look only at the investment-selection section of the

18   IPS in which the 3- and 5-year performance consideration is laid out, that consideration is

19   just one of 5 considerations the IPS requires the Committee to consider.  (*See id.* at 5–6.)

20        Fourth, the 3- and 5-year performance metrics contemplate that they are not be-all,

21   end-all metrics: "In addition to performance, the Committee should consider other

22   variables . . . in order to develop a holistic view about a strategy and its appropriateness

23   within the Plan."  (*Id.* at 6.)

24        Fifth, the removal-specific section of the IPS contemplates that investment options

25   should not "be changed or deleted frequently."  (*Id.* at 7.)  That would not be possible if,

26   as Plaintiffs contend, an investment option was required to be removed as soon as it fell in

27   the bottom half of its peer group for either the 3- or 5-year lookback period.

28        Sixth, Wagner elsewhere criticized the Committee for allegedly imbuing the

1   Captrust scoring system with a "formulaic" quality that replaced its "own independent

2   judgment to determine how best to proceed." (Day 1 Tr. at 60:8–12 (Wagner).) And

3   Wagner elsewhere testified that qualitative considerations "are important" and "matter[]"

4   when reviewing an investment in a retirement plan, noting that "it's extremely important

5   to know about the management team." (*Id.* at 96:24–97:11.) But Wagner would have the

6   Court believe that the IPS imbues the 3- and 5-year performance consideration with that

7   exact same "formulaic" quality. Indeed, to the extent that Plaintiffs' reading of the IPS

8   were correct and required blind adherence to a single consideration to the exclusion of all

9   other relevant information, such an IPS would likely violate ERISA and would not be

10  binding under 29 U.S.C. § 1104(a)(1)(D), which requires adherence to Plan documents

11  only "insofar as such documents . . . are consistent with [ERISA]."

12       **E.**    **Alleged Reflexive Deference to Captrust**

13      Plaintiffs next contend that the Committee reflexively deferred to Captrust when it

14  came to monitoring the Plan's investment options. (Pls.' Proposed COLs ¶ 66.) For

15  several reasons, the Court finds as a factual matter that the Committee did not reflexively

16  defer to Captrust.

17      First, Plaintiffs' contention depends in large part on the testimony of Wagner that,

18  based on the materials she reviewed, the Committee "did nothing, from what [she] can

19  tell, to check or to probe or to inquire with respect to Captrust's giving [of] favorable

20  ratings to the challenged funds." (Day 1 Tr. at 38:23–25 (Wagner); *see also id.* at 46:22–

21  24 ("[The Committee] really just passively relied on Captrust in that respect[] . . . .").)

22  But, as explained, the Court does not find Wagner's testimony on what the Committee did

23  and did not do to be probative because she focused on the meeting minutes as the only

24  evidence of what the Committee discussed. (*Supra* section IV.A.4.)

25      Second, this claim requires the Court to accept Plaintiffs' reading of the IPS, which

26  it squarely rejected above. (*Supra* section V.D.) Indeed, Plaintiffs expressly tie this

27

28

1  contention to that rejected reading of the IPS:

> [E]ach of the Challenged Funds underwent prolonged and substantial periods of **underperformance under the criteria established by the Plan's IPS** and the Committee failed to analyze the continuing prudence of retaining the Challenged Funds.  Indeed, despite reserving for itself the duty to make all decisions regarding the Plan including its investment alternatives and ratifying an IPS that provided specific evaluative criteria, Defendants effectively abdicated their monitoring role to the **Captrust scoring system** . . . .

(*Id.* (emphasis added).)

Third, the Court finds that the Committee—with the assistance of Captrust—closely monitored the Challenged Funds.  Below, the Court describes the Committee's monitoring of each of the Challenged Funds.

### 1.    Active Suite

The Court finds that the Committee closely monitored the Active Suite.  The Active Suite was the Plan's qualified default investment alternative ("QDIA") while it was in the Plan and, as such, the Committee paid especially close attention to the performance of the Active Suite, the amount of Plan participant money invested in the Active Suite, and any changes to the Active Suite that would affect its performance.  (*See* Day 1 Tr. at 218:13–219:17 (Brady); Day 2 Tr. at 311:20–312:3, 450:5–451:5, 453:2–454:4 (Heather); Day 3 Tr. at 497:1–14, 502:7–12 (Heather).)

At each Committee meeting, the Committee monitored the portion of Plan participants' assets that were invested in each fund, including the Active Suite, and there was a separate line in each Captrust QIR showing the amount of Plan participants' assets specifically invested in the Plan's QDIA (the Active Suite).  (*See*, *e.g.*, 2013 Q3 Presentation, Ex. 246 at 15–16.)  Consider, for example, the Committee's 2012 Q3 meeting as just one example (of many) of specific discussions the Committee had regarding the Active Suite.  At the time, the Active Suite received a score of 80 ("Good Standing"), but the "Fund Management" measurement was nevertheless "Marked for

-31-

1   Review" by Captrust's scoring system.  (2013 Q3 Presentation at 20.)  Fidelity had

2   announced upcoming changes to the Active Suite, including a change in fund managers

3   with the addition of new managers who had a strong track record of performance, and

4   changes to the fund's glidepath.  Captrust informed the Committee that they believed

5   these changes were "well-researched and thoughtful, however, clients should re-evaluate

6   the appropriateness of this series for their participant base," a discussion that Committee

7   member Heather credibly testified to at trial.  (*Id.* at 22; Day 2 Tr. at 453:2–457:21

8   (Heather).)

9          Additionally, the Court finds that the Committee appropriately discussed and

10  analyzed the benchmarks Captrust used for the Active Suite.  Brady credibly testified

11  specifically that, using his background as a former investment advisor, he "often looked at

12  the benchmarks to make sure that [he] agreed" with the benchmarks Captrust used in their

13  analyses.  (Day 1. Tr. at 120:7–15 (Brady).)  Given Plaintiffs' sprawling theories of

14  liability and the length of the Class Periods, the credibility of Brady's testimony about his

15  confirmatory research is not undermined by his inability to recall the benchmark for a

16  different fund years later during his deposition.  (*Contra* Pls.' Proposed FOFs ¶ 273.)

17  Moreover, the Court finds that there is not sufficient evidence in the record even to

18  support a finding that the Committee had used an incorrect benchmark for the Active

19  Suite.  Martin Dirks, Plaintiffs' proffered expert on damages, testified in passing that the

20  Committee used an incorrect benchmark for the Active Suite, but, in support of that

21  proposition, he simply referenced his report—which is not in evidence.  (Day 3 Tr. at

22  688:16–689:15 (Dirks); *see* Day 1 Tr. at 63:16–17 ("[T]he expert reports haven't been

23  admitted into evidence by agreement of the part[ies].").)  Similarly, Wagner testified, in a

24  conclusory manner, that the Plan used the wrong glidepath and the wrong benchmark.

25  (Day 1 Tr. at 52:1–13 (Wagner).)  The Court found her not to be credible as a general

26  matter (*supra* section IV.A) and she specifically conceded that she was not "an economic

27  expert," not an expert in "determining the appropriate benchmarks for a fund," and not an

28  expert in assessing "investment performance."  (Day 1 Tr. at 74:4–16 (Wagner).)

1

### 2. FIAM Blend Funds

2    The Committee elected to replace the above-discussed Active Suite with the FIAM

3 Blend Funds, which the Committee understood to be a similar strategy to the Active

4 Suite—but in a different investment vehicle (collective trust) and with a "hybrid"

5 approach to investment management (compared to the "active" management of the Active

6 Suite).  The Court finds that the Committee, after replacing the Active Suite with the

7 FIAM Blend Funds, continued its close monitoring of the Plan's QDIA (now the FIAM

8 Blend Funds).  (*See* TDF Comparison, Ex. 720; Day 2 Tr. at 317:18–20 (Brady); *id.* at

9 433:17–22 (Heather); Day 4 Tr. at 828:14–829:12 (Davis).)

10    In early 2021, the Committee conducted another comprehensive review of the

11 FIAM Blend Funds, which included a presentation by Captrust that analyzed the FIAM

12 Blend Funds and its characteristics, and compared the FIAM Blend Funds to other TDF

13 alternatives in the marketplace.  The Committee elected to retain the FIAM Blend Funds

14 in the Plan as the QDIA, but, around the same time, Captrust secured approval from

15 Fidelity to move the Plan's investment in the FIAM Blend Funds to a lower cost share

16 class.  (Day 2 Tr. at 433:6–10 (Heather); Day 4 Tr. at 935:11–936:5 (Langkamp); *see also*

17 Stipulated Facts App. ¶ 186 ("Captrust worked with Fidelity to gain approval for the Plan

18 to invest in a share class of the FIAM Blend with a lower expense ratio.").)

19

### 3. Prudential Fund

20    The Court finds that the Committee closely reviewed the Prudential Fund even

21 when it was in "Good Standing" under Captrust's scoring system.  (*See* Day 2 Tr. at

22 280:2–18 (Brady); *id.* at 425:14–426:5 (Heather).).  As of the first quarter of 2018, the

23 Prudential Fund had an overall score of 85 under Captrust's scoring system ("Good

24 Standing"), but it was "Marked for Review" due to its 3- and 5-year performance versus

25 its peers.  (2018 Q1 Presentation, Ex. 263 at 23.)  At that quarterly meeting, the

26 Committee analyzed and discussed a detailed analysis of the Prudential Fund that Captrust

27 prepared, which noted "[t]he strategy's Q1 2018 results were in the bottom quartile of its

28 small cap growth peer group."  (*Id.* at p. 27.)  Based on this recent underperformance,

Captrust "continue[d] to recommend this strategy, but look[ed] for improved results in the coming quarters in order to maintain our conviction." Captrust also presented its analysis of this underperformance, noting the Prudential Fund's "[o]verweight positions in energy and real estate, two of the worst performing sectors in the index, also weighed on peer-relative results. The strategy has less of a growth tilt than some of its peers, which has weighed on results in the growth-driven rally over the past year." (*Id.*; *see also* Day 2 Tr. at 280:5 – 282:14 (Brady).) The Committee analyzed and discussed this information, and agreed with Captrust's recommendation to maintain the fund in the Plan but "look for improved results in the coming quarter." (Day 2 Tr. at 280:19–282:14 (Brady).)

### 4. Invesco Fund

The Court finds that the Committee closely monitored and reviewed the performance of the Invesco Fund during the time it was an investment option under the Plan. For example, as of the first quarter of 2021, the Invesco Fund received a total score of 70 under Captrust's scoring system ("Marked for Review"). (2021 Q1 Presentation, Ex. 275.) Following the Committee's meeting, Captrust emailed Committee member Brady to flag the recent underperformance of the Invesco Fund, and recommended the Committee consider alternatives for this fund. (May 21, 2021 Emails, Ex. 696.) After he received this email and reviewed the attached analysis, Brady spoke with Captrust to discuss the Invesco Fund and potential alternatives, and he relayed that conversation to the Committee at the next meeting. (Day 2 Tr. at 303:18–304:20 (Brady).) At the second quarter 2021 Committee meeting, the Committee analyzed and discussed potential alternatives for the Invesco Fund, and the Committee decided to replace the Invesco Fund with the Cohen & Steers Institutional Fund following a comprehensive review. (May 26, 2021 Minutes, Ex. 239; *see also* Day 2 Tr. 302:10–304:16 (Brady).)

### 5. T. Rowe Price Fund

The Court finds that the Committee closely monitored and reviewed the performance and suitability of the T. Rowe Price Fund, even when it was considered in "Good Standing" under Captrust's scoring system. For example, as of the second quarter

of 2017, the T. Rowe Price Fund scored 100 under Captrust's scoring system ("Good Standing"). (2017 2Q Presentation, Ex. 259 at 20.) Despite this high score, Captrust flagged recent information for the Committee to consider. (*Id.* at 25; *see also* Day 2 Tr. at 306:18–307:19 (Brady).) Specifically, Captrust noted that the fund's "year-to-date results have lagged behind its peers and benchmark" but that the fund was "coming off a very strong 2016 performance and its longer-term results remain in the top quartile of its peer group." (2017 2Q Presentation at 25.) Captrust "continue[d] to recommend" this investment option "due to its experienced portfolio manager and unique investment process." (*Id.*) Captrust explained: "David Wallack has been at the helm of the strategy since 2001 and with the firm since 1990. He uses a contrarian approach which looks for solid companies that are underperforming their potential. The process focuses on firms with strong management and market leading positions. David believes that a depressed stock price is often the best catalyst to pressure management to implement changes." (*Id.*)

### 6.    Oakmark Fund

The Court finds that the Committee closely monitored the Oakmark Fund while it was an investment option under the Plan. (*See* Day 2 Tr. at 296:6–302:8 (Brady).) In May 2020, Captrust sent the following email to the Committee:

> Oakmark Equity & Income's conservative nature has caused it to struggle for some time. While we have respect for the long-term management of the Fund, it has evolved considerably since it was first included in the Plan's menu and it continues to change its structure going forward. Initially the Fund was chosen because it used a conservative approach on the equity side and also used a 'government backed' only approach on the bond side. Over time, the Fund has loosened that latter stance and in fact the team recently appointed a new fixed income manager who continues to expand the Fund's corporate bond exposure. There is nothing wrong with that, but it represents a meaningful change in strategy, which, when combined with the Fund's relative underperformance, we think should cause you to consider the Fund's inclusion in your menu. Our best recommendation is to use this as an opportunity to simplify your Plan's menu by removing the Fund.

1

2    (May 12, 2020 Email, Ex. 671 at 1.)  At the first quarter 2020 Committee meeting, the

3    Oakmark Fund received a score of 67 ("Consider for Termination").  (2020 Q1 QIR, Ex.

4    270 at 25.)  The Committee analyzed detailed information regarding the Oakmark Fund's

5    then-recent underperformance and strategy changes.  (*Id.* at 31; *see also* Day 2 Tr. at 298:1–

6    300:15).  Accordingly, the Committee decided to remove the Oakmark Fund from the Plan

7    and map the Plan participant assets invested in the fund to the age-appropriate vintage of

8    the Plan's TDF, the FIAM Blend Funds.

9            **F.    Alleged Failure to Consider Red Flags**

10           Plaintiffs contend that the Committee acted imprudently by failing to consider

11   certain alleged "red flags" regarding the Active Suite.  (Pls.' Proposed COLS ¶ 69.)  In

12   particular, Plaintiffs argue that the Committee acted imprudently by failing to consider the

13   "Reuters Report and other indications of capital flight with respect to the [Active Suite]."

14   (Pls.' Proposed FOFs ¶ 308–318.)  The Court rejects this contention for three reasons.

15           First, as an initial matter, the Court already found that the Committee used a

16   prudent process to monitor the Active Suite specifically and the Plan's investment options

17   generally.  Therefore, it appears that Plaintiffs are simply taking issue with the Committee

18   not more quickly moving to better-performing alternatives—without showing any

19   underlying deficiencies in the investment-monitoring process.  *See* Tibble, 843 F.3d at

20   1197 ("[T]he court focuses not only on [1] the merits of the transaction, but also on [2] the

21   thoroughness of the investigation into the merits of the transaction."); *White*, 752 F. App'x

22   at 455 (unpublished) (affirming dismissal of a complaint because "the allegations showed

23   only that [the defendant] could have chosen different vehicles for investment that

24   performed better during the relevant period").

25           Second, the Court rejects a factual premise of Plaintiffs' argument: that Defendants

26   failed to consider the Reuters report.  Indeed, Plaintiffs' own post-trial submission

27   acknowledges that one Committee member, Brady, was familiar with it.  (*See* Pls.'

28

1  Proposed FOFs ¶ 309.)  And Brady credibly testified that, while he had reviewed the

2  report, he simply disagreed with its evaluation of the merits of the Active Suite's strategy

3  change.  (*See* Day 1 Tr. at 147:17–20 (Brady) ("Q.  Was it concerning to you that that

4  strategy change had occurred?  A.  No, I think it actually helped and was good."); *see also*

5  2013 Q3 Presentation at 22 (detailed evaluation of the strategy change).)

6      Third, the Court rejects another premise of Plaintiffs' argument: that the Active

7  Suite's loss of market share was necessarily a red flag linked to those funds' alleged

8  underperformance.  Brady and Davis credibly testified that the Active Suite's loss of

9  market share was reflective of increased competition in the target-date-fund market.  (Day

10  1 Tr. at 14621–147:3 (Brady); Day 4 Tr. at 822:22–823:1 (Davis).)

11      Therefore, even assuming that failure to consider a red flag can constitute

12  procedural prudence where a fiduciary employed a prudent process to monitor

13  investments, the Court finds Defendants did not ignore any relevant red flags.

14                                    * * *

15      For the above reasons, the Court concludes that the Committee used a prudent

16  process to select, monitor, and remove investment options in the Plan.  Accordingly, the

17  Court rules in Defendants' favor on Plaintiffs' first claim.

18  **VI.**   **CLAIM 2: THE COMMITTEE'S ALLEGED FAILURE TO PRUDENTLY**

19         **MONITOR THE PLAN'S RECORDKEEPING FEES**

20      The Court concludes that the Committee used a prudent process to monitor the

21  recordkeeping fees that the Plan paid to Transamerica.  *See Wright*, 360 F.3d at 1097

22  (holding that the "court's task" is to determine whether the fiduciaries "employed the

23  appropriate methods to investigate the merits of the" challenged transaction).  The Court

24  finds that Plaintiffs presented no credible evidence showing that the Committee's

25  recordkeeping-fee-monitoring process fell below common industry practice.  The Court

26  further finds that the Committee reasonably informed itself of the market for

27  recordkeeping fees through its 2012 request for information and its 2015, 2017, and 2020

28  vendor-fee benchmarks; that the Committee routinely monitored the quality of

1   Transamerica's services, including at a standing monthly meeting a Committee member

2   had with Transamerica; and that Gissiner credibly testified that the Committee's

3   monitoring process was consistent with what he had seen over the course of his career in

4   the retirement-benefits industry.  Therefore, Plaintiffs failed to prove that the Committee's

5   recordkeeping-fee-monitoring process lacked the "the care, skill, prudence, and diligence

6   under the circumstances then prevailing that a [person] acting in a like capacity and

7   familiar with such matters would use in the conduct of an enterprise of a like character

8   and with like aims." 29 U.S.C. § 1104(a)(1)(B).  Below, the Court describes the

9   Committee's recordkeeping-fee-monitoring process before turning to the specific flaws

10   that Plaintiffs contend were present in that process.

11        **A.**    **Legal Standard**

12       Fiduciaries have a duty to monitor recordkeeping fees to ensure that they are

13   reasonable.  See *Tibble v. Edison Int'l*, 843 F.3d at 1197–98.  They "have an obligation to

14   (i) determine the needs of a fund's participants, (ii) review the services provided and fees

15   charged by a number of different providers and (iii) select the provider whose service

16   level, quality and fees best matches the fund's needs and financial situation." *Liss v.*

17   *Smith*, 991 F. Supp. 278, 300 (S.D.N.Y. 1998).

18        **B.**    **Factual Findings Regarding the Committee's Fee-Monitoring Process**

19       Transamerica has specialized experience in the healthcare industry, was recognized

20   as a "Best in Class" service provider by industry experts, was specifically recognized for

21   work it did providing Prime Plan participants with "custom education[al]" programs, and

22   was favorably rated by 95% of Prime Plan participants.  (Stipulated Facts App. ¶¶ 159–

23   161; Day 3 Tr. at 577:14–578:6 (Gomez); Day 4 Tr. at 834:3–6 (Davis); *id.* at 943:13–

24   944:2 (Langkamp).)  Indeed, Wagner, Plaintiffs' proffered process expert, conceded that

25   Transamerica was experienced and well-regarded—testifying that she believed

26   Transamerica has specialized experience working with healthcare entities and that

27   Transamerica is "very well known," "highly regarded," "very prominent [and] very

28   prestigious." (Day 1 Tr. at 91:16–19 (Wagner).)  Moreover, Sarah Langkamp, the lead

account representative at Transamerica for the Plan, has experience working with healthcare clients—having worked with 14 such clients. (Day 4 Tr. at 916:20–24.)

### 1.    2012 RFI

The Committee conducted a formal review of Transamerica's fee and services every few years, reviewing Transamerica's fees as relevant here in 2012, 2015, 2017, and 2020. In 2012, Captrust conducted a Request for Information ("RFI") for the Committee and prepared a vendor fee benchmark presentation for the Committee to assess Transamerica's fee. (2012 Vendor Fee Benchmark, Ex. 79; Day 3 Tr. at 550:7–552:24 (Dhuper).) Transamerica's then-current fee was lower than all of the bids from eligible companies received by the Committee. Nevertheless, following this exercise, the Committee was able to secure from Transamerica a fee decrease from 0.23% to 0.21%. (Day 4 Tr. at 836:7–838:12 (Davis); Amendment to Fee Schedule, Ex. 199 at 1.)

### 2.    2015 Vendor-Fee Benchmark

In 2015, Captrust worked with the Committee to identify recordkeeping candidates to present to the Committee regarding their fee structures and services. (Vendor Search & Selection Minutes, Ex. 33.) Prudential, Milliman, and Fidelity all presented to the Committee and discussed their fee structures and the services that they could provide to the Plan. (Vendor Search and Selection Minutes, Ex. 33 (identifying "Firms Presenting"); *see* Day 2 Tr. at 408:25–409:7, 409:23–410:4 (Heather); Day 4 Tr. at 839:3–841:2 (Davis).) Transamerica was not present at the initial presentations, but they later presented to the Committee. At that meeting, Transamerica stated that they could provide an improved service team to assist the Plan with the complex administration required by the fact that the Plan was a multi-employer plan that was routinely adding new payrolls due to Prime's merger and acquisition activity. (*See* Vendor Search & Selection Minutes ("Subsequent to the presentations by the above three vendors, Transamerica presented a proposal that provided an improved service team. As a result, the Committee determined they would remain with Transamerica, but will continue to monitor service."); *see* Day 2 336:9–20 (Brady) (describing the risk in moving to another service provider, especially

since Transamerica had agreed to "create[] a dedicated team because they realized the heavy lift on their part"); *id.* at 448:15 – 450:4 (Heather) (noting Transamerica increased the size of its team dedicated to the Plan); Day 4 Tr. at 840:8–841:5 (Davis) (describing discussions of "service level").)

### 3.    2017 Vendor-Fee Benchmark

In 2017, Captrust and the Committee conducted another review of Transamerica's fee to determine whether it was still reasonable.  (*See* Apr. 20, 2017 Meeting Minutes, Ex. 52 at 2 ("Mr. Davis asked Ms. Langkamp to work with her internal team to determine if Transamerica fees will be reduced as Transamerica will no longer provide document support services to Prime Healthcare."); June 26, 2017 Email at 1 ("We want to get an updated proposal from Transamerica on fees as they will no longer be doing amendments to the plan[,] which should reduce administrative burden."); Day 2 Tr. at 326:18–327:14 (Brady) (describing the thought process behind the 2017 benchmark exercise); Day 4 Tr. at 842:16–844:15 (Davis) (same).)  Captrust utilized its proprietary client database to find comparator retirement plans that it could use to assess the reasonableness of Transamerica's fee and corresponding services.  (2017 Vendor Fee Benchmark, Ex. 6 at 9.)  Captrust identified "drivers of pricing," including "administrative complexity."  (*Id.* at 5.)  Captrust's analysis provided the following ranges for retirement plans with over $250,000,000 in assets: "High": 0.39%; "Average": 0.32%; and "Low": 0.25%.  (*Id.* at 10.[13])  At the time, Transamerica's fee was 0.21% of Plan assets.  (*Id.* at 11.)

---

[13] The Court rejects Plaintiffs' contention that Captrust failed to include similarly sized plans in its 2017 vendor-fee benchmark.  Multiple witness testified that Captrust, at that time, had clients with plan assets over $500,000,000.  (*See* Day 4. Tr. 785:6 (Davis) (Captrust had clients with "well over a billion dollars in assets" and Captrust was "[d]ecidedly not" a "small-sized plan investment advisor"); Day 5 Tr. at 1021:9–19 (Gissiner) ("I actually went online and looked to see how many clients they had over a half a billion in assets. And as of 2017, they serviced 48 plans that had over 500 million in assets, and the way that I did that was using the Form 5500 data sets.  So, again, as of 2017, 48 plans with over half a billion in assets.").)  The vendor-fee benchmark used Captrust's proprietary database of client information, and those plans would have been included in that dataset.  Therefore, of the two different articulations of the upper band of plans in the dataset—$250 to $500 million (as one slide states) or $250 million and above (as

1    Accordingly, Transamerica's fee fell below the "Low" range in Captrust's analysis.

2    Following this fee review, the Committee decided to stay with Transamerica: Despite the

3    above-average services that Transamerica was providing to the Plan, its fee fell on the

4    low-end of the market.  (*See* Day 2 Tr. at 327:15–330:1 (Brady).)

5              **4.    2020 Vendor-Fee Benchmark**

6              In 2020, the Committee had Captrust conduct another vendor-fee benchmark.

7    (Mar. 16, 2020 Minutes, Ex. 234 at 2 ("Captrust will provide a fee benchmark for the Plan

8    later this year.").  Accordingly, Captrust solicited bids from recordkeeping candidates and

9    presented those bids to the Committee at an August 2020 meeting.  (*See* 2020 Vendor Fee

10   Benchmark, Ex. 13; Day 2 Tr. at 334:19–337:23 (Brady).)  Consistent with its previous

11   fee reviews, Captrust worked with the Committee to prepare client-specific screening

12   criteria, and Captrust used that criteria to identify eligible candidates to bid for the Plan's

13   recordkeeping services. (2020 Vendor-Fee Benchmark at 5.)  Empower, Fidelity, and

14   Milliman all submitted bids for the Plan's recordkeeping services.  Empower's bid was

15   $43 per participant, Fidelity's bid was $36.50 per participant, and Milliman's bid was $39

16   per participant.  (*Id.* at 14).  Transamerica also submitted a bid, which was initially $40

17   per participant.  (*Id.*; Aug. 31, 2020 Emails, Ex. 677.)  Captrust and the Committee

18   continued negotiations with Transamerica to reduce their fee even further.  Through these

19   negotiations, Transamerica agreed to an even lower fee of $34 per participant, provided

20   that the Committee would also allow Transamerica to offer its "Managed Account

21   Services"[14] as a voluntary option to Plan Participants.  (Day 3 Tr. at 540:24–541:24

22   (Dhuper); Day 4. Tr. at 869:19–870:25 (Davis).)  At the 2021 first-quarter meeting, the

23

24

25   ───────────────
     another slide states)—the Court finds that the former articulation is more likely to be a typo.
26   Accordingly, Plaintiffs have not proven that the 2017 vendor-fee benchmark compared Prime's
     recordkeeping fee to those of Plans much smaller than Prime (*i.e.*, $500 million or less).
27   [14] Managed Account Services are a service offered by Transamerica to Plan Participants through
     which Transamerica works with Plan Participants, who voluntarily elect the service, to select
28   investments for their account.

1    Committee officially agreed to retain Transamerica as the Plan's recordkeeper with a

2    reduced fee of $34 per participant.  (Feb. 24, 2021 Minutes, Ex. 238 at 1–2.)

3    **5.    Ongoing Monitoring**

4    In addition to the above fee-assessment exercises, the Committee continuously

5    monitored the level of services that Transamerica was providing the Plan.  Committee

6    member Gomez held a monthly meeting with Transamerica to discuss its ongoing

7    administration and work on various projects related to the Plan.  Transamerica also held

8    an annual meeting with one or more Committee members to review Transamerica's

9    overall performance servicing the Plan.  (*See* Day 3 Tr. at 573:18–574:12 (Gomez); Day 4

10   Tr. at 938:23–939:12, 942:1–25 (Langkamp).)

11                                           * * *

12   The Court now turns to what Plaintiffs contend were flaws in the above-described

13   fee-monitoring process.  The Court finds that Plaintiffs have not proven by a

14   preponderance of the evidence that the Committee departed from industry practice; nor

15   have Plaintiffs otherwise shown that the Committee's fee-monitoring process was

16   imprudent in any of the challenged aspects.

17   **C.    Allegedly Inadequate Fiduciary Governance Structure**

18   First, Plaintiffs contend that the Committee's fees-monitoring process was

19   imprudent because its "fiduciary governance structure [allegedly] failed to provide

20   members of the Committee with appropriate guidance or training regarding their [fee]

21   monitoring responsibilities"—namely that (1) Committee members allegedly received

22   inadequate training on their fiduciary duties, and (2) the Committee lacked a charter

23   before 2019.  (Pls.' Proposed COLs ¶ 44.)  The Court has already rejected Plaintiffs'

24   contention that Committee members received inadequate training.  (*Supra* section V.B.1)

25   And the Court has already concluded that it is not *per se* imprudent to lack a written

26   charter.  (S*upra* section V.B.2.)  Therefore, the Court concludes that Defendants acted

27

28

1    pursuant to a prudent fiduciary-governance structure.

2        **D.    Alleged Insufficient Documentation**

3        Second, Plaintiffs contend that the Committee's fee-monitoring process was

4    imprudent because the "Committee insufficiently documented its decision-making

5    process"—in Plaintiffs' view because "the Committee's meeting minutes were largely

6    boilerplate." (Pls.' Proposed COLs ¶ 45.) The Court again assumes without deciding that

7    procedural imprudence encompasses a recordkeeping component. Even assuming that it

8    does, the Court finds that the Committee reasonably documented its decision-making

9    process. (*Supra* section V.C.)

10        **E.    Allegedly Flawed Information Gathering Exercises**

11       Third, Plaintiffs contend that the Committee "never undertook measures sufficient

12   [to] become informed of the reasonable market rate for the Plan's services or [to]

13   sufficiently leverage the Plan's size to obtain reasonable fees." (Pls.' Proposed COLs

14   ¶ 46.) This contention is two-fold: (1) that it is industry custom to conduct formal request

15   for proposals ("RFP"); and (2) that vendor-fee benchmarks that the Committee and

16   Captrust did conduct were fundamentally flawed, such that the Committee did not have

17   reliable information against which to assess the fees it was paying to Transamerica. The

18   Court rejects both factual contentions.

19       **1.    Lack of RFPs**

20       The Court finds that Plaintiffs have failed to prove by a preponderance of the

21   evidence that it is industry custom to always conduct an RFP, which is the most formal

22   and time-intensive type of information-gathering exercise.

23       The Court finds that Gissiner credibly testified that the Committee's combination

24   of an RFI and vendor-fee benchmarks was "pretty robust" and "consistent with [the]

25   industry practice" he had observed over the course of his substantial experience in the

26   retirement-benefits industry. (Day 5 Tr. at 1047:16–1048:15 (Gissiner).) Gissiner also

27   credibly testified that RFPs are not industry standard. Gissiner cited a survey of plans that

28   found, in 2017, only about 18% of plans used RFPs to assess recordkeeping fees. Instead,

1  the "most common way that plan sponsors benchmark[ed] recordkeeping fees" was "using

2  a consultant database," like that used by Captrust in its vendor-fee benchmarks, with

3  about 50% of plans taking such an approach. (*Id.* at 1045:13–1046:13.)

4      Only Geist testified that RFPs are industry practice. As explained, the Court

5  generally finds Geist's testimony has little to no probative value given his limited relevant

6  experience and the *ipse dixit* nature of his testimony. (*Supra* section IV.B.) The Court's

7  concerns apply with full force here. Unlike Gissiner who relied both on his substantial

8  industry experience and a survey of plans, Geist leaves the basis of his opinion

9  unexplained: "[I]t's well understood in the standard of care to know that soliciting

10 proprietary bids [*i.e.*, conducting an RFP] is the conduct that is required because it

11 achieves best outcomes for plan participants." (Day 3 Tr. at 615:11–15.)

12      Moreover, Geist's testimony is contradicted by that of Wagner—another of

13 Plaintiffs' proffered experts. Wagner testified both that "ERISA does not mandate best

14 practices" (a premise of Geist's testimony) and that "Plan fiduciaries can obtain the same

15 information as an RFP without incurring the expenditure of time and resources that an

16 RFP requires through benchmarking services, industry surveys, and the like." And she

17 further testified that "categorically stating that an RFP is the only reliable way for a plan

18 fiduciary to maximize its bargaining power is a proposition [she has] disagreed with under

19 oath." (Day 1 Tr. at 80:7–17, 88:3 (Wagner).)

20          **2.      Alleged Flaws in the Vendor-Fee Benchmarks**

21      The Court finds that Plaintiffs have failed to prove by a preponderance of the

22 evidence that the vendor-fee benchmarks the Committee relied on were so flawed that the

23 Committee was not apprised of the market for recordkeeping fees for plans similar to

24 Prime's. The Court has already rejected Plaintiffs' contention that the vendor-fee

25 benchmarks failed to compare the Plan's recordkeeping fee to those paid by similarly

26 sized plans. (*See* Pls.' Proposed FOLs ¶ 141; *supra* n.13.) And the Court does not credit

27 the remaining criticisms that Geist raised—as they are unsubstantiated nitpicks, not well-

28 informed opinions about how the Committee allegedly departed from industry practice or

1    otherwise used an imprudent process.  (*Supra* section IV.B.)

2    ### F.    Alleged Failure to Monitor Fees as Assets Grew

3    Fourth, Plaintiffs contend that the Committee acted imprudently by failing "to

4    monitor fees closely to ensure that growth in asset levels do not result in fees increasing

5    precipitously."  (Pls.' Proposed COLs ¶ 47.)  Because the Court finds that the Committee

6    closely monitored fees over the course of the Class Period and that the 2012, 2015, 2017,

7    and 2022 fee-monitoring exercises were prudent (*supra* section VI.E), the Court

8    necessarily finds that the Committee closely monitored the fees over the subset of the

9    Class Period in which the assets under management were growing significantly.

10    ### G.    Alleged Failure to Consider Per-Capita Fees

11    Fifth, Plaintiffs contend that Defendants breached their fiduciary duties by

12    allegedly failing "to review the total fees paid to Transamerica on a per-participant basis

13    and, after the managed advice service was added to the Plan, total fees from all sources."

14    (Pls.' Proposed COLs ¶ 48.)  The Court rejects both contentions.

15    The Court rejects the first contention, which appears to be based on nothing more

16    than the fact that the Plan previously used a basis-points arrangement to pay

17    Transamerica.  Simply because the Committee paid Transamerica on a basis-points

18    arrangement rather than a per-participant arrangement during a portion of the relevant

19    Class Period, it does not follow that the Committee failed to consider per-participant

20    costs.  Indeed, as Plaintiffs acknowledge in their post-trial submission, the effective per-

21    participant fee is readily calculated from a basis-points arrangement.  (*See* Pls.' Proposed

22    FOFs ¶ 107 ("Transamerica was paid the following effective per-participant rates based

23    on the total dollar amounts on an average, per participant basis: $42 in 2014; $34 in 2015;

24    $35 in 2016; $43 in 2017; $43 in 2018; $52 in 2019; $50 in 2020; $41 in 2021.").)

25    The Court finds the second contention to be irrelevant.  The Class Period for

26    Plaintiffs' fee-monitoring claim is August 18, 2014, to July 31, 2019.  (Class Certification

27    Order at 1.)  The Committee, however, did not add the managed advice service until 2021.

28    Moreover, Plaintiffs offer no authority for the proposition that the Committee should have

considered the revenue Transamerica would receive from participants who **voluntarily** opt into that service. Nor do Plaintiffs explain how the Committee could have estimated that figure—since the voluntary opt-in rate would have been unknown at the time. And there is, in any event, no evidence in the record that the revenue from that voluntary service materially impacted the per-participant fee Transamerica received.

### H.    Settlor Expenses

Sixth, Plaintiffs contend that Defendants improperly "caused the Plan recordkeeping costs associated with Prime's mergers and acquisition to be paid by the Plan." (Pls.' Proposed COLs ¶ 49; *see also id.* ¶ 50.) And Plaintiffs make the alternative argument that, even if the fees were properly payable by the plan, "the Committee failed to evaluate the reasonableness of the fees attributable to merger and acquisition services." (*Id.* ¶ 51.) Plaintiffs rely on Department of Labor Advisory Opinion 2001-01A (Jan. 18, 2001),[15] which reads in relevant part:

> Expenses incurred in connection with the performance of settlor functions would not be reasonable expenses of a plan as they would be incurred for the benefit of the employer and would involve services for which an employer could reasonably be expected to bear the cost in the normal course of its business operations. ***However, reasonable expenses incurred in connection with the implementation of a settlor decision would generally be payable by the plan.***

(Pls.' Proposed COLs ¶ 49 (emphasis added).)

Plaintiffs' argument is entirely undeveloped. Plaintiffs do not identify which "costs associated with Prime's mergers and acquisitions" are the subject of their argument. Beyond the above Advisory Opinion quotation, Plaintiffs provide the Court with no legal authority. Plaintiffs make no contention regarding the weight to which Department of Labor Advisory Opinions are generally entitled or the weight that this particular Advisory Opinion should be afforded. And most critically, Plaintiffs fail to

---

[15] *Available at* https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/advisory-opinions/2001-01a.

offer any argument whatsoever as to why the following costs (which the Court assumes are the expenses subject to Plaintiffs' argument) are costs "incurred in connection with . . . settlor functions" as opposed to costs "incurred in connection with the implementation of a settlor decision"—which, according to the Advisory Opinion, are "payable by the plan":

- Enrolling new employees in the multi-employer plan following Prime's acquisition of new companies;

- Separately processing the payrolls of the 68 employers in the multi-employer plan;

- Meeting with and providing educational programming to employees on-site at the various locations of the 68 employers in the Plan; and

- Implementing specific rules for subsets of employees who were subject to collective bargaining agreements.

(Day 2 Tr. at 328:12–329:4 (Brady); *id.* at 418:1–6, 446:4–447:25 (Heather); Day 3 Tr. at 542:14–23 (Dhuper); *id.* at 582:17–583:24 (Gomez); Day 4 Tr. at 848:25–849:16, 859:14–860:9 (Davis); *id.* at 926:1–927:5, 928:14–929:6, 931:1–933:9, 952:25–953:21 (Langkamp); Day 5 Tr. at 1012:14–1013:15 (Gissiner); 2018 Plan, Ex. 167 at 109–111 (listing protected benefits for subsets of Plan participants).)  And as explained above, the Committee routinely assessed the reasonableness of the fees paid to Transamerica—defeating Plaintiffs' fallback contention.  (*Supra* sections VI.B, VI.E.)

* * *

For the above reasons, the Court concludes that the Committee used a prudent process to monitor the recordkeeping fees that it paid to Transamerica.  Therefore, the Court finds in Defendants' favor on Plaintiffs' second claim.

## VII.    <u>CLAIM 3: THE COMMITTEE'S ALLEGED FAILURE TO PRUDENTLY MONITOR THE PLAN'S SHARE CLASSES</u>

The Court concludes that the Committee used a prudent process to monitor the share classes of the investment options in the fund.  *See Wright*, 360 F.3d at 1097 (holding that the "court's task" is to determine whether the fiduciaries "employed the appropriate methods to investigate the merits of the [challenged] investment").  The Court finds that

Plaintiffs have not proven by a preponderance of the evidence that the Committee "reflexively switched to a zero-revenue sharing fee structure and inadvertently added share classes with higher net effective expenses." (Pl.'s Proposed COLs ¶ 56.) Instead, the Court finds that the Committee closely monitored the Plan's share classes and made reasonable, informed choices with respect to those share classes.

Prior to July 2019, during the time that the Plan paid an asset-based recordkeeping fee to Transamerica, the Plan utilized share classes that included "revenue sharing." (Day 1 Tr. at 129:20–130:12 (Brady).) In July 2019, when the Committee decided to change the recordkeeping fee structure to a per-participant fee, the Committee also began to transition the funds in the Plan to institutional share classes, which generally do not offer revenue sharing. (Day 2 Tr. at 331:7–15 (Brady).) The Committee made this decision because the Plan was no longer paying an asset-based fee to Transamerica and, therefore, revenue sharing was no longer needed to mitigate recordkeeping costs because recordkeeping fees would not increase if the Plan's assets increased. (*Id.*).

Additionally, Brady, a former investment advisor, researched funds and the share classes offered for those funds, and he discussed his analysis with Captrust and the Committee. (*See* Apr. 21, 2017–May 5, 2017 Emails, Ex. 602 (emails between Brady and Davis comparing two share classes); June 28, 2017 Emails, Ex. 610 (forwarding prior discussion to Committee); Aug. 13, 2017–Sept. 9, 2017 Emails, Ex. 678 (further discussion of the two share classes); Oct. 1, 2017 Emails, Ex. 680 (email from Davis to Brady about "a new share class for T. Rowe's Stable Value Fund"); Day 2 Tr. at 339:14–346:16 (Brady) (testifying about above-cited exhibits).). Indeed, while Plaintiffs' theory of liability is that the Committee overlooked net expenses, the above-cited emails refute that. As Plaintiffs themselves describe one of Davis's emails: "In weighing whether to select the R5 or I share class of the MassMutual Fund, Mr. Davis advised that, while the expense ratio of the R5 share class was higher, since it returned 15 basis points in revenue sharing, *its net effective cost was lower* than the I share class, which had zero revenue sharing component." (Pls.' Proposed FOFs ¶ 194 (emphasis added).)

1    Brady credibly testified that "share classes and their investment expenses [were]

2    something that the committee routinely discussed."  (Day 2 Tr. at 339:14–18 (Brady); *see

3    also* Sept. 15, 2016 Minutes (noting Captrust's recommendation to replace certain "index

4    funds with collective trusts . . . at lower fees").)  And Captrust worked with fund

5    managers to investigate whether the Plan could qualify for lower-cost share classes.  For

6    example, Captrust leveraged its relationship with Fidelity to move the FIAM Blend Funds

7    into a lower share class in 2021.  (Sept. 18, 2021 Minutes, Ex. 240 at 1 ("moving to a

8    lower cost share class of the FIAM Blend Target Date Suite"); Stipulated Facts App.

9    ¶ 186 ("In June 2021, Captrust worked with Fidelity to gain approval for the Plan to invest

10    in a share class of the FIAM Blend with a lower expense ratio.").)

11    * * *

12    For the above reasons, the Court concludes that the Committee used a prudent

13    process to monitor the share classes of investment options in the Plan.  Therefore, the

14    Court finds in Defendants' favor on Plaintiffs' third claim.

15    **VIII.   CLAIM 4: PRIME'S ALLEGED FAILURE TO PRUDENTLY MONITOR**

16    **THE COMMITTEE**

17    A claim for breach of the duty to supervise is derivative of an underlying fiduciary-

18    duty claim.  *See Lauderdale*, 2022 WL 17260510, at *24.  Because the Court finds no

19    underlying breaches of fiduciary duty with respect to the Committee's investment,

20    recordkeeping-fee, or share-class monitoring, this derivative claim fails as well.

21    **IX.    UNPLED CLAIM: ALLEGED MISUSE OF THE EBA**

22    Plaintiffs' Proposed Findings of Fact and Conclusions of Law assert a claim that

23    Defendants breached their fiduciary duties by failing to "distribute" the funds in the Plan's

24    expense-budget account ("EBA") directly "to participants."  (Pls.' Proposed COLs ¶ 53.)

25    That is, Plaintiffs fault Defendants for using the EBA to pay the Plan's recordkeeping fees

26    for active participants.  (*See* Pls.' Proposed FOFs ¶ 184.)

27    Under Federal Rule of Civil Procedure 26(e), "[t]he pretrial order controls the

28    subsequent course of the action and the parties are bound by their agreement to limit the

1   issues to be tried." *United States v. Joyce*, 511 F.2d 1127, 1130 n.4 (9th Cir. 1974)

2   (citations omitted); (*see also* FPTC Order at 10 ("[T]his Final Pretrial Conference Order

3   shall supersede the pleadings and govern the course of the trial of this cause, unless

4   modified to prevent manifest injustice.").

5        Here, neither the FPTC Order nor Plaintiffs' operative complaint included such a

6   claim.  (*See generally* FPTC Order; Amended Consolidated Class Action Compl., Doc.

7   16.)  And while a single paragraph of Plaintiffs' pre-trial memorandum of contentions of

8   fact and law alludes to the EBA, it advances a materially different theory: that Defendants

9   acted unlawfully by "failing to return over $650,000 to Plan or participants ***or use the***

10  ***same for their benefit***."  (Pls.' Pre-Trial Memo., Doc. 162 at 14 (emphasis added).)  Now,

11  Plaintiffs scrap the "or" clause presumably because they learned at trial that the funds in

12  the EBA were used for participants' benefit—*i.e.*, by paying their recordkeeping fees.

13       The Court is concerned with Plaintiffs' pattern of sandbagging in this case—raising

14  issues and presenting evidence in a manner that leaves Defendants with a moving target of

15  what to defend against.  At trial, Plaintiffs attempted to use a demonstrative featuring the

16  "updated . . . loss calculations" of one of their experts that had been "augmented to

17  address" the criticisms of that expert's initial report raised by one of Defendants' experts.

18  (Day 1 Tr. at 108:13–14, 109:12–13.)  The updated loss calculations, which were never

19  included in an expert report, increased Defendants' damages exposure from "$9 million

20  up to above $30 million" and the demonstrative featuring that more-than-tripled exposure

21  was disclosed just a week before trial.  (*Id.* at 111:3–7.)  The Court excluded that

22  evidence, finding that it was an undisclosed surrebuttal expert report.  (*Id.* at 113:20–24.)

23       Similarly, here, Plaintiffs—after trial concluded—introduced a theory of liability

24  they never raised over the course of this years-long case: that it was improper for

25  Defendants to use the EBA to pay for recordkeeping fees.[16]  Because this claim was

26  ─────────────────

27  [16] Indeed, the Court questions whether Defendants were on notice as to several of Plaintiffs' theories of liability advanced in Plaintiffs' post-trial submission.  Plaintiffs' contentions regarding Defendants' alleged failure to monitor fees on a per-capita basis, Plaintiffs' criticism of the

28

1 neither pleaded nor contained in the FPTC Order, the Court declines to consider it.  In any

2 event, the Court finds that Plaintiffs' contention has no merit.  The Plan document

3 establishing the EBA provides that funds in the EBA can *either* "be allocated to Plan

4 Participants at the end of the year" *or* "be used to pay Plan-related expenses"—with this

5 latter option being exactly what the Committee did.  (Amendment to Fee Schedule at 3.)

6 And the Court credits Gissiner's testimony about industry practice regarding expense

7 budget accounts over the competing testimony of Geist for the reasons previously stated.

8 (*See supra* sections IV.B, IV.C); Day 5 Tr. at 1083:25–1084:12 (Gissiner).)

9 **X.    CONCLUSION**

10      For the above reasons, the Court concludes that the Committee used a prudent

11 process to monitor the Plan's investments, recordkeeping fees, and share classes.

12 Therefore, the Court rules against Plaintiffs and in favor of Defendants on all of Plaintiffs'

13 claims.  Consistent with Federal Rules of Civil Procedure 52(a)(1) and 58, the Court shall

14 issue a separate Judgment.

15

16 DATED:  August 22, 2024

17                                    JOSEPHINE L. STATON
                                  _____
18                                  HON. JOSEPHINE L. STATON
                                  UNITED STATES DISTRICT JUDGE
19

20

21

22

23

24

25

26

27 managed-advice offering, and Plaintiffs' argument about Defendants' alleged use of Plan assets to pay for "settlor" expenses appear to have been in- or post-trial developments—having never

28 appeared in Plaintiffs' complaint, Plaintiffs' pre-trial memorandum, or the FPTC Order.